Black *v.* Delaware and Raritan Canal Co.

---

BLACK and others *vs.* THE DELAWARE AND RARITAN CANAL COMPANY, and others.

1. The act of March 17th, 1870, authorizing the United Railroad and Canal Companies of New Jersey "to consolidate their respective capital stocks, or to consolidate with any other railroad or canal company or companies in this state or otherwise, with which they are or may be identified in interest, or whose works shall form with their own, continuous or connected lines, or to make such other arrangements for connection or consoli-

dation of business with any such company or companies by agreement, contract, lease, or otherwise, as to the directors of said United Companies may seem expedient," gives authority to the United Companies to lease to a corporation of another state.

2. The works of the United Companies form both connected and continuous lines with the works of the Pennsylvania Railroad Company. Two railroads form a continuous line, when their tracks and rails join so that a train may pass from the tracks and rails of one directly upon those of the other. They form a connected line, when this is done by means of an intervening or connecting road.

3. The directors of these companies have power to sell, or otherwise dispose of any of the property of the companies, except the roads and canal, and the franchises granted, without the consent of the state or of all the stockholders.

4. They have power, by consent of the state, and a majority of the stockholders, or of any other proportion required by law, to sell or lease, or otherwise dispose of these works, or to abandon them.

5. A lease made by virtue of such authority, is within the power delegated to the directors, and there is, in the charter of these companies, no express or implied contract violated by it, and, therefore, the act authorizing it is not unconstitutional.

6. The purpose for which these works are leased, the benefit and advantage of extended public highways, controlled and operated by one head, for regular and easy communication from and through New Jersey and other states, is a public use for which property may be taken by condemnation.

7. Even if the directors had not power to lease for a term, so as to bind the stockholders or their successors, the leasing and delivering the works to the lessee, with a stipulation and obligation to have the shares of dissenting stockholders valued and paid for, is not taking property without first making compensation. The shares, and not the works, are the property of the stockholders, and these are not taken until paid for.

8. The Pennsylvania Railroad Company, the proposed lessee, has, by its charter and supplements, and the public laws of Pennsylvania, power to take the lease, and bind itself to all its stipulations. The courts of one state, in construing the statutes of another state, will be governed by the decisions of the courts of that state.

. 9. A statute to authorize a corporation to lease or transfer the franchises, rights, and powers granted to it, unto another corporation, with no increase of franchises or privileges, is not such grant by the state as requires the same strict rule of construction, that is applied where the state creates franchises, or originally grants rights. It relates to the transfer of the rights and property of one citizen to another.

10. An injunction will not be granted, unless the right of the applicant, alleged to be violated by the proceedings sought to be restrained, is settled and clear.

11. It is not always necessary that the right or title of the applicant for an injunction should have been settled by an adjudication of a court of law. If the facts on which the right is founded, are admitted or clearly established, and the principles of law on which it depends have been adjudicated or are settled, a court of equity may apply these principles to the facts, and grant an injunction upon a right so ascertained.

12. But where the facts are doubted, or the principles of law on which the right of the applicant depends, are disputed and may admit of doubt, and have not been adjudicated and established by the courts of law in this state, an injunction will not be granted until the right of the complainant has been established at law.

The bill in this cause was filed June 23d, 1871, by John Black and others, stockholders in the three corporations defendant, for themselves and such other stockholders as might choose to come in and cause themselves to be made parties, against the Delaware and Raritan Canal Company, the Camden and Amboy Railroad and Transportation Company, and the New Jersey Railroad and Transportation Company, commonly called the United Companies of New Jersey, and the directors, respectively, of said companies, to restrain the execution of a proposed lease of the works of the said United Companies to the Pennsylvania Railroad Company.

The bill shows that the several complainants hold a certain number of shares of stock in the said United Companies, respectively.

The bill sets forth at length the rights, powers, privileges, immunities, and franchises vested in the said United Companies, and to which they were respectively entitled under and by virtue of their respective acts of incorporation, and the several successive supplements thereto; and also the provisions, conditions, liabilities, limitations, and restrictions to which the said companies were, by their said charters and the said supplements thereto, respectively subject; and also the rights and privileges therein and thereby vested in the state of New Jersey.

It shows that under the aforesaid acts of incorporation, the said companies were respectively organized; and that

under said acts and the acts supplemental thereto, large sums of money were raised, by subscriptions, loans, &c., whereby real and personal property of great value were acquired.

That, subject to all the conditions, limitations, restrictions, uses, and trusts in any wise imposed on them by their said acts of incorporation and the supplements thereto, the Delaware and Raritan Canal Company, and the Camden and Amboy Railroad Company, (usually called and known as the Joint Companies,) on the 1st day of February, 1867, entered into an agreement with the New Jersey Railroad Company for the purpose of consolidating and uniting their respective interests; and that said agreement was authorized and confirmed by an act of the legislature.

The bill further shows that, under and by virtue of the said companies' acts of incorporation and consolidation, and the several supplements thereto—all of which, it alleges, were accepted by the United Companies, and acquiesced in by all of their respective stockholders—and of other laws of this state, and of the agreements between them, the said United Companies own, and are in the absolute possession, enjoyment, and use of the Delaware and Raritan Canal, and the feeder thereof; the Camden and Amboy Railroad, Trenton Branch Railroad, New Jersey Railroad, Princeton Branch Railroad, Trenton Spur Railroad, Jersey City ferries, and Harsimus Cove property, with all their other branches, lateral and side roads, appendages, equipments, and appurtenances; and of all the corporate rights, powers, liberties, franchises, and privileges in any wise granted or belonging to them; but subject, nevertheless, to all the restrictions, limitations, conditions, taxes, and impositions in anywise reserved, imposed, or otherwise existing, under or by virtue of said acts, and other laws of this state. And that, in like manner, the said United Companies own and are in the absolute possession, enjoyment, and use of a very large amount of other property, real and personal, not strictly appertaining to their said works, as above particularly men-

tioned, with all the estates, rights, incidents, privileges, and appurtenances in anywise belonging thereto.

It further shows, that the actual cost of the aforesaid properties of the United Companies, as officially stated in their last annual report to the legislature of this state, for the year ending on the 31st of December, 1870, and sworn to by their respective presidents, and which the complainants believe to be substantially true, is the sum of $35,245,-629.41; and they believe that the actual worth of said properties is not less than $50,000,000; and that the sum of their aggregate capitals, then, was $18,990,677.50, making, with their indebtedness, as therein stated, a sum just equal to the said cost of their properties.

It further shows, that the moneys invested in the capitals of said United Companies have been exceedingly productive to the stockholders; and judging from the past, and looking to the unparalleled location of their works between the two great and growing cities of this country, promise to become much more lucrative to them in the future, if their property and franchises, under the protection and guardianship of the laws of this state, shall be continued, and with special reference to which those investments were originally made, and have been since enlarged and continued; that the average of the dividends upon the stock in the aforesaid joint companies—to wit, the Delaware and Raritan Canal Company, and the Camden and Amboy Railroad and Transportation Company—from 1833 to 1871, a period of thirty-eight years, has been twelve and twenty-hundreths per cent.; and that, although the complainants have not at hand the materials to estimate the productiveness of the other of said United Companies, to wit, the New Jersey Railroad and Transportation Company, yet they believe that, for nearly the same period of time, it has been equally productive; and they believe that, with like management and care, for a coming period of thirty-eight years, average dividends, of at least fifteen per cent., may be rationally and confidently expected.

It further shows, that although the *legal* title to the afore-said properties is in the said several corporations, consti-tuting said United Companies, yet they are, in truth and fact, but mere ideal or artificial persons, created by law for the purpose of taking, holding, managing, and preserving the properties of their stockholders, as their naked trustees, without interest; and that the real, equitable, and beneficial estate and interest in said properties, and in all the dividends and income accruing, and to accrue therefrom, are in said stockholders; and that every act or thing which takes, de-stroys, endangers, or in any wise injures those properties, or any of them, or lessens their value or productiveness, is an injury to those stockholders, and not to their said trustees. And that any act or thing which, without the consent of those stockholders, or by due process of law, destroys those trustees, to whom those stockholders have confided their property; or which prevents those trustees from fully and freely performing their trusts; or which, in whole or in part, substitutes new or other trustees; or which constrains those stockholders to sell, assign, or transfer their stock or estates and interest in those properties to their said trustees, for their own use or the use of any other person, natural or artificial; or which takes from those stockholders their stock or estates and interest in those properties, for any other than a *public use*, within, and for the benefit of, this state; or which, for such public use, takes from those stockholders their stock or estates and interest in those properties, with-out just compensation being *first* made to them; is an unjust and unconstitutional act, violative of the just and legal rights of those stockholders over their own property, and an impairing of the incidental contracts between the state of New Jersey and those corporations, and between those cor-porations and their respective stockholders.

It sets out at length, the act of March 17th, 1870, the pre-amble and first section of which are as follows :

"An act to enable the United Railway and Canal Companies to consolidate their stock, and to consolidate or connect with other companies.

"WHEREAS, the Delaware and Raritan Canal Company, the Camden and Amboy Railroad and Transportation Company, and the New Jersey Railroad and Transportation Company, sometimes called the United Companies, and the United Railway and Canal Companies, are identified in interest, and have also an identity of interest with the Philadelphia and Trenton Railroad Company and other companies; therefore,

"1. *Be it enacted by the Senate and General Assembly of the State of New Jersey*, That it shall and may be lawful for the said United Companies, by and with the consent of two-thirds in interest of the stockholders of each, expressed in writing and duly authenticated by affidavits, and filed in office of the secretary of state, to consolidate their respective capital stocks, or to consolidate with any other railroad or canal company or companies, in this state or otherwise, with which they are or may be identified in interest, or whose works shall form with their own continuous or connected lines; or to make such other arrangements for connection or consolidation of business with any such company or companies by agreement, contract, lease, or otherwise, as to the directors of said United Companies may seem expedient; *provided*, that if any stockholder or stockholders, being such at the time of making any such consolidation, agreement, contract, lease, or other arrangement, shall be dissatisfied with the same, the said companies shall pay to such dissatisfied stockholder or stockholders, the full value of his, her, or their stock, immediately prior to such consolidation, agreement, contract, lease, or other arrangement, to be assessed by three disinterested commissioners, appointed for that purpose by the Supreme Court or Court of Chancery of this state, on the application of either party, made upon twenty days' notice; but the said companies shall not be compelled to pay for stock of any such dissatisfied stockholder or stockholders

unless he or they shall give written notice of such dissatis-
faction to the president, secretary, or treasurer of the
company, whose stock shall be held by him or them, within
three months after such consolidation, agreement, contract,
lease, or other arrangement, shall have been made and con-
sented to by the requisite number of stockholders; *provided,
further,* that no such consolidation, agreement, contract,
lease, or other arrangement, shall have the effect, or be con-
strued to release or discharge the said United Companies, or
any or either of them, or any company or companies with
which any such consolidation, agreement, contract, or lease,
may be made, from any taxes, liabilities, obligations or duties,
which they, or either of them, may be subject or liable to,
either to this state, or to any other person or persons."

It further shows, that the said act has never been sub-
mitted to the board of directors of either of said United
Companies, or to the stockholders of either, for acceptance;
nor has it ever, in any way, been accepted or acquiesced in
by either of said companies, or by the complainants, or any
or either of them. But, on the contrary, the complainants
have, from time to time, resisted said act and denied its
validity and opposed the exercise, by said companies, of the
powers granted or claimed to be granted by it. They,
therefore, submit that, as to said companies and each of
them, and as to the complainants, the said act is void.

The bill sets forth the names of the directors of the United
Companies. Its sets forth the submission of an indenture of
lease to the joint board of the United Companies for their
consideration and approval. It shows that the United Com-
panies, and the Philadelphia and Trenton Railroad Company,
were therein named as lessors, and the Pennsylvania Rail-
road Company was named as lessee; that the object and
general import of said indenture was, and is, to grant and
demise, by the said lessors, all the aforesaid canal, feeder,
and railroad of the said United Companies, with all their
appendages, equipments, and all the other property, real

and personal, hereinabove mentioned and referred to, and all their corporate powers, franchises, and privileges, with all and singular their appurtenances, together with a certain other railroad, therein stated to be owned by the said Philadelphia and Trenton Railroad Company, extending from some point within the city of Philadelphia, in the State of Pennsylvania, to the Delaware river, opposite the city of Trenton, with its franchises, appendages, property, and appurtenances, for the term of nine hundred and ninety-nine years; yielding and paying therefor, in equal quarterly payments, the yearly rent of $1,948,500.

It sets forth the resolutions of said joint board, declaring the expediency of said lease, on the terms and conditions therein set forth, and appointing a committee to submit the said lease to the stockholders and obtain their consent in writing, in proper form, and to do all things necessary to consummate the negotiation therefor; and directing the execution of the lease, in case two thirds in interest of the stockholders consent thereto.

It further shows, that most of the members of said committee, ever since their said appointment, have been, and now are, actively engaged, by themselves and others in their employ, in obtaining the consent of the stockholders of said United Companies to said lease; and the complainants believe and charge that it is their intention to persevere in their efforts until they shall obtain the consent of two-thirds of said stockholders, and then procure the execution of said lease by the said United Companies, respectively; and that it is the intention of a majority of the members of said joint board, at the earliest time practicable, to have the said lease executed and delivered; and they believe and charge that the said committee, and a majority of said board, will carry their said intentions into complete execution, and that the officers of said companies will seal and deliver said lease, unless they and said United Companies shall be restrained therefrom by this honorable court.

The bill further shows, that the said Pennsylvania Rail-

road Company is a corporation created by and under the laws of the state of Pennsylvania, and exists only under and by virtue of the laws of that state, from which it derives its powers and franchises, whatever they may be; and that it is incapable of existing, living, or being in this state, except only by sufferance and permission, based on an assumed comity of friendly nations. And the complainants, therefore, respectfully submit and charge, that it has not, and cannot have, the right or power to become the lessee of the aforesaid properties, powers, franchises, and privileges of the said United Companies, as contemplated by said indenture, for the term therein stated, or of any of those properties, powers, franchises, and privileges, for any lesser or greater term; that, as such foreign corporation, it is incompetent and incapable of taking, having, holding, or using said properties in this state, and of exercising those powers, franchises, and privileges in this state, or any of them; and that it is, also, incompetent and incapable of discharging the trusts, duties, obligations, and other liabilities which, by the laws of this state, have been and are imposed on the said United Companies, and each of them, and from which trusts, duties, obligations, and other liabilities these companies, on their part, are alike incapable of either discharging themselves, or of transferring them to others.

It further shows, that the only authority which the said joint board of the United Companies, or the members thereof who voted for the making of this said indenture of lease to the said Pennsylvania Railroad Company, have or pretend to have, is the said act of March 17th, 1870. That, although the complainants deny the validity and constitutionality of said act, yet admitting its constitutionality and validity, they respectfully submit that it confers no power on said United Companies, either jointly or severally, to make the said indenture of lease to the said Pennsylvania Railroad Company; or by such indenture, or any other agreement, contract, or arrangement to grant, demise, or in anywise assign or transfer the said properties, franchises, powers, and

privileges to the said Pennsylvania Railroad Company. That the powers conferred by that act on the said United Companies, to consolidate and enter into agreements, contracts, leases, and other arrangements with other railroad and canal corporations, is confined to other railroad and canal corporations of this state, with which the said United Companies are identified in interest, or whose works form, with the works of said United Companies, continuous or connected lines; and not with any railroad or canal company of another state, or not identified in interest with said United Companies, or whose works do not form, with those of said United Companies, continuous or connected lines.

It further shows and expressly charges, that the said Pennsylvania Railroad Company is not a railroad or canal corporation of this state; that it is not identified in interest with the said United Companies, or any or either of them; and that its works do not form a continuous or connected line with the works of the said United Companies, or any or either of them, according to the true intent and meaning of said act. On the contrary, that the said Pennsylvania Railroad Company is a corporation of the state of Pennsylvania; that its interests, instead of being identified with those of the said United Companies, are hostile to them; and that the said contemplated lease is intended to assuage that hostility, and to *create* an identity of interest; and that its works, instead of being continuous or connected, are detached and separated from those of the said United Companies, as follows, viz. either by the bridge of the Trenton Delaware Bridge Company, the railroad of the Philadelphia and Trenton Railroad Company, and the railroad of the Connecting Railway Company, which extend, consecutively, from the most westerly terminus of the said United Companies' works at Trenton, in this state, across the Delaware river at Trenton, and thence, in the State of Pennsylvania, to Mantua, in that state, a distance of about thirty-one miles; or else, by the open Delaware river, opposite the city of Camden, in this

state, and the densely populated city of Philadelphia, in the state of Pennsylvania, a distance of about three miles.

It further shows, that there are not in the charters of said United Companies, or in either of them, or in any of the said supplementary or other acts relating thereto, any reservations of power to the legislature of this state, to repeal, alter, or suspend said charters, or either of them, in the discretion of said legislature, or without the consent of said companies or their stockholders; that each of said charters was granted to said companies, respectively, prior to the enactment of the general act of this state concerning corporations, approved on the 14th day of February, 1846, enacting, in substance, that the charter of every corporation which should thereafter be granted by the legislature should be subject to alteration, suspension, and repeal, in the discretion of the legislature. And the complainants, therefore, respectfully submit, that neither of said charters can be repealed, or materially altered, by the legislature, without the consent of said companies and their stockholders; nor can any act, which in itself repeals or materially alters, or which authorizes a repeal or material alteration of said charters, be or become a law, as to said companies, until accepted by them, or so acted upon or acquiesced in by them s to be tantamount to such acceptance; and that the granting of said charters constituted a contract between the state and those companies, respectively, to the effect that no such repeal or alteration should be made without such consent; and constituted, also, a contract between those companies and their respective stockholders, to the effect that the management of the affairs of those companies, respectively, should continue, in substance, as provided for in their charters; and that no act should be done by said companies, or the directors and other officers managing and conducting their affairs, which should, directly or indirectly, change, materially, the organic provisions in their charters, or should take from those stockholders, in whole or in part, the control of those companies, in the manner provided for in their

respective charters; and that those contracts, and any others expressed or implied in those charters, are protected from being impaired, directly or indirectly, by the legislature, both by the Constitution of the United States and of this state.

It further shows and charges, that the said act of the legislature of this state—on which a majority of the members of the said joint board of the United Companies rely for their right and power to make said indenture of lease, as aforesaid—if it can, or ought to be construed to authorize or justify the making of such a lease to the said Pennsylvania Railroad Company, by the said United Companies, either by themselves or in connection with the said Philadelphia and Trenton Railroad Company, is invalid, unconstitutional, and void; and that it is, therefore, insufficient to authorize or justify the making of said lease for the following, among other reasons, viz.

*First.* Because the said canal and feeder and said railroads of the said United Companies are public highways of and within this state, and that it is not competent for the legislature of this state, directly or indirectly, to assign or transfer, or authorize to be assigned or transferred, the highways, or the control of the highways of this state, to a foreign corporation.

*Second.* Because it is not competent for the legislature of this state to authorize the said United Companies, either in their joint or several capacity, or otherwise, to make or execute the said indenture of lease, or any lease of like import, to the said Pennsylvania Railroad Company, and to deliver the demised property to that company.

*Third.* Because it is not competent for the said Pennsylvania Railroad Company to take, hold, or receive the properties demised, or intended to be demised by said indenture to it; or to perform, execute, or discharge the duties, trusts, obligations, contracts, and other liabilities of the said United Companies, which constitute the greater part of the consideration for the making of said indenture.

*Fourth.* Because the making of such lease, and delivery of the demised property—if possible to do so to a corporation incapable of being in this state—would be a virtual dissolution or extinguishment of the said United Companies, and substitution of the said Pennsylvania Railroad Company in their stead, to take all their property and perform and execute all their powers, and discharge all their duties trusts, obligations, contracts, and other liabilities, without the consent of their stockholders and others to whom they are bound, and without making, or providing for the making of just compensation to those stockholders and others, whose property would thereby necessarily be taken, endangered, destroyed, or injured.

*Fifth.* Because the said United Companies are the trustees of their respective stockholders, to whom they have voluntarily confided the custody, care, and management of their property; and that the making of such a lease, and the delivery of the demised property to the said Pennsylvania Railroad Company, for the term mentioned in said lease, would be a substitution of that company, as trustee, in the place of said United Companies, and the taking of their property from their confidential agent, and giving it to another, without their consent and without just compensation, for no public use, either in or out of this state; and would be an impairing of the incidental contracts between this state and those corporations, and between them and their stockholders, in violation of the Constitution of the United States and of this state.

*Sixth.* Because the only provision made in said act for compensating the dissatisfied stockholders for the taking of their stock is, that its value shall be assessed as of the time immediately before the taking; but that the assessment thereof shall not be made, and compensation paid, until *after* the taking, while the Constitution of this state expressly requires compensation to be "*first made.*"

*Seventh.* Because the said act requires the dissatisfied tockholders to give up their stock to their own trustees, the

United Companies, to take, either for the use of said companies, or else for the use of the said Pennyslvania Railroad Company; and that such is not a "public use," in this state or out of it.

*Eighth.* Because the said act, by requiring the dissatisfied stockholders to give up their stock to the United Companies, in order to enable them to carry into execution any agreement, contract, lease, or other arrangement which they may deem it expedient to make with any other of the companies mentioned in the first section of said act, thereby delegates, or attempts to delegate, to said United Companies, the right to decide what constitutes a "public use," sufficient to justify the taking of private property; which right can only be exercised, directly, by the legislature itself; and

*Ninth.* Because the charter of each of said United Companies commits the direct management of their affairs to a board of directors, to be chosen annually by their respective stockholders; and neither of those charters is liable to be repealed, or materially altered, without the consent of the company whose charter is sought to be repealed or altered, and of all the stockholders thereof; yet, if the act in question, as claimed, authorizes the execution of the lease in question, it enables the joint board of directors of the said United Companies to transfer the management of their affairs to a foreign corporation, over which they have no control, for nine hundred and ninety-nine years; and yet, also, this act, which thus indirectly destroys those charters, by transferring the possession and management of their stockholders' property to an alien corporation, has never been, in anywise, accepted, or submitted for acceptance, to either of said companies or their stockholders.

It further shows, that the making of the said lease, and delivery of the demised property over to the said Pennsylvania Railroad Company, would be a great and irreparable injury to the complainants, for which the law affords no adequate remedy, and from which, as they submit, they should be protected by the restraining power of this court.

It further shows, that the complainants have authentic copies of all the aforesaid acts of the legislature, ready to be produced, not only in verification of the aforesaid statements concerning them, but also of all other their contents and provisions; and they pray that the said authenticated copies of said acts may be deemed and considered as annexed to the bill, and as a part thereof, the same being much too voluminous to be actually attached thereto.

The bill prays an injunction, to be directed to the United Companies, respectively, and the directors thereof, respectively, restraining the execution of the proposed lease to the Pennsylvania Railroad Company; and also requiring them to desist and refrain from making or executing any other agreement, contract, lease, or other arrangement to consolidate the capital stocks or business of the said United Companies, or either of them, with the capital stock of the said Pennsylvania Railroad Company, or to grant, demise, or lease the works of the said United Companies, or either of them, or their or any of their powers, franchises, or privileges, to the said Pennsylvania Railroad Company, for the term of nine hundred and ninety-nine years, or for any greater or lesser term.

Upon filing the bill, a rule to show cause, on the 25th of July, was granted, why a writ of injunction should not issue, according to the prayer of the bill. It further ordered the defendants to desist and refrain from executing, or procuring to be executed, the said lease, &c., until the hearing of the rule.

Upon the day fixed for the hearing of the rule, answers were filed and read.

The answer of the United Companies, admits that the several complainants are stockholders in the corporations defendant, respectively.

It admits the several acts of incorporation, and the supplements thereto, and the acts whereby said companies were

consolidated, and the agreements between them, and other laws of this state, set, forth in the bill of complaint. It admits that said acts were accepted, but, denies that they were all acquiesced in, as alleged. It admits that the state is a stockholder in said corporations.

It admits that the United Companies were organized under their respective charters, and that under them, and the acts supplemental thereto, they raised large sums of money, and acquired real and personal property of great value; that the Delaware and Raritan Canal Company, and the Camden and Amboy Railroad Company, entered into the agreement with the New Jersey Railroad Company, set forth in the bill, for purpose of consolidating and uniting their respective interests, and that said agreement was ratified by the legislature.

It admits that the United Companies own, and are in the absolute possession, enjoyment, and use of the Delaware and Raritan Canal and the feeder thereof, and of the Camden and Amboy Railroad, Trenton Branch Railroad, New Jersey Railroad, Princeton Branch Railroad, Trenton Spur Railroad, Jersey City ferries, and Harsimus Cove property, with all and every of their branches, lateral and side roads, (among which branch or lateral railroads is the said Philadelphia and Trenton Railroad,) and other property in said bill described, with the corporate rights, powers, franchises, and privileges, in any wise granted or belonging to them and each of them, and subject also as charged in the said bill; and also of a large amount of other property, real and personal, not strictly appertaining to their said works, with the estates, rights, incidents, privileges, and appurtenances, as charged.

It admits the costs of the said properties as stated. It denies that the actual worth of the said properties is not less than $50,000,000. It admits that the aggregate capitals, with the indebtedness of the said companies, make a sum equal to the cost of their properties as charged.

It admits that the moneys invested in the capital of the

said companies have been productive to the stockholders, but have not been exceedingly productive; and denies that the moneys so invested promise to become much more lucrative in the future. It submits that by no possible immediate and direct management by the board of the United Companies, can the dividends upon the capital stock of the said United Companies be as large a per centage as they have been in the past, and that in the judgment and belief of the said united board, they cannot, by the most faithful, skillful, and economical management of the properties, powers, and privileges of the said United Companies, in view of the past and prospect of the future, by any direct or immediate management of the said works and properties by the directors of said companies, expect or reasonably hope hereafter to make dividends upon their capital stock exceeding ten per centum per annum, nor even so much.

It admits that the average dividends of the Delaware and Raritan Canal Company, and of the Camden and Amboy Railroad and Transportation Company from 1833 to 1871, have been about twelve and twenty hundredths per cent.; but such dividends have been caused partly by the fact that the capital of the said companies was small, and their bonded debt large, and said bonded debt was subject, a large part of it, to a low rate of interest, being a rate of interest of five per centum per annum, and partly by the fact that the said canal and railroad companies had the monopoly of the transportation of passengers and merchandise between New York and Philadelphia, across the state of New Jersey.

It says that the New Jersey Railroad and Transportation Company has, in times past, been almost as productive in its per centage of net revenue as the two companies formerly called the joint companies, but the revenue of the New Jersey Railroad and Transportation Company has been greatly diminished by reason of the fact of the competition now existing in the transportation of passengers and merchandise. That, between Newark and New York, there are now three railroads, where there was formerly one. The

competition produced by the Newark and New York Railroad, and by the Morris and Essex Railroad, has taken away nearly all the profits from the business between the places last aforesaid. The competition produced by the Central Railroad of New Jersey, between New York and Elizabeth, has also greatly reduced the revenues of the New Jersey Railroad and Transportation Company.

It denies that it is possible for the United Companies for the coming thirty-eight years, with the utmost care and good management, to earn a net revenue of fifteen per cent. as charged, or any such per centage; and says that, on the contrary, the state of New Jersey is now open to competition by other railroad lines, which they clearly see will be constructed, and the effect of which must be, greatly to reduce the revenues of the United Companies.

The earnings on the cost of the works represented by capital and indebtedness were, in the year 1855, only eight and forty-five one hundredths per cent., while the amount earned on the stock, after paying interest on the bonds, was a little less than seventeen per cent. In 1868, with an average of eight per cent. of net earnings upon the cost of the works, there was applicable to the stock, nine and one half per cent. When all the works became united, as the United Companies, the per centage of net earnings on the capital and debts, has been seven and twenty-six one hundredths, from and including the year 1867, to and including the year 1870.

Many of the causes which have led to these results will continue. The compensation for the transportation of passengers, merchandise, and chattels has decreased, and must still further decrease, and the expenses of operating railroads and canals have increased. The taxes paid to the Government of the United States have been very large. Loans made at an earlier date, at a low rate of interest, are constantly falling due, and have to be renewed at a heavy discount. In consequence of the competition with which the United Companies are threatened, they are and will be

compelled to enlarge and perfect their works, at a faster rate, than the ordinary increase of business would otherwise demand.   To make the real estate of the United Companies at Jersey City profitable, and to prevent it from being a source of constant loss, large expenditures will be required, rendered necessary by western and other business.   Warehouses, wharves, and piers must be constructed, and canals must be excavated at Jersey City.   An elevated railroad from their main line in Jersey City to Harsimus cove must be built at great expense.   Another track must be laid along a great part of the main line from Jersey City to Philadelphia.     Expenditures for such purposes will necessarily amount to several millions of dollars, above the amount authorized by the said lease.   These expenditures should be made by the Pennsylvania Railroad Company.   That company is unwilling to incur them, without a lease of the property for a long term of years.

Without such additions and improvements, business will be diverted to other lines, and irreparable loss will result to these defendants.   These defendants are unwilling to part with the entire control of their terminal property at Jersey City, for the reason that the value of the residue of their property would be permanently impaired.   Such improvements should not be made by these defendants under agreements which, in the course of time, might be disregarded. If they shall be made by the proposed lessee, as they undoubtedly will be if the lease shall be executed, they will add to the permanent value of the property, and will afford great security for the payment of the rent reserved.   For these, and many other reasons which might be suggested, these defendants deny the flattering prospects for the future set forth in the complainants bill.

The dividends which have been declared for the last four years by the said companies, have been made in some part, from the surplus heretofore accumulated by the application of revenue to construction, and which surplus is now wholly exhausted.

It admits the passage of the act of March 17th, 1870, set out in the bill, and avers that the said act has been submitted to the board of directors of the said companies, as a joint or united board, which said joint or united board consists of the directors of the several boards, and the said act has been accepted by the said joint or united board, by a large majority thereof. That the directors of the said several companies can lawfully act in such a matter as the acceptance of the said law, only as a joint or united board. It avers, that the said act has been submitted to the stockholders of the said several United Companies, and the stockholders of each of the said companies, have assented to the same by more than two-thirds in interest of such stockholders. It denies that the said act required any formal acceptance, and says, that a compliance with the terms and conditions of the said act, was all that was requisite to entitle the said companies or the stockholders thereof to avail themselves of its provisions, which has been done; and insist, that the said act is operative and binding in law.

It admits that an unexecuted indenture of lease, previously prepared for the purpose, was submitted for the consideration and approval of the members of the joint board of directors of the United Companies, and if approved by said directors, the same will be executed by the several parties therein named, (not, however, without first obtaining the consent of two-thirds in interest of the stockholders of each, in compliance with the said act of March 17th, 1870,) unless restrained by this honorable court.

It says, that more than two-thirds in interest of the stockholders of each of the United Companies, have given their consent, expressed in writing, to the said proposed lease, and desire that the said lease should be executed, in full compliance with the said act of March 17th, 1870. It admits that it is the intention of a majority of the said joint board, to have the lease executed and delivered at the earliest time practicable, as the act and deed of the several companies composing the United Companies.

It insists that the Pennsylvania Railroad Company was, and is, both a proper and necessary party to the bill, and the omission of that company, as a party, should cause the bill of the complainants to be dismissed; and the same benefit is prayed, as if the defendants had demurred to the bill for want of proper parties. It says, that the Philadelphia and Trenton Railroad Company are ready to join in the said lease, as one of the lessors, and submits that the last named company is a necessary party to the said bill, and that no injunction can issue without making the last named company a party, and prays the same relief as if defendants had demurred to the bill for that cause.

It admits that the Pennsylvania Railroad Company is a corporation, created by the laws of the state of Pennsylvania, but denies the legal conclusion therefrom charged in the bill, and declares, that on the contrary, said company can lawfully, under the laws of the state of New Jersey, and of the state of Pennsylvania, as such laws now exist, become the lessee of the property and franchises in the said lease mentioned; and that the said proposed lessee, in case the said lease shall be executed, together with the said lessors, can perform lawfully all the duties, trusts, and obligations, and discharge all the liabilities imposed on the United Companies whether with reference to the state of New Jersey, or any corporations or individuals.

It says, that the said United Companies, as charged in the said bill, do claim that they have derived additional right and power, from the said act of March 17th, 1870, to execute the said proposed lease, when they shall have obtained the consent of two-thirds in interest of the stockholders of each of the United Companies, and shall have fully complied with the said act.

It claims and insists, that without the aid of the last named act, enabling them to make the said lease, the defendants had, and still have, the power to make the same; and they respectfully submit, that the complainants have no right to the injunction of this honorable court to restrain

these defendants from executing and delivering the said lease, for the reason that the said lease will not impair any right of any of the complainants, and will not cause any injury to them or any of them.

It insists, that the last named act of the legislature of the state of New Jersey is constitutional and valid in law; that it confers full and ample power on the said companies to make, execute, and deliver the said indenture of lease to the Pennsylvania Railroad Company in form, in substance, and in legal effect, as the said lease has already been prepared and agreed upon; and, that if the said lease shall be executed and carried into effect, the United Companies or either of them, will not thereby, in any manner, be hindered, prevented, or incapacitated from fully and fairly performing and discharging all the duties and obligations which they, or any of them owe, either to the state of New Jersey, or to their stockholders; on the contrary, after the said lease shall have been executed and delivered, the United Companies, will be better able to perform and fulfill all and every of their duties, both public and private.

It insists that the powers conferred by the act of March 17th, 1870, for consolidation and making business arrangements, are not confined to railroad or canal companies of this state. On the contrary, one of the objects of the said act, as is most clear and apparent, was to enable the United Companies to lease their works to the Pennsylvania Railroad Company, for the reason that the railroad and canal corporations of the said United Companies were, when the said act was passed, and still are, identified in interest with the Pennsylvania Railroad Company; and the railroads of the United Companies formed, with the railroad of the Pennsylvania Railroad Company, both continuous and connected lines. The canal of the United Companies formed, when the said act was passed, and still forms, with the railroad of the Pennsylvania Railroad Company, a connected line of business and transportation. The works and business of the

United Companies, when the said act was passed, bore, and still do bear, such connections and relations with the works of the Pennsylvania Railroad Company, and the business thereon conducted, as to make the true intent, meaning, and purpose of the said act apparent beyond all doubt or controversy.

It admits that the Pennsylvania Railroad Company is a corporation created by the laws of Pennsylvania, but insists that it is not confined, in the exercise of the powers, privileges, and franchises, to that state alone; on the contrary, the Pennsylvania Railroad Company, by its railroads and works, and by the railroads and works of other corporations in other states and territories, with which it is connected by agreements, contracts, and leases, and with which it forms continuous and connected lines, is a part of a great system of internal communication, which extends from the Atlantic ocean to the Pacific ocean, and which brings in close intercourse with the towns and cities of the Atlantic seaboard, the states and territories of the northwest, the west, the southwest, and south.

It denies that the Pennsylvania Railroad Company is not identified in interest with the United Companies, and that the works of the Pennsylvania Railroad Company do not form a continuous and connected line with the works of the United Companies, or with any or either of them, as charged; and insists that the works of the United Companies form, with the works of the Pennsylvania Railroad Company, continuous lines, and also connected lines, within the true intent and meaning of the act of March 17th, 1870; and that the same are not detached therefrom, either by the bridge of the Trenton Delaware Bridge Company, or by the railroad of the Philadelphia and Trenton Railroad Company, or by the railroad of the Connecting Railway, or by any or either of them, in manner and form, substance and effect, as charged in the said bill. It denies that the open Delaware river separates the railroad of the Camden and Amboy Railroad and Transportation Company from the rail-

road of the Pennsylvania Railroad Company; and says that it is, in point of fact and in law, no severance of the works of said company, from the city of Philadelphia, and is no severance of the business connection of said company with the Pennsylvania Railroad Company, and it does not interrupt or interfere with the identity which exists, and did exist, on the 17th day of March, 1870, between the said Camden and Amboy Railroad and Transportation Company, and the Pennsylvania Railroad Company, or between the United Companies aforesaid and the Pennsylvania Railroad Company.

It submits, that the nine propositions in the said bill set forth, are unsound and erroneous in law, and have no application whatever to the rights of the lessors in the said lease to make, execute and deliver the said lease, or the said lessee to receive the same; and are irrelevant to the case made by the said bill of complaint.

It denies that the making of the said lease, and the delivery of the demised property to the Pennsylvania Railroad Company, will be a great and irreparable injury to the complainants; but, on the contrary, the same will be a great and permanent benefit to them.

The defendants are ready to refer to, accept, and receive the said acts of the legislature stated in the bill, and their contents, as instruments of evidence, subject to their true construction and legal effect, and will on their part refer to the same, and other acts of the legislature of the state of New Jersey and the state of Pennsylvania, having a bearing upon the subject matter before this honorable court in this cause.

It charges, that the bridge over the Delaware, and the railroad of the Philadelphia and Trenton Railroad Company, form a part of the works of the United Companies. The right to use the said bridge for the railroad of the companies formerly known as the Joint Companies, originally commenced by contract between "the president, managers, and company, for erecting a bridge over the river Delaware, at

or near Trenton," with the Philadelphia and Trenton Railroad Company, in the year 1835. The defendants believe, that at the time of the making of said contract, the Joint Companies were the owners of more than one-half of the shares of the capital stock of the said Bridge Company; and, on the 1st of March, 1836, they were the owners of more than one-half, in amount and value, of the capital stock of the said Bridge Company. Under that contract railroad tracks were laid on the said bridge, on which locomotive engines and cars passed from the Trenton Branch Railroad and Spur, to the Philadelphia and Trenton Railroad, and returned, as the business required. The expense of laying railroad tracks on said bridge was nominally borne by the Philadelphia and Trenton Railroad Company, as was stated in the arrangement, but in point of fact was borne by the Joint Companies aforesaid. Subsequently, and on the 7th day of December, 1850, an agreement was entered into between the said Bridge Company and the Philadelphia and Trenton Railroad Company, whereby, for the consideration therein mentioned, it was agreed that the said railroad company should have permission to use the south part of the said bridge, for running railroad cars and other vehicles on and over the railway laid over the said bridge, for the period limited by the charter of the said railroad company. The railroad company thereby agreed to keep, at their own expense, the railway over said bridge, and that part of said bridge in repair, and would indemnify and save harmless the party of the first part from all loss, damage, or injury whatever, which the said bridge might sustain from the use aforesaid, by fire and locomotives or otherwise.

Semi-annual settlements should take place on the first Monday of April and October in each year. The amount for tolls from the 1st day of April, 1849, should be adjusted and settled on the terms of that agreement.

Such contracts, and the arrangements arising therefrom, though in form continued to the present time, have virtually ceased, by reason of the fact that the Philadelphia and

Trenton Railroad Company and the United Companies are, and long prior to the year 1870 were, the owners of all the capital stock of the said Bridge Company, except one share. And these defendants charge that the Philadelphia and Trenton Railroad Company, and the United Companies, on the 17th day of March, 1870, were, and from thence have continued to be, the owners of all the capital stock of the said Bridge Company, except said one share thereof; and that the ownership of said stock was fully authorized by several acts.

The answer further says, that the railroad of the Philadelphia and Trenton Railroad Company, extending from the said Delaware bridge, in the state of Pennsylvania, to the city of Philadelphia, in said state, was one of the works of the United Companies, on the 17th day of March, 1870, and for many years prior thereto, and has continued as such until the present time.

On the 22d day of April, 1836, an agreement was made between the Delaware and Raritan Canal Company, and the Camden and Amboy Railroad and Transportation Company of the one part, and the Philadelphia and Trenton Railroad Company, of the other part, by which agreement the said parties did covenant and agree with each other, and their successors, that from and after the 1st day of June then next ensuing, during and until the expiration of their said charters, respectively, the clear profits arising from the stock of the said companies, (except so much thereof as had been theretofore transferred to the state of New Jersey,) should be divided among all the stockholders of the said several companies, share and share alike. And it was further agreed that, whenever the state of New Jersey should accede to the said arrangement, the stock of the Philadelphia and Trenton Railroad Company, should be put on the same footing as the stock of the Delaware and Raritan Canal Company and the Camden and Amboy Railroad and Transportation Company, and that the exception thereby made of the stock transferred to the state of New Jersey by the said the Delaware and

Raritan Canal Company and the Camden and Amboy Railroad and Transportation Company, was made from no invidious or improper intention, but simply because the companies believed it would be improper for them to attempt to bind the state of New Jersey, leaving the state of New Jersey to determine as it might see proper. It being by the said agreement expressly understood, that the state of New Jersey should have the option at any time to come in and participate in the benefits of the said agreement from the time of such option being made.

The answer avers, that since the making of the last mentioned agreement, the state of New Jersey, as a stockholder, and all the other stockholders of the Joint Companies, have borne the burdens and shared in the profits arising from the said agreement.

It charges, that the terms and conditions of the said agreement were fully complied with and carried into effect by the said companies, from the date thereof to the time of the agreement of union between the old Joint Companies and the New Jersey Railroad Company, February 1st, 1867, (which said agreement was validated by an act of the legislature) and from that time they have been fully carried into effect by the said New Jersey Railroad Company, as well as the original parties to said agreement.

The following clause in the said agreement between the said three companies, set forth in the bill, refers to the said agreement of the 22d of April, 1836 : "That the agreement between the said parties hereto of the first part, and the Philadelphia and Trenton Railroad Company, and all other agreements and obligations now in force by or against either of the parties hereto, shall be binding on the consolidated companies composed of the parties hereto."

Since the union of interest affected by the said agreement of the 1st of February, 1867, and validated by the said act of February 27th, 1867, the said agreement of the 2d day of April, 1836, has been carried into effect, and complied with, by the Delaware and Raritan Canal Company, the Camden

and Amboy Railroad and Transportation Company, the New Jersey Railroad and Transportation Company, and the Philadelphia and Trenton Railroad Company.

The complainants, who have been stockholders, as charged in the said bill, for five years last past, have had all the benefits arising from the said agreement; have received or become entitled to additional stock, distributed among the stockholders of the said Joint Companies and said United Companies; and have received dividends and profits arising out of the business of said four roads, which have been so operated as one concern. And the state of New Jersey, as a stockholder, has received the like benefits with the other stockholders, and has, in manner aforesaid, formally and by enactment as aforesaid, ratified and confirmed the said agreement as obligatory on the Joint Companies and on the Philadelphia and Trenton Railroad Company, and on the United Companies and the Philadelphia and Trenton Railroad Company, and as obligatory on the state of New Jersey as a stockholder, as the sovereign power which created and has confirmed the franchises, powers, and privileges of the said several companies composing the Joint and United Companies, whether conferred on them severally, or as Joint Companies, or as United Companies.

It further says, that the number of shares of the capital stock of the Philadelphia and Trenton Railroad Company is twelve thousand five hundred and ninety-one, and the United Companies are the owners of seven thousand six hundred and fifty of said shares; that under the powers conferred by the act approved April 15th, 1868, and under the other acts in this answer referred to, the said United Companies have the ownership and control, over the said Philadelphia and Trenton Railroad Company, conferred by the ownership of the said stock, and by virtue of the said agreement.

It further says, that by articles of agreement made and entered into on the 18th of February, 1863, by and between the Pennsylvania Railroad Company, the Philadelphia and Trenton Railroad Company, the Delaware and Raritan Canal, and

Camden and Amboy Railroad and Transportation Companies, and the New Jersey Railroad and Transportation Company, and by agreements explanatory thereof and supplemental thereto, it was, among other things, provided and agreed, that the Pennsylvania Railroad Company would obtain the necessary right of way, and lay out and construct a first class railroad from the point on the Pennsylvania Railroad, at or near where it crosses Thirty-fifth street in the city of Philadelphia, about one mile from Market street, where the Junction Railroad crosses under said Market street, by some eligible and direct route, to some point on the Philadelphia and Trenton Railroad, at or near Frankford, crossing the Schuylkill river above Girard avenue bridge, with masonry constructed for a double track. And the Pennsylvania Railroad Company did, thereby, further agree, as soon as the said railroad connecting the Pennsylvania Railroad with the Philadelphia and Trenton Railroad should be constructed and ready for use, to execute and deliver to the Philadelphia and Trenton Railroad Company, a lease of the said Connecting Railroad, for a term of nine hundred and ninety-nine years; and that, from and after the said time, when the said Connecting Railroad should be so constructed and ready for use as aforesaid, until the expiration of the said term of nine hundred and ninety-nine years, the Philadelphia and Trenton Railroad Company, their successors and assigns, should have as full and exclusive use and control of said railroad, and its appurtenances and appendages, and all lands and rights therewith connected, as if they, the Philadelphia and Trenton Railroad Company, had been, from the first, the owners thereof.

In pursuance of the said agreements the said Connecting Railroad was constructed. It commences on the line of the Philadelphia and Trenton Railroad at Frankford, in the city of Philadelphia, and runs southwesterly, crossing the river Schuylkill near and above the Girard avenue bridge, and connecting with the railroad of the Pennsylvania Railroad

.Company about one mile and one quarter northerly from Market street in said city.

It further says, that by an act of the legislature of Pennsylvania, approved on the 14th day of April, 1863, the Connecting Railway Company was incorporated. Said company subsequently constructed said railroad. The stock of the said Connecting Railway Company is owned by the·Pennsylvania Railroad Company.

It further shows, that on or about the 1st day of January, 1868, an indenture of lease was made and executed between the Connecting Railway Company, of the first part, the Pennsylvania Railroad Company, of the second part, and the Philadelphia and Trenton Railroad Company, of the third part, whereby the Philadelphia and Trenton Railroad Company became the lessees of the said Connecting Railroad, extending from its two connections with the Pennsylvania Railroad, (one of said connections being at or near Thirty-fifth street, and the other at or near Fortieth street, in West Philadelphia,) to its connections with the Philadelphia and Trenton Railroad, at or near Frankford, with all the tracks, bridges, right of way, lands, and other things connected therewith, or appurtenant thereto, including, also, all lands purchased by the said Connecting Railway Company, whether for right of way or otherwise, and then held by or for the said Connecting Railroad Company; together with the full and exclusive right to run and use the said railroad, and to take the tolls and exercise the franchises thereof, or therewith connected, and the right to build one or more additional tracks or sidings as may be lawful, at their own expense, and to do all other lawful acts which they may find necessary or expedient. Which term in said lease was limited at nine hundred and ninety-nine years from the date of the said articles of agreement, which have been hereinbefore referred to.

It expressly avers that by means of the said bridge over the Delaware at Trenton, and the rails for a railroad thereon, and by means of the said road of the Philadelphia and

Trenton Railroad Company, and by means of the said Connecting Railroad, possessed, owned, and held as aforesaid by the said the United Companies, the works of the United Companies form with the works of the Pennsylvania Railroad Company, both continuous and connected lines.

It says that passengers, goods, wares, and merchandise, are transported over the works of these defendants by ferries or floats from the city of New York to Jersey City, thence in railroad cars by the New Jersey Railroad to New Brunswick, from New Brunswick to the Delaware bridge at Trenton by the railroad called the Trenton Branch and Spur; thence on a railway over the said Delaware bridge; thence by the Philadelphia and Trenton Railroad to the Connecting Railroad at Philadelphia; thence over the Connecting Railroad to and upon the rails of the Pennsylvania Railroad; thence over the Pennsylvania Railroad to Pittsburg, in the state of Pennsylvania, and from thence to various points northwest, west, and southwest. That the railroad cars drawn by locomotive engines, in which cars, passengers and merchandise are transported, pass by a continuous and unbroken line of railroad from Jersey City to Pittsburg, as aforesaid, the same cars being used, though owing to the long distance traversed, many locomotive engines are used for the same train, in which passengers and merchandise are carried from Jersey City aforesaid, to Pittsburg aforesaid, and beyond. Such was the state of facts on the 17th day of March, 1870, and prior thereto, and since the said Connecting Railroad was completed. That the said railroad line from Jersey City to Pittsburg, as aforesaid, was on the 17th day of March, 1870, and prior thereto, and from thence to the present time has been, used for business on the same from Jersey City to points west of Philadelphia on the said Pennsylvania Railroad, and practically operated as one line, under contracts and arrangements, and was one of the chief and essential means in carrying on the internal commerce and business of this country. This mode of communication between the state of New York, the state of Pennsylvania,

and the West, has been fostered, protected, and legalized by the respective legislatures of the two last named states; and it was with a full knowledge of the vast magnitude of the internal commerce carried on by such agencies, and to facilitate and promote the same, that the said act of March 17th, 1870, was passed, by which the said proposed lease was authorized. The concurrent legislation of the state of Pennsylvania, hereinafter stated, was a part of the same plan by which full authority was given to make the said lease; such legislation did not spring from the whims or caprice of speculators and adventurers, but from the demands for the means of intercourse, by which accommodation for every town and village along the line of transportation is afforded across the continent, and a shorter pathway is opened for commercial intercourse with the East Indies.

It further says that the Pennsylvania Railroad at Philadelphia extends to the Delaware river at two points; one at the Washington street wharf and another at the Greenwich wharves. The Camden and Amboy Railroad, which runs from South Amboy to Camden, is at Camden connected with Philadelphia by a ferry, owned and operated by the United Companies, which ferry has been declared to be a part of the line, and thus a connected line of business is formed between the last named railroad and the works of the Pennsylvania Railroad Company. The communication between the terminus of the Camden and Amboy Railroad at Camden, by ferry boats over the Delaware river, to the Washington street wharf aforesaid, at Philadelphia, and thence on the Pennsylvania Railroad, was on the 17th of March, 1870, and still is used for the transportation of merchandise over and from the Camden and Amboy Railroad, over the Delaware river as aforesaid, to the Washington street wharf aforesaid, and over the Pennsylvania Railroad aforesaid, and was provided for by the said contract of February 18th, 1863. Where the Pennsylvania Railroad comes to the Delaware river, at the Greenwich wharves, coal, lumber, and merchandise, transported over the Pennsylvania Railroad,

were on the 17th day of March, 1870, and before and since, and to the present time, discharged into boats of the Delaware and Raritan Canal at Philadelphia, floating in the Delaware river, and in such boats transported up the Delaware to the canal, and from thence to New York and other destinations. The Delaware and Raritan Canal was, and is, thus connected directly with the Pennsylvania road as a connected line, making also an identity of interest between the Canal Company as one of the United Companies, and the Pennsylvania Railroad Company.

To show the identity of interest and connection in business between the railroads and the canal of the United Companies, and the railroad of the Pennsylvania Railroad Company, the answer states and shows the amount in money received by the United Companies, and the Philadelphia and Trenton Railroad Company, for passengers and freight delivered to and received from the Pennsylvania Railroad, in the years 1869 and 1870:

From passengers—

| | | | |
|---|---|---|---|
| 1869 | - | - | - | $161,857 70 |
| 1870 | - | - | - | 267,496 09 |

From freights—

| | | | |
|---|---|---|---|
| 1869 | - | - | - | $537,578 44 |
| 1870 | - | - | - | 545,191 61 |

The following number of tons of coal were transported over a portion of the Pennsylvania Railroad to the Greenwich wharves aforesaid, and from thence in the canal boats of the Delaware and Raritan Canal, on and over the said canal—

| | | | |
|---|---|---|---|
| In 1869 | - | - | - | 147,788 tons |
| " 1870 | - | - | - | 175,000 " |

It further answering, says, that the Pennsylvania Railroad Company is a corporation created by the laws of Pennsylvania, by an act of the legislature of that state, approved April 13th, 1846, having, by their act of incorporation, and by subsequent acts of the legislature of the last named state, full power to own and operate a railroad

from Philadelphia to Pittsburg and beyond, and also having full power, by the laws of Pennsylvania, to merge and consolidate with any other railroad company, in that state or out of it, on compliance with the laws of the last named state. By the laws of the state of Pennsylvania, the said agreement of February 18th, 1863, and the said lease of the Connecting Railroad are valid. It charges, that by the laws of Pennsylvania, the Pennsylvania Railroad Company aforesaid can become the lessees of any railroads or canal navigation works whatever, whether such railroads or canal navigation works may be within the limits of the state of Pennsylvania, or created by, or existing under the laws of any other state or states. Among the various acts of the legislature of the state of Pennsylvania, giving powers as aforesaid, these defendants refer to two acts, exemplified copies of which are hereunto annexed—" An act to authorize railroad companies to lease or become lessees, and to make contracts with other railroad companies, corporations, and parties." Approved February 17th, 1870. " An act relating to leases or contracts for the use of canals or other navigation works by railroad companies," approved May 3d, 1871.

And the defendants have hereunto annexed exemplified copies of such acts of the legislature of Pennsylvania, of a public and general charter, which give authority to railroad companies in that state, to merge or consolidate with other railroad companies, both in and out of the state of Pennsylvania, to which reference is made.

The defendants draw attention to the said legislation of the state of Pennsylvania, in connection with the said act of the legislature of the state of New Jersey, approved March 17th, 1870, entitled " An act to enable the United Railway and Canal Companies to consolidate their stock, and to consolidate or connect with other companies," as giving evidence of a very important state of facts in the history of the internal commerce of this widely extended country, so largely carried on by means of railroads and canals, in and over

the states by which such railroads and canals were authorized to be constructed, connecting with the railroads and canals in adjoining states, the construction of which has been authorized by like authority; thus making continuous lines of travel and transportation over and beyond state boundaries, to meet the emergencies of business, and also serving to keep united under one government a great and enterprising people.

As to the dangers from a foreign corporation, which haunt the imaginations of the complainants, the defendants submit the fact that, of the 189,904 shares which compose the stock of the United Companies, less than one-fourth is owned by residents of the state of New Jersey, and the residue are owned by persons residing out of the state of New Jersey. They charge, that of all the funded indebtedness of the United Companies, or either of them, less than one-quarter in amount and value are held by people residing in New Jersey; that a large part of their bonds are sterling bonds, the interest whereof is paid in Europe, and the holders of which reside in Europe.

It avers, that the exhibition of the said bill of complaint, by which the complainants object to the resolutions of the board of directors of the United Companies, and to the proceedings of the said board, touching the negotiations for the said lease, and the purpose of the said board to cause the said lease to be executed and delivered, came too late. Since the said act of March 17th, 1870, in the said bill set forth, the subject of making a lease in pursuance of the powers thereby conferred, by the United Companies to the Pennsylvania Railroad Company, has been a matter of notoriety and public discussion, and has attracted and received the attention of the stockholders and directors of the said companies, and the complainants have laid quietly by, and taken no steps in this honorable court relative thereto, until the said negotiations were closed, and the said lease was prepared, and the said resolutions were passed. That the same should be executed and delivered when the conditions

of the said act should be complied with, as in the said reso-lutions set forth.

It insists, that the said corporations composing the United Companies of the state of New Jersey, lessors in the said indenture of lease, have good right and lawful authority to make, execute, and deliver the said indenture of lease, to the Pennsylvania Railroad Company aforesaid. That the Pennsylvania Railroad Company, have a good right and lawful authority to accept the said lease, and become the lessees, in manner and form as in the said lease has been prepared and agreed upon. That said complainants have no right to prevent the execution and delivery of the said lease; that they have no equitable standing in this honorable court to have an injunction issued according to the prayer of the said bill, or. any other injunction restraining the execution and delivery of the said lease.

The agreements referred to in the answer, and the acts of the legislature of Pennsylvania which were relied upon as authority for the Pennsylvania Railroad Company to take the lease, were annexed thereto.

An answer was also filed on the part of the defendant, George Richards, state director of the Camden and Amboy Railroad Company. The state was a large stockholder in the United Companies; and the answer of Mr. Richards was filed by the Attorney-General, that the state might be represented in the argument. This answer merely submitted certain legal propositions to the consideration of the court, neither admitting nor denying any of the allegations of the bill.

Upon the answers being read, *Mr. Browning* asked that a reasonable time might be allowed counsel to examine the answer of the companies. It contained matter of surprise. The cause should be fully heard.

*Mr. Scudder* opposed the request, on the ground that there was no new matter in the answer, and the counsel

should have come prepared to argue the case, on the denial being put in.

*Hon. J. S. Black,* (of Pennsylvania,) in reply, urged that the answer was very voluminous, and counsel for complainants ought not to be compelled to go on with the argument, in so important a case, without having an opportunity to examine it more particularly, and with care, and asked that they might be allowed a week for that purpose.

THE CHANCELLOR.

When the rule to show cause in this case was granted, an unusual length of time was allowed, and I then mentioned to the counsel of the complainants, that I would expect them to be ready, to-day, to proceed with the cause. The time has been sufficient to prepare, on the side of the complainants, unless the answer of the defendants put the matter in an entirely new and different light. The answer of the defendants, as read, is long, not much longer than the bill; but the great part of that answer is made up of admission of the facts charged in the bill—admitted shortly, it is true, not spun out to a great length; but each separate fact, each separate act, each separate organization, the acceptance and approval of each act of the legislature is, distinctly admitted by itself. I noticed carefully the reading of the answer, and there appeared to me to be few or no new facts. One, two, or perhaps three of the facts charged by the complainants in the bill, are denied. One, that appeared to me, upon the original reading of the bill, to be important, and does now, was, whether there was a connection between the roads in question and the Pennsylvania Railroad. A large part of the answer is taken, in denying—not a mere simple denial, (which would have been of no avail in such a case,) but denying, (by setting forth the facts,)—the allegation in the bill, that there was no connection, between the Pennsylvania Railroad, the proposed lessee, and the united roads. Another part of the answer denies the fact stated of the

expected income of the roads, under their present manage-
ment and organization. The bill states that they might
make fifteen per cent. under good management, as at present
organized. Another long part of the answer is denying that
fact.

Counsel have not pointed out to me any matter in the
answer, that is new, any matter that changes the case, as
they may be supposed to have come prepared for arguing it.
Counsel, in preparing for arguing a cause like this, do not
come expecting that the defendant will admit everything
that is charged against him. These matters are matters
responsive to the bill. Counsel ought to have come prepared,
upon their being denied, to contest the case, upon a denial
being put in.

In these injunction cases, the remarks of the opening
counsel are very sensible, and addressed to the discretion of
the court, which ought to be exercised in favor of a full
hearing of all parts of the case; and, though I do not see
what the surprise is, though I do not see what, in this
answer, is to change the case, from its position as originally
presented for the allowance of the rule to show cause, I am
willing to accede to so reasonable a request as counsel have
made, for an adjournment over until next Wednesday, that
they may read this answer and consider it; because, although
I have failed to see in it, by the reading, and counsel seem
to have failed to see in it, anything that is new or unexpect-
ed, or that should change the position of the case, (or at
least have not pointed it out to me, therefore, I presume
have not seen it,) it may be that, on a careful perusal of this
answer, counsel may see something different in it. And one
week longer cannot seriously incommode the defendants.
The rule, as it now exists, if I merely adjourn the case, will
prevent the execution or consummation of the lease. It may
be important to the corporations, defendants, if they are to
execute the lease, that it be done soon. If it is so beneficial,
as they set out in their answer, to the stockholders, the
sooner it is done, probably the better, and I am unwilling to

delay them in what they consider—whether I consider it so or not—a matter important to have finished; but I think the week's delay asked by counsel, is not unreasonable. If the time, therefore, will suit the counsel on the other side, or, at least, is not incompatible with their engagements, I will adjourn the cause till next Wednesday.

Owing to the illness of the Chancellor, the case was postponed till the 12th of September, when the argument was had upon the rule to show cause, on the bill, answers, and affidavits annexed thereto.

*Mr. V. L. Bradford,* (of Philadelphia,) for complainants.

I. The companies named as lessors in the proposed lease, severally or collectively, prior to March 17th, 1870, did not possess any franchise or power to make or execute any lease of their canal and railroads, with their appurtenances, and of all their property and interest, real, personal, and mixed, for the purpose and object contemplated in said lease.

II. That said companies do not now possess, nor have they at any time since March 16th, 1870, possessed, severally or collectively, any franchise, privilege, or power to make and execute said lease, or any similar lease.

It is alleged, by the defendants, or some of them, that, on the 17th of March, 1870, the legislature of New Jersey, by an act approved on that day, conferred on said companies a franchise, privilege, or power to make and execute the said lease.

The complainants deny this allegation; because,

1. The title, preamble, and enacting clauses of said act demonstrate that its proposed application to said lease is an entire perversion of it.

It is a safe and reasonable canon of judicial interpretation and construction of a statute, that, if its language and spirit are fully satisfied by a different construction, or on a different hypothesis, than the one contended for, such latter con-

struction is excluded and inadmissible, for, "*expressio unius est exclusio alterius.*"

2. Said act does not authorize or sanction a lease, of the franchises, or of any of the franchises of the United Companies, or either of them, in any way or manner, expressly or by legal implication, to "the Pennsylvania Railroad Company."

That company is not named in said statute; nor, is a lease to "the Pennsylvania Railroad Company," indirectly authorized or sanctioned by the language of said enactment. The *works* of that company are not, "in connection or continuity" with the *works* of "the United Companies of New Jersey." They do not form "continuous and connected lines with the works of the United Companies of New Jersey." The *works* of three distinct and independent corporations—to wit, of "the Trenton Delaware Bridge Company," (partly a New Jersey corporation and partly a Pennsylvania corporation), of "the Philadelphia and Trenton Railroad Company," and of "the Connecting Railway Company," (both Pennsylvania corporations) lie between the works of "the United Companies of New Jersey," and those of "the Pennsylvania Railroad Company," and separate them, by an interval of at least thirty-one miles. How, then, can "the continuity or connection" required by the statute, be said to exist between the works of "the United Companies of New Jersey," and those of "the Pennsylvania Railroad Company," respectively?

Again: the statute refers to railroad companies in the state of New Jersey, "or otherwise." The word "otherwise" is not an adverb of place or situation. It here has not the meaning of the words, "otherwhere," or "elsewhere," which are synonymous words. Lexicographers agree, that no such meaning attaches to the word "otherwise," which signifies "in a different manner," "by other causes," "in other respects." It is used, with such signification, in a subsequent part of the same act. Substitute such correlative renderings, or such significations, of "otherwise," and

they are wholly inapplicable, without meaning, and, in legal parlance, are insensible, here. If so, that word is not to be regarded, as it appears, in this part of the statute. This portion of the statute must be read without it. If the legislature had intended to authorize a lease, between "the United Companies of New Jersey" and a foreign corporation, they should have either expressly named such corporation, or, have used the word "elsewhere," or, the word "otherwhere," in the connection, in which the insensible word, "otherwise," appears. It is not in the rightful power of any court, to supply language not used by the legislature, except where, of logical necessity, such language is implied from the context. To erase the word "otherwise," and substitute the word "elsewhere," or, the word "otherwhere," would be to make law, and not to expound it. To convert the word "otherwise" into the word "otherwhere," or, the word "elsewhere," would simply be, to furnish a new idea, and not a mere verbal correction. No one can contend, that a judicial tribunal can do this and thus legislate. To speak of "companies in New Jersey, or in a different manner," or, "by other causes," or, "in other respects," is not the same as to say, "in New Jersey, or in another state," "elsewhere," or, "otherwhere;" but, such an expression, in such connections, is without meaning, insensible, and to be wholly disregarded in reading and expounding said act.

3. The said act of March 17th, 1870, does not authorize a grant or *transfer*, by lease or otherwise, of *all* the property and estate, real, personal, and mixed, and, of *all* the franchises appurtenant thereto, of the United Canal and Railroad Companies of New Jersey, such as is proposed by the said lease, to any other company, domestic or foreign.

4. The said act of March 17th, 1870, has never been *accepted*, by either of the several corporations sometimes called "the United Canal and Railway Companies," named in the said act as the recipients of the proffered grant of additional or supplemental corporate franchises and powers.

The said act purports, "to enable" the said companies,

and to grant to, confer, and bestow on them, severally and collectively, the additional and supplemental franchises and powers set forth in said act, which they did not, in whole or in part, previously possess. The said act is, therefore, in legal contemplation, a proffered supplement to the several acts of incorporation of the aforementioned respective companies; is, *pro tanto*, a new act of incorporation, *i. e.*, it proffers new and further terms of contract to the said corporation. Said act must, therefore, be clearly, distinctly, and formally *accepted*, before it can form any part or portion of the several charters of the aforementioned respective companies, or bind, as a new, further, and additional contract, either the state, the said several corporations, or their several and respective stockholders. An acceptance of the proposed lease in the manner mentioned in said act, is in no just sense an acceptance of said act by the stockholders of either of the corporations who are named in said act, or in said lease. To validate said act, an *acceptance, by all* the stockholders, in a duly convened corporate meeting of each of the companies whose respective charters are affected by said act, is absolutely indispensable. In reference to a proper acceptance of said act, the mode adopted by the board of directors of the United Companies of New Jersey, to obtain the assent of the stockholders of the several companies, *impliedly* to said act, by the appointment of a committee " to obtain the consent of the stockholders to said lease," and to effect an execution of said lease, is illegal, inequitable, inappropriate, and unconstitutional. The aforementioned action of the said united board is manifestly a breach of trust by trustees, by means of a combination to effect a surrender and extinguishment of their trust, in disregard of the good faith and fidelity which they owe to the people of New Jersey, and to the stockholders and bondholders of the United Companies of New Jersey.

5. The said act of March 17th, 1870, does not authorize said lease, because it is an unconstitutional and void act. It is invalid and unconstitutional; because,

*First.* It authorizes, (where a single stockholder is unwilling to accept it, in the case of such stockholder,) a divestiture of vested rights, "an impairment of the obligations of contracts," and such a change or alteration of private property as is tantamount to "a taking of such private property" "for a private use, and not for a public use."

*Second.* The only provision made, in said act, for compensating the dissatisfied stockholders for the taking of their stock, is, that "its value shall be assessed, as of the time immediately before the taking, but that the assessment thereof shall not be made and compensation paid until *after* the taking."

The Constitution of New Jersey expressly requires, that compensation shall be *first* made. See *Const. N. J., Art. IV,* § 7, *Clause* 9.

*Third.* In requiring the dissatisfied stockholders to give up their shares of stock, and equitable corporate franchises and rights belonging to them, as *cestui que trusts* or beneficiaries of said corporations, (to wit, among others, the right, "of electing directors to manage the business of said railroads and canal, and the right to participate in a division of the net earnings or profits of said business, in the ratio of the stock held by each of them, as evidenced by certificates for said shares of stock,") in order to enable said corporations to carry into execution, any agreement, contract, lease, or other arrangement which they may deem it expedient to make, with any of the other companies mentioned in the first section of said act; the act delegates, or attempts to delegate, to said United Companies, the right to decide (in their own case) what constitutes "a public use," sufficient to "justify the taking of private property," which right can only be exercised by the legislature itself.

*Fourth.* The said canal and feeder, and the said railroads of the said United Companies, with their necessary and proper appendages and appurtenances, respectively, are "public highways," within the state of New Jersey, and it is not competent for the legislature of New Jersey, directly

or indirectly, to assign or transfer, or to authorize an assignment or transfer of the highways, or the control of the highways of New Jersey, to a *foreign* corporation.

III. The lessee named in the proposed lease, " the Pennsylvania Railroad Company," possesses no power or franchise to become lessee in the said lease.

It is a legal presumption, until the contrary is shown, that " the Pennsylvania Railroad Company " possess no power or franchise to become the lessee of all the canal, railroads, franchises, and *other property*, real, personal, and mixed, of the lessors, (corporations of the state of New Jersey,) as mentioned in the said lease, for the reason that the said " Pennsylvania Railroad Company " is a foreign corporation, having its exclusive residence and field of corporate action on the soil of Pennsylvania, and possessed of a corporate life and existence derived, solely, from the commonwealth of Pennsylvania, which, as respects the present question of corporate franchises and property, is as foreign to the sovereignty of New Jersey, as that of any distinct and independent government in christendom. The Pennsylvania Railroad Company is, legally speaking, an artificial person, *inhabitant and citizen* of the commonwealth of Pennsylvania.

The counsel here examined successively, and at length, the different statutes of the state of Pennsylvania, to show that they conferred no power or authority on the Pennsylvania Railroad Company to take the lease.

IV. The said lease, or any such lease, is a violation of the laws and Constitution of New Jersey.

V. The said lease, or any similar lease, will, if executed and carried into effect, be contrary to equity and good conscience, and tend to the manifest wrong and injury of the complainants.

The unconscionable and inequitable features of said lease, are—

1. The rent or dividend of ten per cent. per annum, stipulated for, is a wholly inadequate return or compensation for a transfer of the valuable and highly remunerative works and franchises of the lessors to the lessee. The average of net profits for thirty-eight years, from 1832 to 1870 inclusive, the whole period of the existence of the companies, was twelve and twenty hundredths per cent. per annum. There can be no reasonable moral doubt, that henceforth the companies will be able to earn net profits equivalent, at the least, to fifteen per cent. per annum.

2. The covenant and guarantee of the Pennsylvania Railroad Company to pay a rent equivalent to a dividend of ten per cent. per annum, on the capital stock of the lessors, for nine hundred and ninety-nine years, is not safe or reliable, to the extent of a substitution of said guarantee for the valuable real, personal, and mixed estate of the lessors, transferred to said Pennsylvania Railroad Company by the proposed lease. The said lease violates the good faith of the corporators of the lessors to their mortgage bondholders whose moneys have paid for nearly half the cost of the works of said companies. Those bondholders contracted directly with their obligors, the United Companies, who are stripped by this lease of the means of fulfilling, in a direct and immediate manner, their respective obligations. If the lessee shall, by mismanagement, either wilful or accidental, be unable to protect the obligations of said companies, they and their creditors may be remitted to expensive proceedings in equity, in a foreign jurisdiction, against the lessee, as their immediate remedy. The United Companies and the guaranteed return or quasi rent, will also be liable for any tort committed on their works, or in connection with them, by the lessee, in a common law action. They cannot relieve themselves by such lease from their corporate obligations and liabilities to the public.

3. The proposed lease is one-sided, and affords very little security to the stockholders of the companies, lessors. It is mainly made in the interest of the Pennsylvania Railroad

Company. It is fair in seeming and false in meaning. "It keeps the word of promise to the ear, and breaks it to the hope." To verify these assertions, reference is made to the lease itself, and especially to the complete severance of the works and franchises of " the Philadelphia and Trenton Railroad Company," from the fortunes and interests of its affiliated companies, the United Companies of New Jersey, affected by it. The Philadelphia and Trenton Railroad Company, with its connecting railway, is an essential part of the main trunk line between Philadelphia and New York. So highly has a close association with it been regarded by the New Jersey companies, that they, in the names of trustees, purchased and now own a considerable majority of its stock. Nevertheless, the aforementioned influential stock interest in the Philadelphia and Trenton Railroad, is assigned and transferred, by the proposed lease, to the Pennsylvania Railroad Company, so that the latter company can, next January, elect every director and officer of " the Philadelphia and Trenton Railroad Company," and then, with the consequent consent of said company, can, at no distant day, merge it into their own corporation, as may suit themselves. In that way, if not in some other way, the lease enables the lessee to sever and annul the security afforded by the business, works, and franchises of " the Philadelphia and Trenton Railroad Company," now and heretofore closely connected with those of the United Companies of New Jersey, to the stockholders of all the companies.

4. The proposed lease provides that the lessors "shall furnish, when required, to the lessee, marketable certificates of new stock of the United Companies of New Jersey, to the amount of $2,250,000, and also $3,000,000 of the consolidated first mortgage six per cent. coupon bonds, free of tax, of the said United Companies, to be used by the lessee in making certain stipulated improvements at Harsimus cove, and elsewhere." What is this but watering the stock and increasing the debt of the United Companies of New Jersey ? It is paying for improvements for the almost exclusive use and

advantage of the lessee, without corresponding security to the lessors; because, in case of the bankruptcy of the lessee, but little use can be had or benefit derived to the United Companies in the transaction of their own proper and legal business, from the contemplated large outlay, by the lessee, at "Harsimus cove," even admitting that by a "re-entry," the said United Companies can ever regain possession of the properties leased by them "as of their former estate therein." It ought to have been stipulated in said lease that such expenditure and improvement, with a view of increasing the security of the lessors, (because the usufruct of the lessee is to be for nine hundred and ninety-nine years,) should be made by the lessee at its own proper charge and cost.

5. The proposed lease assigns and transfers to the lessee the absolute possession, control, and disposal of the vast amount of saleable real and personal property of the lessors, which the lessee will have in its power to use and apply, according to its numerous and varied necessities, and at its own option.

6. The alleged remedy of "a re-entry," provided in and by the lease "for covenants broken," affords no security. It is an illusory and ineffectual remedy. It is, indeed, no remedy whatever. There can be no "re-entry" on public franchises and property appurtenant thereto. The canal and railroads of the lessors are "public highways," "rights of way" common to every citizen, on which every citizen has a right of going, and on which there can be no private entry, nor any "re-entry" for covenants broken. The lessors cannot maintain ejectment for their railroads and canal, or for the necessary appurtenances or appendages thereto, which are exempt from taxation, such as stations and depots. They can only have such remedies as are appropriate to their vindication of "a right" to a franchise or to an incorporeal hereditament, such as a "right of way." What remedy can the stockholders of said companies have, other than a bill in equity, against the lessee, in case of a failure to pay the rent stipulated or non-performance of any other

covenant contained in the proposed lease? There is no
such "privity of contract" between individual stockholders
and the lessee as to entitle them to a common law remedy,
such as an action of covenant, debt, or *indebitatus assumpsit*
Their supposed right of "re-entry," and of re-vesting of
their former position, in relation to their canal, railroads'
and business as common carriers, is fallacious, impracticable,
and valueless.

7. The proposed lease for the long term of nine hundred
and ninety-nine years, by legal presumption, is taken out of
and from an interest of greater duration, capable of sustain-
ing a quasi reversion, and must, therefore, rest on the cer-
tain continuance of that larger interest beyond the term of
such lease. If such quasi reversionary interest is dependent
on circumstances, if a continuance of its supporting franchise
is uncertain, or if it may be defeated by a condition, such
lease, together with its annual return, in a quasi rent, to
wit, the guaranteed dividends, will fall with such cessation,
discontinuance, or defeasance, and the lessee, moreover, will
have good cause of action for a disturbance, and a claim for
pecuniary damages against said lessors. Now it is well
known that the state of New Jersey has attached a condition
to its grant of franchise to the United Companies, respect-
ively, viz. that the state may take the works of said com-
panies in 1889, on a just valuation. If the state should so
do, either at the suggestion of the lessee, its successors or
assigns, or of its own motion, in 1889, it may be inquired,
who will have the right to receive, from the state, the pecu-
niary consideration for such assumption? Clearly, so far as
its leaseholders of nine hundred and ninety-nine years (which
may be, practically, regarded as almost equivalent to the
whole interest) is involved, the lessee will be entitled to a
very large compensation for a deprivation of the usufruct;
for a very long period, of a most valuable and remunerative
property. What will be the appraised value, as respects the
stockholders, of a quasi reversionary interest, after the ex-
piration of nine hundred and ninety-nine years? and what

would be the proportion payable to them of the amount to be paid by the state?    What then will become of the quasi security afforded by the usufruct of the leased property, for the payment of the annual dividend of ten per cent., by the said lessee to the said stockholders? and what then will be the right of the stockholders to claim, from the lessee, such dividends, by way of quasi rent or return?

VI. The complainants, by reason of such manifest wrong and injury, are without adequate remedy, other than the protection by the preventive writ of injunction prayed for in the bill, and are, under and by virtue of the Constitution of the United States, the Constitution of the state of New Jersey, and the laws of New Jersey, entitled to the protection afforded by said writ of injunction.

*Mr. Bradford* discussed these propositions in a long and elaborate argument, and cited many authorities in their support.

*Mr. J. P. Stockton,* for defendants.

The bill is bad on account of the omission of necessary parties.

The rule is, that the rights of all persons whose interests are immediately connected with the decision, and affected by it, shall be provided for, as far as they reasonably may be.

The Philadelphia and Trenton Railroad Company, and the Pennsylvania Railroad Company, are both necessary parties.    Their interests are immediately connected with the decision.

The general rule is, that all persons legally or beneficially interested in the subject-matter of a suit should be made parties; or, if the expression be deemed more exact and satisfactory, that all persons interested in the object of the bill are necessary and proper parties.    All the exceptions to the rule are founded upon public convenience and policy, and courts of equity never permit any exception, unless they

can dispose of the merits of the case before them without prejudice to the rights and interests of other persons who are not parties. If complete justice cannot be done without others being made parties, whose rights or interests will be prejudiced by a decree, then the court will altogether stay its proceedings, even though these other parties cannot be brought before the court; for in such cases the court will not, by its endeavor to do justice between the parties before it, risk the doing of positive injustice to other parties not before it whose claims are or may be equally meritorious. *Story's Eq. Pl.*, § 77, and cases cited; *Hallet* v. *Hallet*, 2 *Paige* 15.

The *object* of the bill is shown in the prayer to restrain the parties, that is, the New Jersey companies and their directors, from executing a lease, of which the Philadelphia and Trenton Railroad Company is one of the lessors, and of which the Pennsylvania Railroad Company is the lessee; a lease the three lessors and parties to which are declared by the acts set out in the bill to be identical in interest with the Philadelphia and Trenton Railroad Company.

The *object* of the bill is further " to restrain the consolidation of the capital stocks of the United Companies, and the Pennsylvania Railroad Company; " and this, although the bill sets out the act of the legislature authorizing it, and expressly consolidating it with the Philadelphia and Trenton Railroad Company *by name*. So the act is declared *invalid* for want of acceptance, and *unconstitutional,* and the court is asked to declare this without an effort being made to get the party *the most interested* before the court.

The bill sets out the making of the lease, showing the Philadelphia and Trenton Railroad Company to be one of the four lessors. It recites the resolution of the boards of all four companies *adopting* the lease.

The principle at the foundation of the question of who are necessary parties, is a principle admitted in all courts, upon questions affecting the suitor's person and liberty, as well as his property, namely, that the rights of no man shall be

decided without giving him an opportunity to be heard. *Story's Eq. Pl.*, § 72.

Is it alleged that the parties are out of the jurisdiction of the court, and cannot be reached by process? It is a well known rule, in such a case, that the bill should not only allege that the person is out of the jurisdiction, but it should go on to pray process against him, so that he may be made amenable to the process of the court, should he come within the jurisdiction. One reason for this is, that the absent person may have an opportunity of appearing to the suit and taking such a course in it as he may deem to be for his advantage. *Munoz* v. *De Tastet*, in note to *Brookes* v. *Burt*, 1 *Beav.* 109.

When the party is out of the jurisdiction, it should be positively averred in the bill, and not left to mere inference. *Penfold* v. *Nunn*, 5 *Sim.* 405. There is no such averment in this bill. The general rule is, that to a bill against a partnership, all the partners must be made parties. But if one of the partners be resident in a foreign country, so that he cannot be brought before the court, and *the fact is so charged in the bill*, the court will ordinarily proceed to make a decree against the partners who are within the jurisdiction; with this qualification, however, *that it can be done without manifest injustice to the absent partner*. *Story's Eq. Pl.*, § 78, and cases cited. But the excuse for a non-joinder of parties, that they are out of the jurisdiction, ought not to prevail where important rights of the absent partners are involved. *Vose* v. *Philbrook*, 3 *Story* 347.

The United Companies of New Jersey, and the Philadelphia and Trenton Railroad Company, under the agreements between them, have been held to be partners. They have a community of interest. In the cases arising out of the accident at Burlington, the facts were set out in affidavits showing the relations of the companies to be a partnership, and a case removed to the United States courts on that assumption.

But since the coming in of the answer, this matter is

established beyond doubt. The answer sets out the fact that on the 22d day of April, 1836, an agreement was made between the Delaware and Raritan Canal Company, and the Camden and Amboy Railroad and Transportation Company, of the one part, and the Philadelphia and Trenton Railroad Company, of the other part, by which agreement the said partners did agree, each with the other, that from and after the 1st day of June then next ensuing, during and until the expiration of their said charters, respectively, *the clear profits arising from the stock of said companies should be divided among all the stockholders of the said several companies, share and share alike.*

By the contract itself, it further appears that it is provided therein that the stock of the said companies, respectively, shall be paid up in full, and that the accounts of the said companies *shall be kept separate,* and the dividends of the clear profits thereof shall be made and declared separately in the same manner as if this agreement had not been made.

The company is an independent organization, treated as such in the contract, and so spoken of in the act of 1870, but the community of interest existing will, if the lease should prevent the making of fifteen per cent. dividends, be the same loss to the corporators of the Philadelphia and Trenton Railroad Company, as to those of the three defendant companies. If the securing of ten per cent. for nine hundred and ninety-nine years is a valuable addition to the stock of the defendant companies, it is of precisely the same value to the stock of the Philadelphia and Trenton Railroad Company.

The Philadelphia and Trenton Railroad Company, and "The Joint the Delaware and Raritan Canal, and the Camden and Amboy Railroad and Transportation Companies," as the act of 1870 recites, have *an identity* of interest.

The lease must be executed by them as a separate company. They might be obliged to perform it specifically, if the courts of Pennsylvania were appealed to? If so, would

it be pretended that such a decree would be made in Pennsylvania without making parties of these defendant corporations?

It has been recently held by a distinguished equity judge, Vice-Chancellor Wood, that when a bill was filed by a stockholder, on behalf of himself and all other stockholders, against the chairman, directors, and secretary of a railway company, to restrain them from acting on an agreement dated some years before, and entered into between the company and six other railway companies, for the general regulation and assimilation of the traffic tolls on the several railways, as being *ultra vires*, and to the damage of the company and its members, *that the six other companies ought to have been made parties to the bill. Hare* v. *Northwestern Railway Company*, 3 *Law Times, N. S.*, 289.

See also *Godifroi & Shortt on Railways* 79; *Salomons* v. *Laing*, 12 *Beav.* 377; *Bryson* v. *The Warwick Canal Company*, 4 *De G., M. & G.* 711.

The Philadelphia and Trenton Railroad and the Pennsylvania Railroad Companies, have a recognized existence in the state of New Jersey. They may sue and be sued, and yet that is a power derived only from their charter. 25 *Vermont* 433.

Corporations may legally contract in other states than those which charter them. *Bank of Augusta* v. *Earle*, 13 *Peters* 591; *Story on Confl. of Laws* 37; *United States* v. *Amedy*, 11 *Wheat.* 412; *Beaston* v. *The Farmers' Bank of Delaware*, 12 *Peters* 136; *Angell & Ames on Corp.*, §§ 272, 273; *Daniell's Ch. Pr.* 134; *Nix. Dig.* 173.

They may hold lands in another state. *Dry Dock* v. *Hicks*, 5 *McLean* 111.

But the Philadelphia and Trenton Railroad is within the jurisdiction, and could be served with process. Since the passage of the act of 1870, it is naturalized in New Jersey, and process can be served upon her, as upon all other citizens. It is not pretended otherwise by the bill.

The connecting roads chartered by different states, are

not to one another and the other states as foreigners by the English law. It has even been suggested in the cases, that they are citizens by the Constitution of the United States.

But has the Pennsylvania Railroad Company, to which I have only incidentally alluded, any interest in the object of this suit? Do the facts in the bill show that, even if the bill was in proper form, and averred directly that that company was out of the jurisdiction, it is a case where the court will go on in the absence of a party in interest? Are not important rights of the Pennsylvania Railroad Company involved? Does not the court run great risk of doing injustice, by going on without an effort having been made to get them into court—without putting the case in such a position that they can come in and show their interest? Is it not a case where the court will stop, rather than run the risk of doing injustice?

The *object* of the bill is to prevent the execution of a contract *already made* and directed to be executed by the United Companies in connection with the Philadelphia and Trenton Railroad Company, as lessors of property they aver to be worth $50,000,000. The Pennsylvania Railroad Company are charged to be incapable of receiving it, the act declared not to authorize it, and yet *they* are not made parties, and cannot come in, and show the fact that they have full and ample authority from the state of Pennsylvania, under which they have made similar leases which the courts have approved. In other words, if this court will deny the party most interested the right of appearing and showing the power they have, then a decree may be had, preventing those who contracted with them from executing a contract *already made* by virtue of an act of the legislature of this state. In such a case, a preliminary injunction has never before been granted.

So far from the Pennsylvania Railroad Company not being a necessary party, it would seem as if they are purposely not made defendants, to prevent their coming in and showing their power.

In the case of *Gratz* v. *The Pennsylvania R. Co.*, and *Phila. & Erie R. Co.*, 41 *Penn. St.* 447, where both contracting companies, in a similar case, were made parties, it appeared that the Pennsylvania Railroad Company being about to purchase the rolling-stock and bonds of the Sunbury and Erie Railroad Company, and to lease it for the term of nine hundred and ninety-nine years, a bill in equity was filed by a stockholder for a preliminary injunction against the proposed purchase and lease: Held, " that the intended contracts were valid because within the corporate powers of the two companies under the acts of Assembly of April 13th, 1860, and April 23d, 1861. This is what they are not permitted to show. This is why one of the contracting parties is not made a party to the bill, the object of which is to prevent the execution of an indenture of lease, which, by virtue of an act of the state which has been in force for more than a year, has been adopted and ordered executed by the parties defendant.

Suppose the Pennsylvania Railroad Company, having a perfect right to sue here, should apply to the United States court, or to this court, for a specific performance, and insist, after a vote of two-thirds, that the company be compelled to execute the lease, would the court refuse to consider that that should be done which was agreed to be done by both parties, *and ordered to be done ?*    Yet, for the first time in the history of equity, this court would find itself in a position where they refused to hear the authority and power claimed, and its source, because they proceeded to adjudicate, with the main party in interest no party to the suit. They act without hearing the parties interested.

If these are foreign corporations, which I insist they are not in the sense used in the English books, even by the strict rules that apply to partnerships—omitting the fact that these corporations have duties to the public at large outside of their relations to their stockholders—I insist that the excuse for non-joinder cannot prevail where not only important rights of absent partners are involved, but the

only party interested on one side in the contract executed between lessors and a lessee, and the fulfillment of which it is sought to restrain, is not a party to the bill. *Story's Eq. Pl.,* § 78.

If the Pennsylvania Railroad Company, and the Philadelphia and Trenton Railroad Company are not interested in the *object* of the bill, then neither are these complainants nor the defendants. If they are, the court must stop until proper parties are joined, and the injunction must be dissolved. *Story's Eq. Pl.,* § 77, and cases.

Can it be gravely insisted in a court of equity that after the lease was adopted and ordered to be executed by the officers on the occurrence of a certain event, that after the performance of the condition which made the order absolute, the companies lessors and individual directors can be restrained from fulfilling the contract, when it is clear that the act was within the legitimate exercise of the powers which had been granted, *on the ground that the company lessees have not the power to accept the lease,* without making a party of that company the doubt of whose power is the ground of the relief sought?

Can it be possible for a court to listen to an argument and examine the statutes of Pennsylvania to ascertain whether the Pennsylvania Railroad Company are empowered to lease other railroads, when they are not made parties to the bill, and have not the power to show their authority, and when and where obtained?

In the case of Mott *v.* The Pennsylvania Railroad Company, the powers of the Pennsylvania Railroad Company, under the act of April 13th, 1860, and April 23d, 1861, were construed by the court at the instance of a dissentient stockholder. The decision was in favor of the power of the company. Now suppose, without making parties of them in this case, the prayer of the bill was granted because the court here took a narrower view of the powers conferred by that act, are you not doing great injustice to the absent? Ought they not to be permitted to show how their courts

had interpreted their acts? You cannot rely upon the defendant companies doing it. They may regret the act they have done. They may be willing to have the contract declared void for want of power to make such a contract on the part of the Pennsylvania Railroad Company. It will not do to leave the Pennsylvania Railroad Company's interest to the mercy of those with whom they are treating for peace.

This is not only a preliminary question, but it is a fundamental question, which should control the whole argument and the extent of the examination which the court will permit in this case.

By not making the Pennsylvania Railroad Company parties, complainants are estopped from denying their power. If it appears that defendants are acting within the scope of their authority, if the acts complained of are no violation of their organic law, the dissentient stockholder has no place in court, no right to examine into the wisdom of the exercise of the discretion vested in the directors and controlled by a majority in interest of the corporators. There is no charge of fraud in the bill; nothing to justify this court in undertaking to review the wisdom of the management of a corporation, whether they should make three or four per cent. dividend. Nor have the court any power whatever to ask whether a foreign corporation with which they have contracted is *ultra vires* in making that contract, or whether it is not. They and their powers, by the act of complainants, are placed outside of your jurisdiction.

The Pennsylvania Railroad Company are not here, and if defendants have the power and have exercised it, the case is at an end. I insist that if the court does permit this case to proceed, the examination is necessarily limited entirely to the question of whether the corporations defendant have exceeded *their* powers in ordering the contract to be executed. Before reaching this question, however, the court will stop if it finds the slightest cause for believing that complainants acquiesced. If it appears that they had knowledge of what was contemplated, and waited until the corporation had

acted before seeking the aid of this court, the corporation cannot be enjoined at the prayer of complainants.

The individual cannot be enjoined, because all that remains to be done is to affix the seal, which is done by the president, in whose custody the law considers it; but the order of the board, by virtue of which it validates and executes the lease, is already made. There is no prayer to enjoin the president from affixing the seal when two-thirds of the stockholders have approved of the contract. It is his duty to do it, even though an injunction rested on the individuals composing the boards of directors of the three defendant companies. An injunction against the corporation may prevent any agent from doing any further act in the matter, but this simply proves that the prayer is too late as against the corporation, as they have exhausted their power and finished their work, leaving nothing but the simple act of obedience of an officer to the order of the board to be enjoined.

Had the lessors power to make the lease set out in the bill?

I claim that they had ample power under the act of 1870. That they had ample power, and it was their duty to do it, without any special enactment, if in their discretion it would enable them better to perform their duties to the public and render more valuable the interest of the stockholders.

To enable it to answer the purpose of its creation, every corporation aggregate has incidentally, at *common law*, a right to take, hold, and transmit property, and may dispose of any interest in the same, having the same power in this respect as an individual. Thus it may *lease*, grant in fee or tail, or for a term of lives, mortgage, and, though insolvent, assign in trust for the payment of debts. *A. & A. on Corp., ch. V*, §§ 145, 191; *Featherstonhaugh* v. *Lee Moor Porcelain Co., Law Rep.*, 1 *Eq.* 318; *Parish* v. *Wheeler*, 22 *N. Y.* 494; *Pennock* v. *Coe*, 23 *How.* 117.

There can be no doubt, the general principle of the majority to control the minority, in all the operations of the

company, within the legitimate range of its organic law, is implied in the very fact of its creation, whether expressly conferred or not. It is incident to every business corporation to obtain such extension and enlargement of its corporate powers as the course of trade and enterprise and altered circumstances shall render necessary or desirable, not altogether inconsistent with its original creation. 1 *Redf. on Railw.*, pages 72, 73, § 20, *Clauses* 3 *and* 8; *Louis., Cin. & Charleston R.* v. *Letson,* 2 *How.* 497; *Ware* v. *The Grand Junction Water Works,* 1 *Russ. & My.* 470.

Hence, it is held that a court of equity will not, at the instance of a shareholder, restrain a joint stock incorporated company, whose acts of incorporation prescribe its constitution and objects, from applying in its corporate capacity to Parliament, and from using its corporate seal and resources to obtain the sanction of the legislature to the remodeling of its constitution, or to a material extension and alteration of its objects and powers. 1 *Redf.* 74, § 9.

There was a time when the tendency of the courts was otherwise, and some few cases were decided which held the principle that the directors, and the majority of the company, may be restrained from employing money subscribed for one purpose for another, however advantageous; but the distinction in these cases, which exist between partnerships and joint-stock companies, unincorporated and unconnected with public duties, and those which had duties to the public constantly increasing, was entirely lost sight of. The duty imposed by the act of incorporation, under actual circumstances, and the demands of increased traffic, drives the corporation to demand increased powers, enlarged capital, new connections and agents, not contemplated in the original act. *Stevens* v. *The South Devon. Railw. Co.,* 13 *Beav.* 48; 1 *Redf. on Railw.* 75.

In the case of *Mott* v. *The Penn. R. Co.,* 30 *Penn. St.* 23, the brief of Cuyler, St. George Campbell and Stanton, states that no case can be found either in England or in this country, of a preliminary injunction being granted for re-

straining a corporation from performing an act expressly authorized by legislative authority. This view was sustained by the court. It was held that a dissenting stockholder of the Pennsylvania Railroad Company cannot have a preliminary injunction to prevent the company from becoming the purchasers under the authority of the act; his rights could only be determined on final hearing.

Could these companies, at the instance of the owner of one share of stock, continue to run a horse railroad from Camden to Amboy, against the will of the legislature, and the majority of the stockholders?

While the wants of the community advanced, while new arteries of trade opened in every direction around, New Jersey, against the will of the legislature, against the demands of access to the national capital, could she stand at gaze, like Joshua's moon on Ajalon? This can't be law, because law is common sense.

The charters of two of these companies, the Camden and Amboy Railroad and Transportation Company, and the Delaware and Raritan Canal Company, with all the subsequent acts to that time, underwent a searching examination in the Delaware Bay Railroad case.

As the grant secured to the companies the exclusive right between the cities, a question arose as to the meaning of the word "between;" whether it embraced local business which did not go through. Chancellor Green, in a very able opinion, examined the subject, and that opinion declares what the *undertaking* was and is. That opinion was confirmed by a unanimous vote of the Court of Appeals. The only two judges who dissented, if I am right in my recollection, did so on points of practice as to how far our relief should go, the Court of Appeals going further than the Chancellor.

In this opinion, the Chancellor said : " The contract is founded upon a valuable consideration, paid by the companies. It was made as an inducement to private enterprise and

private capital, to construct an important highway required for public travel and the convenience of commerce, and which *it was incumbent upon the state in its sovereign capacity to provide,* either directly by its own means or through the agency of others."

Now, is it reasonable, can it be law, that as the public demands increased, as it became necessary to expend vast amounts of money to do the business which the public wants demanded, that while men talked of moving the national capital, because proper and continuous means of access across New Jersey were said to have been denied; while Congress maintained the right to break down all state rights, and ignore their boundaries, to force roads across the states for continuous communication, on account of its paramount necessity; that while it is a fact that cannot be denied that the existence of the nation was preserved, and its political unity secured, by bands of continuous iron rails, reaching from the Pacific to the Atlantic; that the law all the time was, and is now, that one stockholder could have defied the whole National Government, the state legislature, the public wants, the safety of the people, the supreme law? One share of stock could do all this, notwithstanding the fact that the charter authorized the Camden and Amboy Railroad Company " to exercise all the rights, powers, and privileges pertaining to corporate bodies, *and necessary to perfect an expeditious and complete line of communication from Philadelphia to New York, and to carry the object of this act into effect.*"

The case of Kean *v.* Johnston, was decided entirely on the construction of the act taken by the Master, he holding *that the act itself, in terms, required every stockholder to assent.* It is also a case of amalgamation, and so cited by Mr. Redfield on his work on Railways. Or rather, it was a case of entire dissolution, and embarkation in a new business, and so treated by the Master. I think I ought further to add that the case was settled by the parties, after an appeal to the Court of Appeals, and has no further weight as

authority than the opinion, at that time, with the lights that then shone round him, of an able and eminent jurist.

But the application of legal principles which do not change, to the ever new and changing circumstances that follow railways, is of much difficulty, and cases are decided differently in the different states and England; and courts never hesitate to correct a mistake in the dicta of the court or the application of the law, as soon as subsequent cases or new events show the error. In the early days of railway cases in this state, it was held by our Supreme Court, that if a cow trespassed upon the track the company should pay its value. The law now holds the owner very properly responsible for his negligence, in endangering the lives of passengers, and causing great loss of property.

In *Zabriskie* v. *The Hackensack and New York Railroad Company*, 3 C. E. Green 178, corporators and private partners, are treated as precisely in the same position. On page 184, the Chancellor says the doctrine of Natusch v. Irving was adopted in New York by Chancellor Kent, in the case of *Livingstone* v. *Lynch*, 4 Johnson's Ch. 573, and in this state by the decision of Parker, Master, in *Kean* v. *Johnston*, 1 Stockton 401, losing sight of the distinction made in Mott v. The Pennsylvania Railroad Company, altogether. This case, however, was put on the ground that *it was a new and different enterprise*, and not within the power of the legislature to so alter the charter under the power to alter or repeal at pleasure. " The question here is, can this company, either with or without the consent of a majority in interest of its stockholders, compel the complainant to embark capital subscribed for the first enterprise in this new one, *entirely different?*" The Chancellor moreover adds, on page 193 : " The company is authorized to construct another road; it is not compelled to do it. If it build it, or if it does not, its old charter remains, with all its franchises and privileges intact, and no new burdens, except so far as it assumes them. This is in no sense of the word an alteration of the charter. It would be as absurd

as to say, that an owner had altered his house who had built a larger one on an adjoining lot."

Now, the act of 1870 is in no sense an alteration of the charter. It is a grant of a privilege the legislature have a right to grant. It is no new burden on the company; it only confers a privilege, which they may exercise or not, as they choose. If the exercise of that privilege violates the law of corporations, that is, the contract between the stockholders, it cannot be done without the consent of all the shareholders.

The necessary changes in the management of business, to keep the business from being diverted from New Jersey, was the duty of the corporation to the stockholders, and to the state, and they had a right, and it was their duty, to apply to the legislature for increased powers, and this has been constantly done, until the capital has increased from one million to thirty-five millions. In addition, by and with the consent of the corporation, alterations have been made in the charter of a fundamental character, rendered necessary by the increased demands of the public.

These companies have made contracts and running arrangements for years, with agents in and outside of the state, which were necessary to make connections and satisfy the just demands of the public wants. They have their arrangements now with the Philadelphia and Wilmington Railroad Company, the Baltimore and Ohio, and Pennsylvania Railroad Company. In one sense this may be called *ultra vires*. It was only contemplated at the time that the city of Camden and the wharf at Amboy should be united; and selling through tickets to New Orleans and California was never dreamed of. These things not being illegal—not being prohibited—are to be considered a part of the original grant; they are the result of the exercise of the discretion of the directors, who represent the majority of stock, and as long as that is honest and does not violate the law, a court of equity will not interfere with it.

It is not *ultra vires*, because it is an exercise of a power,

made necessary by a change of circumstances, to carry out the very object of the original charter. What would be *ultra vires* in this case, would be to fail in their duty to the public, to the state, and the stockholders, by letting the march of improvement pass them by, or annihilate them. And this subject is confided to the discretion of the directors, and not to the court. *Hodges on Railways*, 57, 58, 59.

The rule is, that the court will not interfere in matters which are properly the subject of internal regulation. See *Kerr on Injunctions*, 565; *Foss* v. *Harbottle*, 2 *Hare* 461; *Gregory* v. *Patchett*, 33 *Beav.* 595; *Charlton* v. *Newcastle*, 5 *Jurist, N. S.*, 109; *Godifroi & Shortt on Railways*, 72, 73, 74.

The suggestion that a stockholder has a right to hold the whole body, in spite of the direct power given by the legislature, to employing the funds to no purpose but that contemplated by the original corporators at the time of the first charter, as applied in some of the cases, is not applicable to public companies, or private companies with public duties. The attempt to apply it has already reduced the proposition to an absurdity.

Is the right derivative, or is it only the injured stockholder who has it? Then, are we to examine the date that each shareholder bought his stock, to ascertain what contract he had a right to insist upon? As one of the material alterations of the management of these companies has been the repeated issue of new stock, it is true, that if that class of power, when authorized by law, with the consent of the majority, is to be considered *ultra vires*, any stockholder could have kept the capital at the original sum of one million of dollars, and the corporation could have defied any improvement whatever in transit across this state. The whole matter controlled by one obstinate man with one share of stock. In fact, the constant re-iteration in the bill that all the alterations became law by *acquiescence*, is a necessity, as they state themselves out of court by admitting that any of

the acts of the legislature were valid.   And yet, whoever heard of the allegation of the performance of anything more than the condition precedent?   In other words, the bill takes the position, and the draftsman found it necessary that every change from the original charter was made by "*acquiescence.*"   The connection with the New Jersey Railroad Company; building the Trenton branch; the marriage act; the building the Belvidere and Flemington roads; the consolidation with the New Jersey road; in some cases an alteration of the charter so fundamental that the assent of the corporation had to be filed; these are all *ultra vires.* And again, interfering with the relations of stockholders, to such an extent that the assent of a majority, or two-thirds, as the case may be, was required, as in the act to validate and confirm the consolidation with the New Jersey Railroad Company when a joint-stock was made.   And at other times, conferring privileges which do not alter the relation, but which simply permit the company to exercise their discretion, with enlarged power to meet the public demands. All these are law only by acquiescence, and the legislature have been for more than forty years passing acts which were invalid—which did not become law by virtue of their own power, but by the laches of those interested.

None of the complainants are shown to be original stockholders in the Camden and Amboy Railroad, or Delaware and Raritan Canal.

None of the complainants were stockholders in the original undertaking of "perfecting an expeditious and complete line of communication from Philadelphia to New York." What are they doing here, asking to hold the majority to a contract to which they were no party—*an undertaking in which they never embarked?*   If the right is derivative, at least the persons who were the original shareholders should have been named, and if they were not the party complainant, the assignment should have been set out so that it would appear on the face of the bill that complainants received their stock in accordance with law and the rules of the com-

pany. Their title to sue as shareholders and hold the majority to a particular undertaking is not set forth at all. And by the affidavits it absolutely is made to appear affirmatively, that the title they have, good or bad, is of a different character and occurred at different dates, while nearly all the stock owned by them may be, and probably is, new stock, created since the most important changes in the organic law of the companies. Yet it appears that John Black was a subscriber to the capital stock of the New Jersey Railroad Company. See 1 *Daniell's Ch. Pr.* 195; 1 *M. & K.* 61; *Sayer* v. *Wagstaff*, 2 *Y. & Coll., Chan.* 230; *Ryan* v. *Anderson*, 3 *Madd.* 174.

They have no standing in court as dissentients to the charge of an original undertaking. The bill is demurrable on this ground, and, in addition, it would seem as if they made the bill multifarious, as though there was a mis-joinder as well as a non-joinder. They claim different and inconsistent equities. They claim no common interest, but claim to hold the majority to different and inconsistent contracts. *Van Sandau* v. *Moore,* 1 *Russell* 441; *Kean* v. *Johnston,* 1 *Stockt.* 414.

The English courts have in some instances, indeed, restrained railway companies from carrying contracts of leasing into effect without the authority of the legislature.

But such contracts being legal, and *not inconsistent with* the policy of the acts of Parliament, are to have a reasonable construction; and where, by the creating of new companies and other facilities, the business is very largely increased, the parties are still to abide by the fair construction of the original contract, *as applicable to the altered circumstances.* *East Lancashire R.* v. *The L. and Y. R.,* 25 *E. L. & Eq.* 465; *Kerr on Inj., (Eng. ed.,* 1867) 560, title " *Leases and Working Arrangements.*"

In Kean v. Johnston the Master says, (page 410,): " In *Ware* v. *The Grand Junction Water Company,* 1 *Russell & Mylne* 461, Lord Brougham, on the application of a single shareholder, restrained the corporation from embark-

ing their funds and credit in getting water by aqueduct from another river instead of the Thames, as originally contemplated. In Cardiff v. the Manchester and Bolton Canal, a corporation, on the application of a stockholder, was restrained from applying to Parliament for a change in their charter to enable them to convert a portion of their canal into a railway." Now, contrast this with the summary of the law in England to-day, as laid down by Mr. Redfield,—*Redfield on Railways, page* 592, *ch.* 22, § 1, *cl.* 6 : "There is no doubt of the right of a railway in England to apply to the legislature for enlarged powers, even for the power to become amalgamated with other companies, so as to make one consolidated company. And contracts between the different companies for this purpose, have been there recognized and enforced in courts of equity." Citing *Mozly* v. *Alston,* 1 *Phillips* 790, where Lord Cottenham said : "There is scarce a railway in the kingdom that does not come to Parliament for extension of powers."

"And there seems," says Mr. Redfield, continuing, "to be no question made in the English courts of the power of Parliament to extend the line of a railway or to consolidate existing companies, *and the shareholders are bound by the acceptance of such legislative provisions by a majority of the company,* as by contracts to procure such powers by act of Parliament." *Great West. R.* v. *The Birm. and Oxford Junc. R.,* 5 *Railway Cas.* 184, 241; *Stevens* v. *The South Devon R.,* 2 *E. Law & Eq.* 138; *Great West. R.* v. *Rushout,* 10 *E. Law & Eq.* 72; *Lauman* v. *The Penn. R. R. Co.,* 30 *Penn.* 42; *Godifroi & Shortt on Railways,* 82 and cases, and 72; *Hodges on Railways* (*4th ed.*) 71.

The Chancellor, in *Zabriskie* v. *The Hackensack Railroad Company,* 3 *C. E. Green* 189, says : "In New York a different rule has been established, and it is held, that the power to alter will authorize the company, by consent of the legislature, to extend its enterprise without the consent of stockholders." He cites a large number of New York cases to that effect, and adds, that the Supreme Court of Massa-

chusetts, in *Durfee* v. *The Old Colony Railroad*, 5 *Allen* 230, had followed the New York rule. He also cites *Banet* v. *Alton and Sanga. R. Co.*, 13 *Ill.* 504; *The Pacific R. Co.* v. *Renshaw*, 18 *Missouri* 210; *The Pacific R. Co.* v. *Hughes*, 22 *Missouri* 291; to the effect that a majority of the stockholders, by the authority of the legislature, may make a change, provided it is not a great nor a radical one.

The Chancellor insists that the principle of these cases is wrong; that if the majority of the stockholders and the legislature can change the *object* of the enterprise in small things, there is no principle of law by which they can be restrained in any a little larger. This may be entirely true; but the distinction we make is recognized in all the cases and authorities between a change of *object*, and a change of power and means to continue the same *object* which became necessary by increased demands. It is not necessary for us to hold that a banking company can abandon its business and make a railroad company of itself.

I recollect a case of deviation, in 9 *Harris*, where it was said that the deviation of a quarter of a mile for a forbidden or unauthorized purpose was illegal, but a deviation of ten miles from a proper necessity was justifiable. Now, in the case now before us, it is admitted that the *object* is the same; the *means* only are altered to suit altered circumstances.

Now, suppose the Chancellor is right, the new cases and new light since the decision, have drawn the line clearly. An entire alteration, creating $50,000,000 of stock where there was only $3,000,000, is legal by authority of the legislature and a majority of the stockholders, provided it be needed by the increased public necessity to do the same character of business; the changes of channels and circumstances made by the rapid growth of the country and the exercise of a wise foresight as to the rivalry in their business being duly considered. Mr. Redfield, on page 199, treating of the fundamental alteration of charter, says: " And an alteration in the charter which consists only in the increase

of the corporate powers, *as of a different organization of the corporate body,* leaving it with lawful power to execute what may be regarded as *substantially* the original object of its creation, will not exonerate subscribers to the original stock of the company." *Pacific Railway* v. *Hughes*, 22 *Mo.* 291; *Peoria & Oquawka R.* v. *Elting*, 17 *Ill. R.* 429.

It appears, then, that an alteration which leaves with the corporation lawful power to execute *substantially the original object of its creation,* is legal. 2 *Stockt.* 174.

Let us then pause before examining the cases further, and understand precisely what was the *original object of the undertaking* in this case. There is not much difference of opinion in the cases as to the law, but the difficulty arises on its application. What are *incidental* powers, is a new question in each case. What was the object of the creation is a question, also, for each case.

Fortunately for us in this case, we do not have to ask the court to decide the objects of our creation from *the words of our act of incorporation and subsequent alterations.* Clear as that object is in all of the legislation of the state, yet I claim that we are past the point when that question can be made in New Jersey. The Court of Appeals, by a unanimous vote, confirmed the construction given by Chancellor Green to the acts defining the objects of the creation of this defendant corporation. 1 *C. E. Green* 362; 3 *Ibid.* 546.

The exclusive privileges have, indeed, expired by the limitation of time; but that cannot affect the application of the opinions of the Chancellor and the Court of Appeals as to what was our *undertaking.* They protected it, and when the franchise was attacked, they *defined its extent,* in order to protect it to that extent only. We now *know* the *object* of the creation of this corporation, and no man can gainsay it.

*Everhart* v. *The Westchester & Philadelphia R. Co.,* 28 *Penn.* 339; *Sparrow* v. *Evansville & Crawfordsville R. Co.,* 7 *Porter (Ind.)* 369; *Sprague* v. *Illinois River Railroad,* 19 *Ill.* 174; *Joy* v. *Jackson,* 11 *Mich.* 175.

In *Bissell* v. *Mich. So. R.*, 22 *N. Y.* 258, the English cases were reviewed, coming down to the case in the House of Lords, of *Eastern Counties R. Co.* v. *Hawkes*, 5 *H. L. Cas.* 331, then the last authority on the question. Since then this question has been the subject of an adjudication in the House of Lords.

The views of Judge Comstock, in Bissell *v.* The Michigan Southern Railroad Company, have been established in England. The head note of this decision in the House of Lords, reads as follows : " That the contract was not *ultra vires* of the directors in the sense of being *prohibited* by the legislature, and was therefore a legal contract, binding on the company." 39 *Law Jour. Ex.* 217.

In the case of Taylor *v.* Chichester and Midhurst Railway, the company agreed to pay the plaintiff £4000 for land, which they proposed to take for an extension of their road, and for personal compensation. They adopted another line for their road, and did not require his land. He sued on the agreement, and the defence was *ultra vires.* In the Court of Exchequer, in 1866, 4 *Hurlst. & Colt.* 409, the contract was held to be binding on the defendant, and judgment was given for the plaintiff. On appeal to the Exchequer Chamber, in 1867, 2 *L. R. Ex.* 356, this decision was reversed by the majority of the judges, on the ground that the covenant required a misappropriation of defendant's funds, and was *ultra vires* in the sense that the legislature intended that such a contract should not be made, and that the company was therefore not bound by it. Willis and Blackburn, the dissenting judges, held that the contract was not *expressly, or by necessary implication, prohibited,* and that the company was, therefore, bound. They followed the case of Eastern Counties Railway *v.* Hawkes, relied on by the Chief Justice in Bissell *v.* Michigan Southern Railroad Company, and held, further, that " a company incorporated by statute is entitled to make all contracts connected with the purpose of its incorporation not expressly, or by necessary implication, prohibited. All such contracts are

*prima facie* valid, and it lies upon a company seeking to repudiate a contract, to show that it is prohibited; not upon the opposite party to show that it is authorized."

The opinions of these judges, pp. 375, 393, present a full review of the cases, and are now upheld as the law.

The reversal of the judgment of the Exchequer Chamber by the House of Lords, in 1870, is found in 39 *Law Jour. Ex.* 217; *L. R.* 4, *Ho. L. Cas.* 628.

Lord Westbury, who followed the Lord Chancellor, said, on page 226: "It would stop all railway companies in all their transactions; for there is not a company, I suppose, that has not, in the course of time, added some new undertaking to the old one."

A contract is *ultra vires* only when from the express provision, or necessary inference, the act of incorporation prohibits it. *South Yorkshire Co.* v. *Great Northern R. Co.*, 9 *Exch.* 55, 84; *Mayor of Norwich* v. *Norfolk Railw. Company*, 4 *Ell. & Bl.* 397; 30 *E. Law & Eq.* 120; 24 *Law Journal, N. S., Q. B.* 105.

See the opinion of Lord Wensleydale, in the Scottish Northeastern Railway against Stewart. 3 *McQueen* 382, 215; *Godifroi & Shortt on Railw.* 81, 72; *Gregory* v. *Patchett*, 33 *Beav.* 595; *Charlton* v. *Newcastle & Carlisle Railw. Co.*, 5 *Jurist, N. S.*, 1096; Ex parte *The Peru Iron Co.*, 7 *Cowen* 540; *Kerr on Inj.* 569.

The law as laid down in England before the recent cases, covers the defendant's course entirely. In 1867 they *carefully distinguish* between the cases where the contract fell properly within *the object of the company. Kerr on Inj.* 564 and cases; *A. & A. on Corp.* 162.

Where a lease was made by express authority conferred by statute: Held, that the directors of both roads were bound, as were the majority of the stockholders in both, to conduct and administer the roads according to its terms, and their liability to the stockholders of each road the same as though they had been united by act of the legislature upon

the same terms and conditions as those contained in the lease.  43 *N. H.* 515.

In cases where it has been held that a railroad company cannot, by leasing its corporate property and franchises, relieve itself from liability to the public for injuries sustained and damages resulting from breach of contract or duty by the lessee, an immense mass of authority sustains the leases incidentally, and manifests the absurdity of the position taken in the bill, " that the lease would be a virtual dissolution or extinguishment of the said United Companies." *Ohio & Mississipi R. Co.* v. *Dunbar,* 20 *Ill.* 623; *Langly* v. *Boston & Maine R. Co.,* 10 *Gray* 103; *McCluer* v. *Manchester & Lawrence R. Co.,* 13 *Gray* 124; *Ingersoll* v. *Stockbridge & Pittsfield R. Co.,* 8 *Allen* 438; *Wyman* v. *The Penobscot & Kennebec R. Co.,* 46 *Me.* 162; *Stearns* v. *The Atlantic & St. Lawrence R. Co., Ibid.* 95; *Whitney* v. *The Same,* 44 *Ibid.* 362; 1 *Redf. on Rail.* 590, § 142, *clause* 3, and cases in the note.

In the *York R. Co.* v. *Winans,* 17 *How.* 30, it was held by the Supreme Court of the United States, that a railroad company organized under a charter from Pennsylvania, is responsible for the infraction of a patent right respecting cars, although the entire capital stock of the company was held by a connecting company in Maryland, which latter company also. worked the road by the instrumentality of its agents and motive power and cars.   That the obligation to the community which the Pennsylvania railroad was placed under by its charter, cannot be evaded by any transfer of its rights and powers to another company.   Justice Campbell, in delivering the opinion of the court, said : " Important franchises were conferred upon the corporation to enable it to provide the facilities to communication and intercourse required for the public convenience.   Corporate management and control over these were prescribed, and complete responsibility for their insufficiency provided, as a remuneration to the community for the grant.   The corporation cannot absolve itself from the performance of its obli-

gations without the consent of the legislature." Citing *Beman* v. *Rufford*, 1 *Sim.*, *N. S.*, 550; *Winch* v. *The B. & L. R. Co.*, 13 *L. & E.* 506.

The lessee of a railroad is an agent of the corporation under the general railroad act of Vermont, making such corporations *and their agents* liable for damages occasioned by want of fences and cattle guards. *Clement* v. *Canfield*, 28 *Vt.* 302.

As the act of 1870 has been in force more than a year, and the bill sets out that the contract was adopted by the corporation, it seems as if the discontented stockholders have acquiesced, that is, taken no step until the contract was completed, and, under the English ruling, the United Companies could be compelled to execute the lease.

If so, the right to interfere by way of injunction on the part of the stockholders, now for the first time coming into court, is lost by acquiescence. 1 *Redfield on Railways*, p. 74, § 20, *clauses* 11 *and* 12; *Graham* v. *Birkenhead, &c., Railway Co.*, 6 *E. L. & Eq.* 132; *Beman* v. *Rufford, Ibid.* 106.

Lord Cranworth said: " This court will not allow any of the shareholders to say that they are not interested in preventing the law of their company from being violated." *Ffooks* v. *London & S. W. R.*, 19 *E. L. & Eq.* 7.

See *Chapman* v. *The Mad River R.*, 6 *Ohio St.* 119; *Godifroi & Shortt on Railways*, p. 87. See 2 *Redf. on Rail.*, p. 356 ,*clause* 3, as to how slight a matter in such cases is considered acquiescence. *Kerr on Injunc.* 202.

Mere objection, or protest, or threat to take legal proceedings, is not sufficient to exclude the consequence of laches or acquiescence. *Birmingham Canal Co.* v. *Lloyd*, 18 *Vesey* 15. *Kerr on Inj.* 203, and cases cited.

If one neglects to apply as soon as he is acquainted with the matter, he cannot have an injunction. *Hodges on Railways* (4th ed.), *page* 62, and cases cited; *Attorney-Gen.* v. *Briggs*, 1 *Jur.*, *N. S.*, 1084.

As the injury to a company in being stayed is great in

proportion to the magnitude of their operations, the court will, in general, hold even slight acquiescence as a bar to relief. *Kerr on Inj.* 202; *Greenhalgh* v. *Manch. & Birm. R. Co.*, 3 *M. & Cr.* 784; 3 *Railw. Cas.* 120.

But this matter of acquiescence rests upon another principle of which nothing has yet been said. It is beyond dispute, that the acquiescence of an agent is binding on the principal, within the scope of his authority. The company being authorized by the act of 1870, as well as by their common law power, to exercise their discretion in reference to the employment of agents and the management of the road, they leased the road as the agents of the stockholders.

Their acquiescence was the acquiescence of every stockholder, subject to the condition of obtaining the requisite two-thirds in interest. Each stockholder can vote as he pleases; but when the condition is fulfilled, which is alleged in the answer, the stockholders are taken to have acquiesced through their agents, whom they appointed for such purposes at their last annual election. *Kerr on Inj.* 202.

From the foregoing examination of the authorities, it seems to be clear:

1. That the majority can control the minority in a corporation, in all the operations of the company within the range of its organic law.

2. That the modern doctrine is, that the legislature may extend the lines of a railway, and consolidate companies, and the shareholders are bound by the acceptance of a majority. That it is incident to every corporation to obtain such extension and enlargement of its corporate powers as the course of trade and enterprise, and altered circumstances, shall render necessary or · desirable, not altogether inconsistent with its original creation.

3. That the leasing of one road by another to carry on the business for which it is chartered, authorized by the legislature, and approved by the majority of stockholders, is

valid, and that contracts to that effect will be enforced in equity; the lessees being simply the agents of the lessors.

4. That the want of express power in the charter does not make it illegal to make a contract connected with the purpose of the corporation not expressly, or by necessary implication, prohibited, and that such contracts will be enforced in equity.

5. That in cases where a single stockholder might object, if he waits until the corporation have concluded their contract with a third party, knowing of the negotiation and the passage of an act to authorize it, his right to object is lost by acquiescence, and the act is valid. If the act is within the scope of the authority of the agent, the silent principal acquiesces.

6. That the policy of the state and the uniform custom toward these companies and others, acquiesced in for nearly forty years by the stockholders, from the marriage act to the consolidation with the New Jersey Railroad Company, is an acquiescence which deprives a single stockholder from objecting to a smaller alteration, which is a matter confided to the discretion of the directors, and authorized by legislative authority.

Let us now examine briefly, taking the case as stated in the bill, what is the contract adopted and ordered to be executed, and what is the authority for it?

If it be not a fundamental change in the organic law changing the object of the association, although not specially authorized by an act of the legislature, it is valid, and an injunction should not issue under any ruling of any court heretofore made in this state or elsewhere.

But the authority for this contract is an act of the legislature set out in the bill passed in 1870. It is entitled "An act to enable the United Railway and Canal Companies to consolidate their stock, and to consolidate or connect with other companies." It recites in the preamble: "Whereas,

the Delaware and Raritan Canal Company, the Camden and Amboy Railroad and Transportation Company, and the New Jersey Railroad and Transportation Company, sometimes called the United Companies, and the United Railway and Canal Companies, are identified in interest, *and have also an identity of interest* with the Philadelphia and Trenton Railroad Company and other companies; therefore."

Now, this preamble acknowledges the valid completion of the consolidation with the New Jersey Railroad by the lease and subsequent act to validate the agreement. It further, in continuation thereof, acknowledges that thereby there is *an identity of interest* with the Philadelphia and Trenton Railroad Company. It confirms the ratification of these consolidations when two thirds in interest approve it.

It then declares it lawful, by the same vote, to consolidate with the Philadelphia and Trenton Railroad Company, which is alleged, in the bill, to be a corporation outside of the state, (and is not a party to the bill,) "and with any other railroad company in the state, or *otherwise*, with whom they may be identified in interest, or whose works shall form, with their own, continuous or connected lines, or to make such other arrangements for connection or consolidation of business with any such company or companies by agreement, contract, lease, or otherwise."

That the word "otherwise" after the words "in this state or" referred to the antecedent "state," and meant *in this state or not in this state*, cannot be disputed, either from the grammatical construction of the sentence, that being its nearest antecedent, or from the context. That a *foreign* corporation was intended to be consolidated or leased, and one with whom they are connected and have continuous lines, is plain, because that is the case with the Philadelphia and Trenton Railroad, who are mentioned by name.

The apparent denial of the fact in the bill, that the Pennsylvania Railroad Company does not form a continuous and connecting line, arises from the persons who verified the bill swearing to the conclusions of law that the draftsman of the

bill inserted. Separating the Philadelphia and Trenton Railroad, which was consolidated by this act, and over which connecting lines had been run for twenty years, from the link, because it is called a foreign corporation and not made a party to the bill, it may be true. As a fact it is not true. The answer sets forth fully all the contracts and various arrangements by which they are shown to be continuous and connecting lines, in every sense, both as to the roads and the business regulations. But this act proceeds to require "that if any stockholder or stockholders shall be dissatisfied, the said company shall pay to such stockholder the full value of his or her stock immediately prior to such consolidation or lease," and provides the means of ascertaining its value.

It is objected in the bill that the Constitution of the state requires that compensation shall be "*first made*" before the taking, and that although the assessment is made before the taking, compensation is paid afterwards.

This is not in fact true. In the first place the property is not taken at all but remains still under the control and management of the trustees, who manage their business agents. It was recently decided in New York that a railroad company who had a lease on real property which had not expired could proceed and condemn the property by the power of eminent domain. The tenures are totally different; one by purchase, and the other by condemnation.

But this point is too finely drawn. The *compensation is previously made*, and may actually be paid by the party. Under the act there is simply a privilege to the party when property is taken (if it be taken), to have this time to assess its value. 55 *Penn.* 350; *Angel & Ames on Corp.*, § 192, and cases; 3 *Zab.* 9; 13 *How.* 518 *and* 83; 6 *How.* 529.

If it were real estate, the time when it was "taken" would be a definite point, but as it is an incorporeal hereditament it is not taken at any particular moment; it is incapable of being "touched or handled," and, therefore, cannot literally be "taken" in the way of sensation or feeling.

It is really only "taken" when the compensation is paid. If they enter before, it is only to *explore*. They neither "take," "have," nor "hold," *until they compensate*. The court would be bound to give the act a constitutional construction, if possible, and if they thought it necessary to sustain it would hold that "immediately prior to the execution of the lease, compensation should be made."

The act was intended to confer the power of leasing or consolidating with the Philadelphia and Trenton Railroad Company, the Pennsylvania Railroad Company, or any other company, foreign or domestic, which fulfilled the requirements of connection, identity of interest, etc.

It has done so effectually.

*Mr. Gilchrist*, Attorney-General, for the state.

I appear before the court in this case, in my *official* capacity alone. I am retained for neither party. The cause is really a private one between private parties. The state is a holder of shares of the stock of the United Companies, and, according to a familiar practice, is allowed to be heard, though not a party, in a case of this kind. It is the interest of the state—even assuming that by the terms of the act of 1870, it has consented to this lease—that it should not be made, if the act does not make the provisions necessary to pass a good title to the works and franchises. Such an abortive lease would not accomplish any good purpose, that the legislature could possibly have had, in giving its consent to the making of a lease.

It seems to me that the act of 1870 does not make the necessary provisions to justify a lease, against the consent of a minority of the stockholders, and that neither a lease to the corporation of another state, nor to a corporation of this state, can be made under this act, against the consent of these complainants.

The answer admits the complainants are shareholders in the stock of the United Companies, and dissent to the lease.

The answer also admits the existence of all the charters

and supplements, which define the nature and extent of the franchises granted to the United Companies.

It does not deny the allegation of the bill, which is proved by the affidavits annexed to it, that the complainants have never assented to the act of 1870, but have always resisted and repudiated it. These admissions and these proofs are sufficient, it seems to me, to show that the making of this lease, or any lease of these works, under the act of 1870, is impossible.

I do not maintain that the legislature cannot by law, authorize the making of a lease of corporate franchises without the consent of all those who are holders of a share of the stock at the time of the passage of the law; for the legislature can call into service for any public use the power of eminent domain, and take—first making compensation—the share of any shareholder who refuses to give or sell his share for the public use. The stock being taken out of the hands of the dissenters, there are no persons capable of dissenting. All property is subject to the right of eminent domain. Any owner of property, whether it be land or a share in the stock of a corporation, must yield it up for the public use, but he is not required to yield it up without just and full compensation. So sacred too, is property considered, that he is not bound to yield it up, even for public use, if it is to go into the hands of an individual or private corporation, until such just compensation is ascertained in due form, and the money paid or tendered to him, so that he shall have *in his hands*, before he sees his property pass into the hands of an individual or a private corporation, a just compensation for it.

The Constitution requires that there shall be no uncertainty, or contingency, or delay about his compensation, when the public use requires that his property shall become the property of an individual or private corporation; and to prevent uncertainty, contingency, or delay, it requires that *before he gives up his property he shall have its value in his hands.*

If the act of 1870, beside providing that the franchises and property might, for the public use, be leased against his consent, also provided, that *before* the lease, he should have the value of his share of this property, or which is the same thing, the value of his stock, ascertained, and that value placed in his own hands, or tendered to him, the franchises and property of the corporation might then be leased as the act directs.

This is the ordinary way in which all property is taken and delivered over to individuals for the public use. This is the way in which leases of railroads, and of all corporate property and franchises, must be made.

So that, in maintaining that this proposed lease cannot be made under the act of 1870 without the consent of every shareholder, I am not contending that corporate franchises and property cannot be leased if one shareholder dissents, and that there is no way of removing this obstacle; but that the legislature, by the act of 1870, authorizes a lease of the corporate franchises and property to a private corporation, not merely against the consent of the shareholders, but without making the usual and requisite provision necessary to overcome that obstacle. In the same manner I would maintain that a railroad corporation could not build its road without the consent of every landowner whose land it crossed, if the law authorizing the road to be built made no other provision for overcoming the obstacle of a dissent by a landowner, than the act of 1870 does to overcome the dissent of a stockholder.

An authority given by legislative act to a railroad company to enter upon lands necessary to build a railroad *from Newark to Trenton*, and take the lands of all owners, if *two thirds* of them consented, without provision was made for *compensation* for the taking of the land of unwilling owners, would plainly violate that part of the Constitution which requires that such a naked authority shall not be given. Under such a law it might therefore be properly said that

the railroad could not be built without the consent of every owner of the land on the route between the termini.

If, by legislative act, authority were given like that just mentioned in every particular, except a provision that the dissenting owners' land might be taken on compensation, but that the company taking it should not be compelled to pay the compensation until three months after the road was built; this authority would not be a valid authority, because it would be an authority to take property without the *previous* payment of the compensation. In such a case, too, it might be said, with propriety, that the railroad could not be built without the consent of every owner of land on the route between the termini; for if one owner dissented, the law gives no valid authority to take his land.

These, it seems to me, are plain cases in which this court would hold that the authority given, was an authority given to a private corporation to take private property for public use, without just compensation *first* made to the owner; and being given directly contrary to a constitutional prohibition, was a void authority, and the execution of it proper to be enjoined on the application of any owner.

The words by which this authority is ordinarily given are "that it shall be lawful for the said company to enter upon, *take*, have, hold, and occupy and enjoy" the property required. These words are not contained in this act. The act declares "that it shall and may be lawful for the United Companies, by and with the consent of two-thirds in interest of the stockholders, to consolidate, &c., or to make such arrangements for connection or consolidation of business with any such company, &c., by *lease*, &c., as to the directors of the said United Companies may seem expedient."

But this is qualified by two provisos. One is as follows:

"Provided further, that no such consolidation, agreement, contract, lease, or other arrangement shall have the effect, or be construed to release or discharge the said United Companies, or any or either of them, or any company or companies with which any such consolidation, agreement,

contract, or lease may be made, from any taxes, liabilities, obligations, or duties, which they or either of them may be subject or liable to, either to this state, or to *any person or persons.*"

The other proviso makes it plain that the legislature intended that the dissenting stockholders should be compensated for the change which the act authorized. "Provided further, that if any stockholder, or stockholders, being such at the time of making any such consolidation, agreement, contract, lease, or other arrangement, shall be dissatisfied with the same, the said companies shall pay to such dissatisfied stockholder, the full value of his, her, or their stock, immediately prior to such consolidation, agreement, lease, or other arrangement, to be assessed by three disinterested commissioners, appointed for that purpose by the Supreme Court, or Court of Chancery, of this state, on the application of either party, made upon twenty days' notice; but the said companies shall not be compelled to pay for stock of any such dissatisfied stockholder, or stockholders, unless he or they shall give written notice of such dissatisfaction, to the president, secretary, or treasurer of the company whose stock shall be held by him, or them, within three months after such consolidation, agreement, contract, lease, or other arrangement, shall have been made and consented to by the requisite number of stockholders."

The making of a "lease" of all the works, franchises, and property, even of the cash, of the United Companies for nine hundred and ninety-nine years, is the thing about to be done under this act.

As the objects of the corporation are distinctly stated in the charter, that becomes the test, whether any act proposed to be accomplished by the corporation is for the promotion of those objects. If tried by this, any object proposed is not one of the objects of the corporation, to accomplish it will be violating the contract.

Whether an authority to make a lease of the franchises, and all the property of a corporation, against the dissent of

one or more stockholders, would be an authority to impair the contract between the corporation and any one who is a dissenting stockholder at the time of the making of it, will appear, if we consider the effect a lease will have when it is carried into effect.

Though after the lease shall be carried into effect, the stockholder will hold a certificate of stock, which, on its face, declares him entitled to a certain number of shares of the capital stock of his corporation—that which *was* the capital stock of his corporation, will, against his consent, on the day after the lease takes effect, be an entirely different thing. It *was* the corporeal works and property then held by the corporation *in possession*, with most extraordinary powers and privileges, enabling the corporation to use and operate the works, exercise the franchises of taking tolls and fares, and divide the profits thereby made; it *will* be a rent. On the day after the lease shall take effect, the capital stock of the corporation will consist of no corporeal works or property whatever in *possession*. The rent, though capable of seizin, is not of corporeal possession. The original capital stock will be passed to the lessee; a new capital stock will be created, and though more or less valuable, it will be an entirely different one; the old certificate of stock will not be called in; he will hold it; it will be unaltered in its language; it will entitle him to the same number of shares in the capital stock of his corporation; but his corporation will be shorn of all means of making any profit for its stockholder; and every power and privilege to use and operate the works and exercise the franchises, and consequently the capacity to make and divide any profits therefrom, will be entirely gone for nine hundred and ninety-nine years.

The structure of the corporation for the next nine hundred and ninety-nine years will be completely altered. Before, it was an artificial being, with ample and important franchises and faculties, by the exercise of which, and the operation of its great works, it had profited its stockholders

for a generation. After, it will be an artificial being, without either franchise or faculty, for nine hundred and ninety-nine years, except, perhaps, (and it is only *perhaps*) the franchise and faculty to take and receive the rent and divide it among those who have now become stockholders in a valueless reversion, and in a rent issuing out of what will become the property of the lessee.

The franchises and faculties it before had, and the works, and other property of the corporation, it will have, by contract, rendered itself incapable of holding or exercising or enjoying during nine hundred and ninety-nine years. All these operations the taking effect of the lease *must* have on the corporation. The corporation will be denuded for nine hundred and ninety-nine years of every characteristic it had; of every marked individuality it had; its identity will be gone. Nothing but its history can show what it has been; what it was before the lease took effect. On examining it, and every feature it has, after the lease shall take effect, nothing can be recalled but its origin; that was legislative. If its origin was not legislative, it could not continue to exist, thus shorn of its features, franchises, and faculties. It will be almost literally a lifeless hulk; practically, it will be a mere ruin. It will exist—but the lease having taken effect—without a faculty it had when it showed life and usefulness. Its powers and franchises will have passed from—will have been taken from it for nine hundred and ninety-nine years for the public use. This is the operation the taking effect of the lease will have upon the artificial being itself.

But these are not all of the results the taking effect of the lease will accomplish. While the certificate of a share or shares in the capital stock of the company of the same *name* will remain—it will be a certificate of a share in the capital stock of a corporation of an entirely different character—in the capital stock of a corporation without a franchise for nine hundred and ninety-nine years (except that of being); without, for nine hundred and ninety-nine years, a single

faculty of making money; confessedly without, for nine hundred and ninety-nine years, a single faculty that can contribute to the public use—for the taking effect of the lease, will have divested it of all of them, to enable another company to put them to a greater public use; without, for nine hundred and ninety-nine years, a single shred of the capital stock which the certificate of stock guaranteed the stockholder certain shares of. The certificate of stock will be a certificate of a share or shares in a corporation totally different in every substantial and valuable characteristic—and shares of an entirely different thing—of an entirely different capital stock. All the capital stock will then be a rent.

This rent will not *issue out* of the capital stock of the corporation. The rent will *be* the capital stock of the corporation. The *former* capital stock out of which the rent will issue, will be the capital stock and property, not of the stockholders' corporation, but of *another* corporation.

The stockholder's certificate will no longer give him any voice in the appointment of managers of the old capital stock out of which the rent will then issue; though the wisdom of this management must constitute the chief security for the rent, which the taking effect of a lease will force upon him.

Under these new circumstances, produced by the lease having taken effect, will not the stockholder, although he will retain the *old* certificate, have a share in a new thing? Will he not have lost his share in the *old* thing, and this too, against his consent?

Will not all of these extraordinary changes, which will be produced if the lease takes effect, the very changes which the courts of this state have repeatedly held do, if produced without the assent of a stockholder, impair the contract between him and his corporation? *Kean* v. *Johnston*, 1 *Stockt.* 401; *Zabriskie* v. *Hack. R. Co.*, 3 *C. E. Green*, 179. And yet a lease which will produce these effects, is authorized by this act to be made without his assent. If the title

of the dissenting stockholder to his stock, is not divested before these changes are produced, is not there a contract between him and the corporation, which is impaired by these changes ?

A change can be lawfully made in this contract with his consent. A change can be lawfully made in the structure of the corporation, or any other change which a lease will produce, if the person who is a stockholder assents to them; or if, before they are made, the stock held by any dissenter is taken under the right of eminent domain; for his stock being taken, no contract with a dissenting person is in existence. This act is plainly based on the idea of the necessity of *taking* the stock of dissenters under the right of eminent domain. That the act recognized the necessity for the taking of the stock of the dissenter is plain. It directs the company to pay him for it, if he dissents and gives notice of his dissent at a certain time named. The act certainly did not contemplate that he should be paid for his stock, and keep it, too. It contemplated that after the payment he should no longer keep it, that it should be taken by, or pass· to somebody else, or be extinguished—which is only another word for saying it shall belong to the corporation.

It may be said that the act *did* contemplate that the stock should be taken, but not till *after* the lease was made. If this be so, then ·it is plain that the stockholder, until his stock *is* taken, is a stockholder, with every right and privilege of a stockholder—a stockholder holding a contract with the corporation, by which it is bound not to alienate its franchises, but to exercise them, to use the works and not dispose of them, and to make profits out of the exercise and use of them. Being a stockholder with such inviolable contracts, this court will restrain the making of this lease, which alienates the franchises, and disposes of the works, and puts it out of the power of the corporation to exercise them, and by which it contracts *not* to exercise or use them, or make a profit for its·stockholders.

In this aspect of the case—that the act contemplates that

the stock shall be taken, but not till after the lease is made
—the *title* of a stockholder to his stock, before and at the
time of the lease, is perfect, and his right to restrain a
threatened breach of the contract between him and the
corporation, by the making of the lease of the franchises and
property for nine hundred and ninety-nine years, seems to
me indisputable. It may be said that the provision which
declares that the companies shall not be compelled to pay
for the stock, unless the dissenting stockholder, within three
months after the lease, shall give notice of his dissent, was a
mere indulgence to the stockholder which gives him three
months to make up his mind whether he will keep his stock
or take its value at the date of the lease. It may be that
this was so intended; but the stockholder has, without this
proffer, a more sacred right—a right that, until he makes
up his mind to assent, and does actually assent, his contract
shall not be impaired by stripping his corporation of all its
franchises, and transferring all its capital, stock, and the
title and the possession of all its works to a stranger, by
means of a lease for nine hundred and ninety-nine years. At
any time before the lease is made, he has the right to come
into this court, and ask that his corporation shall not violate
that contract, but be enjoined to keep it. The act may have
been intended to give him a right after the lease was made,
instead of the right he would have in this court before the
lease was made to restrain the making of it; but the gift of
this right *after* the lease, even if it were expressly said it
should be instead of the right to come into this court *before*
the lease and restrain it, would not take away the right to
come here beforehand. The right to come here before the
lease and restrain it, cannot be taken from the stockholder,
for it depends on the provision of the national Constitution
that no state shall pass any law impairing the obligation of
a contract, and on the provisions of our own Constitution
that the legislature shall not pass any law impairing the
obligation of contracts, or depriving a party of a remedy for
enforcing a contract which existed when the contract was

made. It matters not how much the stockholder was to be indulged by this clause; he already had a higher and stronger right secured to him by irrefragable sanctions. That right still subsists; that right this court is bound to enforce, notwithstanding any law whatever that the legislature may make, giving substitute rights, or attempting to cripple the power of this court, to give the old relief to which the party was entitled before the passage of any such law.

It may be said that there was no necessity for taking the stock at all, and that the provision for the payment of its value to the stockholder, was a mere gratuity. If there was no necessity for taking the dissenter's stock, as a step toward the lease, the payment would be a mere gratuity. Whether there is a necessity to take the stock of the stockholder, to enable a lawful lease to be made, depends upon the question, whether, while the stock remains in the hands of the stockholder, there is not a contract between him and the corporation, that the franchises shall be exercised and not disposed of, that the works shall be used to make profit for the stockholder, and not passed over to others.

That there is such a contract between the corporation and the stockholder 'at the moment he becomes such, I think, all the cases hold; and that it subsists, until he consents to its abrogation, or ceases to be a stockholder, I think is apparent. If the contract continues, and a lease is made, against the consent of the parties to it, to say that it is a lawful lease, is to say that the law authorizes the other party to do that which the other party has contracted not to do, and which the Constitution says no law can authorize him to do. The execution of such a pretended law will be restrained, and the corporation held to its contract by this court, by injunction. Hence, if a lawful lease is to be made, the stock must be taken and paid for, or the contract will subsist.

It may be said that there can be no taking of the stock within the constitutional provision against taking property,

because it is not property. But the charters of the United Companies expressly declare the shares of stock to be personal property. *The Canal act,* § 17; *The Camden & Amboy act,* § 16; *The New Jersey R. R. act,* § 2.

It appears to me that the act of 1870 did intend to give the right to *take* the stock of the dissenting stockholder. The creation of a special tribunal to ascertain and determine the value of the stock of any dissenter, and the direction that that value should be paid, can be accounted for on no other basis. It is a very important part of the act; it follows immediately after the authority to lease; it is introduced by way of proviso after that authority and in qualification of it; *it is a condition upon which the authority to make a lawful lease is given.*

The office of a proviso is to repeal the *purview. Townsend* v. *Brown,* 4 *Zab.* 86. This proviso repeals the authority to lease, so far forth as any dissenting stockholder is concerned, and as long as one exists, no lease can be made. He is to be dealt with otherwise. His stock is to be paid for—and if paid for, of course it is to be taken; he is not to be paid for his stock and keep it too; but his stock is to pass from him.

I have endeavored to establish that so long as the stock continues the property of a dissenting stockholder, so long as there is a person standing in the way who holds such a contract of the corporation, that against his consent, no lawful lease can be made. Because the contract will continue so long as the dissenter holds his stock, and cannot be overcome except by his consent, the taking of the dissenter's stock before the lease is attempted, is necessary.

This act does provide for the taking of the dissenter's stock as one of the means necessary to make the lease, but it does not provide for its being taken *at the time* when it can assist the lease. The constitutional provisions against impairing contracts connot be complied with if a lease is made before the stock is taken. If the act of 1870 does not provide for the dissenter's stock being taken before the lease

is made, it authorizes as lawful that which all the authorities agree will impair a contract, a contract which, from its nature, subsists so long as the title of the dissenter to his stock subsists.

Does the act authorize the stock to be taken *before* the lease? The only parts of the act from which it can be ascertained whether the stock was to be taken *before* the lease, are the first and second provisos.

The provision for the payment of the dissenting stockholders contemplates that the stockholder who is to be paid shall be one who continues a stockholder down to and at the very time of making the lease, and even afterwards, for it is not every dissenting stockholder that is to be paid—it is "*such* dissenting stockholder," that is, the stockholder before mentioned in the clause, "if any stockholder, being such *at the time* of making any such lease shall be dissatisfied."

The stockholders who are to be paid, then, are only such as continue stockholders at the time of the making of the lease.

The act, therefore, cannot contemplate taking the stock of a dissenter *before* the lease, for it pays no stockholder who is not such *at the time* of the lease. But the act goes further and indicates most distinctly, that the stockholder whose stock is to be taken must continue such till *after* the lease; it pays no other. He must not only be a stockholder at the time of the lease, but afterwards; for unless *after* the lease he gives notice of his dissatisfaction, he is to have nothing. The act says expressly, " but the said companies shall *not* be compelled to pay for stock of any such dissatisfied stockholder or stockholders, unless he or they shall give written notice of such dissatisfaction to the president, &c., within three months *after* such lease shall have been made."

This provision, postponing the *obligation* to pay a dissenting stockholder till *some time after* the lease, plainly shows that the act contemplated that the dissenter's stock should *continue* vested in him till after the lease, for there is no

obligation to pay till notice, and no notice can be given, which will be of any validity to raise the obligation to pay, till *after* the lease. If he is dissatisfied *before* the lease, it gives him no compensation. He may be dissatisfied before and give notice before, but he must be dissatisfied at the very time of the lease, and give notice *afterwards*.

He must retain the character of stockholder until the time comes when he can give the notice. On giving this notice at the particular time mentioned in the act, and at no other time, does the obligation to pay arise; for the clause is in the negative. It does not say that the company shall pay when notice of dissatisfaction is given, but that the company shall *not* be compelled to pay, unless within three months *after* the lease the notice is given. "Within" three months *after* an event is *some* time after. It is not before. This the courts of New York have held. Our Court of Chancery and Court of Appeals, in the case of Krous and the Continental Hotel Company, held that where a statute which 'required a chattel mortgage to be filed "within" a certain time before a day, filing it before the time "within" which it was required to be filed, was no compliance with the act. So here the obligation to pay arises only some time *after* the lease; at no time before it; and then it does not arise to any one but to him who continues to be at that time—after the lease—a stockholder. This, it seems to me, makes it clear that the act gives no indication of an intention that the dissenting stockholder's stock shall be taken before the lease.

The words "shall pay to such dissatisfied stockholder or stockholders the full value of his, her, or their stock, immediately prior to such 'lease'" describe what valuation shall be placed upon the stock, *i. e.*, the value immediately before the lease. They do not fix the time of the payment of *that* value, and therefore afford no indication that the stock was to be taken before the lease, but merely that *that* value before the lease was to be paid, and to be paid as the subsequent clause says, *after* the lease—after notice given

*after* the lease. When we are considering whether the act requires the stock to be taken before the lease, or not, it is proper to give all due weight to the clause in the second proviso—that the lease shall not have the effect, or be construed, to release or discharge any contract. If the clause authorizing the stock to be taken is capable of the construction that the stock is to be taken after the lease, and if that construction gives to the lease the effect of releasing or discharging the contract with the stockholders, it might be asked, why should not that clause, as to the taking, receive a different construction—a construction that it permits and enjoins the taking before the lease?

But the language authorizing the taking, cannot bear that construction. Every word in it looks to a taking *after* the lease, and to a payment after the lease, to a continuation of the relation of stockholder after the lease, and it is. impossible to construe it as indicating an intention to take before —the words are too strong and specific. The stock cannot be valued, the commissioners cannot be appointed, till *after*, unless the stockholder continues a stockholder at the date of the lease, and is *then* dissatisfied; and, indeed, it would seem not until the written notice of dissatisfaction is given, which must come *after* the lease, to entitle the stockholder to valuation or payment.

But if this construction were possible, the United Companies intend, they say, to execute this lease as soon as practicable, after two-thirds of the stockholders assent. So that, even with this construction, the lease cannot lawfully be made till the stock is taken, and as it is now threatened to be made without taking the stock first, it must be restrained.

It seems to me, from these considerations, that it is plain that the clause authorizing the taking of the stock will not bear the interpretation of an authority to take *before* the lease, and, on the contrary, does not permit the taking till afterwards, thus requiring the dissatisfied stockholder to remain a stockholder till after the lease; the contract of the

corporation with the stockholder consequently continuing per force in existence.

To say that a lease authorized while a stockholder continues such and his contract is in force, and he dissents to the lease, is a lawful lease, is to say that a lease is lawful which not only impairs, but overrides, prostrates, and destroys the contract against the will of one of the contracting parties. In such case, neither the lease, nor any pretended law which sanctions it, is valid or lawful; both are contrary to the Constitution.

It seems to me the clause giving the right to take the stock after the lease only, was conferred intelligently and knowingly; but the clause conferring it is so framed that it is useless for the only purpose for which, if framed properly, it could have been used. It is so framed that it cannot be used at the very time when only it could be of any use to promote the object of the act, which was to transfer the title to these franchises and property to another corporation. It is so framed as to make the power to take the stock exercisable only *after* the contract (which exists with the stockholder so long as he is a stockholder) shall have been entirely disregarded, and his right to redress for the injury complete. It makes the power to take the stock exercisable after the injury of impairing his contract has already been inflicted upon him.

The effect of so framing the clause, giving the right of eminent domain, as to be exercisable only after the lease is given, is to make the authority to lease an authority to disregard the contract; and, as such, an illegal authority. An authority to disregard a contract cannot be given by a law of the legislature; and, therefore, so much of the law as gives such an authority is void, and the authority is void. It may be said that there is no distinction, in substance, between impairing the obligation of a contract and compensating for that illegal injury, and *taking* the property created by the contract and paying for *it;* but the law and the Constitution say there is.

"The eminent domain, the highest and most exact idea of property, remains in the government, and it has a right to resume the possession of the property whenever the public interest requires it." *West River Bridge* v. *Dix*, 6 *How.* 535.

"This taking by the state has never been held to impair the obligation of the *contract by which* the property is held." *Ibid.* 536.

"However nice the distinction may seem to be—when examined it will be found substantial. The Constitution does not prohibit a state from impairing the obligation of a contract *unless* compensation be made, but the inhibition is absolute." *Ibid.* 538.

"The power of eminent domain is *implied* in the contract." *Ibid.* 542.

It can, therefore, be executed on *that* which *is held* by the contract, and without impairing its obligation. To take stock, or a franchise, under the right of eminent domain— both of which are held under, and existing by force of, a contract—is not to impair the obligation of the contract, not to violate it; but to regard it, recognize it, to assume its validity, to concede that it created and vested the property. The new taker holds the property under the contract as a link in the chain of his title to it; and the contract is necessarily left unimpaired, so that it may be a muniment of the title of him in whom the exercise of the right of eminent domain vested the property created by the contract.

The clause in this act, giving the right to take the stock, stays the exercise of the right of eminent domain until after another constitutional right is invaded. How perfect soever *this* clause may be in every respect, the lease made under the first clause will inflict an injury, if made as it must be before the stock can be taken.

It seems to me that this clause was so framed of purpose, and it was endeavored to be cured by giving to the stockholder, after his contract was impaired, the value his stock had at the time of its being impaired. In other words, it

gives as a compensation for the injury of impairing a con-
tract the compensation which would be due if his *property*
had been *taken* at that time under the right of eminent
domain, instead of his *contract* being *impaired* at that time.
Now, as the Supreme Court of the United States say in the
case just cited, " the Constitution does not prohibit a state
from impairing the obligation of a contract *unless* compensa-
tion be made, but the inhibition is absolute ;" and therefore
it in no wise cures the act of 1870, which authorizes the
lease to be made while the stockholder's contract exists,
that it gives to the stockholder as a compensation for that
*unlawful* act the same compensation that he would have
been entitled to if his stock had been taken by a *lawful* act,
done under the right of eminent domain. But, in truth, it
does not give him the same compensation that he would
have been entitled to in the latter case. For he would, in
the latter case, have had his compensation for a rightful act
*first*, and his property would have been taken afterwards ;
whereas, here a wrongful act is done *first*, which is con-
sidered so violative of all public policy, that it is never per-
mitted, even where the most ample compensation is given,
and *afterwards* a compensation is given which would be due
for an entirely different and lawful act.

The reason for framing the clause as it was framed, was
that the taking of the property beforehand, under the right
of eminent domain, would be inconvenient in carrying out
the lease in view. The exercise of that power beforehand
would require compensation *first*, or before the lease, and
would require entirely too solid a confidence in the success
of the new enterprise on the part of a promoter of it, to
make it entertainable by capitalists. But safeguards for
property *are* inconvenient. They *are* obstacles. They are
established because they make it inconvenient to appropriate
property.

The dissenting stockholder, on examining an act which is
worded as this is, might well be impressed with his helpless
condition. He sees in this law that the state permits his

whole interest to be swept away *first*, and that he is sent to look after a limited compensation—limited to a value at a certain time—either from his own company, *after* it is stripped of its assets, or from a strange company, of whose responsibility he knows nothing and which he more than suspects— a company which may or may not be reached by the process of that state only, whose process he could invoke to bring it to justice.

Such laws ought not to be permitted to pass, and this court sits here with the high function of saying that if passed they shall not be executed.

On the other hand, if this law provided that before his stock was taken he should have the value of it put into his hands, as he, in common with the owner of every other kind of property, is entitled to have it, he would see that all the hazards of the new enterprise were upon those who promoted it; and would have the benefit of the timidity of capital to invest in doubtful enterprises, on the side of his desire to keep his own.

Whatever the compensation is to be; how much it resembles the compensation due for taking his stock—however ample it may be, how fully soever it may be, a compensation for the injury of impairing the contract, the fact remains—the injury to be done under the act of 1870 is the impairing of a contract. The promoters of the act chose to accomplish the lease by impairing the stockholder's contract, first, and then authorize his stock to be paid for afterwards at its value at the time of his contract being impaired. This was their way of accomplishing it. This is not the way of the law, of the Constitution, and it is a way in which this court will not permit a lease to be accomplished. I am sure that if the promoters of the act had perceived that this was the real operation and effect of postponing the exercise of the right of eminent domain under the first proviso until after the lease was made, they would have been the last of all men to ask for a law which permitted the prostration of any contract between the companies and their stockholders; for the

very existence of corporations and the preservation of all their extraordinary and necessary rights and powers depend upon the existence of a healthy public sentiment which will secure the inviolability of contracts.

The same considerations which show that the United Companies cannot make a lease of their works and franchises, show that no other corporation can take the lease of them; for to take a lease of these franchises will affect the structure of the lessee corporation in the same manner that granting them affects the lessor corporation.

The law of Pennsylvania is the same as our own law on this subject.

Besides, there is no pretence of power on the part of the lessee to condemn its dissenting stockholders' stock and so procure a unanimous body of stockholders and prevent the violation of any contract that might exist if there were a dissenter.    More than this : besides the assent of the stockholders, or a condemnation of their stock, the assent of the state in which these franchises are to be exercised by the lessee corporation, is necessary to be given to it in special. It is clear that a general authority to lease a franchise to *any* corporation, would not give the capacity to any corporation *to take* the franchise and exercise it.    A bank could not take such a lease under such a general power, nor an insurance company, nor a manufacturing corporation—under any supposed implication that an authority to one corporation to lease its franchise to any other, is an authority to that other to take them and exercise them.

The best precedents of enabling statutes of this kind, and there are many, add a distinct clause authorizing a particular corporation, or class of corporations, to take, and so, on principle, it should be.

The other questions which are raised by the pleadings in this private case, I do not feel called upon to discuss.    I think none of them so important or so clear against the lease as those I have considered.

*Mr. I. W. Scudder*, for defendants.

1. The legislature of the state of New Jersey had the power to pass the act approved March 17th, 1870, entitled, "An act to enable the United Railway and Canal Companies to consolidate their stock, and to consolidate or connect with other companies." A lease executed under the authority of this act, was not in violation of that clause of the Constitution of the United States which declares, "that no state shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

We must look into the charters of the companies—lessors —for the contracts. The charters are the contracts between the state as one party, and the corporations as the other party. These charters are not executory contracts—they are contracts executed—they are grants. There is no contract in any of these charters which prohibits these companies from executing a lease.

The cases which give construction to this clause of the Constitution of the United States, all show that to impair the obligation of the contract, the legislature must make some change in the grant made by the state and contained in the charter; and inasmuch as the charters in question do not prohibit the corporations from making a lease, a law of the state, conferring a power to the corporations to make a lease, would not impair the obligations of the contract. An act, giving power to make a lease, would be an enabling act, authorizing the lessees to execute a part of the powers originally granted.

The following cases were cited and commented on : *Dartmouth College* v. *Woodward*, 4 *Wheat.* 519; *Providence Bank* v. *Billings*, 4 *Peters* 558; *Gordon* v. *Appeal Tax Court*, 3 *How.* 133; *Planters' Bank* v. *Sharp*, 6 *How.* 330; *Satterlee* v. *Matthewson*, 2 *Peters* 380; *Holbrook* v. *Furney*, 4 *Mass.* 566.

Under the lease the obligations of the lessors to the state remain the same. The lessee is to operate the works demised under the charters of the lessors. No property can be

sold, unless by consent of the lessors. The proceeds of the property of the lessors when sold, must be applied to the enlargement of the works of the lessors, or to pay debts. The corporations of the lessors remain, and the stockholders remain. In case of failure to pay the rent, the lessors resume all their property and franchises.

There was no express contract in the charter of the corporations—lessors—that they should not convey and transfer their property. On the contrary, such power was given. *Charles River Bridge* v. *Warren Bridge*, 11 *Peters* 420, Justice McLEAN, *p.* 521. "After a careful examination of the questions adjudged by this court, they seem not to have decided in any case that the contract is impaired within the meaning of the Constitution, where the action of the state has not been on the contract."

See *Smith on Stat. and Const. Law, p.* 409, § 266.

2. The case of a lease by a railroad company does not fall within that class of cases denominated *ultra vires*, and in which one stockholder can ask for an injunction to restrain the execution of a lease, to which two-thirds of the stockholders assent.

The cases in which a few stockholders can enjoin a corporation, even though the majority should assent, are those in which the corporation uses its capital and money in a business, and for a purpose different from that authorized by the legislature.

The leading cases stated and reviewed : *Coleman* v. *Eastern Counties' Railway Co.*, 10 *Beav.* 12 ; *Hodgson* v. *the Earl of Powis*, 12 *Beav.* 397 ; *Cal. & Dumbart. Junction Railway Co.* v. *Magistrates of Hellensburgh*, 2 *Macqueen* 391 ; *Scottish Northeastern Railway Co.* v. *Stewart*, 3 *Macqueen* 383 ; *Bissell* v. *Mich. South. & North. Indiana R. Co.*, 22 *N. Y.* 258 ; *Kean* v. *Johnston*, 1 *Stockt.* 403 ; *Zabriskie* v. *The Hack. & N. Y. R.*, 3 *C. E. Green* 180 ; *Sussex Railroad* v. *Morris & Essex R.*, 4 *C. E. Green* 13 ; 5 *C. E. Green* 543 ; *South York. Railway Co.* v. *Great West. Railway Co.*, 8 *Exch.* 73 ; *Beman* v. *Rufford*, 1 *Simons (N.*

*S.*) 550 ; *Great North. Railway Co.* v. *Eastern Counties' Railway Co.*, 9 *Hare* 306 ; *East Anglian Railway Co.* v. *Eastern Counties' Railway Co.*, 11 *C. B.* 775 ; *Vance* v. *East Lan. Railway Co.*, 3 *K. & J.* 57 ; *Great West. Railway Company* v. *Rushout*, 5 *De Gex & Sm.* 307 ; *Hawkes* v. *Eastern Counties' Railway Co.*, 1 *De G., Mac. & G.* 737 ; 5 *H. L. Cas.* 348.

The principles of these cases do not apply to this lease. The United Companies are not to spend money received for one purpose, for another purpose. The railroad and canal constructed for certain purposes are not to be used for other purposes.

The doctrine of partnership does not apply. A stranger cannot be introduced into a firm without the concurrence of the firm. Any person can become a stockholder. Parties must join together having goods, labor, or skill. The stockholder purchases his shares, and leaves the management to the executive officers. Partner liable in his individual estate for the debts of his firm ; not so a stockholder.

3. The lease is said to be against the policy of the law, founded on the case of Winch *v.* The Birkenhead, Lancashire and Cheshire Junction Railroad Company. 13 *Eng. L. & E. Rep.* 506 ; 5 *De G. & Sm.* 562.

That case is distinguishable from the lease. It was an agreement which provided for the *amalgamation* of three roads and the lease of a fourth ; and, after the three roads had been amalgamated, the fourth road, or leased road could also be *amalgamated* with the other three. Such an agreement was pronounced *against the policy of the act of Parliament, and savoring of illegality.*

That case, neither in principle nor its facts, can control the case before the court.

One class of cases shows the doctrine of *ultra vires*, viz. the expenditure of the capital of a corporation in a project not authorized by the charter.

The case of Winch, it has been contended, shows another class in which money is not expended in a new project, but

which are said to be against public policy, and savor of illegality. This is not true in fact. A court of equity will not enjoin where the contract is merely against the policy of the law, there there is no irreparable injury.

4. The state of New Jersey has authorized this lease by the act approved March 17th, 1870, entitled "An act to enable the United Railway and Canal Companies to consolidate their stock, and to consolidate and connect with other companies," and this lease, when executed in pursuance of the powers thus given, will be lawful.

The *connection* is not limited to any class of railroads, whether in or out of the state. The United Companies can lease to "any such companies" as they would have a right to consolidate with. They can consolidate with any company with which they "are or may be identified in interest."

They can then consolidate with the Philadelphia and Trenton Railroad Company, as they have "an identity of interest with the Philadelphia and Trenton Railroad Company."

The act empowers a consolidation or lease with a named company out of the state, "and any other companies." It is clear then that the power to consolidate with, or lease to "any other railroad or canal company," is not by the general scope of the act confined to such companies only as are in the state of New Jersey.

There are three positions set forth by the act which authorize a lease or consolidation. 1. Identity of interest. 2. Continuous lines. 3. Connected lines.

Every one of these three positions have reference to companies out of the state.

The connection of the United Companies in New Jersey with their branches and auxiliary lines, is such as that on the question of intention in the statute they could not be meant.

Then the identity or connection must be looked for out of this state. The lines of the companies were continuous

lines across the state. The bill so charges, as to canal, a " perfect, expeditious, and complete line of water communication between the cities of Philadelphia and New York." By Camden and Amboy Railroad, bill charges " a perfect, expeditious, and complete line of communication between the cities of Philadelphia and New York." By New Jersey Railroad, bill charges, " another perfect, expeditious, and complete line of communication, by way of Trenton, between the cities of Philadelphia and New York."

Charter of canal, § 2, power given " to perfect an expeditious and complete line of communication from Philadelphia to New York," &c.

*Camden and Amboy Railroad* v. *Briggs,* 2 *Zab.* 633; held in a penal suit, that the line extended from New York to Philadelphia.

Continuous lines across the state, into Philadelphia, could only have continuous lines by connection in Pennsylvania. Works out of the state only could form continuous or connected lines.

" In this state *or otherwise.*" The term " otherwise," thus connected, could only mean out of the state. The power to lease, if given generally, would not have been confined to the state of New Jersey. It was intended to make the case clear, by expressions not doubtful—" in this state, or otherwise." The word " otherwise " refers to and is predicated of the conditions in which these United Companies exist— otherwise than in New Jersey. The United Companies were all created by the laws of New Jersey; companies " otherwise," must be such as were not created by the laws of New Jersey.

The concurrent legislation of the states of New Jersey and Pennsylvania give meaning to this act. The " act to authorize railroad companies to lease or become lessees, and to make contracts with other railroad companies, corporations, and parties," was passed February 17th, 1870; the New Jersey act, March 17th, 1870.

5. The lines are both continuous and connected.

Their contracts, business connections, &c., show this clearly.

6. The Pennsylvania Railroad Company has full power in law to become the lessee.

The complainants cannot deny this position, as they have not made the Pennsylvania Railroad Company a party.

Two acts make this clear: "An act to authorize railroad companies to lease or become lessees, and to make contracts with other railroad companies, corporations and parties," approved February 17th, 1870. "An act relating to leases or contracts for the use of canals or other navigation works by railroad companies," approved May 3d, 1871.

The legislature of Pennsylvania have thus clearly conferred the power.

The law is clearly settled in Pennsylvania: *Commonwealth* v. *The Atlantic & Great Western R. Co.*, 53 *Penn.* (3 *P. F. Smith's*) 9; *The Philadelphia & Erie R. Co.* v. *The Cattawissa R. Co.*, *Ibid.*, *p.* 56.

7. The complainants can only complain of injury to their private rights. They have no foothold in this court for pretended injury to public interests, or the violation of public property, by this lease. Their private rights can be paid for, and the defendants tender just compensation, in such mode as equity may require. The act of March 17th, 1870, passed by the New Jersey legislature, prescribes an equitable mode of compensating the complainants by commissioners.

This mode of compensation does not violate the Constitution of New Jersey. There are two clauses of that Constitution.

Art. I, pl. 16. "Private property shall not be taken for public use, without just compensation; but land may be taken for public highways, as heretofore, until the legislature shall direct compensation to be made."

Art. IV, § 7, pl. 9. "Individuals or private corporations

shall not be authorized to take private property, for public use, without just compensation first made to the owners."

The mode of compensation is not unconstitutional, because no property has been taken. The property of the shareholders has not been taken. The title remains in them. They can vote on the stock. The shares of stock do not amount to a deed for the property. Whatever interest in the property, represented by the stock, remains as before.

The Constitution contemplates that the private property which shall be taken, shall be for public use. Stock cannot be taken for public use. An exclusive right might be condemned, that thereby physical property could be taken for public use. Then the exclusive right would be extinguished. Shares of stock are like choses in action. *Angell & Ames on Corp.*, 9th ed., §§ 560, 563; *Williams on Personal Property* 186.

The language of the New Jersey Constitution, "compensation first made," has a well known history. It was to prevent *land* from being taken first and paid for afterwards. *Bonaparte* v. *The Camden & Amboy R.*, 1 *Baldwin C. C. Rep.* 205; *Den* v. *The Morris Canal Co.*, 4 *Zab.* 590.

These cases prove that *land* could, under the old Constitution, be taken and used first and paid for afterwards. The clause in the new Constitution was introdued simply to do away with this legal conclusion. *Doughty* v. *The Somerville & Easton R.*, 1 *Zab.* 443.

The title of a stockholder in his stock may pass by a certificate signed in blank—it passes by delivery merely. The rule of this act, therefore, is just, that the stockholder should dissent to the lease, make known his dissent, and then have his shares condemned, if he seeks compensation in that way. If the calling in the aid of commissioners should be regarded as a mode of condemnation under the Constitution, it would nevertheless be legal.

The complainants contend that the lease is not valid as against them, because of their objection. If necessary

to condemn their stock, then the lease is not valid as against them until their stock shall be condemned. The proper time for fixing values would be immediately prior to the making of the lease. Then the ownership of the stock could be ascertained.

The works when leased are subject to public use. Under the Constitution, the legislature can determine the public use and the mode of condemning. The leased roads are subject to the public use, and the legislature have declared that the interest of the stockholders can be condemned. The right to condemn, and the mode of condemnation under this law, are complete.

The bill is not framed on the basis that the complainants want their stock condemned, or that condemnation would be unlawful. The bill is based on the idea that the lease is wholly unlawful, and that the objection of any stockholder can defeat the same. Equity can provide a mode of compensation to the stockholder, if the lease would be inequitable as to him.

*The Irrigation Company of France,* 39 *Law Jour., N. S., Chan.*; *S. C., on appeal,* 6 *Law Rep. Ch.* 176; *Lauman* v. *The Lebanon Valley R.,* 30 *Penn. Rep.* (6 *Casey*) 46; 2 *Parsons' Mar. Law* 555.

8. The lease of the works requiring a continuation of the former use, a majority of the directors and stockholders should control.

*Durfee* v. *The Old Colony & Fall River R. Co.,* 5 *Allen* 242; *Bank of Augusta* v. *Earl,* 13 *Peters* 519; *Lauman* v. *The Lebanon Valley R.,* 30 *Penn. Rep.* (6 *Casey,*) 46; *Nix. Dig.* 341; *Gifford* v. *The New Jersey R.,* 2 *Stockt.* 172; *Vance* v. *The Eastern Lancashire Railway,* 3 *K. & J.* 57.

The analogy of a partnership is delusive. Each partner attends to the business. The partnership manage the business. Not so in corporations. Each partner contributes of capital, or skill, or labor. A new partner cannot be introduced without the consent of the former partners. Stockholders change daily, and that, too, by certificates in blank.

The legislature of New Jersey has declared that the rights of stockholders could be affected without the assent of them all.

By the act (in the case) by which the Delaware and Raritan Canal Company, and the Camden and Amboy Railroad Company, were united as Joint Companies, the consent of seven-eighths was required.

9. The local railroads, constituted in states, under state charters, have been recognized by the courts, as the means by which commerce is carried on, under the clause of the Constitution of the United States, by which Congress shall have the power to regulate commerce among the several states. *The Erie Railway Co.* v. *The State*, 2 *Vroom* 531.

The Cumberland Road was constructed with the consent of the states through which it passed.

2 *Statutes at Large*, 357, § 3 ; *Gibbons* v. *Ogden*, 9 *Wheat.* 203 ; *Passaic Bridges*, 3 *Wall.* 782.

10. The powers of corporations can be exercised out of the territorial jurisdiction in which they were created; and there is a necessity for the union of railroads in different states, to carry on "commerce among the several states."

*Bank of Augusta* v. *Earl*, 13 *Peters* 519 ; *Lumbard* v. *Aldrich*, 8 *New Hamp.* 31 ; *State* v. *Freeholders of Hudson*, 3 *Zab.* 210 ; 4 *Zab.* 719, 725 ; *State of Vermont* v. *Boston*, *&c., Railroad*, 25 *Vt.* 433.

11. Assuming that the lease might be avoided, on information filed by the Attorney-General on behalf of the state, the lease, if executed and delivered without the license of the state, would not be void.

Without the sanction of the state, the stockholders of the leased roads would be without remedy, by reason of acquiescence.

This lease does not transfer the franchise of being a corporation.

12. Independent of the covenants in the lease by the lessee, the lease would not in any degree relieve the lessors from

any obligations which they owe to the state of New Jersey or to individuals.

1 *Redf. on Railw.* 590; *Nelson* v. *The Vermont and Canada R.*, 26 *Vt.* 717; *Sawyer* v. *The Rut. & Bur. R.*, 27 *Vt.* 370; *Clement* v. *Canfield*, 28 *Vt.* 302.

The state and individuals are protected by the express covenants in the lease.

13. The contention that the lease is unlawful because it not only demises the roads and canal, but other property, such as stocks, is unfounded.

The shares of stock in other roads held by the lessors under the sanction of the laws of New Jersey, are the means by which the lessors hold their title to property in auxiliary works, as stock of the Associates of the Jersey Company; stock of the Ferry Company at Camden; stock of the Belvidere Delaware Railroad, &c. They are like the titles to lands which are not now a part of the works. These stocks pass as appurtenant to the demised property. *The Philadelphia & Erie R. Co.* v. *The Penn. R. Co.*, 53 *Penn. R.* 56.

14. If the execution of such a lease was not sanctioned by the act of New Jersey of March 17th, 1870, and if it is against the policy of the law by reason of the exercise of prerogative franchises in the state of New Jersey, by the Pennsylvania Railroad Company, without sufficient license, the private rights of stockholders would not be invaded, and the only remedy is by *quo warranto.*

*Vermont* v. *Boston, Concord & Mont. Railroad*, 25 *Vt.* 433, 441; *Gifford* v. *The New Jersey R.*, 2 *Stockt.* 177; *Bissell* v. *The Mich. South. R.*, 22 *N. Y. R.* 272; *Att. Gen.* v. *Great West. Railway Co.*, 1 *Drewry & Sm.* 154; *Vermont* v. *Boston, &c., Railway*, 25 *Vt.* 441.

15. There can be no injunction until the rights of the complainants are settled at law. A *quo warranto* would be a remedy at law.

*Morris & Essex Railroad* v. *Pruden*, 5 *C. E. Green*, 537; *The Hackensack Improvement Commission* v. *Midland*

*Railway Co., ante p.* 94; *Treadwell* v. *Salisbury Man. Co.,* 7 *Gray* 399.

16. There are two main propositions in this case which have been discussed, and which can be answered affirmatively, and the others enforce and illustrate them.

1. Had the legislature of New Jersey the constitutional power to pass the act of March 17th, 1870? 2. Does that act authorize this lease?

Under these propositions the lease is good against the state as well as the complainants.

*Mr. Browning,* for complainants.

The learned counsel who immediately preceded me has stated to your honor, that more than two-thirds in value of all the stockholders have assented to the execution of the lease in question. He mentions this, of course, as a fact, to have some influence upon the court. He does not state, however, nor pretend that when the bill was filed, or when the answer of the corporate defendants was put in, such was the condition of things. But simply stated, as I understood him, that the fact is so now.

This statement is in no sense responsive to the bill; and, therefore, in this case, as it now stands, is entitled to no consideration; however true in fact. But I go further—fearing that silence may be regarded as acquiescence in the truth of the statement—and put in a rejoinder. For, although the learned gentleman may, and no doubt does, so understand it, as a simple fact; yet when the proper time shall arrive, we will maintain that, as yet, there has been no *legal* consent of any of the stockholders. That the assents referred to have been procured by personal application to the individual stockholders; and not upon duly convened meetings of the stockholders, after full and fair representation to, and consideration by them. And that assent to such a paper, cannot be legally and properly obtained, by sending emissaries around the country to the several stockholders, men and women, and obtaining their

signatures to a prepared written assent, at best but imperfectly understood, upon such representations as the emissary may choose to make.

The relation of trustee and *cestui que trust*, exists between the directors of these companies and the stockholders; and before trustees can acquire an assent of their *cestuis que trust*, to a contract which is to deprive them of both their property and trustees, by transferring it to another set of trustees, for a different use, they should be convened, and the contract fairly and fully explained, and all the information touching it imparted to them, which the trustees themselves possessed, to avoid all misrepresentation and unfairness. The simple application of this rule, if it would not dispose of the whole list of assents to which the gentleman refers, would clearly exonerate the complainants, and all others of the stockholders, who have not understandingly and with a full knowledge of all material facts, actually signed the assent. *Shortz* v. *Unangst*, 3 *Watts & Serg.* 52.

The counsel here, by way of preliminary to a discussion of the questions involved, directed the attention of the court to the character and value of the property proposed to be leased; the title of the companies to this property; and the interest and estate of the state therein. He then proceeded—

I.

The only statutory authority conferred upon the United Companies to execute the lease in question, so far as New Jersey is concerned, is the act of March 17th, 1870.

It is entitled "An act to enable the United Railway and Canal Companies to consolidate their stock, and to consolidate or connect with other companies."

The enacting clause is as follows: "Be it enacted by the Senate and General Assembly of the state of New Jersey, That it shall and may be lawful for the said United Com-

panies, by and with the consent of two-thirds in interest of the stockholders of each, expressed in writing, and duly authenticated by affidavits, and filed in the office of the Secretary of State, to consolidate their respective capital stocks, or to consolidate with any other railroad or canal company or companies in this state or otherwise, with which they are or may be identified in interest, or whose works shall form, with their own, continuous or connected lines, or to make such other arrangements for connection or consolidation of business with any such company or companies, by agreement, contract, lease, or otherwise, as to the directors of said United Companies may seem expedient."

The second proviso in this section is : " Provided further, That no such consolidation, agreement, contract, lease, or other arrangement, shall have the effect or be construed to release or discharge the said United Companies, or any or either of them, or any company or companies with which any such consolidation, agreement, contract, or lease may be made, from any taxes, liabilities, obligations, or duties which they or either of them may be subject or liable to, either to this state or to any other person or persons."

Admitting, for the present, that this act is valid and binding upon those corporations, respectively, and upon their stockholders, then, as a mere matter of construction, my proposition is,

1. *That it does not authorize the making of the lease in question, by the United Companies, to the Pennsylvania Railroad Company, a foreign corporation not mentioned in the statute.*

It proposes to confer on existing private corporations, new and important powers, not existing at common law, or included in their charters, or prior supplements. In such cases, and in all cases of legislative grants to private corporations, the well established rule of construction I take to be this : That grants to private corporations shall be construed, strictly, against the grantees; and to prevail they must be express and clear beyond a doubt; a doubt defeats

the power. Like a doubt in criminal cases, it acquits the accused; and it is the duty of the court to direct an acquittal. In other words, what is not granted, in clear and unequivocal language, is withheld.

2 *Dwarris on Stat.* 750; 2 *Redf. on Railw.*, pp. 445–6, § 233; *C. & A. R. Co.* v. *Briggs*, 2 *Zab.* 623, 641, 647; *Townsend* v. *Brown*, 4 *Zab.* 80, 87; *Leggett* v. *N. J. Man'f. Co.*, *Saxt.* 541, 550; *Bridge Co.* v. *Land and Imp. Co.*, 2 *Beas.* 81, 94; *S. C., Ibid.* 556; *Joint Co.'s* v. *R. & Del. Bay R. Co.*, 1 *C. E. Green* 321, 372; *Morris Canal Co.* v. *Central R. Co.*, *Ibid.* 419, 436; *Mor. & Essex R. Co.*, v. *Sussex R. Co.*, 5 *C. E. Green*, 542, 562; *Nix. Dig.* 168, § 3; *Packer* v. *S. & Erie R. Co.*, 7 *Harris* 218; *Bank of Penn.* v. *Comm., Ibid.* 152; *Penn. R. Co.* v. *Canal Com's*, 9 *Harris* 10, 22; *Comm.* v. *Franklin Canal Co., Ibid.* 125, 138; *Comm.* v. *Erie R. Co.*, 3 *Casey* 351.

I confine my authorities, except the elementary books first mentioned, to this state, and the state of Pennsylvania. So far as I know, the same rule, in substance, prevails everywhere. And I limit my reading to the New Jersey and Pennsylvania cases, assuming that the rulings in them will govern the court in this case.

In the case of Leggett v. The New Jersey Manufacturing Company, Chancellor Vroom, in 1832, said: "I concur in the opinion of the Supreme Court of the United States, as pronounced by Justice McLean, in the case of Beatty v. The Lessee of Knowles, 4 Pet. 168, that a corporation is strictly limited to the exercise of the powers specifically conferred on it; and that the exercise of corporate franchises, being restrictive of individual rights, connot be extended beyond the letter and spirit of the act of incorporation." *Saxt.* 550. And Chancellor Halsted, in the case of the Camden and Amboy Railroad Company v. Briggs, decided by our Court of Errors, in 1850, says it is a "familiar principle, that a corporation, being a creature of law, has just such rights and powers as the law creating it gives it, and no other." 2 *Zab.* 641. And Justice Randolph, in the same case, said: "In

questions arising on canal and railroad charters, as to the right to take freight or toll, or the quantity thereof, courts have uniformly construed the charter in favor of the public, and most against the company." *Ibid.* 647. And Chief Justice Green, delivering the opinion of our Supreme Court, in the case of Townsend *v.* Brown, in 1853, says : "It is a rule of construction, no less wise than clear, that in all cases of public grants, the interpretation shall be most favorable to the public, and most strongly against the grantee. The rule is founded in wisdom. All experience teaches that public rights are yielded to private interests with sufficient alacrity. If the legislature really design to grant to individuals the right of several fishery, below low-water mark, it is easy to do so, in plain and express terms. It is far better that the right should be unequivocally settled by legislative interference, than that public rights should be frittered away by the aid of judicial construction." 4 *Zab.* 87.

In a later case, decided by the same distinguished jurist, in 1860, as Chancellor, against the claim of a bridge company, to the exclusive right of a bridge over the Hackensack river, within certain prescribed limits, designated in its charter, he said : " Public grants are to be strictly construed. Contrary to the rule adopted in the case of private contracts, they are to be taken most strongly against the grantee, and in favor of the public. If there be a doubt as to the extent of the grant, the doubt is resolved in favor of the public. This is especially true of all grants which, like the present, narrow the powers, or abridge the functions of government. This grant is in derogation of public right. It restrains the sovereign power. It narrows the exercise of the great duty which the sovereign owes the people, of furnishing convenient highways." On this rule, where the exclusive right of a bridge had been clearly and expressly granted, by our legislature in 1790, he held that a railroad bridge, across the Hackensack, over which thousands of persons and hundreds of tons of merchandise were daily

carried, was not a bridge within the meaning of the grant. And our Court of Errors, on appeal, affirmed the decree, on that rule. *Bridge Co.* v. *Hob. Land & Imp. Co.*, 2 *Beas.* 94 *and* 503.

In the still later case of the Joint Companies *v.* the Raritan and Delaware Bay Railroad Company, decided by the same very learned Chancellor, in 1863, he said : "It is a well settled rule of construction, that public grants are to be construed strictly ; and in all cases of grants of franchises by the public to a private corporation, the established rule of construction is, that any ambiguity in the terms of the contract, must operate against the corporation, and in favor of the public. The corporation take nothing that is not clearly given by the act." 1 *C. E. Green* 372.

At a later period, in the same year, Master Wilson, sitting for the Chancellor, in the case of the Morris Canal and Banking Company *v.* the Central Railroad Company of New Jersey, stated the same rule, equally strong and clear. " It is a well settled rule of construction," says the Master, " in regard to a public grant, that the grantee can take nothing not clearly given him by the grant. In case of doubt, the grant is construed in favor of the state, and most strongly against the grantee." *Ibid.* 436.

Nothing can more fully establish the rule as I claim it, than these cases—that public grants, to private corporations, must be express and clear. A doubt defeats the claim. Whatever is not clearly and expressly granted, is withheld.

This rule is no less clearly and firmly established, and acted upon, in the state of Pennsylvania. On this point, the courts in that state "give no uncertain sound." If possible, they lay down the rule more strongly, and adhere to it more rigidly, than we have done.

In the case reported in 7 *Harris* 218, of *Packer* v. *The Sunbury & Erie R. Co.*, the Chief Justice of that state, delivering the opinion of the Supreme Court, says : " All acts of incorporation, and acts extending the privilege of incorporated bodies, are to be taken most strongly against the

companies. Whatever is not expressly and unequivocally
granted in such acts, is taken to have been withheld."
Again, on page 152, in the same book, in the case of the
Pennsylvania Bank v. the Commonwealth, the Chief Justice
illuminates the rule, and exposes the great dangers which
require an unflinching adherence to it. "If," says he,
"acts of incorporation are to be so construed as to make
them imply grants of privileges, immunities and exemptions,
which are not expressly given, every company of adventurers
may carry what they wish, without letting the legislature
know their designs. · Charters would be framed in doubtful,
or ambiguous language, on purpose to deceive those who
grant them; and laws, which seem perfectly harmless on
their face, and which plain men would suppose to mean no
more than what they say, might be converted into engines
of infinite mischief. The legislature, without knowing or in-
tending it, might be thus induced to disarm the state of its
most necessary powers and transfer them to corporations.
The continued existence of a government, under such circum-
stances, would not be of much value. There is no safety to
the public interests, except in the rule which declares that
the privileges not expressly granted in a charter are with-
held."

In the subsequent case of The Pennsylvania Railroad
Company v. The Canal Commissioners, the same learned
judge repeats the rule, as follows: "Corporate powers can
never be created by implication nor extended by construc-
tion. No privilege is granted unless it be expressed in plain
and unequivocal words, testifying the intention of the legis-
lature, in a manner too plain to be misunderstood. When the
state means to clothe a corporate body with a portion of her
sovereignty, and to disarm herself to that extent of the
powers which belong to her, it is so easy to say so, that we
will never believe it to be meant when it is not so said. Words
of equivocal import are so easily inserted by mistake or
fraud, that every consideration of justice and policy requires
that they should be treated as nugatory when they do find their

way into the enactments of the legislature.  In the construction of a charter, to be in doubt is to be resolved; and every resolution which springs from doubt is against the corporation.  This is the rule sustained by all the courts in this country and in England.  No other has ever received the sanction of any authority to which we owe much deference. This court has asserted it times without number." 9 *Harris* 22.  And still again : in the same book, in the case of The Commonwealth v. The Franklin and Erie Canal Company, the same learned judge reiterates the rule, with emphasis. *Ibid.* 128.

In the case of The Commonwealth v. The Erie and Northeast Railroad Company, the same judge sums up the rule.  " This case," says he, " requires us to give a construction to the charter of a private corporation.  The frequency of such cases excites some surprise, when we reflect that an act of incorporation is, and always must be, interpreted by a rule so simple that no man, whether lawyer or layman, can misunderstand or misapply it.  That which a company is authorized to do by its act of incorporation, it may do; beyond that, all its acts are illegal, and the power must be given in plain words or by necessary implication.  All powers not given in this direct and unmistakable manner, are withheld. *   *   *   If you assert that a corporation had certain privileges, show us the words of the legislature conferring them. Failing in this, you must give up your claim.  A doubtful charter does not exist; because, whatever is doubtful is decisively against the corporation." 3 *Casey* 351.

The undeniable rule, then, of construing legislative grants to private corporations—admitted and acted upon everywhere, and no where more firmly and fully than in this state and in Pennsylvania—is simply, that to prevail they must be expressed in such plain and unambiguous language as to admit of no doubt; for doubt defeats the grant.  Or, in terser phrase, all corporate powers not so granted are withheld.

This rule of construing corporate grants must, and I think

will, control the action of this court, not only because it is a rule of law, founded in wisdom and authoritatively admitted in our own courts, but because, if possible, it is made still more imperative by special enactment in our act concerning corporations. It has been for more than twenty-five years the statute law of this state.

2. Keeping, then, this rule in view, I respectfully submit, in the first place, that the power granted to the United Companies by the act of 1870, to consolidate, contract, or lease, is confined to canal and railroad companies in this state; and that it does not extend to the Pennsylvania Railroad Company, which is averred in the bill, and admitted in the answer, to be purely a foreign corporation.

In this regard, the substance of the enactment is, that it shall be lawful for said United Companies to consolidate their [own] respective capital stocks; or to consolidate [their own respective capital stocks,] with the stocks of any other railroad or canal company or companies, in this state; or, *otherwise*, make such other arrangements for connection or consolidation of business with any such company or companies, by agreement, contract, lease, or otherwise, as to the directors may seem expedient.

It is obvious that the arrangement of the subordinate sentences of the act, is not a lucid one; and, also, that the punctuation is imperfect and inaccurate. These defects, in a critical reading of it, must then, of necessity, be supplied.

In my reading, I do this; omitting, at the same time, those portions of the enactment which have no relation to the point now being discussed, and supplying in brackets, the necessarily implied portions of the sentences. This reading, in my judgment, brings out the true intent of the legislature, to be gathered from the words of the act. It limits the power granted, to domestic corporations—corporations "in this state;" and gives to the word "otherwise," about which the contention is, its proper meaning of qualifying the word "make," which relates back to its correlative verb, "consolidate," so as to authorize other arrangements besides

a consolidation of stocks, viz. "any arrangements for connection or consolidation of business," as distinguished from a union of stocks.

Precisely the same interpretation of the word "otherwise" would be effected by simply transposing it from its present place, where it is senseless, to that immediately after the second "consolidate" in the section. It would then read "or to consolidate, or otherwise, with any other railroad or canal company or companies in this state;" and would perform its proper office, by directly qualifying the verb "consolidate," instead of doing so, indirectly, as the correlative of the verb "make," as I have already suggested.

While this construction of the statute will give to every word its proper signification, it will also confine the operation of the court to its legitimate province—the interpretation of statutes, instead of the making of them. The word in question would be given its proper meaning, instead of an entirely different one; or else, as proposed by the last learned counsel who addressed the court, instead of standing for itself, would have some half dozen words added to it. The one mode would be the substitution, for the word used by the legislature, "otherwise," having a specific and known meaning, an entirely different word, "elsewhere," having also a well known, but entirely different meaning; or else it would be adding to it a number of other words, not necessarily implied to effect any expressed, or declared intention of the legislature. This would not be expounding laws, the legitimate province of a court; but the making of them, the legitimate province of the legislature. A sheer usurpation of legislative power by the judicial. This is never permissible; much less is it not allowed, to eke out a corporate grant, which can only be made by clear and express words; and not being so made, is positively withheld.

My reading effects, too, the three obvious objects of the act. First, to authorize a consolidation of the stocks of the United Companies, which had not been done by the agreement of 1867 : Second, to authorize the United Companies

to consolidate their stock, with the stocks of other companies in this state : and Third, to authorize the consolidation, or other arrangement or connection of business, with such companies.

See *Dwarris on Stat.* 702, '4, '7, '8, '9, '11 *and* '20; *Sedg. on St. and Cons. Law,* 260, 261; *Smith* 629, § 481; *Forest* v. *Forest,* 10 *Barb. S. C., Rep.* 46, 48; *Jones* v. *Smart,* 1 *T. R.* 42.

In this last case, Mr. Justice Buller completely over-throws my learned friends' differing modes of construction, by striking out and substituting, or interpolating words. "We are bound," he says, "to take the act of parliament as they have made it. A *casus omissus* can, in no case, be supplied by a court of law; for that would be to make laws." To which I take leave to add, a *multo fortiori,* we cannot so make corporate grants.

The intention of the legislature to limit the arrangements authorized to domestic corporations, appears very clearly, in the second proviso to this section; which I have already read. The object of the proviso was to avoid giving sanction to any contract, by the United Companies, with any other company with which they were authorized to contract, which would release either party from taxation, or any obligation by them to this state. "Provided further," says the legislature, "that no such consolidation, &c., shall have the effect, or be construed to release or discharge the United Companies, or any or either of them, or any company or companies, with which any such consolidation, &c., may be made, from any taxes, liabilities, obligations or duties, which they, or either of them, may be subject or liable to, either to this state or to any other person or persons."

It is obvious, that the companies with which the United Companies were authorized to contract, were *such* companies as the legislature had the power to tax, and which were subject "to liabilities, obligations, and duties" to this state. As no foreign corporation was subject to taxation, or owed any liability, obligation, or duty to this state, the legislature

could not have had reference to such a corporation; and consequently, intended that contracts should be made only with *domestic* corporations; to which the jurisdiction of New Jersey extended, and which, only, were liable to her.

Again, the "effects and consequences" of the construction contended for, is a proper subject of consideration. It certainly cannot be—and ought not to be—the established policy of this state, to extend the almost unlimited power of consolidation and contract to the corporations of this state, with foreign corporations, anywhere and everywhere. And if, as in this case, the United Companies have had granted to them such power as contended, it is very easy to see that all the other railroad and canal corporations will, sooner or later, procure like powers. The sovereign attributes or franchises of the state, vested in them for the public good of the people of the state, will soon become cheap articles of merchandise, everywhere. If, to carry the grant now claimed, "otherwise" can be stricken out of the statute, and "elsewhere" inserted, or its simple, known, and acknowledged meaning can be perverted to mean what it does not in truth mean—that is, if, by judicial construction, to strain a more than doubtful public grant to a private corporation, "otherwise" can be made to mean "otherwhere," or "elsewhere;" then the power of consolidation and arrangement, granted to the United Companies, becomes territorially unlimited. It will be made to extend, not only into every state in this Union, but to every nation in the world—England, France, China, and Japan; provided they can, by arrangement, get up some "identity of interest" with a railroad or canal company in either of those countries. "Otherwise," or "elsewhere," unlimited, is "everywhere," except in the places previously named. Such legislation cannot be presumed. It would degrade the state. The impression of stupidity, or artifice, could not be avoided.

It cannot be denied that the powers here granted, even if limited to our own state corporations, are certainly extra-

ordinary. Any contract for consolidation or arrangement of business, however exceptional, is sanctioned in advance. But if extended to foreign corporations, our most important highways, without knowledge or notice to any one but the parties, by simple contract, may pass into the ownership and control of these corporations; and through them, to the states creating them. The contract is irrevocable. What, then, becomes of the control which every state ought to have over its own highways?

Is not the power contended for, if granted, a most important legislative grant to a private corporation? Is not this interpretation on which the claim is based, at least a doubtful one? This is all I ask. Doubt defeats the claim. All corporate franchises, which are not expressly granted in language so clear and unmistakable as to repel every doubt, are withheld. This is the law of both New Jersey and Pennsylvania, or the maxim of *stare decisis* is a mockery.

3. But if this court shall hold that the act does authorize the United Companies to consolidate with or lease their works to a foreign corporation, it must yet be such foreign corporation as is "identified in interest" with them; "or whose works form, with the works of the United Companies, continuous or connected lines."

Here, again, we are in the region of conjecture. What constitutes an "identity of interest" between two railroad or canal companies? or what constitutes continuous or connected lines of their works? it is utterly impossible to determine. Identity is sameness. Must it be a sameness, or harmony of interest throughout? or will any one or two interests in common, and all others conflicting, be an identity within the act? Or may they, for the purpose of creating an identity of interest, first make a business arrangement which would, in the same sense, unite all or some portion of their business, and then calling that "an identity of interest;" rely on it to justify a consolidation or lease? Must their works, to be continuous, continue in the same, or nearly the same direction? or are they continuous, what-

ever may be their respective directions, simply because you can get from one to the other, and then continue on to some other place, without regard to course? And to constitute connection must their works join, so as to pass immediately from one to the other? or may they be connected by the intervening works of other companies, so that the works of others, which actually separate them, legally connect them? And if so, how many miles of intervening railroads or canals would be simply a connection? and how many would create a separation? or where would connection, by intervening roads, end, and separation begin? These are all questions much more easily put than answered. And because they are so difficult to answer as to create doubt upon the well established rule already stated, no corporate grant can be predicated upon them.

The complainants aver that there is no identity of interest between the United Companies and the Pennsylvania Railroad Company; but that, on the contrary, they are rival companies, having hostile interests; and that this pretended lease is resorted to to assuage hostilities. The only answer to this averment is, that there is an identity of interest; because there is a contract or arrangement, between the parties, by which the New York passengers and freight, brought by the Pennsylvania Company to Philadelphia, are transferred over the intervening works of other companies to the works of the United Companies at Trenton, and thence to New York, for an agreed compensation. This is a simple arrangement, touching through freight and passengers, similar, in substance, to the forwarding contracts between railroads all over the country: and I deny that it constitutes the "identity of interest," contemplated by the act. If so, an "identity of interest" exists between all the railroads of the country, where passengers and freight are, directly or indirectly, transferred from one to the other; and the act would justify consolidation with any railroad or canal company, with which any such arrangement had been, or should be made.

4. Again, the act requires that the works of the company to be consolidated with, must form a continuous or connected line with the works of the United Companies. The exact language of the act is, " Whose works shall form with their own [i. e. the works of the United Companies,] continuous or connected lines."

The condition required is, that the " works " of the contracting parties shall be " continuous or connected ;" not their " works," by the aid or intervention of the works of other companies; but their works, only, of themselves. And it is the " works," that is their railroads or canals, physically; not a mere business connection, or continuity of travel or traffic. It is very clear, I think, that the act requires the continuity or connection to be a physical one; and to connect immediately, and not indirectly, by intervening works or lines. It was so held in Pennsylvania, as I am informed, under similar language in their act of March, 1859, and the defect was cured by the act of 1861.

Now, the complainants in their bill aver, that there is no connection or continuity of " works ;" and they explain how they are separated. That the works of the United Companies have their westerly termini at Trenton, Bordentown, and Camden; that the works of the Pennsylvania Railroad Company have their easterly termini at Mantua, in that state, and on the west side of the Delaware, below Philadelphia; and that the works of the contracting parties were, necessarily, separated by the intervening works of other companies, between Trenton and Mantua, on the one hand, and by the river Delaware on the other. This physical separation is admitted in the answer of the corporate defendants, and by their counsel in argument. But, it is contended that, because the United Companies, by ownership of a majority of the stocks of the intervening bridge and railroad companies between Trenton and Mantua, can and do control those companies, and transport passengers and merchandise to Mantua; and also, from the mouth of the canal at Bordentown, and from the westerly terminus of the Camden

and Amboy Railroad at Camden, down the river, to the Delaware spur of the Pennsylvania road, below Philadelphia, and that in this way a *business* connection and continuity of traffic exists between the contracting parties, within the intent of the act.

This insistment of counsel admits, that there is no direct and actual continuity and connection of the " works " of the United Companies, with the works of the Pennsylvania Company; which, in my judgment, and as I respectfully submit, admits that there is no such connection as the act requires. The " works " of the companies are to be " continuous or connected;" not the *business or traffic*, over other works and natural highways. The works of other companies, and the Delaware river, which actually separate them, cannot, truthfully, be said to " connect " them. The same things cannot perform directly opposite functions at the same time. Upon this principle, the works of the United Companies " form continuous and connected lines," with one-half the railroads and canals in the United States, and all the lands, on either side of the Delaware, and thereby separated, would still be connected by it! And in like manner, the New Jersey Railroad, by having its northern terminus on the Hudson, opposite New York, would " form a continuous and connected line " with all the railroads which terminate at that city and its surrounding waters; and would be *connected* with the railroads in Europe by the Atlantic ocean !

The truth is, there is no such connection or continuity of the works of the contracting parties as the act obviously requires; and sophistry can not prove to exist that which does not exist.

I respectfully submit that, by no proper rules for construing statutes, can our act of 1870 be held to authorize the execution of the lease in question. Much less can it be so construed, upon the established rules for construing public grants to private corporations, by which doubt defeats the grant.

VOL. VII. R

. II.

In the next place, I submit that the act of March 17th, 1870, if it is to be construed as authorizing the United Companies to make the lease in question, is, as against dissenting stockholders of the United Companies, invalid.

As preliminary to discussing this general proposition, I call attention to the statements in the bill, touching the charters of those companies.

They were granted in 1830 and 1832, before the passage of our act of 1846, and without any reservation to the legislature of the power to alter or repeal. They are, therefore, irrepealable, except in the exercise of eminent domain. These facts are stated in the bill and admitted in the answer, which denies only the conclusions of law.

I also call attention to some of the familiar provisions of those charters, to the effect; that, for constructing the works of the companies, the moneys shall be raised and paid by the stockholders, upon subscriptions to the capital stock; that the shares shall be personal estate; that the lands across which the works shall be located may be taken from the owners at an appraised value by condemnation; that the works, when completed, shall be public highways; that the state, at the expiration of thirty years after their completion, may take them at an appraised value, not exceeding cost; that this reserved power in the state to take the works by subsequent supplements, has since been extended to the year 1889; that the affairs of the companies are to be managed by respective boards of directors, to be annually chosen by the stockholders; and that the net profits of the works shall be periodically distributed to the stockholders. These are, most of them, the ordinary provisions in our charters, and are provisions in these.

They are organic provisions; in reference to which the charters were accepted, the companies organized, the subscriptions to the stock made and paid, the works constructed,

and they are, in part at least, the considerations of the implied contracts between the state and the corporations, and between the corporations and their stockholders.

In the granting and accepting of every private charter, there is, incidental to it, an implied contract between the state and corporation, that, unless forfeited for some wrongful act or omission, it shall have and hold all the corporate powers and franchises granted, according to the provisions of its charter. If unlimited, the grant is perpetual. If limited, then it is taken subject to the limitations, whatever they may be. This contract, like every other valid contract, on principles of universal law, is irrevocable, except by the parties to it or their representatives. The one cannot do it without the other. And, under our constitutional forms of government, it is sacredly protected against legislative violation, by the provision in the Constitution of the United States, that no state shall pass any "law impairing the obligation of contracts." And, also, by the similar provision in the Constitution of this state, that our legislature shall not pass any "law impairing the obligation of contracts." The language is precisely the same in each. The one is a paramount prohibition on all the states; the other is a prohibition of the people of this state upon their own legislature. It is, on this principle of universal law (that contracts are, in their nature, irrevocable, except by the consent of the parties to them), protected from violation by the two-fold constitutional prohibitions mentioned, that no state of this Union, after having granted a charter to a private corporation, without limitation or reservation, can repeal or alter it in any of its material parts, without the consent of the corporation, the other party to the contract.

There is, also, in the accepting of every private charter of incorporation, and the organization by the stockholders under it, an implied contract between the corporation itself and its stockholders, to the effect that none of the powers or franchises of the corporation, or any of its corporate property, shall be applied or used, to or for any other object or

purpose than·those contemplated or authorized by the charter.
The charter constitutes the articles of the corporation part-
nership entered into, limiting its business to the objects con-
templated ; and the powers and funds of the partners can. be
properly applied to no other business. Any other application
of them is illegal, outside of the contract, *ultra vires*, and
liable to be restrained or set aside.    This contract is also
inviolable, for the same reason ; and protected, in the same
way, as the contract between the state and corporation.

I. In considering the general proposition—that the act of
1870 is void against dissenting stockholders—my first sub-
ordinate proposition is, that the organic provisions of the
charters of the United Companies are irrepealable and unal-
terable, either directly by the state, or indirectly by the di-
rectors, under legislative sanction, without the consent of
the companies and their stockholders, on the ground that
such alteration would impair the obligation of the implied
contracts contained in the granting of their charters, con-
trary to the Constitution of this state, and of the United
States.    *Const. U. S., Art. I*, § 10 ; *N. J. Const., Art. IV*,
§ 7, *pl.* 3.

It is unnecessary to argue before this court, that what the
legislature cannot do directly it cannot do indirectly.    In
other words, that it cannot authorize others to do what it is
unable to do itself.

The legislature cannot repeal or materially alter the
charters of private corporations, without the consent of the
companies and their stockholders.    *A. & A. on Corp.*, § 767,
and cases cited.

I refer, specially, to some of the cases in this state, be-
cause they are authoritative on the action of this court.

The case of Glover v. Powell, decided by Chancellor Wil-
liamson in 1854, was touching an act which authorized the
cutting of a dam, without the consent of the meadow owners,
across the mouth of Little Timber creek, in Camden county,
which had been made by a meadow corporation, created in

1760. In reference to that act the learned Chancellor said : " The act of the legislature, passed the 17th March, 1854, which authorizes and requires the township committee of the township of Union to remove the dam, is in violation of the Constitution of the United States, which declares that no state shall pass  *  *  any law impairing the obligation of contracts.  *  *  *  In the Dartmouth College case, Justice Story remarks : ' A grant of a franchise is not, in point of principle, distinguishable from a grant of any other property.  If, therefore, this charter were a pure donation when the grant was completed and accepted by the grantors, it involved a contract that the grantees should hold, and the grantors should not resume the grant, as much as if it had been founded on the most valuable consideration.'  *  *  * It is in violation of good faith ; it impairs the obligation of a contract which has been enjoyed to the mutual benefit of both parties ; and it is, therefore, repugnant to the Constitution of the United States.   It is in direct conflict with repeated judicial decisions, declaring similar acts void."   2 Stockt. 211, 228, '9.

In the case of the Joint Companies v. the Raritan and Delaware Bay Railroad Company, in 1863, Chancellor Green said, in reference to the franchises of those companies : " The right of an incorporated company to be protected in the enjoyment of their franchises, and the duty of the court of equity, by the exercise of its restraining power, to afford such protection, are familiar doctrines of this court.   These principles have been so often declared, and are so constantly recognized in practice, as to render their re-affirmance, or the citation of authorities in their support, an unnecessary formality.   They are freely conceded as the recognized law of the court."   1 C. E. Green 361.

The decree of the Chancellor, based on this doctrine, was affirmed on appeal to the Court of Errors.   3 Ibid. 565.

And in the more recent case, to which I shall have occasion again to revert, of Zabriskie v. the Hackensack and New York Railroad Company, your honor, holding this court,

said : " Since the Dartmouth College case, in the Supreme
Court of the United States, the doctrine has been considered
firmly established, and been confirmed by repeated decisions,
both in that court and the state courts, that a charter
granted by the legislature to a corporation, is a contract be-
tween the state and the corporators ; and that the state can
pass no act to take away or impair any of the franchises or
privileges granted by it." 3 *C. E. Green* 183.

These New Jersey cases will be acknowledged as authority
by this court.   They require no argument to apply them.

II. My second subordinate proposition is, that the act of
1870 is void as against the *complainants*, at least; because
it attempts to grant new and extraordinary powers to the
directors, by contracts with other corporations, materially
to alter the charters of the United Companies ; to vest the
property and control of all their corporate franchises and
property in those corporations ; to limit the income of the
stockholders to a fixed rent instead of the total earnings ;
and, in fact, practically to annihilate the United Companies
themselves ; and yet that act has never been accepted, either
by said United Companies, in their corporate capacity, nor
by their respective stockholders.

In considering this proposition, I lay out of view the
claimed consent of two-thirds in interest of the stockholders,
because such allegation is, in no sense, responsive to the
bill, and is now denied by the complainants.   It cannot,
therefore, be considered on this motion for an injunction, on
bill and answer alone.

1. In support of this proposition, I first direct your honor's
attention to the fact, that the non-acceptance of the act by
the companies and the stockholders, and the positive dissent
to it by the complainants, is expressly averred in the bill.

Besides the general oath of all the complainants to the
truth of the bill, each has, by special affidavit, sworn or
affirmed that he has never, in any way, assented to the act ;
and that they respectively believe that it has never been

accepted by, or presented to the directors or stockholders of either company for acceptance. Mr. Forker, one of the complainants, in his affidavit, swears that at a joint meeting of all the directors, they refused to call a meeting of the stockholders; and that no meeting has ever been called.

The only answer to the averments in the bill, and affidavits annexed, is to the effect that the act was submitted to the joint meeting, or joint board of directors, consisting of the directors of all the boards, and accepted by a large majority of the joint board; and that the stockholders of the several United Companies, on personal solicitation, to the extent of two-thirds in value, have consented to the act. But when, or in what form the assent of even the joint board was given, or the assent of the individual stockholders, is not stated or made to appear, except by the resolution of the joint board, recommending the leasing of the works to the Pennsylvania Railroad Company for nine hundred and ninety-nine years; and by the production of some rolls of paper, which counsel say contains the assent of two-thirds in value of the stockholders to the lease.

Suppose all this to be true (which is more than apocryphal), yet it is no consent to the act of 1870. It would be, at most, but a simple consent to the execution of the lease to the Pennsylvania Railroad Company—the performance of a single act of assumed power under the statute—not an acceptance of the statute itself as a part of their charters, under and by virtue of which the directors may go on, indefinitely, in contracting and uncontracting, with pretty much all the railroad and canal corporations in the world! The act, I respectfully submit, must be accepted in whole, and in fact, so as to become, in all its parts, a portion of the charters, under and by virtue of which the powers of contracting, conferred by it on the directors, can be repeated at pleasure, or else not at all. It cannot be accepted or used to justify a single contract under it, and then held in abeyance or rejected, as to all others.

But I deny that the joint board, as such, has any power

whatever. either to consent or dissent to the act. It has not, and cannot have, any power to consent to an alteration of the charters of the respective companies, much less to their surrender or annihilation. If it has such powers, where and how did it acquire them? We have not been advised of this, as yet, either by the answer or arguments of defendants' counsel.

But again: the answer of the defendants is in no sense responsive to the bill. The bill avers "that the said act has never been submitted to the board of directors *of either of the said United Companies, or to the stockholders of either* for acceptance; nor has it ever been accepted or acquiesced in by either of said companies. There is no averment in the bill that the act had never been presented to, or accepted by, the joint board of directors; nor that it had never, on personal solicitation, been presented to or accepted by two-thirds in value of the stockholders. The bill charges that the act had never been acted upon by the separate board of directors of either company; or by the stockholders, as a body, of either; or accepted or acquiesced in by the *complainants*. The omission to answer any of these charges is, upon this motion, an admission of their truth, and I shall so consider it.

2. The joint board of directors has no control over the organization, or life of either of the United Companies. The majority, or the whole, as such, of the joint board, have no power to alter the organism of the United Companies; much less to enter into contracts for their annihilation or dissolution. The article of agreement, uniting the United Companies, simply provides that the directors of the said companies "shall meet in joint board, * * and jointly transact, manage, and conduct the business of the parties hereto." It is simply a business meeting for directing the ordinary business of the companies; a kind of committee of the whole, with powers of general supervision. And the act of 1867 confirming this contract of union, expressly provides that "the *organization* and election of directors of the several

companies, shall remain distinct; and the provisions of their respective charters, with all the restrictions and liabilities therein contained, except as necessarily modified by such consolidation, shall continue in force."

The joint board is no corporation; it has no common seal; no corporate powers or franchises; it represents no corporation. It is simply a joint meeting of the directors of the three companies, which, for the transaction of a common business in which they have, by a sort of corporation partnership, embarked, united themselves for the simple purpose of giving their united energies to that business. As a joint meeting, they have no more power over the constitutional organism of each other, or over the corporate existence of either of its members, than a firm, composed of three individuals, and can no more change, or destroy the separate physical existence of each other. It seems to me perfectly clear, that taking everything alleged in defendants' answer, the act of 1870 has never been in fact or legal effect, presented to or accepted by either of the United Companies, or the stockholders of either, much less to or by either of the complainants. It is, therefore, for the want of such acceptance, no part of the charters of either of the United Companies, and void. No law.

The charters of the United Companies were passed some fifteen years before the passage of our general act of 1846, concerning corporations; which enacts, in substance, that the charter of every corporation *thereafter* granted, shall be subject to alteration, suspension and repeal, in the discretion of the legislature. Two of the charters were granted in 1831, and the other in 1832. They are not, therefore, affected by that act.

Neither of the charters reserves any power to the legislature of alteration or repeal, and neither is subject to any limitation, except the power reserved to the state, to take the works at a prescribed time, now fixed in the year 1889, at an appraised value, not exceeding cost. Subject then only to this limitation in favor of the state, they are per-

petual, and cannot be altered or repealed without the consent of the companies. The consent can only be made by some act or acts of the companies, amounting to an acceptance of the act altering their charters. The corporation or legal entity, and the stockholders, who are the corporators, together, constitute the companies. The corporation and its directors, or managers, hold the legal title to the franchises and corporate property, and are the trustees. The stockholders, whose money paid for the franchises and property, are the beneficial owners; the *cestuis que trust* for whose use the property is held and managed. The two—the trustees and *cestuis que trust*—holding together the whole estate, legal and equitable, are the company; and hence it is, that to constitute an acceptance to any alteration in the charter, they must both consent.

*A. & A. on Corp.*, §§ 81–2 and cases cited. I refer also to *Lincoln & Ken. Bank* v. *Richardson*, 1 *Maine* 79; *Galena & Ch. R. Co.* v. *Appleby*, 28 *Ill.* 283; *M. River R. Co.* v. *Zimmer*, 20 *Ill.* 654; *Winter* v. *Muscogee R. Co.*, 11 *Georgia* 438.

These authorities fully sustain the point stated, that an acceptance by the corporation and stockholders to any material alteration in the charter of a private corporation is necessary. I, therefore, submit that for the want of such acceptance the act of 1870 is void.

III. Failing to convince the court that the acceptance of the act of 1870, by the respective United Companies and their stockholders is necessary, and that they have not accepted it; my next subordinate proposition is, that that act is void against the complainants, on the ground that it impairs the obligation of the implied contract between the United Companies and their stockholders, to the effect that none of their corporate franchises, powers or property shall be applied or used, to or for any object or purpose not contemplated or authorized by their charters, by authorizing or attempting to authorize (that being the construction of the act) the

directors to execute the lease in question, without the consent of *all* the stockholders.

Assuming the existence of such a contract, without reference to the authorities with which the books are saturated, the question presented by the proposition is : Is it competent for the legislature to authorize the directors, with the consent of two-thirds only of the stockholders, to execute the lease in question ?

It certainly is not competent for the legislature so to do, if such would impair the obligation of that contract; for the legislature is prohibited, both by the Constitution of this state and of the United States, from passing "any law impairing the obligation of contracts." What then is the contract ?

It is a contract between the companies and their stockholders. Not with *two-thirds* of the stockholders, or any number less than the whole, but with all, every one; as much with one as the other. The contract is with them, jointly and severally. Each one is a contractor, as much as any other one, or all the stockholders; and on the faith of his contract, each one has invested his money, and that is the contract protected by the constitutional provisions to which I have referred, and to impair which would certainly be an infraction of those constitutions. A contract by A with B and C cannot be revoked or altered by A, with either B or C, without the other. The parties only, or their representatives, who made the contract, can unmake or alter it.

Again: the contract is that the corporate franchises, powers and property procured by the moneys of the stockholders, shall not be applied to any other objects or purposes than those provided for in their charters. The stockholders agree to embark or invest their money in a particular enterprise, specified and provided for in their charters. That is their contract. To use or apply their money, or the property procured by it, in any other enterprise, or any other way than contemplated in their charters, would be a violation of that contract—an impairing of it within the meaning of the Con-

stitution. This the legislature is not competent to do, or authorize to be done, without the consent of all the stockholders; for the same reason that I have already stated, touching the other branch of the contract. The money and other property belong to the stockholders. Each has an estate in it in the ratio of his amount of stock, and neither can be deprived of his property without his own individual consent, any more than one of several joint tenants, or tenants in common of lands, can be deprived of his estate, however small, by the action or consent of any or all the others.

I submit, therefore, that upon the well established principles of the rights of property and constitutional law, it is not competent for the legislature to make, or authorize the directors of the United Companies to make, by contract or otherwise, any alterations in their charters, or apply the corporate franchises, powers and property to any other use or purpose than contemplated and provided for in their charters, without the consent of *all* their stockholders.

Having defined, and, to some extent, elucidated the character of the implied contract between an incorporated company and its stockholders, I proceed to discuss more particularly the question now being considered:

Is it competent for the legislature to authorize the directors of the United Companies, with the assent of two-thirds only of their stockholders, to execute the lease in question?

1. The act of 1870 does not in terms direct or authorize the execution of the lease. It is in general terms, without express reference to any particular contract or company. But assuming what I have endeavored to disprove, that it can be *construed* to extend to the Pennsylvania Railroad Company, then it authorizes the United Companies to make with it, for connection or consolidation of their business, such "agreement, contract, lease or otherwise," as they may deem expedient. Under this general power, those directors propose to execute the lease in question. This brings up the question stated.

It is too clear to require argument or reference to authorities to prove or establish before this court, that if the legislature could not, by direct enactment, direct or authorize the execution of the lease, it cannot do so indirectly by giving authority to the United Companies. What it cannot do directly, it cannot authorize another to do. The question then is reduced to this: Can the legislature directly, by special enactment, authorize the directors of the United Companies, upon obtaining the consent of two-thirds of the stockholders, to execute the lease in question, against the dissent of the remaining stockholders, or any number of them? I maintain that it cannot.

2. There is no difference in principle between obtaining the consent of two-thirds of the stockholders and obtaining simply that of a majority of them. If two-thirds can control the other one-third, then upon the same principle a majority of the stockholders can control the minority. This is admitted by counsel on the other side. If a majority cannot control all the minority, it cannot control any of them; and I maintain, and I submit, that it is well settled upon principle and authority that it is not a question of majority or minority of the voices, or extent of interests, or opinions of stockholders, but a question of *property, without regard to value,* based on the contract of each individual stockholder with the corporation, as I have already defined it. Each one must answer for himself, and not any number, or all others of the stockholders, for him. His own *will* is the law; and his own estimate of value, and what he will do or have done with his own property, is a question belonging exclusively to himself. He can "do what he will with his own." It is his own property, and not the property of another, and he cannot be disturbed in its enjoyment, except in the exercise of the right of "eminent domain."

3. Before referring directly to the authorities sustaining this position, I have simply to suggest that if this is a right of property, based on the contract as I have stated it, between the stockholders and the corporation, then it is pro-

tected by the constitutional prohibitions to which I have referred, from being impaired by the legislature; and, consequently, that the act of 1870, so far as it attempts to subject it to the control of two-thirds of the stockholders, is void.

"If a majority of a railway company obtain an alteration of their charter, which is fundamental, as to enable them to build an extension to their road, any shareholder who has not assented to the act may restrain the company from applying the funds of the original organization to the extension." 1 *Redf. on Railw.* (*4th ed.*), *p.* 196; *Stevens* v. *R. & B. R. Co.*, 29 *Vt.* 562.

Touching the unconstitutionality of a law, so far as it interferes with the property right of each individual stockholder: see the opinion of Mr. Justice Davis, in the Supreme Court of the United States, in the case of *Clearwater* v. *Meredith*, 1 *Wall.* 39.

And upon this point your honor held that, even under a charter which reserved to the legislature the power "at any time to alter, modify, or repeal" the charter, it had no power, against the rights of a single dissenting stockholder, to authorize the use of the corporate franchises and powers to the extension of the road. *Zabriskie* v. *The Hack. & N. Y. R. Co.*, 3 *C. E. Green* 191–2.

It is perfectly clear, on principle and authority, that if the act, without the provision requiring the assent of two-thirds in value of the stockholders to authorize the contract, would be unconstitutional, it is equally so with it. The only question then is, whether the contract between the corporation and the stockholders, to the effect that the corporate franchises and property shall not be applied to any other than the objects and purposes contemplated and provided for in the charter, *is impliedly qualified*, so that a majority of the stockholders, as to such contracts, can control the minority? I now proceed to show that the whole scope of authority is against such qualification.

4. The doctrine of *ultra vires* is more fully discussed in the first volume of Redfield on Railways, and the authorities, both in England and this country referred to, than in any book I have consulted.

He says : " There can be no doubt that subscribers to the stock of a railway company are released from their obligations to pay calls, by a fundamental alteration of their charter. This is so undeniable and so familiar a principle, in the general law of partnership, as not to require confirmation here. * * * Every owner of the shares expects and stipulates with the other owners, as a corporate body, to pay them his proportion of the expenses, which a majority may please to incur, in the prosecution of the particular objects of the corporation. To make a valid change in this special contract, as in any other, the consent of both parties is indispensable. * * * If a majority of a railway company obtain an alteration of their charter, which is fundamental, as to enable them to build an extension of their road, any shareholder who has not assented to the act, may restrain the company, by injunction, from applying the funds of the original organization to the extension." *P.* 196, § 56.

To the same effect is the doctrine laid down by *Angell & Ames on Corp.,* *p.* 414, § 391, and cases cited.

But, without multiplying special references to authorities in other states, I come directly to our own. I refer, first, to the familiar case, decided in 1853, of *Kean* v. *Johnston,* 1 *Stockt.* 401.

That was a case almost identical with the present, except that it was an attempt to directly amalgamate or consolidate two domestic corporations, under a special act, authorizing it by special reference to the corporations ; instead of accomplishing the same thing, in substance, between the United Companies of this state, with a Pennsylvania corporation, indirectly, by a contract or lease, *under an act confirming, in advance, any contract or lease for consolidation or arrangement in business the said United Companies should*

*make.* That case had the merit of candor. So much cannot be said, truthfully, of this.

A railroad, under a special charter, had been constructed from Elizabethtown to Somerville. Another company had been chartered by a different name, to construct another road from Somerville to the Delaware river, opposite Easton, in Pennsylvania. This company, by its charter, was specially authorized to purchase the Elizabethtown and Somerville road, so as to make a continuous line across the state; and that, on the purchase being effected, the two roads were to become consolidated into one, by the name of the Central Railroad Company of New Jersey. An agreement for the purchase was entered into between the companies; and Col. Kean, a single stockholder in the original road, filed his bill to set aside the agreement, and to restrain all further proceedings under it. The then Chancellor (Williamson) being interested, referred the case, on demurrer to the bill, to Master Parker, on whose opinion the demurrer was overruled. It was elaborately argued by able counsel.

The opinion of the master is of marked ability. I read a small portion of it, relating to the point now being considered.

Referring to the rights of the stockholders in the Elizabethtown road, the master says:

" As stockholders, they own the road in common, to be employed in specified uses. Each owns a share in the whole, and is to have a proportionate share in the profits. They have invested a portion of their capital in it, and in it alone. They have a right in the road, and in every dollar it earns. The directors are their trustees, to employ the joint capital in the management of the road, and the road only, to the end that from the investment the stockholders have chosen, they may reap the contemplated profits; and this is the agreement of the stockholders among themselves. They each contract with the other that their money shall be so employed. What the majority determine, within the scope of this mutual contract, they each agree to abide by; but there their mutual contract ends, and no majority, however large, has a

right to divert one cent of the joint capital to any purpose not contemplated with, and growing out of this original, fundamental, joint intention." 1 *Stockt.* 407, 408.

But I come for the settlement of this fundamental principle, still more closely, and, if possible, more authoritatively, square into this court, held by the same distinguished jurist whom I now address; and I adopt his very language, in 1867, in the case of Zabriskie v. The Hackensack and New York Railroad Company.

" It is settled," says your Honor, " upon the principles of the common law, in this state, and most of the states of the Union, that when a number of persons associate themselves as partners, for a business and time specified in the agreement, or become members of a corporation for definite purposes and objects specified in their charter, which, in such case, is their contract, and for a time settled by it, that the objects and business of the partnership or corporators cannot be changed, or abandoned, or sold out, within the time specified, without the consent of all the partners or corporators; one partner or corporator, however small his interest, can prevent it. And this is so, although by law a majority in either case can control or manage the business against the will and interest of the minority, so long as it is within the scope of the partnership or charter."

" This rule is founded on principle; the great principle of protecting every man and his property by contracts entered into; a guiding principle in all right legislation; and incorporated into the Constitution of the United States, and of almost every other state in the Union. And the rule is not changed, because the new business or enterprise proposed is allowed by law, or has been made lawful since the association was formed." 3 *C. E. Green* 183, '4.

It is this inherent right of private property, which will not tolerate, without destruction, any qualification other than the right of eminent domain; doubly protected by constitutional prohibitions against legislative action; and thus enunciated in this house, in words worthy of being written in

letters of gold; on which I rely to arrest the contemplated sacrifice of the rights of private property, aimed at by the execution of the lease in question.

See also *Bank of Penn.* v. *Comm.*, 7 *Harris* 151.

In perfect harmony with the American decisions are those of England, in the appreciation and unswerving protection of this great principle of private property. All the leading English cases are referred to in the recent work of Hodges on Railways, not yet published in this country. See *pages 61 to 81.*

There is this distinction to be observed between the English cases and the American. Parliament is omnipotent, unrestrained by any actual constitutional prohibition; so that, in case of an act of Parliament positively directing a thing to be done, it controls the courts. Hence, the English cases can harmonize with ours only where there is no such positive act.

With but very few exceptions, all the authorities in England and in this country, are to the effect that every shareholder in an incorporated company, when not otherwise specially provided in the charter, has a special property interest, founded upon contract, represented by his share of the stock, which, in law and equity, gives him a right to require the corporate property and franchises to be kept to the chartered uses of the corporation; and that a Court of Chancery, on application by one, or any other number of the stockholders, will restrain their application to any other uses.

A single shareholder out of six hundred, having five hundred and ninety-nine against him, says Vice-Chancellor Kindersley, may come into a court of equity and restrain any unauthorized use of the corporate property or credit, however profitable the use, by simply saying, " that is not our contract among ourselves." 1 *Dr. & Sm.* 794. Master Parker, in the case of Kean *v.* Johnston, in this state, touching a case very much like the present, said : " Each shareholder may simply say, '*non haec in federa veni.*' " And your

Honor, in the case of the Hackensack and New York Rail-road, declared that "one partner, or corporator, however small his interest," is sufficient; and that the rule is founded on the great principle of protecting every man in the enjoyment of his property. And the Chief Justice of Pennsylvania shuts the door against every possible disregard of the rule, by averring that no judge who has a decent respect for the principle of *stare decisis,* can deny that it is immutably established. 7 *Harris* 151.

If it is settled that private corporations have no right or power to apply their corporate franchises and property to objects or purposes not contemplated and provided for in their charters; and that any stockholder can restrain any attempt so to apply them; it remains only to determine, on the point now being considered, whether the execution of the lease in question is within the objects and purposes contemplated and provided for in the charters of the United Companies.

The only objects and purposes of those companies, now considered as one company, and the only ones declared or provided for in their charters, were to make, maintain, and operate, across the state of New Jersey, a distance of about ninety miles, complete and expeditious lines of travel and transportation, by railroads and canal, between the cities of New York and Philadelphia; without any pretence of power or object of extending those lines, by contract or otherwise; or of co-operating in any scheme for the extension of those lines westward, across the state of Pennsylvania, three hundred miles, to Pittsburg; much less, across the continent of North America, three thousand miles, to the Pacific ocean. In the simple venture of traversing the state of New Jersey alone, and connecting those cities by railroad and canal, the stockholders of those companies embarked and invested their moneys upon the irrevocable contracts between them and the state, and between themselves and their respective companies, that their corporate powers and franchises should be confined to that business; and that they should have to

their own use, all the proceeds and profits, whatever they might be, of that business; and that their funds, thus invested, should be confined to that business.

As a further security to this investment, the stockholders were to have the absolute possession, direction, and control of their own works, by boards òf directors, to be chosen annually by themselves, and to be made more directly responsible to them, by such securities and by-laws as they might make and require. But it was not contemplated, in that scheme, that all their franchises and works, including all their other corporate property, now admitted to be of the value of fifty millions of dollars, under the pretence of a lease, should be practically assigned and sold out, for one thousand years, to the Pennsylvania Railroad Company, to take, for that period of time, all those franchises, works, and other property, into its absolute possession and control; and to maintain and operate those works, and dispose of all the other property and proceeds, except only a fixed rental or pension (call it what you please,) of two millions a year; thereby stripping those stockholders not only of all the care and control over their own property, but of all ability to pay or discharge their own debts to avoid absolute sacrifice of everything; and all this upon the naked covenant of a foreign corporation, over which this state has no jurisdiction, and that without the payment of a single dollar of purchase money, or giving any particle of security for the payment of the rental, or the performance of any other covenant contained in the lease! All this is now proposed to be done by simple contract, through the instrumentality of the lease in question. Execute it, if valid, and it is all accomplished, passed redemption. To argue that such an absolute breaking up, practical annihilation of the United Companies, would be beyond the objects and purposes contemplated in their charters, I should regard as a positive stultification of myself; and an implied stultification of this court. I shall, therefore, forbear, further than to refer to a few authorities.

The principal English cases as to what acts of corpora-

·tions, or its directors, will be regarded as *ultra vires*, beyond their strength, or outside of the proper objects or purposes ·of their charters, will be found collated and commented upon in *Hodges on Railw., pp.* 61 *to* 71.

*Shrewsbury & Bir. R. Co.* v. *Northwest. R. Co.*, 6 *H. L. ·Cas.* 113. This was a case where a lease was specially authorized by an act of Parliament upon the happening of a certain event. The bill was filed to restrain the execution ·of the lease before the happening of the prescribed event, *i. e.* the completion of three lines of railway.

The Lord Chancellor, in delivering the opinion of the .court, said :

" If on the completion of one of the lines, the Shropshire ·Company had granted a lease, under its common seal, to the Northwestern Company, it would have been doing, or attempting to do, something *ultra vires.* A railway company ·certainly cannot grant a lease, except when it is authorized to do so by Parliament; and though, by the terms of the .eleventh section, the Northwestern Company is entitled to the possession of each line as it shall be completed, paying a .rent to the Shropshire Company, yet the Northwestern would hold strictly, not as lessee, deriving title under the Shropshire Company as lessor, *but by virtue of the special provisions of the act of Parliament.* I think, therefore, that inasmuch as the whole undertaking had not yet been completed, the time had not arrived when the Shropshire Company had authority to grant a lease." *P.* 130.

This, it may be observed, is not only a case against the ,execution of a lease without special act of Parliament authorizing it; but it exhibits the requiring of a strict compliance with the act. As the whole three roads on which, literally, the power to execute the lease in question was given, had not been completed, the court restrained the execution of the lease, by *one* of the companies, whose road had been completed, and possession of it given to the lessee company, under the .act, which was paying rent, not as *lessee,* but, as

the Chancellor said, "by virtue of the special provisions of the act of Parliament."

Again, on page 136, the Lord Chancellor further said, in the same opinion : "The principle has often been recognized and acted upon in courts of law and equity. In the case of the East Anglican Railway Company v. The Eastern Counties Railway, it was held by the Court of Common Pleas, that no action could be maintained on the covenant of the defendants to accept a lease of the railways of the plaintiffs, to find the capital for constructing the railways, and to pay the costs of promoting certain bills, then pending in Parliament. The covenant was held to be void, being a covenant to do acts not within the objects of the corporation."

The East Anglican case, mentioned by the Lord Chancellor, (reported in 11 *Com. Bench* 775,) was a suit at law in the Common Pleas, on a contract to accept a lease. The contract was held *to be absolutely void*, because the lease would be *ultra vires;* beyond the corporate power of the company.

Both the English and American cases will be found referred to in 1 *Redf. on Railw.*, *p.* 588, *ch.* 22, *sec.* 1, and notes.

*Troy & Rutland R. Co.* v. *Kerr*, 17 *Barb.* 581. This was an action of the company against one of the subscribers to pay the instalments on his subscription to the stock. One of the grounds of the defence was, that he was released from payment by a lease of the road to another company. The court held that although the lease was absolutely void, yet that the mere execution of a void paper did not discharge the defendant from his subscription.

*Ohio & Miss. R. Co.* v. *Ind. & Cinn. R.*, 14 *Am. Law Reg.* 733. This was an action on a contract, by plaintiff company with the defendant company, that upon certain considerations the plaintiff company would, in effect, lease [so construed by the court,] their road, or a particular use of it, to the defendant company. The court held the contract *to be absolutely void*. This case is closely applicable

to the present, because the companies contracting, like the present, were corporations of different states. It is, too, a well considered case, upon argument of some of the ablest lawyers of the country.

This latter case I regard as on all fours with the present. Upon exactly the same reasoning on which that lease was held " simply void," the contemplated lease to the Pennsylvania Railroad Company, had it been executed—simply regarded as a lease—would also be held void; and now, to avoid the irreparable wrong of its execution, should be restrained. But when we consider that the lease contemplated is not only for thirty, but for thirty-three times thirty years; and not only for a partial use, in common with the other company, but a lease of all the franchises and works, and some *twenty millions of dollars* worth of detached personal and real estate, outside of the works; it would seem to me— I say it with great respect to the court—upon any principle of law or common sense, utterly impossible to hold that the proposed lease, or assignment of the corporate property and franchises of the United Companies, is within the contemplated objects and purposes of their charters. I therefore respectfully submit, that the act of 1870 cannot be sustained upon such a basis.

IV. If the question of validity of the act of 1870 (as defendants' counsel, by their arguments, seem almost to admit) is to depend upon the power of two-thirds in interest of the stockholders to control the remaining one-third, I feel quite sure that, both on principle and authority, the act must fall. The act itself, by implication, admits this in its provision for taking the stock of the dissatisfied stockholders by condemnation. It aims, by this provision, to compel them, either to consent to the lease or else surrender their stock to the companies at an appraised value, on the same principle that lands are taken for highways, upon making just compensation to the owners.

Two things are absolutely necessary to justify this pro-

ceeding. First, the use contemplated must be a *public use;* and secondly, just compensation must be made *before* the stock can be taken. These are constitutional essentials, required to exist, in order to justify the taking of private property, under legislative authority, by a private corporation. Neither of these, in my opinion, exist in the present case.

The use must be a *public* use, as distinguished from private. Private property, even *with* compensation, cannot be taken from A and given to B, merely because the legislature thinks B is a wiser, more prudent, industrious, energetic, or public spirited man, and will, therefore, make a better use of it; will cultivate the land better, or will introduce a more profitable culture; will grow corn instead of tobacco. Naboth's vineyard could not be taken "for a garden of herbs." It must be a public *use—i. e.* useful to the public—as distinguished from mere matter of ornament, taste, or convenience. The San Souci miller's mill could not be taken for pleasure grounds, even for Frederick the Great. And it must be a public use for the people of the state taking it, and not for the people of another state. Private property in New Jersey cannot be taken for the use of the people of Pennsylvania, any more than for the people of England. Every government is for the protection and care of its own people only. The lands taken for the construction of the canal and railroads of the United Companies, were taken, and only could have been taken, for highways for the use of the people of New Jersey; to facilitate *their* travel and transportation to the New York and Philadelphia markets; and not to promote the wealth and prosperity of those cities, however much these works may do so.

Again: the compensation must be made *before* the property can be taken; and in order to be so made, some mode of determining upon its amount, prior to the taking, must be provided for. It cannot be made until the amount is fixed. It must be a *cash* transaction, as distinguished from a *credit;* and a determination of the amount of cash to be

paid down, must precede the payment. The plain and une-
quivocal language of our Constitution is, "private corpora-
tions shall not be authorized to take private property for
public use without just compensation *first* made to the
owners."

The "private property," proposed to be taken, under the
act of 1870, is the *stock* of the dissatisfied stockholders.

Stock, in a private corporation, may be defined to be the
estate or interest which each stockholder has in the corpo-
rate property; and is, relatively, to the extent of the ratio,
which the number of shares held by him bears to the whole
number into which the capital stock is divided. The certifi-
cate which he may hold is not the stock; only the evidence
of his ownership of it, and of the amount. If the whole
number of shares be one hundred, and the dissatisfied stock-
holder holds ten of them, he owns, in equity, the one-tenth
part of the corporate property. His certificate, like a man's
deed for his land, is only a muniment of title.

Although the *legal* title is in the corporation, yet the bene-
ficial, or equitable estate, is in the stockholders, whose
money paid for the property. The corporation itself, as a
legal entity, is the mere representative, or trustee, of the
stockholders; and the directors are but managers and
agents.

Chief Justice Comstock thus defines stock:

"Whenever it means anything different from the capital
of a corporation, it can refer to nothing else than the inter-
ests of the shareholders or individuals. Such interests are
called 'stocks'; and the sum total of them is, appropriately
enough, called the 'stock' of a corporation. Those interests
are the resulting estates of private persons, which flow from
the nature of corporate organizations. In some respects,
they resemble a chose in action; and thus are so treated in
the relation of husband and wife, and in other relations.
More accurately, I think, they may be called equitable
estates; which entitle the holders to share in the income of
the capital, which is legally vested in, and managed by the

corporate body." *People* v. *Com's of Taxes,* 23 *N. Y. Rep.* 220.

But, however "stock" may be defined—that it is the "private property" of the stockholders; and that the shares held by each stockholder are his own "private property," and estate, which he can sell, assign, or otherwise transfer, and which can be attached, and sold on execution, will admit of no doubt; and that, as such "private property," it can no more be taken from its owner, except in the legitimate exercise of the right of *eminent domain,* is equally clear.

The charters of the United Companies expressly declare that their capital stocks shall be divided into shares, and shall be "*personal estate.*" And our statute of 1846, respecting executions, makes shares of stock in private corporations liable to be seized and sold on execution.

It is this "private property"—this estate in all the corporate property of the United Companies—that the act of 1870 authorizes, or attempts to authorize, the trustees of the dissatisfied stockholders, holding for their use, *first,* to take from them, by assigning it to the Pennsylvania Railroad Company, for its use; and then, *secondly,* after having been thus taken, to be assessed and paid for by the United Companies; which, by the assignment, have been denuded of all their property and franchises, and rendered wholly unable to pay.

1. It is perfectly obvious that the act authorizes, or attempts to authorize, the United Companies, without the consent of the dissatisfied stockholders, first, by contract or lease, to consolidate or demise their works to the Pennsylvania Railroad Company, if that company is embraced in the enacting clause; and under this authority, these companies propose to execute the lease in question, transferring all their franchises and corporate property to that company for nine hundred and ninety-nine years. My first proposition, on the point now being considered is, that such transfer, or taking of the property of the dissatisfied stockholders, through the

operation of the contract authorized, is a taking of their property for a private use, and not a public one.

When I speak of the private property, or estate, of stockholders of the United Companies, I mean that private estate which each individual stockholder has, in common with others, in the undivided property of those corporations, as distinguished from the public interest, which the state has in their works, as common highways, for the use of the people; and when I speak of taking their property, I mean a taking of their private estate, in that property; and which can only be taken by a legitimate exercise of the right of eminent domain. Such "private property" can only be taken for a *public* use. *Dwarris on Stat. (Potter's ed.) pp.* 375, 376.

It must be kept in mind that the private property sought to be taken in the present case, through the operation of a contract, is the private estate of the dissatisfied stockholders in the corporate property of the United Companies; that the property, so far as the public works—the canal and railroads —are concerned, is already dedicated to, and in the actual use of the public as highways; and that so far as the detached property is concerned, it is the private equitable estate of those stockholders, in such undivided property; that those companies are now the trustees of those stockholders, and hold that private estate for their use. The execution of the lease in question will transfer the legal estate, now held by those trustees, for the use of those stockholders, *to the Pennsylvania Railroad Company, to hold to the use of its stockholders.* The public have no interest in this. It is a simple, unmixed taking of the stock or estate of the dissatisfied stockholders from them and their trustees, and a vesting it in the Pennsylvania Railroad Company, for the use of its stockholders. A taking of the property of A, and giving it to B.

But after this transfer shall have been made, and the property taken, the act provides that an assessment shall be made of its value, immediately before the transfer; and that

thereupon " the said companies shall pay to such dissatisfied stockholders the full value of their stock" thus assessed. For what purpose? This is not stated; nor how they are to get the money to pay for it. It may be said that it is the *intent* of the act, that the Pennsylvania Railroad Company, having·had the whole corporate property vested in it by the transfer, it must pay; and that such payment will enure to its benefit; and that it would then be entitled, in equity, to have the stock of the dissatisfied stockholders, as such, assigned to it. Suppose this to be so; but in what way are those dissatisfied stockholders *to compel that company to pay them?* But suppose it should pay, or furnish the money, and in that way get an assignment of the stock, in specie, made to it—for whose use? Certainly their own: and thus the operation has been that the stock has been taken, in kind, from the dissatisfied stockholders, and given to the Pennsylvania Company. A simple taking, by circumlocution, of A's stock and giving it to B.

But, in all this, the public use of the works—the highways of the United Companies—will have continued unchanged. The private property, only, of the dissatisfied stockholders—their stocks—will have been taken irrevocably from them, and given to the Pennsylvania Company. It is true it has not been done directly, but very indirectly, by stealth as it were; or, at least, subtlety; through a secret contract. Had it been proposed to be done, openly, and by candid legislation, in every word, requiring the dissatisfied stockholders to assign their stock to the Pennsylvania Company, the flagrant enormity would be easily seen, and universally condemned.

In the case of *Coster* v. *The Tide Water Co.*, 3 *C. E. Green* 54, to which reference has been made, your Honor held, in an opinion commanding admiration, that an act creating and authorizing a company to improve the salt meadows in the county of Hudson, without the consent of their owners, at an annual compensation per acre, to be fixed by commissioners, and paid by the owners, was unconstitu-

tional and void.   On the principles laid down in this case, I confidently rely to sustain the point which I am now considering, that the use for which the act seeks to take the estate or stock of the dissatisfied stockholders from them, under the power of *eminent domain,* is not a public, but a private use; and that the ultimate right of determining what constitutes a public use, as distinguished from a private one, belongs to the judiciary.

Although the Court of Errors, on appeal, differed with your Honor, yet, I think, not as to the principles stated; but on the ground that the reclamation and improvement of the low and partially submerged meadow lands along our navigable streams—amphibious in their character, like Holland in the time of Cæsar; difficult to decide whether land or water—was, and always has been, both by the legislature and courts, regarded in New Jersey as a public use.   The difference was one of *fact,* rather than *principle.*   It is so regarded, I think, by the profession; and, on this basis, can be sustained.   Having arrived, as a fact, at the conclusion that the reclamation and improvement of the low meadow lands was a *public use,* the Court of Errors properly held that it belonged, exclusively, to the legislature, and not to the courts, to determine upon the *sufficiency* of the use, to justify the exercise of the right.   *Tide Water Co.* v. *Coster,* 3 *C. E. Green* 518.

2.   But I have still another objection to the proviso in the act of 1870, providing for taking the stock of the dissatisfied stockholders by making compensation—that it not only does not require compensation to be made *before,* but that it actually postpones the compensation until *after* the taking; directly in conflict with the provision in the Constitution of this state, " that private corporations shall not be authorized to take private property for public use, without just compensation *first* made to the owners."   *N. J. Const., Art. IV,* § 7, *cl.* 9.

This objection is expressly made in the bill; and is the *sixth* reason assigned, in detail, against the proposed lease.

No answer is attempted to be made, or explanation given to the objection, in the answer. Nor, as far as I have observed, has any answer been attempted, in the arguments of the opposing counsel, who have preceded me.

There are two provisions in our Constitution, touching the taking of private property for public use. The *first* is in the bill of rights, (*cl.* 16,) that " private property shall not be taken for public use without just compensation." This is general, applicable to all such taking, whatever the emergency ; whether to meet the immediate necessities of active warfare, or to prevent the spread of a conflagration ; or where the necessity is not pressing, as in the ordinary cases of private corporations, under their charters, taking lands for highways. The *second* is in the article relating to, and limiting the legislative power—that " individuals or private corporations shall not be authorized to take private property for public use, without just compensation *first* made." (*Art. IV*, § 7, *cl.* 9.) It was not then so well settled as it is now, that in all cases admitting of it, the right to compensation, either before or at the time of the taking, was an inherent qualification of the power of *eminent domain.* I was a member of the Convention, and my recollection is, that this second provision was made on my motion. It meets exactly the present case.

As already stated, the proviso in question not only does not require compensation to be *"first"* made, but expressly postpones the payment, by simply providing that, after the contract or lease shall have been executed, commissioners, on twenty days' notice, may be appointed to assess the value of the stock, to be paid on the subsequent award of the commissioners.

There is, obviously, no power given, by this proviso, to make application for an assessment, until after the lease or other contract has been executed ; that application must be made on twenty days' notice ; on that application, commissioners are to be appointed, who, at some *subsequent* time— not specified—are to assess the value ; after which, the value

having been thus ascertained, the United Companies are to pay the owners of the stock the amount assessed. All this has been done, and must necessarily be done, *after* the making of the lease. It is so, expressly, required by the act. Consequently, no obligation to pay can arise; for no possibility of payment can exist, until the amount to be paid has been ascertained; which cannot be, until more than twenty days after the execution of the lease; and if that act constitutes the taking, not until that period of time after the property has been taken.

What then constitutes the taking? Whenever, under the provisions of this act, the title of the dissatisfied stockholder to his stock, or his estate in the corporate property, is to pass from him, or his trustees, to some other person, or company, then his property will be taken, within the meaning of the Constitution. *Whenever it ceases to be his, and is transferred to another, it is taken from him.*

Whenever then, under this act, according to its provisions, the lease in question may be made, that is the time fixed by the act for the taking of his property. It would then cease to be his, by becoming the property of the Pennsylvania Railroad Company for nine hundred and ninety-nine years. That act would necessarily constitute the taking. His *equitable* estate which, up to that time, had been his, by the *legal* title remaining in the United Companies for his use, will now have passed from him, with the legal title of his trustees, to the Pennsylvania Railroad Company. His control, and the control of his trustees, ceases. His estate, with the legal estate, has passed to that company, for its use; and he must now look to the United Companies only for payment. And the marked peculiarity of the transaction is, that the very act, which strips him and his trustees of their respective estates, and requires them to pay, deprives them, absolutely, of all means of payment.

The act, then, which requires commissioners of assessment to be appointed more than twenty days after the property of the dissatisfied stockholders has been taken, cannot

Black v. Delaware and Raritan Canal Co.

be said to provide for "just compensation, *first* to be made," and is, therefore, necessarily, unconstitutional.

I respectfully submit, for the reasons stated, upon both the grounds last urged, that the use contemplated is not a public one, and that payment for the stock to be taken is not required to be made before being taken; the act, as to the complainants, is unconstitutional and void.

V. My next and last subordinate proposition, under the principal one, that if the act of 1870 can be construed to authorize the United Companies to make the lease in question, is this : If it can be held that it is competent for the legislature to authorize the execution of the lease in question against the will of the stockholders, or that the use contemplated is a public use; or can be held that the stock of the dissenting stockholders can be condemned as for such use, and taken by the United Companies in the mode provided for in the statue of 1870; I yet maintain further—

That that act is void, because it delegates, or attempts to delegate, to those companies, by contract between them and other canal or railroad companies in or out of this state, the power to determine what constitutes a sufficient public use to justify an exercise of the right of eminent domain, and then to carry such contract into execution by condemnation of the stock of dissatisfied stockholders; whereas, such public use can only be determined by the legislature, and carried into execution immediately by the state, or some constituted agent of the state, or else, indirectly, through the instrumentality of the courts, or other established tribunals of the state.

I direct your Honor's attention, before proceeding to discuss this proposition, to the substance of the enactment, relative to this point.

It is, that it shall be lawful for the United Companies, with the consent of two-thirds in interest of the stockholders of each, by agreement, contract, lease, or otherwise, to make any arrangement, for connection or consolidation of business, with any canal or railroad company or companies, with

which they are identified in business, or whose works form with theirs, continuous or connected lines; and if any stockholder shall be dissatisfied with such contract, the United Companies may take his stock at its value, to be appraised by commissioners.

It is lawful, then, for the United Companies to make any agreement with any other canal or railroad company, with which they are identified in interest, and then such contract is to be valid; and they are to carry it into execution, by exercising the right of eminent domain. The only limitation upon this power of contracting, being in terms as it is in fact, if valid, a roving commission to the United Companies, to go out into the world and make contracts with any railroad or canal company they please, is, first, that it shall be a *business arrangement.* What other kind of arrangement could they make? Secondly, it must be with a canal or railroad corporation, in some way identified or connected with them in business. They could, in one minute, make a contract identifying them; and then the next minute, make another contract or lease by which to condemn the property of the stockholders. Selecting such a corporation, so far as I can see, the only limit is, that it shall be a *business* contract; and I never yet knew any other. It may be for the construction of a railroad in Kansas or Kamschatka; or else for the constructing and running a line of steamers from San Francisco to Yeddo!

Still, there is yet a constitutional limit, which hedges in and protects private property. If such contracts are to be carried into execution by taking private property, there must be some sufficient public use to justify the exercise of the right of eminent domain. Two things are necessary to justify the exercise of that right. First, it must be for a public use; and second, that use must be of sufficient magnitude to induce the legislature to act upon it.

Coming, then, to this case—to justify taking the stock of the dissatisfied stockholders by condemnation, it must be for some such sufficient public use as to induce the legislature to

authorize it; and my objection to this statute is, that it authorizes, or attempts to authorize, the United Companies to determine, not only what is a public use, but upon the sufficiency of it; instead of the legislature of the state, by special or general laws, so deciding. In other words, instead of the legislature, openly and publicly, at the place and in the manner authorized by the Constitution to legislate; in open public council, deliberating, discussing, and determining what constitutes a public use sufficient to authorize the forcible taking of private property; this act leaves, or attempts to leave it, to the United Companies.

Now, it is very clear that, if the act of 1870 is valid, the legislature has made the United Companies, so far as this power of contracting extends, the exclusive judges of what constitutes a public use, sufficient to justify an exercise of the power of eminent domain. It is, therefore, to say the least of it, an attempt to delegate to private corporations, secretly, privately, and for their own use, the power to determine, within the limits of the ceded powers to contract, what constitutes a sufficient public use to justify the taking of the private property of the people of New Jersey from them, and giving it to others, for an assessed compensation.

My proposition is—the legislature has no such power. That it holds the sovereign attribute of eminent domain in trust for the people of New Jersey, and cannot delegate it to private corporations; and much less to be exercised for their own use.

1. The right of eminent domain is "that *dominum eminens,* or superior right, which, of necessity, resides in the sovereign power in all governments, to apply private property to public use, *in those great public emergencies which can reasonably be met in no other way.*" 1 *Redf. on Railw.,* p. 229, § 63, and cases cited.

See *Vattel, Bk.* 1 *ch.* 20, *sec.* 244; *Code Napoleon, Bk.* 2, *tit.* 2, 545; 1 *Black. Comm.* 139; *Gardner* v. *Newburgh,* 2 *Johns. Ch.* 162; *Vanhorne's Lessee,* v. *Dorrance,* 2 *Dall.* 304.

Of the cases cited by Redfield, I refer to the following

upon the point now being considered, *viz.* that the legislature *only*, can judge of the sufficiency of the public use, to justify the exercise of the right of *eminent domain.*

*Bonaparte* v. *C. & A. R. Co., Bald.* 220; *Beekman* v. *Sar. & Sch. R. Co.,* 3 *Paige* 73; *Heyward* v. *The Mayor,* 3 *Seld.* 325; 2 *Blatchf.* (*U. S. C.*) 99; *Tide Water* v. *Coster,* 3 *C. E. Green* 522.

These authorities—going back to remote antiquity, and coming down to the present day—establish, incontestably, that the right of *eminent domain* is one of the highest attributes of sovereignty, to be exercised only for *public use*, in case of necessity; and that nothing but the legislature can rightly determine upon the necessity, and of the character and extent of the public good, which will justify its exercise. In other words, that private property—its protection being one of the two objects of all government—can be, in no sense, violated, except by the sovereign power, in cases of necessity, for the public good.

But these authorities, I admit, leave it still to be decided in what way the legislature—having determined the extent and character of the public use which, in each case, will justify the exercise of the right of eminent domain—must carry the object into execution. The legislature must, in some way, determine the character of the public use, which will justify the exercise of the right. But, in saying this, I do not question, but admit, that, after the *public use* shall have been determined by the legislature to be sufficient to justify the exercise of the right, the object may be carried into execution, either, indirectly, through the instrumentality of special agencies, or the public courts or officers; or, directly, by the state itself. This is *conceded by my proposition.*

It is done, directly, by the state, when it, by its own political officers, and out of its own treasury, constructs and operate works of *internal improvement;* as Pennsylvania, at first, constructed her railroads and canals, and operated them, through the instrumentality of her own public officers.

And, as was done in the Province of New Jersey anterior to the American Revolution, in the laying out and maintaining of the King's highways.

All states must act by public officers or agents. The *ideal* state has neither head nor hands, unless it be a single despot; and then he acts not as a man, but as the state. The ideal state is embodied in himself. All states, I repeat, must act by officers or agents; but they must be the officers and agents of the *state*, and not of *private corporations*.

It may also be done by indirection. By creating private corporations especially for the purpose, and conferring upon them the franchises and powers of making the highways, as was done in the case of the United Companies.

What does the state then do? It determines that it is a public good to make a railroad from the city of Camden to Jersey City; or a canal from the Delaware to the Raritan; and that that is such a public good as will justify the exercise of the right of eminent domain. That determination is made directly by the state, through its legislature. Having thus decided, it carries its judgment into execution by creating a private corporation as its agent; which, for a consideration given—tolls and freights and fares—is authorized to execute the work, by fixing upon the precise line and mode of construction. Not judging for themselves, as judges in their own cause, but, through the instrumentality of courts and tribunals, condemning the property to public use, and taking it under the special act of the legislature.

Or, it may be done by conferring the power upon a single individual, not a corporation; as was done for the purpose of shortening the navigation of Salem creek. The legislature authorized John Denn, (a gentleman well known to the profession,) to cut a canal across the bend of a peninsula formed by that creek—a short half mile—instead of rounding the bend for two or three miles. The legislature determined that the shortening of the navigation was a public good, and then authorized John Denn to execute the work.

He did it, and his authority was sustained by the courts of this state, in the case of *Sinnickson* v. *Johnson*, 2 *Harr.* 129.

Or, the judgment of the legislature may be carried into execution—as is now done through all the United States, and in this state, and in England; and, perhaps, almost everywhere—through the instrumentality of courts and public officers, in the laying out of ordinary public highways under road laws. I presume, if the legislature should see fit to pass general turnpike and railroad laws, instead of granting special acts, it might, for purposes of making turnpikes and railroads, admitted highways, do it through the same instrumentality.

On this point I refer your Honor to the case of the *Delaware and Raritan Canal Company* v. *The Camden and Atlantic Railroad Co.*, 1 *C. E. Green* 365.

But, when done through the instrumentality of courts and public officers, they are the courts and officers of the state; constitutionally organized and appointed; independent men, public officers, sworn to perform their duty. Not by private corporations, for their own use, in the mode described.

The United Companies, however respectable, are not the public tribunals of the state; have not sworn allegiance; have not been appointed by the people, nor by any of the organized tribunals. More than all this, under the act, the United Companies judge for themselves. That cannot be. No man can be made a judge in his own cause. While there is no provision in the state Constitution against it, there is such a provision in the constitution of nature. No legislature can make such an appointment; nor provide for it. Nor, I respectfully submit, can the legislature appoint private corporations to determine, for their own use, when my property shall be taken from me and transferred to them, or some other, for their use.

The right of eminent domain is a sacred trust, and, like all other trusts, cannot be delegated. It has been confided by the people to their representative government in trust for them, and only that government can execute it. It cannot

delegate it. Much more, can it not delegate it to men, or private corporations, to determine for themselves, and for their own use, when it shall be exercised.

See *Smith's Const. Law,* p. 487, § 331, *and* p. 517; 11 *New Hamp.* 19; 23 *Pick.* 396; 21 *N. Y. Rep.* 598.

No stronger or more strikingly objectionable exercise of the powers attempted to be given by this act to the United Companies, can be suggested than the lease in question. Under pretence of a lease of their "works" to the Pennsylvania Railroad Company, they barter away all their franchises, and assign all their other property. On what ground? They are authorized to "*lease.*" What? To lease cash? To lease franchises? No, they are simply authorized to lease their works. But what do they do? They lease $4,555,905 of stocks; $356,750 of bonds and mortgages; $2,135,436 of cash advances; $57,752 of sinking fund; $447,880 of unappropriated materials; and $831,285 of clear cash, in the hands of the treasurer! Thus they propose to lease for nine hundred and ninety-nine years, $8,385,009 of cash, and cash assets; and this, under authority to lease their "works!" What are these cash assets? They are the net profits; in part the earnings of the United Companies which, under special acts of the legislature, they have invested, instead of dividing them into dividends to the stockholders.

They are the *net earnings* of the companies over the cost of their works, invested for the use of the stockholders; and I hold it to be perfectly indisputable, that no corporation, unless specially authorized by language that will admit of no two constructions, can "lease" that amount of the personal property of its stockholders.

But not content, they do all this, and much more. They have real estate, in no wise connected with the working of the roads, amounting to as much more as the sum which I just now stated, and they dispose of all that real estate, on a lease for nine hundred and ninety-nine years. Is not this a beautiful scheme on the face of it? The covenant in the lease is, that the Pennsylvania Railroad Company may dis-

pose of any part of this property whenever the lessee—*i. e.* the Pennsylvania Railroad Company—shall think proper!

The lessee, the Pennsylvania Railroad Company, whenever it shall think it necessary for the use of the canals and railroads, or for the protection of the interests of the lessors to sell their property, may do so. Why not leave the lessors some discretion about that? Oh, but they are to have the consent of the lessors. Who are the lessors? The board of directors of the United Companies, the joint board, a single board, or all the stockholders?

The concluding clause of this covenant is: "The proceeds of all such sales shall be applied, at the option of the lessee, either to the permanent reduction of the funded debts of the said lessors, or either of them; or to permanent additional improvements, upon the property hereby demised."

That is an extremely equitable provision! The Pennsylvania Railroad Company have got the property for nine hundred and ninety-nine years. They may sell ten or twelve millions of dollars of real estate and cash assets, and lay out the proceeds in permanent improvements at Harsimus Cove, for their own use, for nine hundred and ninety-nine years. After that, the lessors can enjoy those permanent improvements! If you give me property for nine hundred and ninety-nine years, I will be exceedingly liberal with the reversion. I do not pronounce the lease a cheat; but it strikes me, that among plain people, not accustomed to examine closely such instruments, it is very well calculated to mislead.

### III.

If the act of 1870 can be construed to sanction the lease in question, then my proposition (which I regard rather as a principal than a subordinate one) is—

That the canal and railroads of the United Companies, called in the statute their "works," are public highways of, and within this state; and that it is not competent for the

legislature, directly or indirectly, to assign or transfer, or to authorize the assignment or transfer of the highways of the state to a foreign corporation; and that the proposed lease would, therefore, be void.

In maintaining this proposition, I beg leave, first, to translate several of the words contained in it.

By *assignment*, I mean a transfer for a valuable consideration, vesting in the assignee, by an irrepealable contract, an absolute right of property in, or control over, the highways.

By *direct* assignment, I mean one made directly by the state to the corporation; and by indirect assignment, I mean one made through the intervention of a corporation, in which the state has vested a legal title to such highways, as its agent or representative.

And by a *highway of the state,* I mean some public line of travel or transportation, established by the state, in the exercise of the right of *eminent domain,* which every citizen has a right to use.

And by a *foreign corporation,* I mean a corporation created and controlled, wholly, by a state other than that in which the highway is.

That the Pennsylvania Railroad Company is such a corporation will admit of no question.

The "*works*" of the United Companies are declared "common highways," by their respective charters; and, therefore, every citizen has the right to use them; the lands on which they are constructed and operated, were taken by condemnation, in the exercise of the right of *eminent domain* by the state, through the instrumentality of those corporations; and they are maintained by established tolls, freights, and fares, paid by those who use them.

The transfer proposed is nominally a lease for nine hundred and ninety-nine years—*i. e.* forever, a perpetuity—upon a contract which, if valid, is necessarily irrepealable, to pay as a rent $2,000,000 annually, and discharge certain obligations of the lessors.

The simple question therefore, in this aspect of the case, is : Can the legislature of New Jersey authorize such a lease to the Pennsylvania Railroad Company ? I maintain it cannot.

1. The making and maintaining of highways is one of the three necessities of government—*trinoda necessitas;* essential to civilization; and therefore a duty which every state owes to its own citizens or subjects.

The three necessities of government, as I understand them, are *highways, taxes,* and *courts;* or, a judiciary for the punishment of criminals and the administration of justice. The powers necessary to provide these necessities are sovereign powers. They are confided, *in trust,* by the people to their sovereign, of which trust he is incapable of divesting himself. The making and maintaining of highways require a constant exercise of the highest and most delicate attributes of sovereignty—the right of taking private property for public use for their construction, and the right of taxation for their maintenance and repair. 4 *Bac. Ab., tit. Highways A, note a.*

See also, *Angell on Highways* 53, § 76; *Del. & Rar· Canal Co.* v. *Rar. & Del. Bay R. Co.,* 1 *C. E. Green* 364.

The money of the people makes and maintains the highways. The state is their trustee—holds for their use. The people are taxed, both to pay for the property for making the highways, and for their making and repairs. Corporations, making these expenditures under legislative sanction, are authorized to charge tolls, freights and fares at rates which produce sufficient to meet their expenditures, and pay them for their care and labor. In this way, by a kind of special tax, the people who use them are taxed in proportion to their use. Whether made and maintained, therefore, directly by the state, or through the agencies of corporations, the people are taxed for their making and repairs.

2. If the making and maintaining of highways call into continued action the highest attributes of sovereignty, then

those attributes—being portions of the sovereignty, and *incidents* of the highways—cannot exist the one without the other : consequently, to part with one is to part also with the other.

In other words, a state cannot dispose of those highways without, at the same time, disposing of those attributes of sovereignty which are incident to and form a part of the highways. A state could as well farm out the courts to another state, to run the judicial "machine." The making and controlling of highways is as much an act of sovereignty as the making and controlling of courts ; and the state can as well surrender or assign the one as the other. The highway and the power are as inseparable as the shadow and the substance ; they come and go together.

3. The *supreme power* of a state—usually denominated *sovereignty*—committed by the people to their government, whatever its form, is a *sacred trust* confided by them to it, for their own protection and welfare, and not for the protection and welfare of any other people. It is, therefore, *inalienable.* *Puff. Law of Nature and Nations, Book* 8, *ch.* 5, § 9 ; *Locke on Gov't,* 304 *to* 307 ; *Vattel, p.* 31 ; *Del. & Rar. Canal Co.* v. *Cam. & Atl. R. Co.,* 1 *C. E. Green* 364, 365.

The state cannot delegate the trust, for that would be divesting itself of the power to perform its own duty. To delegate by an irrevocable contract, vesting, directly or indirectly, its control in another, is to surrender all power over it. A sale of the trust, confided personally to the state, would not only be a breach of trust, but a void act.

Railroads are highways. This is admitted. No corporation has any property in them as highways, although it may have property in the *franchises* ceded to it, and exercisable by it, to the extent of the grant.

See opinion of Chief Justice Black in *Erie & Northeast R. Co.* v. *Casey,* 2 *Casey R.* 307.

4. If the power be surrendered to another state, its exercise would be by and for the people of that state. The people of New Jersey did not form their government for the

people of Pennsylvania, but for themselves. They made their constitution; they made the state, for their own good. If the trust of making and maintaining highways for their good should be surrendered, it might not be performed at all; or, if performed, solely for the good of others.

I maintain that the highways of a nation are upon, and are a part of the soil of a nation—inseparable from it, and can no more be bartered away by the legislature than any other or all other portions of the territory.

Let me put a case by way of illustration : Suppose the state of New Jersey, instead of having constructed a railroad through the instrumentality of a corporation across the state, had directly, from its own treasury, condemned and taken a strip of land, one hundred feet in width, from Trenton bridge to Jersey City; had made thereon an ordinary highway, hard and smooth as the roadways of the best possible construction, equal or superior to the Roman ways; and that Pennsylvania should then construct another of like character from Pittsburg to Trenton bridge, as smooth and level as this floor, so that any kind of carriage could run upon it, the question then which I propose is this—

Could the legislature of New Jersey sell her highway to the state of Pennsylvania, and put her in the absolute possession and control of it? If so, then Pennsylvania would come into New Jersey. How could she push her sovereignty inside of ours? Two substances cannot occupy the same place at the same time. If our highway could be sold to the state of Pennsylvania, so that the state of Pennsylvania might come here with her executive, her officers, her courts, and take the absolute possession and control of our highway, then the state of Pennsylvania would occupy our soil, and push New Jersey "from her own stool." But every state is full of its own sovereignty.

If the state of Pennsylvania take control, she may bar up those tributaries by actual bars, if you please; or, she may exact toll of the citizens who travel upon them; or do any other thing she may choose to do. How would that comport

with the honor, the dignity, the sovereignty of the state of New Jersey? Instead of exercising the power incident to her sovereignty, of making and controlling her highways, she has surrendered it to another state, which deprives her own citizens of its use.

5. If she cannot assign such a highway as that, she cannot a railroad. They are, in substance, the same. Each is the avenue along which the people of New Jersey go to market. It was made for them; with their money; on their soil; and for their use: and cannot be disposed of for the benefit of the people who come from California, or from any other state. The gentlemen on the other side tell us the lease is a magnificent scheme for the good of the whole people; conferring benefit on all out-doors. It is the duty of the state of New Jersey, according to their theory, to make highways for the commerce of the world; and they have cited the Constitution of the United States for that! My understanding of the Constitution of the United States is, that if the people of other states choose to come over into New Jersey, they shall have the same right to use our highways that we have. But, *I rather think*, they have no right to compel us to make highways for them; nor are we compelled to let them come here and make them for themselves, and control them.

I submit that the highways of this state belong to the people of this state; that they are the beneficiaries, and that the state cannot dispose of them.

6. If it cannot be done directly by the state, it cannot be done indirectly through the instrumentality of corporate agents, or a foreign corporation. What cannot be done directly by principals, they cannot authorize agents to perform. We cannot communicate strength to others which we do not possess ourselves; to do what we cannot do. The stream can be raised no higher than its fountain.

If the United Companies, creations of New Jersey and subject to her jurisdiction and laws, can be empowered to transfer her highways to the Pennsylvania Railroad Com-

pany, the creation of that state, and subject only to her juris-
diction and laws, then Pennsylvania, governing her own
corporation, will control through it those highways, as effec-
tually as if they had been transferred immediately to her by
the state of New Jersey.  The servant would be subject to
his master, and the master would act through his servant.
*Qui facit per alium, facit per se.*

II.  My argument, thus far on this point, assumes that a
foreign corporation is capable of becoming the lessee of the
works of the United Companies, but that our legislature is
incapable of authorizing such a lease.  In other words, that
the incompetency is in the legislature, simply.  In order to
make a good lease, there must be a capable lessor and a
capable lessee.  I now reverse the condition of imbecility,
and maintain that the Pennsylvania Railroad Company,
being a foreign corporation, is incapable of becoming the
lessee of those works, because it is incapable of entering into
their possession and enjoyment so long as it is a foreign cor-
poration.  Observe the qualification : I say, so long as it is
a foreign corporation, it is incapable of taking possession ;
for I do not question that the legislature of New Jersey may
incorporate J. Edgar Thomson, Thomas A. Scott, and all the
stockholders of that company, and make them a corporation.
Then they would be a New Jersey corporation—a creature
of this state—on which it could confer whatever powers it
pleased.  Or, it might, perhaps, by some indirection, make
the Pennsylvania Railroad Company a *quasi* corporation, for
the purpose of operating the United Companies' works.  But
that has not been done, nor attempted.

1.  The Pennsylvania Railroad Company is now purely a
foreign corporation.  It is so charged in the bill, and admitted
in the answer.  Nothing has been done, or attempted to be
done, by our legislature to make it a domestic, or a *quasi*
domestic, corporation.  There is nothing in the answer pretend-
ing any such thing.  The simple authority to *contract*, does not
domesticate it.  If it would, then a grant to the United Com-
panies to contract with the corporation of London, or with the

East, India Company, would make them *quasi* corporations of New Jersey. It requires something more than a mere power of contract. There must be something to domesticate them; to make them, as it were, citizens of New Jersey; and bring them within the control of our own laws. Until this shall have been done, they will be incapable of coming here and taking possession of our highways.

As yet, New Jersey has, at most, attempted to confer the power of entering into certain business contracts with foreign corporations,—not to create them New Jersey corporations, nor to domesticate them. No such attempts, or thought, can be found in the act. Nothing of the kind is suggested, either in the bill or answer; nor, as yet, in the arguments of defendants' counsel. The proposed lessee, therefore, stands now here, a purely Pennsylvania corporation; and, as such, I maintain that it is barred out of New Jersey, and incompetent to come into it for the purposes contemplated by the lease.

2. It is obvious that the works of the United Companies of New Jersey—their canal and railroads—are on, and a part of the soil and territory of New Jersey; and are now under and subject to the jurisdiction of New Jersey, and must continue so until in some way ceded to the state of Pennsylvania, and thereby brought within her jurisdiction. I have already attempted to prove that that cannot be done. Trusting to my success on that point, I now assume that they are, and must continue to be, a part of our territory, and within the jurisdiction of our state. The question then is: Can a purely foreign private corporation enter upon and take possession of and operate those works, in this state, as contemplated by the proposed lease?

3. In order to effect the object of the lease, it would be necessary for the lessee to enter upon and take possession of the demised premises. No action for rent accrues, or can be maintained, until there has been actual entry, or ability on the part of the lessee to enter. The covenants are void if the lessee cannot take possession. The perfection of the

lease, therefore, requires entry, or a power to enter. If the lessee has no power to enter, the lease cannot be made. It takes two to make a bargain. The law on this point is perfectly familiar to the court. See *Salmon* v. *Smith*, 1 *Saund. Rep., p.* 203, *note* 1.

My proposition, as already stated, is that the Pennsylvania Railroad Company is a foreign corporation, created by the state of Pennsylvania, and can have no actual, potential existence in the state of New Jersey, sufficient to enter upon and take possession of the works of the United Companies and operate them; and that, without such power, it cannot become the lessee of the United Companies.

"A private corporation, whose charter has been granted by one state, cannot hold meetings, pass votes, and exercise powers in another state. It can have no legal existence out of the boundaries of the sovereignty by which it is created. It must dwell in the place of its creation, and cannot migrate to another sovereignty." *A. & A. on Corp.*, § 104, and cases cited.

This is very strong language; cannot be made stronger. "It can have no *legal* existence out of the boundaries of the sovereignty by which it is created." As it is, itself, a mere legal entity, if it can have no "legal" existence, it can have none whatever, for it lives and breathes only by law. If it "cannot hold meetings, pass votes, or exercise any powers" in another state, on what principle can it enter into the actual possession of the franchises and works of the United Companies, impossible to be separated or moved from New Jersey? The sovereignty of New Jersey cannot go out of, nor the sovereignty of Pennsylvania come into, New Jersey. If the Pennsylvania Railroad Company cannot dwell in any place but Pennsylvania; if it cannot live or breathe, elsewhere; then it would be a *dead* corporation as soon as brought here. It would be nothing.

I refer also to a case decided in our own state: *Hilles* v. *Parrish*, 1 *McCarter* 380.

In the case of the Bank of Augusta *v.* Earle, Chief Justice

Taney, after the arguments of some of the ablest counsel of the country, delivered a very learned and exhaustive opinion. He said : " Whenever a corporation makes a contract, it is the contract of the legal entity ; of the artificial being created by the charter ; and not the contract of the individual members.   *   *   *   And it may be safely assumed that a corporation can make no contracts and *do no acts,* either within or without the state which creates it, except such as authorized by its charter ; and those acts must also be done by such officers or agents, and in such manner as the charter authorizes.   And if the law *creating* a corporation does not, by the true construction of the words of its charter, give it right to exercise its powers beyond the limits of the state, all *contracts* made by it in another state would be void." And again he adds : " It is true that a corporation can have *no legal existence* out of the boundaries of the sovereignty by which it is created.   It exists only in contemplation of law, and when that law ceases to operate, and is no longer obligatory, the corporation can have no existence. It must dwell in the place of its creation, and cannot migrate to another sovereignty."   13 *Peters* 587, '8.

4. While it may be true that a foreign corporation—not of legal right, but by the comity of nations—may make contracts existing only in words, transitory in their character ; yet it is not, and cannot be true, that a being incapable of existing in New Jersey, can have or take the actual possession of the highways of New Jersey.   Contracts are but breath ; but the possession of lands passes by delivery. *Franchises* are not contracts ; they are *sovereignties,* as distinguished from contracts.

See the case of the *Ohio & Mississipi Railroad* v. *Wheeler,* 1 *Black's Rep.* 286, 297.

The right of a foreign corporation, by comity, to exercise the power of contracting, and doing certain other acts which are incidents of *corporations,* is a very different thing from exercising those corporate franchises and powers which are the incidents of *sovereignty.*   By comity, the incidental pow-

ers of corporations of other states, may be exercised out of the state of their creation, but no comity can, or ought to, extend to the authorizing of foreign corporations to exercise attributes of *sovereignty* in any other state than that in which they were created. Before such sovereign powers can be exercised, the corporation must, in some way, become domesticated. That has not been done, nor attempted to be done here.

See the case of *The State* v. *The Boston, Concord, and Montreal Railroad Co.*, 25 *Vt.* 436, 442.

The true distinction is clearly, positively, and most conclusively, to my mind, stated in this case—that, while by the comity of nations, the incidental powers of a corporation may be exercised through the instrumentality of agents, as that a New Jersey corporation, or even the state of New Jersey, may, by an agent, go over into the city of Philadelphia and buy something for the corporation or state; yet that the comity of nations does not permit the introduction of an agent of a foreign corporation to exercise the sovereign powers of the state creating it, in another state. That is quite a different thing.

See *Commonwealth* v. *The Franklin Canal Co.*, 9 *Harris* 125.

In conclusion, upon this point, I respectfully submit that, both on principle and authority, a purely foreign corporation can have no legal existence in the state of New Jersey; and that the Pennsylvania Railroad Company, being such corporation, can, therefore, have no legal existence in New Jersey; and, consequently, is incapable of being the lessee of the works in question. Hence, that the Pennsylvania Railroad Company cannot become the lessee and take possession of those works; and, being incapable of so becoming a lessee, any lease of those works to it, would necessarily be void.

## IV.

The Pennsylvania Railroad Company has no legislative authority from the state of Pennsylvania, to become the lessee of the United Companies of New Jersey, as contemplated by the lease in question.

1. The charter of the Pennsylvania Railroad Company, itself, contains no authority to that company to become the lessee of any canal or railroad corporation; much less of a foreign canal or railroad corporation.

They rely on the acts of 1870 and 1871. We must, then, look to them for the enlarged powers claimed to be conferred. No power is expressly given to that company to lease the United Companies' works, although it may be that it had a "hankering" after them. But, to exist, it must have been granted by such express and unequivocal language as will admit of no doubt. As to that, I cannot be too emphatic.

2. It is a well established rule of law, in England and this country, that corporate grants must be free from doubt. This is true as to domestic corporations. Much more so, I think, when applied to foreign corporations; and *a multo fortiori* in its application to foreign corporations, in reference to such ·grants of powers as are now claimed.

Although we had supposed that the Delaware river separated the state of Pennsylvania from New Jersey; and, consequently, separated the lands and works of Pennsylvania from those of New Jersey; yet to sustain implied grants, it is seriously claimed here, that the works of the Pennsylvania Railroad Company, on the west side of the Delaware, are connected with those of the United Companies on the east side, simply because of ability to cross the river, in vessels, from one to the other! For instance, because the Pennsylvania Railroad Company has a depot down the river two or three miles from Philadelphia, from which to ship oil; and because a canal boat can pass from Bordentown

down to that depot, it is claimed that the Pennsylvania Railroad " connects " with the Delaware and Raritan Canal. Upon the same principle, the ocean which separates Europe from America, connects those continents. And, although the statutes require the " works " of the companies, to justify a contract of consolidation, to be " connected;" yet that any existing business arrangement between them, will constitute a connection within the act. If so, a business arrangement could be made one minute sufficient to stand upon in order to " connect," and the consolidation or lease be effected the next. This is the latitude of construction claimed.

3. There are only four statutes of Pennsylvania, to which I shall refer. They are, *first*, the act of March 29th, 1859; *second*, the act of April 23d, 1861; *third*, the act of February 17th, 1870; and *fourth*, the act of May 3d, 1871. These are all I have investigated.

The first two of these acts are expressly confined to Pennsylvania corporations. The first authorizes companies, owning connecting railroads in the state of Pennsylvania, to enter into any lease or contract with each other, in respect to the use, management, and working of their several railroads. That is in terms confined to the state. The phraseology of the act is, " *connecting railroads.*" The true intent of those words, as I understand, became the subject of judicial inquiry in that state, and it was held that they meant an actual, immediate, and physical connection.

The second Pennsylvania act, to which I have referred, authorized the railroad companies of Pennsylvania to enter into leases or contracts with other roads, although connected only *by intervening railroads*, curing the supposed defect in the first act. Hence, so far as the state of Pennsylvania is concerned, a connection by intervening railroads, however long or short, if it be a connection of an actual, visible, tangible character, is authorized. Neither of those acts extended to foreign corporations. I may add, too, that they are both confined to *railroads*, as distinguished from

canals, or navigation works. Those two acts may, therefore, be excluded from consideration in this case.

The third is the act of February 17th, 1870, which preceded ours of March 17th, 1870, by just one month. By this act it is enacted, " that it shall and may be lawful for any *railroad company or companies in this commonwealth,* to lease or become the lessees, by assignment or otherwise, of any other railroad or railroads, or enter into any other contract with any other *railroad* company or companies, whether the road or roads embraced in such lease, assignment or contracts, may be within the limits of this state, or created or existing, under the laws of any other state or states."

It will be perceived that this act is confined to railroads to be leased directly, or to be acquired by assignment or otherwise. Beyond all question, the words " road or roads," in that connection, refer to railroad or railroads; and not to common turnpikes or plank roads, or anything of that kind ; much less to ferries and steamboat lines. Then comes the proviso : " Provided, that such road or roads so embraced in any such lease, assignment, or contract, shall be connected, either directly or by means of intervening lines, with the railroad or railroads of said company or companies of this commonwealth so entering into such lease, assignment, or contract, and thus forming a continuous route or routes for the transportation of persons and property."

The act of 1870 contains the substance of the two acts of 1859 and 1861 ; but enlarges the power in them, to the leasing or contracting with railroads *outside of the state.* The substantial effect, then, of the act of 1870, was simply to extend the provisions of the acts of 1859 and 1861 to railroads outside of the state of Pennsylvania. But that act does not extend to *canals.*

Then came the act of 1871, which simply enlarged the powers in the act of 1870, to the leasing or the making of contracts, relating to " *canal and other navigation works,*" situate in Pennsylvania or any other state. Those two acts,

it is claimed, will embrace the works of the United Companies—both railroads and canals—and their appendages.

The statutes of Pennsylvania, as they now stand, authorize any railroad company or companies in the state of Pennsylvania, to obtain, by lease, assignment, or otherwise, any other railroad or railroads in that state, or any other state of the Union. With reference to this legislation, one point, I think, is conclusive, so far as the present case is concerned. The power granted to the Pennsylvania companies is confined to *railroads, and canal and navigation works.* It does not extend to banks, nor to insurance companies, nor to steamboat lines, nor to plank roads, nor to bridges, nor to ferries, nor any such small " trash." Nor does it extend to the acquisition of from *ten to twenty millions* of stocks in other companies; and cash assets of every kind and description. Nor does it extend to the buying up of sinking funds; nor to the guaranteeing of millions of debts; nor any such friendly accommodations as sometimes operate upon the minds of persons having souls.

4. Touching those matters, let me direct your attention to what this so-called lease proposes. I am now speaking simply of the statutory powers of the Pennsylvania Railroad Company to come into New Jersey, and buy up railroads and other " fixins."

It is the outside property referred to in this lease, about which I wish to inquire. The United Companies own various ferries, and own property, real and personal, " in *said* cities heretofore named;" which are in New York, Philadelphia, Jersey City, New Brunswick, South Amboy, Trenton, and 'Camden, " and *elsewhere.*" My inquiry is: Where is the right granted to the Pennsylvania Railroad Company, by those statutes, to become the lessee of that property ?

The United 'Companies own $8,385,009.35 of nearly all 'kinds of personal property, scattered about; " lying loose " all over the state of New Jersey, and " elsewhere." By means of these, they control the West Jersey Railroad and all its branches; the Belvidere Delaware Railroad; and all

the other railroads that are in subjection to them, on the principle that the servant is controlled by his master. How did the United Companies get the power to buy those stocks, and to make the other investments? By special, specific acts of the legislature of New Jersey, authorizing them to do so. Now, I ask, and I desire a direct answer: Where in those Pennsylvania statutes, does the Pennsylvania Railroad Company acquire the powers to come here and buy, or "lease" those stocks and other assets, from the United Companies?

Did it ever enter into the imagination of anybody, in the state of Pennsylvania, or "elsewhere," except only the procurers of those statutes, that they could be held to extend to the buying up of stocks, cash, cash assets, and lands, lying around loose in the state of New Jersey? There is only the trifling sum of about eight millions and a half—nearly one-half their entire capitals—personalties, alone. Without any kind of enactment whatever, other than an authority to buy up *railroads and canals, and navigation works*, the Pennsylvania Railroad Company, as counsel inform us, with a capital only half sufficient to make and equip three hundred miles, has, by contracts and "otherwise," *seven thousand miles of railroads* in its control. Safety to the country lies *in the weakness of expansion*.

What I have just said relates only to the personal estate of the United Companies, estimated at par. As to the outside real estate, I have no data before me, from which I dare estimate its value. Harsimus Cove, as alleged in the bill, and not denied in the answer, is stated to be worth $3,000,-000. Simply, for the sake of *guessing* (being well assured that I do not guess more than one-third the value) I assume that the remaining real estate, situate, promiscuously, in all the principal cities of this state, and in the cities of New York and Philadelphia, and "elsewhere," may, by possibility, be worth $3,000,000. Adding these two items to the personal estate, the total would be $14,385,000—not, perhaps, more than two-thirds the actual value. Looking to these figures,

some little idea may be formed of the character and value of the corporate properties, outside of the *works* and equipments, which the Pennsylvania Railroad Company propose to take, not by direct, or specific description, but by generalities—appurtenances if you choose—as if one railroad could be appurtenant to another railroad, any more than one lot of land to another lot of land.

5. Numerous railroads, with their branches, the Pennsylvania Railroad, under the Pennsylvania acts of 1870 and 1871, proposes to take by becoming lessee by assignment, or otherwise. Those contain the power, and all the power. But if you will look at the act of 1870, you will find this important provision in it; that the roads leased or assigned, shall be "connected and continuous" roads, with the Pennsylvania road. Is the Belvidere Delaware a "connecting and continuous" road with the Pennsylvania Railroad? Is the West Jersey, or any of its branches? Is the Flemington road? Is the Jamesburg road? Do they form "connecting and continuous" lines with the road of the Pennsylvania Railroad Company? It is absurd to talk about it.

This, however, is only the *railroad* part of this scheme. What else have we? because they deal in *generalities.* They have a steamboat line from South Amboy to the city of New York. Where does the lessee get the power to take that? Does that form a connected and continuous line with the Pennsylvania Railroad? Is that a railroad? Is it a canal, or is it a *navigation work?* If it be a "navigation work," within the act, then the Atlantic ocean is a "navigation work," and so would anything that can be sailed upon.

Then there are shares of stock, and assets, and interests in other railroad companies; stock in passenger railway companies; bridges; ferries; turnpikes.

Such are the various kinds of property which the Pennsylvania Railroad Company proposes to take, under the power of leasing "railroads, and canals, and navigation works," or of obtaining them by assignment, or *otherwise.*

But I have not yet named all. The Pennsylvania Railroad

Company proposes to take under lease all the *franchises* of the United Companies, and of all the other companies;—for they take by assignment, or *otherwise.* It proposes to gather in one strong, concentrated grasp, all the franchises of all the works owned and within the control of the United Companies; and what then will be the pitiable condition of those companies?

I have the high authority of the ex-Chief Justice of Pennsylvania, for saying that *franchises* are all they have. When they are gone, their all is gone; they come to a shameful end. And that, to hold otherwise, "would be to put into their right hand length of days, and into their left, riches and honor."

6. Seriously, it would seem to me but little less than absurdity, upon well established principles for construing such statutes, to adopt the construction contended for. We have the Pennsylvania statutes before us; and, under our act authorizing the reading of the statutes of other states, published by authority, they are properly here for interpretation. But we have, also, the decisions of the highest court of that state, furnishing the rules by which such statutes are, and would be construed there. We must take the statutes with the rules. The courts of the state, enacting the laws, are their proper interpreters; and, I therefore, refer to some of those decisions.

"If acts of incorporation are to be construed so as to make them imply grants of franchises, immunities, and exemptions which are not expressly given, every company of adventurers may carry what they wish without letting the legislature know their designs." *Bank of Penn.* v. *The Comm.,* 7 *Harris* 152.

That might have been written for our special instruction, if it had not been written in 1852. I proceed:

"Charters would be framed in doubtful or ambiguous language on purpose to deceive those who grant them, and laws, which seem perfectly harmless on their face and which plain men would suppose to mean no more than what they

say, might be converted into engines of infinite mischief. The legislature, without knowing or intending it, might thus be induced to disarm the state of its most necessary powers and transfer them to corporations. The continued existence of a government under such circumstances would not be of much value. There is no safety to the public interests except in the rule which declares that privileges not expressly granted in a charter, are withheld." *Ibid.*

If the gentlemen on the other side will point out to me where, in the acts of 1870 and 1871, the privileges claimed in this case are expressly granted, we will concede the point.

Now I turn to the case of *The Commonwealth* v. *The Franklin Canal Company,* 9 *Harris* 117. I read from pages 127 and 128:

"We hold," says Chief Justice Black, "without doubt or hesitation, that no railroad company can connect with a foreign railroad which meets it at the state line, unless expressly authorized by its charter, or unless such connection cannot be avoided without losing the advantage of what is clearly the best route. If this be not so, the doctrine of strict construction is a mockery. The right of determining to what extent and in what manner our territory shall be made a thoroughfare, for the benefit of foreign corporations, belongs to the state herself. It is so important to the interests of our own commerce, and the prosperity of our own public works, that no proposal to surrender it has ever been made without grave deliberation, and seldom without more or less opposition. The fiercest of our legislative struggles have been upon bills granting rights of way. The state will not be held to have parted with this right until she does so in plain words, of which the sense cannot be mistaken. It will not pass by construction as an incident of the privilege to make railroads between two designated points within the State."

In the case of *The Commonwealth* v. *The Erie and Northeast Railroad Company,* 3 *Casey* 351, the same court said:

"This case requires us to give a construction to the charter

of a private corporation. The frequency of such cases excites some surprise when we reflect that an act of incorporation is, and always must be, interpreted by a rule so simple that no man, whether lawyer or layman, can misunderstand or misapply it. That which a company is authorized to do by its act of incorporation, it may do; beyond that, all its acts are illegal. And the power must be given in *plain* words, or by *necessary* implication. All powers not given in this direct and unmistakable manner are withheld. It is strange that the Attorney-General, or anybody else, should complain against a company that keeps itself within bounds which are always thus clearly marked, and equally strange that a company, which has happened to transgress them, should come before us with the faintest hope of being sustained. In such cases ingenuity has nothing to work with, since nothing can be either proved or disproved by logic or inferential reasoning. If you assert that a corporation had certain privileges, show us the words of the legislature conferring them. Failing in this, you must give up your claim, for nothing else can possibly avail you. A doubtful charter does not exist, because whatever is doubtful is decisively certain against the corporation."

See also the case of *Packer* v. *Sunbury & Erie R. Co.*, 7 *Harris* 218.

I submit, without further comment, the case upon the merits.

## V.

Neither the Pennsylvania Railroad Company, nor the Philadelphia and Trenton Railroad Company, is a necessary party to the bill of complaint, unless it appear by the bill, or answer, or some evidence in the cause, that they, or one of them, has some legal or equitable estate in the subject matter; or, that one, or both, would, in some way, be concluded by granting the entire relief sought; which is, simply, to enjoin the United Companies of New Jersey, and their

directors, from executing the lease in question, on the ground that they have no legal or constitutional power so to do. Neither the Pennsylvania Railroad Company, nor the Philadelphia and Trenton Railroad Company, is charged, in any way, with having done or participated in the wrong complained of, or even advised any act whatever towards executing or sanctioning the lease in question; much less that either had executed, or agreed to join in the execution of, such a lease. Nor is it so stated in the answer; nor, so far as I know, is it true.

" It is a rule in equity, subject to certain exceptions which will be hereafter noticed, that all persons materially interested, either legally or beneficially, in the subject matter of the suit, are to be made parties to it, either as plaintiff or defendant, however numerous they may be; so that there may be a complete decree which shall bind them." *Story's Eq. Pl.*, § 72.

The interest required is a legal or equitable estate, or a fixed legal right; not a mere interest in the question, without such estate or right to be disturbed. If a decree can be made without affecting the rights of a person not a party, or without his having anything to perform necessary to the operation of the decree, the court will proceed without him. *Eden on Inj.* 172–4; *Joy* v. *Wirtz*, 1 *Wash. C. C. R.* 266.

If the lease in question had been executed, or any valid agreement made to execute it, the case would be different. Then there would be an estate, or a right fixed in the defendant. Even if it should now appear that such execution had taken place, or agreement been made, the court would not dismiss the bill or refuse the injunction; but would either require those companies to be made defendants, or allow them to appear and make defence. But the facts are the other way; nothing of the kind appears to have been done, and *quod non apparet non est*. Neither company, although having full notice, asks to appear. If they should do so, in proper form, stating sufficient interest, no objection will be raised.

Another point was suggested by the learned gentleman, touching acquiescence. As to any acquiescence on the part of the complainants sufficient to bar their right to object, as suggested by the defendants' counsel, I forbear trespassing on the time of the court. It clearly appears, that the first and only open corporate act done by either of the United Companies, prior to the exhibition of the bill, was the passage of the resolution of the joint board that it would be expedient to lease their works to the Pennsylvania Railroad Company. The bill was exhibited, as soon afterwards as it could be prepared; certainly, within a reasonable time, considering the magnitude of the case. No corporate act, of any kind, by either the Pennsylvania Railroad Company, or the Philadelphia and Trenton Railroad Company, appears to have been done before or since.

*Mr. Vanatta,* for defendants.

The bill charges that the defendants intend, and are about to lease to the Pennsylvania Railroad Company, for a term of nine hundred and ninety-nine years, all of their " canals, bridges, railroads, with their appurtenances, and the floating stock, rolling stock, chattels, and other property, real and personal, of whatsoever kind, and wheresoever situate, and all the franchises, rights, and privileges of the said lessors thereto respectively belonging, or in anywise appertaining."

The prayer is that the defendants may be restrained from all further proceedings towards the " execution of the aforesaid indenture of lease, or making, or entering into any other agreement for the consolidation of the capital stocks, or business of the said United Companies, or any or either of them, with the said Pennsylvania Railroad Company; and from all further proceedings, in anywise, to grant, demise, or lease the aforesaid canal, feeder, or railroads, or their or either of their appendages and equipments, powers, franchises, or privileges to the said Pennsylvania Railroad Company;" and for other and further relief.

The only rights of the complainants, shown by their bill,

in the property included in the proposed demise, *are those of stockholders.* Therefore, it is manifest, the complainants *can* only be injured *in their rights as stockholders,* and the defendants, in the present suit, can only be enjoined from doing such acts as do, or necessarily will, illegally, injure *the rights, as stockholders,* of the complainants. No matter how illegal, or in excess of their powers, any proposed act of the defendants may be, the complainants can not enjoin the doing of that thing without showing that the act will do some injury to some *private right* vested in and peculiar to them. *Irwin* v. *Dixon,* 9 *How.* 27; *M. & E. R. Co.* v. *Pruden,* 5 *C. E. Green* 537; *Buck Mountain Coal Co.* v. *Lehigh Coal Co.,* 50 *Penn.* 91; *Brown* v. *Monmouthshire Railway and Canal Co.,* 4 *E. L. & Eq. R.* 113, 124; 12 *East* 429; 14 *Conn.* 565; 7 *Barr* 34; 63 *Penn.* 127.

The defendant corporations owe two classes of duties.

1st. To the state, as the representative and guardian of the public.   2d. To their stockholders.

Their duties to the state were and are : To construct the works pursuant to the charters; to cause the works to be used for the purposes for which they were authorized to be made; to pay the taxes required by law; to obey the laws of the state in relation to the use of their property and powers.

For the violation of any of these duties, the state can only have judicial relief.   A stockholder cannot maintain a suit for neglect or violation of any of these duties, unless he shows that such neglect or violation is also a neglect or violation of some of the duties which the defendant corporations *owe to him, as a stockholder,* in consequence of which he is exposed to special private damage.

The duties, owing to stockholders, are : To preserve the capital intact, and to employ it in the prosecution of the business for which the defendant corporations were established, (*Salamons* v. *Laing,* 6 *Railw. Cas.* 301; *Kean* v. *Johnston,* 1 *Stockt.* 401); to pay to the stockholder his share of the net profits, commonly called dividends.

These are the sum total of the duties which the defendant corporations owe to their stockholders. This will be manifest from an examination of the rights of stockholders.

" A share in one of these companies may be defined to be a right to partake, according to the amount of the party's subscription, of *the surplus profits* obtained from the use and disposal of the capital stock of the company to those purposes for which the company is constituted." *Angell & Ames on Corp.*, § 557.

See also opinion of Chief Justice Shaw, in *Hutchins* v. *State Bank*, 12 *Metcalf* 426.

That this was the law in New Jersey is manifest from the fact that shares of stock could not be seized, or sold on execution, until that power was conferred by statute. *Nix. Dig.* 294, §§ 7, 8.

See *Denton* v. *Livingston*, 9 *Johns.* 96; *Duncuft* v. *Albrecht*, 12 *Sim.* 189; *Tippets* v. *Walker*, 4 *Mass.* 596; *Bligh* v. *Brent*, 2 *Younge and Coll. Exch.* 268, 294; *Bradley* v. *Holdsworth*, 3 *Mees. & Wels.* 422; *A. & A. on Corp.*, §§ 391–3; 1 *Redf. on Railw.* 106, § 29.

I venture to say that no adjudication *in favor* of a stockholder, *against the corporation* which issued the stock, based upon the rights of the plaintiff as a stockholder, can be found, which enforces any other duty towards the stockholder than those before mentioned. If the plaintiff did not succeed in showing that one of these duties had been neglected or violated, he failed in his suit. And in this case, the injunction must be dissolved and denied, and the bill be dismissed, if the complainants have not shown:

1st. That the proposed demise endangers the safety of the capital of the United Companies; or,

2d. That using the capital of the lessors pursuant to the lease will be to cease to employ it, or to employ it in a different business than that for which the defendant corporations were established; or,

3d. That the effect of the lease will be to certainly destroy, or materially and certainly diminish their dividends.

In support of this position, counsel cited and commented on *Gifford* v. *N. J. R. Co.*, 2 *Stockt.* 174; *Ware* v. *Grand Junction Water Works*, 2 *Russ. & My.* 470; *Ward* v. *The Society*, 1 *Coll.* 370; *Att'y-Gen.* v. *M. & L. R. Co.*, 1 *Railw. Cas.* 436; *Mangles* v. *Grand Collier Dock Co.*, 10 *Sim.* 519; *Illingworth* v. *M. & L. R. Co.*, 2 *Railw. Cas.* 187; *Kean* v. *Johnston*, 1 *Stockt.* 401; *Zabriskie* v. *Hack. & New York R. Co.*, 3 *C. E. Green* 178; *Coleman* v. *East. Coun. R. Co.*, 4 *Railw. Cas.* 513; *Salamons* v. *Laing*, 6 *Railw. Cas.* 289; *Bagshaw* v. *East. Union Railway, Ibid.* 152; *Cooper* v. *The Shropeshire Union Railw. & Canal Co., Ibid.* 136; *Foss* v. *Harbottle*, 2 *Hare* 461; *Lewis* v. *Billing*, 4 *Railw. Cas.* 414; *Gilbert* v. *Cooper, Ibid.* 396; *Bryson* v. *Warwick Canal Co.*, 23 *E. L. & Eq.* 91.

Now let us look into the bill of complaint, to see what *rights* of the stockholders are alleged to be threatened with injury.

The bill admits, repeatedly and in the broadest manner possible, that the capital has been, and now is, all most advantageously invested in the very works which were authorized and intended to be constructed with it.

There is no charge, or pretence in any part of the bill, that the defendants threaten, or intend to employ the capital, or the works which have been made with that capital, in the prosecution of any other business than that for which the defendant corporations were established.

The bill utterly fails to show—it does not pretend—that the proposed demise endangers the safety or security of the capital, or works, or property of any kind, of the lessors. Nor does the bill show, or pretend, that there is any intention, or that the effect of the lease will be, to cease to employ the capital or property of lessors in the business, or to employ it in any different places, than those, to carry on which the defendant corporations were established.

It therefore follows that the complainants cannot possibly be injured, unless it is in respect of dividends.

The bill does not allege or pretend that there is any

intent to destroy, or danger or probability of *destroying* the complainants' dividends. On the contrary, it shows a guaranty of and security for dividends of ten per cent. per annum, payable quarterly.

It does not charge or pretend, that there is danger that the dividend of ten per cent. per annum will not be paid pursuant to the terms of the lease.

The complaint, then, if anything, is that their dividends, hereafter, under the lease, *will not be as great* as they will be if the lease is not made.

The complainants make no complaint that there has been any mismanagement; they laud it. They say that the dividends have, heretofore, been twelve and twenty hundredths per cent. per annum, on the stock; and then, they say that they *believe* that, with like management and care for a coming period of thirty-eight years, average dividends of at least fifteen per cent., may be rationally and confidently expected.

No reason for this belief is given, except that dividends, averaging twelve and twenty hundredths per cent., have heretofore been paid. That single fact warrants no such conclusion. The bill and the legislative acts which it refers to, show that the monopoly which the defendants so long enjoyed, expired in 1869. The statute books show that authority to build railroads in every part of the state, has been freely granted. The official reports, made to and published by the legislature, show that those powers have been extensively used. The New Jersey West Line Road, a new line across the state, striking the Delaware below Phillipsburg, is now in actual course of construction. What is known as the "Air Line Road," a road intended for direct and immediate competition with the United Companies, between New York and Philadelphia, has been so long agitated that its authorization can not be much longer prevented. Nothing but the consummation of this lease can prevent it; and even that will only postpone it a little longer. A very considerable amount of the newly con-

structed roads is used in competition with the roads of the defendant companies. That is more particularly the case in the vicinity of Elizabeth and Newark. But the whole exterior business of the company, for years, has been in sharp competition with the great through lines in the state of New York, and the Central Railroad Company of New Jersey. That competition will become sharper and more depressing upon profits every year. Besides that, the capital of the defendant corporations has very largely increased. In 1853, the stock of the Joint Companies was $3,000,000. Their funded and other indebtedness, $7,835,400. Making the aggregate capital invested, $10,835,400. In 1866, their total capital invested was $18,169,549.50.

In 1867, the capital invested by the United Companies was $28,169,549.50. In 1870, three years afterwards, it was $35,853,467.16, an increase, in three years, of $7,683,-917.66. Besides that, it is contemplated, and it is necessary, for the purpose of improving the Harsimus cove property, to immediately add to the stock $2,250,000. The development and improvement of this property is a necessity, whether the lease be made or not. That will make the capital invested nearly thirty-three per cent. greater than it was in 1867.

Now, in view of the increased and increasing competition, and in view of the great increase of capital invested, is there any reason to expect larger dividends in the future than in the past? Are not much smaller dividends an *unavoidable necessity?* Large masses of capital have never made and never can make, as large *a per centage* of profits as a smaller amount of capital employed in the same business.

But the proposed lease violates no right of the complainants in respect to dividends.

The general principle, apart from charter or statutory regulations, is that a court of equity will not compel the directors of a corporation to declare dividends out of the surplus earnings, unless they refuse from a willful abuse of

their discretion; nor will the court interfere with the discretion of the directors as to dividends, unless it appears that they are acting in bad faith, or with extreme negligence.

2 *Redf. on Railw., pp.* 336, 337; *Stevens* v. *The South Devon Railway Co.*, 12 *E. L. & Eq.* 237; *Brown* v. *Monmouthshire Canal Co*, 4 *E. L. & Eq.* 124; *Barnard* v. *Vermont & Mass. R. Co.*, 7 *Allen* 512; *Angell & Ames on Corp.*, § 314.

The Court of Chancery cannot be the administrator, or manager of the internal affairs of the numerous private corporations of the state. It can and will intervene, only in cases of *fraud, accident, or mistake.*

By the respective charters of the several companies composing the United Companies, the matter of dividends was confided entirely to the discretion of the directors of each company.

It is, therefore, very clear that there can be no relief against the directors, or the corporation, in respect to dividends, unless it be grounded upon the fraud or gross negligence of the directors, or the corporation. Stockholders can only recover such dividends as have been declared by the corporation; and the directors, or corporation, if acting in good faith, cannot be compelled to declare any more, or greater dividends than they, in their discretion, think most advantageous to the best interests of the corporation.

In this bill there is no charge of fraud against the directors, or any of them. There is no imputation of any fraudulent intent or scheme, whatever. The utmost of the charge is that the complainants *believe* that the defendants have erred in judgment as to the quantum of future profits. I trust that I have shown that that belief is unfounded. Therefore, all ground for interference on account of the dividends fails.

On the other hand, the answer shows that, in making the lease, the defendants have been prompted entirely by a desire to secure to the stockholders, permanently, the largest possible profits, and that in their judgment the lease achieves

that result. Their motive was to secure, permanently, to the stockholders, a larger profit on their capital than can or will be secured without the lease. Their reasons for accepting ten per cent. per annum, for a thousand years, save one, were : 1. The capital stock has increased from $2,750,000 to $20,249,797.50. 2. The capital, to make the improvements at Jersey City, and to improve and enlarge the capacities of the works of other places, will require the capital stock to be increased several millions of dollars, it will not be rash to say, at least $5,000,000. 3. The old loans, which were negotiated in foreign markets at what, to us, were low rates of interest, have fallen and are falling due. To renew those loans, bonds have to be negotiated at higher rates of interest, and at large discounts from the face of the bonds. Thus, while the stock, in amount, is more than six times greater than it formerly was, the interest on the other indebtedness consumes a larger per centage, and a larger amount of the earnings, than formerly. 4. That the wages of all kinds of labor, and the cost of all kinds of materials used by the companies, have greatly increased. 5. That, owing to the great competition in business to which the defendants have been subjected, the rates of fare and freight have been very much reduced. The almost certain prospect is that, hereafter, competition will be very much increased, and fares and freights still further reduced. 6. Already these and other causes have reduced the profits of the defendants, upon the whole capital invested, to seven and twenty-six hundredths per cent. per annum, and upon the capital stock to less than ten per cent. per annum. 7. That without the lease, the causes aforesaid, and others, will still further reduce the profits upon the capital employed. 8. The legal as well as the average rate of profit (interest) on capital does not exceed seven per cent. The capital is subject to taxation for municipal, county, and state taxes. The interest is subject to the United States income tax. These taxes reduce the net interest to at least five per cent. The lease in question secures to the stockholders an interest of

ten per cent. per annum, "free and clear of and from all taxes, charges, and assessments whatsoever, now existing, or hereafter to be imposed by lawful authority upon the said corporations lessors, their respective franchises and property, including all income tax of the United States."

This lease, then, secures to the complainants double the average rate of interest.   The complainants retain all the security they heretofore had for the payment of their dividends, and in addition to that they have the covenant of the wealthiest corporation in America.   Besides all that, if the lessees fail to pay the rent, or to keep any of their covenants contained in the lease, the lessors may re-enter, evict the lessees, and re-possess the whole property, as if the lease had not been made.

The bill charges that the making of the lease and delivery of the demised property, would be a virtual dissolution or extinguishment of the United Companies, and the substitution of the lessee to take the property and execute the powers and duties of the defendant corporations, without the consent of the stockholders, and without compensation to the stockholders whose property should thereby be taken, endangered, or destroyed.   That the defendant corporations are the trustees of the stockholders, and that the effect of the lease will be to substitute the lessees to that trust.

I answer, that the lease will not operate as a dissolution or extinguishment of the United Companies, or of the corporations composing that union.   The lease is made subject to the proviso, "that nothing herein contained shall be deemed or taken, in any manner, to affect the right of corporate existence of each of the lessors, parties hereto, or such powers and franchises of which the exercise may from time to time be necessary *to protect the interests of their respective stockholders*, according to the true intent and meaning of these presents."   Again, *the title to* all canals and railroads used for transportation between New York and Philadelphia, hereafter acquired by the lessees, shall be taken in the name of the lessors, or of some of them.   Besides, the lease

makes provision to "enable the said lessors to keep up and maintain their corporate organizations." The twelfth paragraph provides that "the accounts to be kept by the said lessee, of the works and property which form the subjects of this lease, and of the business thereof, shall, at all reasonable hours and times, be open to the inspection and examination of the *president*, or *presidents* of the said lessors, and each of them, and of such other person or persons as the said lessors shall, from time to time, by resolution of their directors, appoint to examine the same."

These and other provisions of the lease repel any idea of any *intent* to dissolve or extinguish the leasing corporations, and thus show a clear purpose to maintain these corporations in full efficiency, and with undiminished powers.

The bill does not charge that these provisions, for maintaining the existence and vigor of the leasing corporations, are not made in good faith.

Nor is it a natural or necessary effect of the demise, to dissolve or extinguish the leasing corporations. An absolute sale and conveyance of all their property would not work a dissolution of the lessors. Much less will a lease.

*Dean & Chapter of Norwich's Case*, 3 *Coke* 75; *Brinckerhoff* v. *Brown*, 7 *Johns. Ch. Rep.* 217; *Angell & Ames on Corp.*, § 773.

This lease is not an alienation, in the ordinary acceptation of that term. It is rather an arrangement by which the demised premises are to be operated for the benefit of the lessors.

The lease negatives any intent to part with, or surrender the property or powers of the lessors, or to part with the control of either, or to apply them to any other uses than those intended and directed by the charters, or to cease to employ the property, powers and privileges for those uses, or to omit, or neglect the performance of any duty owing to the public, or to the stockholders.

The right of the complainants to vote upon their stock, to have their capital preserved, to have it employed in the

business for the prosecution of which it was invested, and to have their shares of the profits of the business, are not only not disturbed, but are preserved, protected and strengthened. So far as the stockholders are concerned, this is the full measure of their rights.·

The lease shows no intent to omit the performance of any duty incumbent on the defendants. It shows a clear intent and purpose to perform every duty in the fullest manner.

It does show, however, an intent to employ the Pennsylvania Railroad Company as an agent to aid in the performance of those duties. There is no intent on the part of the lessors, to discharge or exempt themselves from liability for the performance of any of their duties. On the contrary, their liability is to remain undiminished and unaltered. They merely make an agent and an assistant of the lessee, and, to some extent, add its liability and responsibility to their own.

The defendants are unrestricted. as to the agencies they shall employ to operate their works.

The only apparent exception is that a majority of the directors of the "*Joint* Companies," shall be citizens of this state. That requirement is not in the charter of the New Jersey Railroad Company.

. The .powers of the boards of directors as to the management of the property and affairs of the company, are very broad. *Charter of Canal Co.*, § 7; *Charter of Camden & Amboy R. Co.*, § 6; *Charter of N. J. R. Co.*, § 5.

The agencies to be employed are what shall *be necessary*, and the boards of directors are the sole judges of what is necessary or expedient.

The complainants, as stockholders, are entitled to no direct voice in the management. The boards of directors are not agents. The board is an organ of the corporation. The corporation is the principal. The board is the organ by which it forms and makes known its will, and by which it makes its appointments and contracts. None of the duties.

which the lessee undertakes to perform are judicial in their nature, but all of them are and every one is such as may be performed by an agent. "Whatever a man has power to do in his own right, he may (except in one or two very particular cases,) appoint an agent to do for him." *Smith's Mercantile Law,* 93; *Clement* v. *Canfield,* 28 *Vt.* 302; *A. & A. on Corp.,* § 162, (*9th ed.*); § 191, (*7th ed.*)

This is peculiarly the case with a corporation, because it can only act by its appointed agents. And one corporation may be appointed to and act as the agent of another corporation. This is being done all the time, everywhere, and in every department of business. The charters of the defendants contain no restrictions or directions as to the agents they should employ, except that they "be required to transact the business of the company." The Pennsylvania Railroad Company—a single person—can operate all the works of the defendants. If the defendants can appoint and employ, as undoubtedly they can, a thousand natural persons to operate their works, why may they not employ one artificial person to do the same thing? And why may not that artificial person be paid for the service by allowing it a share of the earnings?

See the *Sussex R. Co.* v. *Morris & Essex R. Co.,* 4 *C. E. Green* 25.

But it is said that the Pennsylvania Railroad Company has not the right or power to receive, hold, or use the property and rights demised to it.

That depends upon whether that power has been conferred upon it by the power which created it—the state of Pennsylvania.

*Angell & Ames on Corp.,* § 162; *Bank of Augusta* v. *Earle,* 13 *Pet.* 519; *Runyan* v. *Coster,* 14 *Ibid.* 192; *Silver Lake Bank* v. *North,* 4 *Johns. Ch.* 370; 2 *Kent's Com.* 282, 283; *Lathrop* v. *Commercial Bank of Sciota,* 8 *Dana* 114.

As a matter of fact, the state of Pennsylvania has con-

ferred that power in full, clear terms. *Laws of* 1870, *pp.* 31, 1274; *Laws of* 1871, *May* 3; 53 *Penn. St. R.* 57–8.

In this state there is nothing preventing or prohibiting the lessee from taking, holding, and using the demised premises.

The spirit and policy of our laws have favored corporations of other states holding real estate in this state. Thus, any alien may purchase lands, &c., within this state, and hold the same to him, his heirs and assigns. *Nix. Dig., p.* 6. An act approved March 2d, 1849, provides that so much and such parts of the "several acts of incorporation in this state as prohibit stockholders residing out of the state from voting on stock held by them, are hereby repealed." *Nix. Dig., p.* 169.

The defendants may have their offices, hold their business meetings, and books, out of the state. *Ibid., p.* 169.

Besides, there are many special acts authorizing corporations of other states to hold lands, and exercise and enjoy New Jersey franchises in this state. As, for instance, the Erie Railway Company, the Delaware, Lackawanna and Western Railroad Company, the Allentown Iron Company, and many others. Every statute which authorizes a corporation of this state to mortgage its property and franchises, and makes no restriction against mortgaging to a foreign corporation, (and none of them make such a restriction,) in effect, authorizes any corporation which may become the mortgagee, in case of non-payment, to hold the mortgaged premises. By authorizing a mortgage of the property and franchises of the United Companies, as the legislature did in 1868, (*Laws* 1868, *p.* 1039, § 5,) it, in effect, authorized the transfer of that property and those franchises to whatever corporation, domestic or foreign, might become the owner of the bonds.

Moreover, as the controlling power of every private corporation is in the ownership of its stock, and as our laws make no restriction on foreign corporations from acquiring the ownership of the stock of our corporations, or against

voting on it, foreign corporations are perfectly free to own and control any and all of our corporations and their property. In this way, the controlling power in the affairs and over the property of the United Companies, has long been vested in persons who do not reside in this state.

Any distinction, in this respect, between domestic and foreign corporations (so long as they are corporations of some state of the Union), is useless and senseless, so far as railroads or canals are concerned. The property of such corporations is local. All the franchises in relation to them must, necessarily, be exercised locally. The property and its use must be regulated by the laws of this state, no difference in what form, or in what place, questions respecting it arise.

*A. & A. on Corp.*, § 163; *Binney's case*, 2 *Bland (Md.)* 142; *Farnum* v. *Blackstone Canal Co.*, 1 *Sumner* 46; *Smith* v. *Kernochen*, 7 *How.* 198; *Black* v. *Zacharie*, 3 *How.* 483, 511.

That distinction *is contrary to the spirit* of Art. IV, § 2, of the Constitution of the United States—which provides " that citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

But, if we assume that the execution of the lease will be to appoint the lessee to perform and execute all the powers, and discharge all the duties, trusts, obligations, contracts, and other liabilities of the defendants, how will that injure the complainants? The appointment cannot be made without the consent of at least two-thirds of the stockholders— a consent which has already been given. If the lessee *does* perform and execute all the powers, and discharge all the duties, trusts, obligations, contracts and other liabilities of the defendants, then, surely, the complainants will not be injured. If they do not perform, then they can be expelled, under the provision of the lease.

But it is said that the complainants are not bound to confide the performance of those duties to the lessee, even as an agent of the defendants, for a single hour. The answer is, that they are bound to submit to having the duties of the

defendant corporations performed by such agents as the boards of directors shall appoint, and the power of electing the directors is absolute in the holders of a majority of the stock. The supreme and final power—the boards of directors, and their constituents, a majority of the stockholders—having made and assented to the appointment, the court cannot relieve the complainants in this respect, unless it can decree the choice of the directors and the appointment of the agents of the corporation to a small minority of the stockholders. This the court cannot do, because it was a part of the contract upon which the stock was taken, and it has ever been held that the holders of a majority of the stock should have the selection and appointment of the directors, and, through them, of all other agents of the corporations.

If it be said that the lease will prevent the appointment of other agents to operate the works of the defendants, and prevent a change of the mode of managing the business of the companies, in case another set of directors with different views—with views, if you please, similar to those entertained by the complainants—shall hereafter be elected, I answer that that will deprive the complainants of no rights they now have. They are in the minority. The right and power to elect the directors is in the holders of more than two-thirds of the stock, who have already waived the right to change the operating agent and the mode of carrying on the works, so long as the lessee fulfills the terms of the lease. It is a right inherent in a majority of the stock, to change the agencies for, and the mode of managing the property and affairs of the company. But that right, like any other right of property, may be limited and qualified by the owner thereof, and such limitation or qualification will attach to the stock now held by the consenting stockholders, in whose hands soever that stock may hereafter be.

See *Gifford* v. *The New Jersey R. & T. Co.*, 2 *Stockt.* 172; 5 *Railway Cas.* 241; *Zabriskie* v. *Cleveland, &c.*, 23 *How.* 381.

In the case now before the court, the consent given by more

than two-thirds in interest of the stockholders to the lease, binds those who gave it, and that consent must, hereafter, bind the assignees of those who gave it. Therefore, the agencies for operating the works and transacting the business of the defendants, provided by the lease, so long as the terms of the lease are performed by the lessee, can remain unaltered without depriving the complainants of any right.

There is no charge, allegation, or pretence in the bill, that a majority, or any near appaoach to a majority, of the stockholders of the defendant corporations agree, or will co-operate with the complainants as to the agencies by, or the policy upon which the property and business of the defendants shall be managed.

The pleadings show that the power of appointing the agents and prescribing the managing policy of the defendants is not now in the complainants, or in any, or all of them together, and that, therefore, in that respect, the lease, if executed, can do *them* no harm. The essence and value of the shareholder's right to vote upon his stock, consists in the power to thereby influence the selection of the agents by, and the policy upon which the affairs of the corporation shall be managed. If those in whom that power and right is vested make an agreement, fixing permanently the operating agents and managerial policy of the corporation, the agreement is within their power to make; it does no illegal injury to any one, and is binding on the rights and interests of those who made it, and the corporations.

The lease, if executed, will not take from the complainants, without their consent, any of their property, or rights, for public or private use, nor with or without compensation.

The bill impliedly charges that the act of 17th March, 1870, authorizes, and that the proposed lease, if executed, will *compel the dissatisfied stockholders* to give up their stock to defendants, and that that is a taking of their stock for private use.

The complainants are not, in any sense, the owners of the

lands, franchises, goods, chattels, or choses in action of the United Companies, or any of them. Their sole estate is a right to share in the net profits of the business of the defendants, that is, in the net profits of the business of transportation. The railroads, canal, rolling-stock, and other property of the defendants, are mere instruments by which they carry on that business, and the defendants are the sole, legal, and equitable owners of all and every of those instruments. In no court could the complainants recover possession of those instruments, nor recover damages for injury done to them, or any of them. For a trespass on any of those instruments the complainants, or any of them, could not maintain an action; nor, at their suit, would this court order an injunction to prevent or abate a nuisance, injuriously or wrongfully effecting any of those instruments. If any of those instruments, real or personal, be taken for public use, by virtue of the right of eminent domain, the damages would be assessed and paid to the defendants, and could not be assessed or paid to the complainants, or any of them. All this is because the stockholders are not the legal or equitable owners of any of the property of the defendant corporations.

This is made very manifest from the fact that if the complainants were to secede, and be erected into a new corporation, they could not take with them, or have a division of, the defendants' property, but the defendants would retain it all, notwithstanding the secession.

*Angell & Ames on Corp.*, §§ 194, 557, 312; *Arnold* v. *Ruggles*, 1 *Rhode Island* 165; *Wells* v. *Rahway White Rubber Co.*, 4 *C. E. Green* 402; *Van Houten* v. *First Reformed Dutch Church*, 2 *C. E. Green* 126; *Story* v. *Jersey City & Bergen Point Plank Road Co.*, 1 *C. E. Green* 14, *&c.*; *Charter of Del. & Rar. Canal Co.*, § 17; *Charter of C. & A. R. Co.*, § 16; *Charter of N. J. R. & T. Co.*, §§ 6, 10.

What the lessee is to take under the lease, therefore, is not *the property of the complainants*, but the property, in law and in equity, *of the defendant corporations*. Nor is

the taking such as will deprive the defendants of the legal or beneficial ownership of the property taken. The taking is to be such as the taking of the tenant from the landlord; and the holding is to be in subordination to the paramount rights of the landlord and for the benefit of the lessors and lessee.

*From the complainants nothing is to be taken.* Their title to their stock is not to be disturbed; their right to vote upon it will be as perfect and as unimpaired as ever it was; their right to dividends is not to be taken; and actual, unusual, extraordinarily large dividends, instead of being taken from, are to be paid to them. There is nothing authorizing the lessors, or the lessee, to take the complainants' stock without their consent, and there is no intent, purpose, or desire to take it from them in any way. If there had been an agreement *to consolidate* the stock of the lessors with that of the lessee, there might then be some ground for saying that the taking of the complainants' stock is contemplated; but there is no agreement to *consolidate.* The agreement is for a *connection of business,* which in no way requires or implies the taking of the stock of any stockholder.

The leasing act of March 17th, 1870, in effect, provides that if any stockholder *does not like the policy,* or the mode of leasing, he *may* withdraw from the corporation, and if he elects so to do, the corporation is *compelled* to buy his stock and pay him *the full value* thereof, immediately prior to the lease. This is nothing but *a privilege,* extended to the discontented stockholders, *at the expense* of the corporation. This provision *is entirely gratuitous.* The right of appointing the managers and agents of the corporations, and through them, of directing the management and policies of the corporations, is, by the charters and fundamental principles of the corporations, vested in a majority of the stockholders. To require the corporation to buy out the stock of those holders who are in the minority, when the majority exercise their clear, undoubted rights of appointing

managers and prescribing how the works, &c., shall be managed and operated, is very generous and gracious to the minority, and onerous—oftentimes oppressive upon—and unjust to, the majority. *Gen. Stat. of Vt.* 233, § 82; *Laws of Penn.* (1870) *p.* 31; *Ibid.* (1871) *p.* 1274; 30 *Penn.* (6 *Casey*) 42; *Stat. United King., vol.* 25, *p.* 819, § 161.

But the act and case in question furnish *complete indemnity* to the complainants and every of them. If they are satisfied with the lease they will not seek to compel the defendants to buy their stock. If any of them is dissatisfied with, or does not chose to run the risks of the lease, he can *compel* the defendants to buy, *at the full value of the stock immediately before its value was in any way impaired by the lease.*

There is, therefore, no taking without the consent of the stockholder, of any of *his* property or rights, and the complaint, in that respect, is unfounded in law or fact.

The act of March 17th, 1870, is not unconstitutional.

Counsel here answered, seriatim, the reasons assigned in the bill, why the act of March 17th, 1870, is unconstitutional.

He then proceeded :

The precise and only constitutional question then is, whether it was competent for the legislature to authorize the defendants to lease their works and privileges.

I regard that question as not open to discussion. That power has been so long and so often exercised, and such vast interests are founded upon it, that it should be regarded as beyond dispute. Every case upon the subject of leases of the property and franchises of a quasi public corporation, has asserted or admitted the power of the legislature in this respect.

The *only* reasons for requiring a legislative authorization, or validation, are of a political or public nature. So far as leasing involves the right of property, and the transfer of it, the power of alienation is complete. It is inherent in every

corporation. Leasing without legislative authority can not, *of itself and alone,* injure the stockholders. It is only when the leasing without authority injures some *private right* of the stockholder that he can be relieved. I think no case can be found where a court, at the suit of a stockholder, on his rights as such, has set aside a lease, or enjoined the execution of one, on the *single, sole* ground that there was not legislative authority to make it. There are cases where the court has refused to *enforce or carry out such a lease*— that is, to give relief founded upon it. That is as far as they have gone. The practical importance of that is this, that the want of legislative authority does not, of *itself and alone,* entitle the stockholder to be relieved against the lease. To have relief, he must show that the lease will impair some of *his* rights as a stockholder, *i. e.,* injure *his* property. If he shows that, and shows that the lease impairs the contract between him and the corporation, without his consent, then he can be relieved, although the legislature has authorized the lease. See *Zabriskie* v. *Hackensack & N. Y. R. Co.,* 3 *C. E. Green* 178.

When there is no wrong alleged against a lease, except the want of legislative authority to execute it, it can only be set aside, or its execution enjoined, at the suit of the state. This must be so, because the wrong, in that case, concerns the public only. *Brown* v. *Monmouthshire Canal Co.,* 4 *L. & Eq.* 124.

This view of the matter answers the question whether the validity of a legislative act authorizing a lease depends upon its being consented to by the stockholders. Manifestly it does not, because the whole object and only efficacy of the act consists in its being *a waiver of* all the *political* and *public reasons* which there may be against the lease. As to these, the consent of the stockholder amounts to nothing. He is not the custodian or guardian of the policy of the state. The validity of a legislative act can not be dependent upon such consent. So far as the stockholders' rights are concerned, there is no need of any legislative act.

If he gives *his* consent to the lease *he* is bound thereby as effectually, if there be no legislative act, as if there is one. It is *his consent,* and not the act, which binds him. So, if the lease does not impair the contract rights of the stockholder, it is good against him, and his consent is unnecessary. If it does impair his contract rights and he consents to it, then he is bound whether there be an act of authorization or not.

Hence the constitutionality of the act in question is of no practical importance in this suit, beyond the fact that it shows that all public objections have been waived. It is a part of the legislative history of the state, that, last winter, petitions were presented to the legislature to repeal the act of 17th March, 1870, on the ground that the defendants were about to lease their works, by virtue of that act, to the Pennsylvania Railroad Company. The legislature did not grant the prayer of the petitioners; in other words, the legislature acquiesced in making the lease.

The real and only question in this case is, whether the proposed lease impairs any contract with the complainants, or otherwise unlawfully injures them in respect of their stock. Already, I trust, I have shown that it does not.

The proposed lease is authorized by the act of 17th March, 1870.

The act does not *confine* its powers to New Jersey corporations, nor is there anything in it showing that such was the legislative intention or meaning. The act *meant* to extend its privileges *beyond* New Jersey corporations, as shown by these words: " With *any* other railroad or canal company or companies in this state, or otherwise." That is to be understood as if it were " companies created by this state or otherwise;" that is, with any railroad or canal company in what manner soever created. This is made clear by subsequent words descriptive of the grantee, thus: " With which they (United Companies) are or may be

identified in interest, or whose works shall form, with their own, continuous or connected lines."

The preamble says that the United Companies "have an identity of interest with the Philadelphia and Trenton Railroad Company, and other companies."

The corporation last named is a Pennsylvania corporation. It will not be disputed but that the act authorizes a consolidation, &c., with that company. This is certain, because the leave is to consolidate, &c., with *any* company with "which they are or may be identified in interest;" and then the preamble says that a certain Pennsylvania corporation is one with which they are identified in interest. It is, therefore, manifest that the legislature did not mean to *confine* the act to New Jersey corporations, *nor to exclude* Pennsylvania corporations.

The only other question on this point, then, is one of fact, namely, whether the defendants are identified in interest with the Pennsylvania Railroad Company, or whether the works of the last named company form, with the defendants' works, continuous or connected lines.

Counsel here showed the identity of interest, by the agreements between the lessors and lessee; and showed further, that the lines were continuous and connected.

The lease, as against the complainants, is good, independent of the act of 17th March, 1870.

Admitting, for this occasion, that the defendant corporations can only exercise the powers conferred by statute on all corporations (*Nix. Dig.* 167–8, §§ 1, 2 *and* 3,) and in addition thereto those expressly given in its charter, and such as are necessary to the exercise of the powers so enumerated and given, there would seem to be no lack of power, as between the defendants and their stockholders, to execute the lease and carry it into effect. By the general statute, "*every* corporation, *as such*, shall be deemed to have power to *hold, purchase, and convey* such real and personal estate, as the purposes of the corporation shall require, not exceed-

ing the amount limited in its charter." The right to *convey* is as extensive as the right to *hold*. Whatever the corporation has the power to *hold* it has the power to *convey*. If the defendants did not have the power prior to 1846, they have had it ever since. Every person who has taken stock in any of those companies since 1846, has taken it upon and subject to that condition. The complainants do not allege that any of them were stockholders prior to 1846, nor that any of the stock they hold was subscribed for, or issued prior to 1846.

The charter of the Canal Company, § 2, gives that company capacity "of purchasing, or of otherwise receiving and becoming possessed of, holding and *conveying* real and personal estate."

The charter of the Camden and Amboy Railroad Company, § 2, confers the same power, in the same words.

The charter of the New Jersey Railroad and Transportation Company, § 2, also confers the same power, in the same words.

As to the corporeal hereditament of the defendants, their power of alienation, subject to the exceptions hereinafter alluded to, is undisputed.

*Zabriskie* v. *Hackensack & N. Y. R.*, 3 C. E. Green 194; *Angell & Ames on Corp.*, §§ 187 *to* 191; *S. & B. R. Co.* v. *North West. R. Co.*, 6 H. L. Cas. 135.

Subject to the qualifications hereinafter stated, the power to alienate the franchises would seem to be undoubted. As between the corporation and the stockholders, in respect to the power of alienation, there is no difference between the franchises and the other property of the corporation. The stockholder, as such, has no interest in the franchises except as property. They are of no account to him except as they effect the value and productiveness of his stock.

*Angell & Ames on Corp.*, § 4; 3 *Cruise's Dig.* "Franchise," § 14; 9 *Coke* 27 *b*; 3 *Kent's Comm.* 458-9; *Brown's Leg. Max.*, *pp.* 336-7.

The *general* power and right of alienation being clear and

undoubted, it remains to inquire what restrictions there are upon that power and right.

They may be divided into two classes : 1st. Those which are for the benefit of the stockholders.    2d. Those which are for the benefit of the public.

As to the first, they are only such as are necessary to secure the rights of the stockholder, as such.    An out and out sale, in many cases, fairly made, would not necessarily or materially *endanger the capital,* and the stockholder could not object on that ground; but where the capital, as in this case, is invested in works which can neither exist, nor be used in any other place, then an absolute sale would prematurely break up and terminate the enterprise in which the capital was invested, and cease to employ the capital in that business.    Such an alienation, according to Kean *v.* Johnston, could not be made.    It would be a violation of the implied contract *to continue to employ the capital* in the business for which it was invested.    But the lease in question is not subject to that objection, because the effect of it will not be to cease, but to continue to employ the capital in the very business for which it was invested, and to employ the very instruments which have been purchased with that capital, and that, too, for the benefit of the stockholders.

I have already shown what the rights of the stockholders are.    I have also shown that the lease cannot injure any of those rights.    Therefore, in behalf of the stockholder, there is no restriction upon the defendants' power to make the lease, because such restriction is *not necessary* to protect any right belonging to the stockholder, as such.    Nor can he, on the footing of that right, enjoin its execution, because he is not injured.

The stockholder who shows no injury to his rights to arise from the lease, cannot prevent its execution, on the mere ground that the legislature have not authorized it to be made.    The state may waive its objections, or acquiesce in the lease, or validate it hereafter, if it had not been authorized in advance.

This is illustrated by the case of *Runyan* v. *Coster's Lessee,* 14 *Peters* 122. There, land in Pennsylvania had been conveyed to Coster and others, in fee simple, in trust, declared in the deed, to the sole use of the stockholders of a corporation created and existing by the laws of New York, called the New York and Schuylkill Coal Company. Runyan was in possession. Coster and his co-trustee brought an action of ejectment, in the Circuit Court of the United States, Eastern District of Pennsylvania, to recover possession of that land. Verdict and judgment for plaintiffs. The defence was based upon a statute of Pennsylvania, which recites that it *is contrary to the laws and policy of Pennsylvania* for any corporation to prevent or impede the circulation of landed property from man to man, *without the license* of the commonwealth. And its enactments prohibited *any* corporation to purchase lands within that state, under penalty of forfeiture of the lands to the commonwealth, unless such purchase should be sanctioned and authorized by an act of the legislature. This was the ground upon which the writ of error was prosecuted in the Supreme Court of the United States. The court held, upon the authority of *Lazure* v. *Hillegas,* 7 *S. & R.* 313, and *Fairfax* v. *Hunter,* 7 *Cranch* 621, that the right of a corporation, in this respect, was like that of an alien, who has power to *take,* but not to *hold* lands; and that, although the land thus held by an alien *may* be subject to forfeiture after offence found, yet, until some act *is done by the government,* according to its own laws, to vest the estate in itself, it remains in the alien, who may convey it to a purchaser; but he can convey no estate which is not defensible *by the commonwealth.* The judgment was affirmed.

This case shows that the mere want of legislative consent cannot be set up as a substantive ground of defence or relief, by a private citizen, in a suit to enforce or protect a mere private right.

This is a safe, sensible, convenient and practical rule. Why should a private citizen set up such an objection when

he does not show that it has injured, or can injure, any private right of his? The question of *ultra vires* has arisen in a great many cases founded upon leases of railroads and canals, but comparatively few of them have been at the suit of a stockholder; and in no case of that kind that I have found has the stockholder been relieved on the bare ground that the lease had not been authorized or sanctioned by the legislature, but the relief, in every case where granted, has been that some right of the stockholder, in respect of his stock, has been injured, or was threatened with it.

There is one apparent exception— *Winch* v. *The Birkenhead, Lancashire & Cheshire Junc. R. Co.,* 13 *E. L. & Eq.* 506 —decided by Vice-Chancellor Parker, in 1852.

The point I now make does not appear to have been made by anybody in the case. The counsel who supported the bill relied only on the allegation that the agreement was illegal and beyond the power of the defendants to make. They said the case fell precisely within *Beman* v. *Rufford* 6 *E. L. & Eq.* 106. But Beman *v.* Rufford was put on the ground that the agreement complained of required the funds of the corporation to be laid out in the doing of a work not authorized by its charter. The whole point of the case and foundation of the judgment were, that the defendants were going to apply the corporate funds to construct unauthorized works.

Winch's case seems, if correctly and fully reported, to stand alone, and to have been imperfectly considered.

No private citizen, suing on his own behalf, can have judgment in his favor, in any court, by merely showing that the defendant has done, or intends to do wrong. To recover, he must go farther, and show that the wrong of which he complains has injured, or will injure, some private right belonging to him. This is a fundamental, unquestionable maxim of law and equity. As the dictum in Winch's case is contrary to this maxim, the case is wrong, and is not authority.

To the point that the protection or advancement of the political and public policy of the state, by the court, in a matter of this kind, can only be invoked by the state herself, acting in her own name and by her own officers:

See opinion of C. J. Taney in *Bank of Augusta* v. *Earle*, 13 *Peters* 291; *Buck Mountain Coal Co.* v. *Lehigh Coal Co.*, 50 *Penn.* 91; *Ex parte Painter*, 2 *C. B.*, *N. S.*, 702; *Mayor* v. *Pemberton*, 1 *Swanston* 260; *Drewry on Inj.* 287; *Lee* v. *Milner*, 2 *Y. & Coll. Ex.* 611; *Solamon* v. *Randall*, 3 *M. & C.* 444; *Wynne* v. *Lord Newborough*, 1 *Ves.*, *Jun.*, 164; *Babcock* v. *N. J. Stock Yard Co.*, 5 *C. E. Green* 296; *Rogers' Locomotive Works* v. *Erie R. Co.*, *Ibid.* 385; *Morris & Essex R. Co.* v. *Pruden, Ibid.* 530; *Mills* v. *Northern R. of Buenos Ayres, Law Rep.*, 5 *Ch. App.* 621; *Ware* v. *Regents Canal Co.*, 3 *De Gex & Jones* 212.

In view of the fact that the intent to make this lease was generally known last winter, and the legislature was petitioned to take action to prevent it, and declined to do so, I assume that the Attorney-General has not felt, and will not feel, at liberty to use the name of the state as a suitor to oppose this lease. At any rate, he has not done so.

The state is not a party to the suit in any form. The state director is not even a stockholder, and is by law prohibited from being one. *Nix. Dig.* 636. If it be said that he represents in the "United Board," the stock of the state, I answer that, as a stockholder, the state has no *greater*, *other, or different rights* than any other stockholder. *A. & A. on Corp.*, § 32, and cases there cited.

The bill in this case, I suppose, was hoped to be supported by the cases of Kean v. Johnston, and Zabriskie v. Hackensack and New York Railroad Company; but I trust and submit, that I have showed that the complainants have failed to show that they are in any danger of either one of the injuries, protection against which the court granted in those cases. The enterprise in which they invested their capital is not to be broken up and summarily ended, as was the fact in Kean's case, nor is their capital to be employed in the

construction and support of works largely extra of what were embraced in the undertaking when they became stockholders, as was the injury in Zabriskie's case.

Here, the whole solicitude of the complainants is about the management of the works, for the purposes and within the limits of the charters and the accepted supplements thereto. The ruling in Natusch v. Irving, (*Gow on Part. App.* 398,) in Kean v. Johnston, or in Zabriskie v. Hackensack and New York Railroad Company, does not apply to the complainants' case, nor reach their difficulty. On a question of internal management they have the misfortune to hold but a small minority of the stock. The only relief they need, and all that can be of any avail to them as to the internal management, is to get a majority of the stock. The court can not furnish them with that. Even if it could, it would now be committed to the lease, and the new holders could not rescind the consent previously given. *Great West. R. Co.* v. *Birm. R. Co.*, 5 *Railw. Cas.* 241.

In case of partnerships, as a necessary incident, the majority must control the management of its affairs. *Collyer on Part.*, §§ 197, 198; *Kirk* v. *Hodgson*, 3 *Johns. Ch.* 405; *Strelly* v. *Winson*, 1 *Vern.* 297; *Robinson* v. *Thompson*, *Ibid.* 465; *Falkland* v. *Cheny*, 1 *Brown's P. C.* 91; *Rooth* v. *Quin*, 7 *Price (Exch.)* 193.

Where it is provided in the articles of copartnership that the management of the affairs of the firm shall be controlled by the majority, or where that is necessarily implied, it would be impairing the obligation of the contract to prevent the majority from exercising that right. In the case now before the court, the distinct provision of the fundamental contract was and is, that a majority of the board of directors should have the management of the affairs of the corporations, and that the boards of directors should be elected by a majority of the stockholders.

It has been the law of the Joint Companies, repeatedly recognized by the legislature and all the stockholders, that consolidations may be made, capital increased, and the

undertaking enlarged, upon the consent of a portion of the stockholders. These stockholders have too often admitted the right of a majority, less than the whole, to determine upon and engage in enlarged enterprises, to now insist upon unanimity being necessary.

The rules laid down in Strelly v. Winson are worthy of notice. True, the property there was a ship; but why should any different rule apply where the property is a railroad? The doctrine of that case is that the majority have the right to direct and control the use of the property. If the minority chose to embark in the venture, they had the *right* to do so; but if they are unwilling to do so, they could not prevent the majority from engaging in the undertaking, but in that case they could *compel* the majority to pay to them the value of their shares in the vessel. This is reasonable and equitable. Upon this very same principle rests the act of March 17th, 1870. Upon the same principle are based all our statutes for the partition and sale of lands held by joint tenants, tenants in common and coparceners. Upon an analogous principle rest the numerous acts for draining, without the consent of a minority, swamp and low lands owned in severalty by many owners, but where the lands adjoin on and connect with each other. *Lauman* v. *Lebanon V. R. Co.*, 30 *Pa.* 42; *Coll. on Part.*, § 198; *Law Rep.* 6, *Ch. Ap.* 176.

In the great mass of legislation in this state relative to private corporations, which has taken place during the last fifty years, every act which has touched the subject (with insignificant and almost a solitary exception), has authorized a majority—less than the whole of those interested in the stock—to enlarge the undertaking, to increase the capital, to engage in new works, create preferred stock, consolidate, and all things of that kind. Have all those acts, or the execution of them, impaired contracts, and have they been and are they all unconstitutional? The question is momentous. But it is said that those acts are saved from invalidity by the acquiescence of the minority. That cannot be, because a law which is obligatory only on those who choose to con-

form to it, is no law at all. Nor can those acts, if invalid, be validated by the acquiescence of the minority presumed from their silence or inaction, because a large portion of the minority, in many cases, consists of infants, married women, persons *non compos*, and others who are incapable of giving consent, and against whom acquiescence cannot be presumed. If those laws have no better foundation than acquiescence, they are all invalid, and the many millions of dollars invested upon the faith of them have no legal stability or security.

The solution of this difficulty to my mind is this : Our legislation has proceeded upon the assumption, that by the law of New Jersey a majority, less than all, of the stockholders of a corporation, through the directors elected by them, had the right by law to govern, as between the corporation and its stockholders, as to the application of the capital and funds and the conduct of the business, and that stock in all incorporated companies had been and would be subscribed for upon that understanding. See the reasoning of Bigelow, Chief Justice, in *Durfee* v. *Old Colony R. Co.*, 5 *Allen* 242, 3. This view did not prevail in Kean v. Johnston, because there was the *exceptional* circumstance that the legislative act authorizing the sale was upon the *condition* that "the said purchase shall be made with the consent of the last mentioned stockholders." It is noticeable that this act did not require the consent of any of the stockholders of the Somerville and Easton Railroad Company—the purchasers.

In Zabriskie v. Hackensack and New York Railroad, it did not appear that a majority of the stockholders had consented to the extension ; indeed, the aspect of the case is that they had not consented. The question here was, therefore, not involved in that case. That circumstance, had it been otherwise, in the opinion of the Chancellor then expressed, would have made no difference. But as the point here was not necessarily involved in that case, we can not say that it was fully discussed in the argument.

As I understand Zabriskie's case, his right, to protect

which relief was granted, was based upon an *implied contract* that the corporation would not thereafter, *without his consent*, extend the business authorized by its charter beyond the limits to which it was authorized when he became a stockholder.

With very great deference, I venture to question whether such a contract, in this state, can be *implied*. In view of New Jersey legislation in respect to private corporations; in view of the fact that almost every corporation authorized to, construct a work of internal improvement, which has constructed its work, has, by subsequent legislation, been authorized to extend or enlarge its works, increase its capital, consolidate with or lease to some other company, and that, too, without requiring the consent of all the stockholders—for over fifty years we have seen such things done over and over again, without getting or asking for the consent of the stockholders,—and in view of the fact that that course of business has been acquiesced in almost unanimously by stockholders for over half a century; are we warranted in concluding or inferring that any intelligent man, when he subscribes for stock in such a corporation, does so upon any such understanding or expectation as is assumed in Zabriskie's case?

On the contrary, as a matter of fact, is not the stock in every such corporation taken, in the hope and upon the expectation and belief that the works and business and capital of the company will be extended as soon as the managers shall deem it expedient, and they shall receive legislative authority to, do so? If there is any implied contract upon that subject, it seems to me it is this: that the corporation *will* enlarge and increase its business as much and as rapidly as possible, and that, if necessary for that purpose, the works shall be extended, the capital increased, and advantageous business alliances formed. That has been the course of all such corporations, and, in such matters, men expect *that what has been, will be.*

*The alleged rights of the complainants should be settled at law, and not on a motion for an injunction.*

1st. The complainants allege that the act of March 17th, 1870, so far as it apparently authorizes the lease in question, without the consent of every stockholder, is unconstitutional.

2d. They allege that the lease in question is violative of a contract between them and the corporation.

The first of these questions is one for a court of law. The Chancellor so held in *Dunn* v. *The Peapack Valley Railroad Company*, and refused the injunction. *Scudder* v. *Trenton Del. Falls Co., Saxton* 694.

The question whether there is such a contract between the complainants and the defendants as they allege, and whether the proposed lease violates it, are also legal questions, and, so far as I know, not decided by any court of law in this state.

In England, it has been very usual to leave or send such questions to be decided at law.

*Clay* v. *Rufford*, 8 *Hare* 281; *S. C.*, 19 *E. L. & Eq.* 350; *Great North. R. Co.* v. *Eastern Coun. R. Co.*, 9 *Hare* 306; *South Yorkshire & C. R. Co.* v. *Great Northern R. Co.*, 19 *E. L. & Eq.* 513; *Johnson* v. *The Shrewsbury & C. R. Co.*, *Ibid.* 584; *Shrews. & Birm. R. Co.* v. *London & Northwest. R. Co.*, 21 *E. L. & Eq.* 319; *Att'y-Gen'l* v. *Ely R. Co.*, *Law Rep.* 6 *Eq.* 106.

Such has been the course of this court.

*Stevens* v. *The Paterson & Newark R. Co.*, 5 *C. E. Green* 126; *Babcock* v. *N. J. Stock Yard Co., Ibid.* 296; *Att'y-Gen'l* v. *Steward, Ibid.* 415; *Higbee* v. *C. & A. R. Co., Ibid.* 435; *Inhabitants of Winslow* v. *Hudson,* 6 *C. E. Green* 172; *Hack. Imp. Com.* v. *N. J. Midland R. Co., ante p.* 94.

To conclude: The complainants have suffered no injury, nor is any right of theirs, legal or equitable, threatened or exposed to any injury.

The proposed lease is within the power of the defendants to make, and of the lessee to take. It is also advantageous,

and will be beneficial to the complainants and all other stockholders, and, therefore, the bill should be dismissed.

*Mr. C. Parker*, on same side.

The controversy is between stockholders, to the amount of $345,000, and others, to that of at least $12,660,000, in relation to policy and their joint interest. The large majority resolve to lease their works. The minority dispute their right. It is a question, merely pecuniary. All that has been said in respect to public policy, is foreign to the dispute.

The answer shows the reasons for the opinion of the majority. Large expenditure is necessary to meet business, which contracts already made has induced, and there is no money. Debt and expense has gradually increased, without proportional earnings. $695,495 was borrowed to pay the dividends of 1869, $1,334,505 to discharge that of 1870. Stockholders accustomed for long years to ten per cent., are unwilling to reject an opportunity of perpetuating it. Millions are necessary, if accummulating business is to be met, and they are not attainable. The business must be met. It is the result of the great trans-continental roads now making New Jersey their gateway to the ocean. If it be not accommodated, there will be rivalry and consequent loss. The situation of the companies may be the result of want of management; it was more that of the want of prophetic vision. But whatever its cause, it is now unavoidable, and this lease the directors and stockholders deem a necessity.

All this is pertinent, for it shows there is no fraud, no heedlessness, and no gross mismanagement in the bargain for the lease.

A word as to certain foreign topics. Whether the act of 1870, and the lease it authorizes, releases the reserved right of the state to take those works at cost in 1888, has nothing to do with the cause. But if it had, the statute and general law settle the point in the negative. The act provides that "no such consolidation, lease, or other arrangement shall

have the effect, * * to release or discharge the companies, or any company, with which any such * * *lease* may be made from any taxes, *liability*, obligation, or duties which they, or either of them may be subject or liable to, either to *this state* or any other person." Is not this reserved right a "liability?" Is not that the word to describe the position of the companies in relation to that right?

And by general law, the lease can only transfer what the party has. If it be mortgaged, or subject to any right, it passes thus, not otherwise. The state assents to nothing more.

The terms of the lease retain security for performance of its covenants, and all new acquisitions of property by the lessee are made to become such. The corporations remain to enforce the rights of their stockholders. The lease is consolidation, but in a way better for their protection than any other. But the policy of the bargain is not for the court to criticise, further than to be sure there is neither fraud, nor such want of diligence as to be equivalent.

We pass then to the case. There are three questions, and but three.

1. Had the United Companies authority to make this lease?

2. Had the Pennsylvania Railroad Company a right to accept it?

3. Was the act of the legislature constitutional?

I shall proceed to consider these points in their order. On the first, the authority of the United Companies to make this lease, it is necessary, first of all, to observe the relative situation, geographically and physically, of these two companies.

There subsisted between them the agreement of February, 1863, which is appended to the answer. It is between the same parties as those named in this agreement of lease; providing for a connection between them, and for the carry-

ing on of through traffic. By it, the Pennsylvania Railroad agree to build the connecting railway, and to lease it to the Trenton Railroad for nine hundred and ninety-nine years. The Philadelphia and Trenton Railroad agree to pay six per cent. for its use and maintenance; the Pennsylvania Railroad agree to allow tracks to be run so as to reach the Wilmington Road and the Pennsylvania Road, "so as to form a continuous line," says the agreement, "over the said road;" and they also agree to give a nine hundred and ninety-nine year lease for that. The Pennsylvania Railroad Company also agree to give the United Companies, for nine hundred and ninety-nine years, two tracks, &c., to the new passenger depot in West Philadelphia, so as to accommodate passengers to New York. The freight and passengers were to be carried over the United Companies' works. The rest of the agreement regulates this traffic, carefully, and settles the division of receipts. The agreement itself was to subsist for nine hundred and ninety-nine years.

Now, this agreement was not, perhaps, in all respects, public, but the connection was, and it lay open to the eye of the legislature. That connection was three-fold. There was the Delaware and Raritan Canal, which brought goods to the Pennsylvania Railroad at Philadelphia, and so was a "connecting and continuous line." There was the Camden and Amboy Railroad, which, by decisions of the courts of our state, ends at Philadelphia, and which there connects with the Pennsylvania Railroad Company's line. And there was the Camden and Amboy, and New Jersey Railroad Company, connected by rails with the Pennsylvania Railroad Company, so as to run cars from New York to New Brunswick by the Trenton branch and the "spur" to the Delaware bridge; thence on the railroad across it; thence on the Philadelphia and Trenton Railroad to the "Connecting Railway," and by that road to the "Pennsylvania Railway."

This spur is authorized by an act of our legislature of

March 5th, 1837.   The Joint Companies own the Phila-
delphia Trenton bridge, by contract of the bridge managers
in 1835, and paid the expense of laying the rails on the
bridge.   On the 7th of December, 1850, an agreement was
made about that, which is set forth in the answer.   In 1870
all the stock of the Bridge Company, except one share,
belonged to or was the property of the United Companies
All this is set forth in the answer, and shows an amalgama-
tion, practically, of the Philadelphia and Trenton Railroad
Company with the New Jersey United Companies.

With this state of things existing, and this structural
business connection apparent, the legislature of New Jersey
passed the act of 1870, which is set forth as part of the
bill.   In considering that act, the first point to be noticed
is, what sort of a lease it was which was projected by the
act?   It is an act " to enable the United Railroad and Canal
Companies to consolidate their stock, and to consolidate or
connect with other companies."   The power given by the
first section of the act, is to consolidate with " any other
railroad or canal company or companies in this state or
otherwise, with which they are or may be identified in in-
terest, or whose works shall form with their own continuous
or connected lines."   Another phrase is used that touches
this question of the lease.   They are authorized expressly to
" consolidate their respective capital stocks, or to consolidate
with any other railroad or canal company."   Then, what they
were authorized to do was to make an arrangement in perpe-
tuity.   That is exactly the idea of consolidation.   " Consolida-
tion" is a railroad word.   Companies only consolidate when
they become one in the sense of absorbing the one in the other.
The Elizabeth and Somerville Railroad consolidated with
the Somerville and Easton, and thenceforward became the
Central Railroad of New Jersey and departed from sight.
It means a permanent transfer of the company; a transfer
which shall be irrevocable; which shall absolutely destroy
the existence of the stockholders in any of the corporations
consolidated.   It is in that sense that the legislature of New

Jersey themselves have used that word, and that too, it will be seen, at a very early day.

In the laws of New Jersey of 1867, p. 114, it is recited: " Whereas, it is desirable that the railroad lines between New York and Philadelphia, forming by their connection essentially one line, should be more closely united in interest and management, whereby great advantages would accrue to the public, as well as to the stockholders." * * * * The very act itself recites that these are railroad lines *between New York and Philadelphia.* " And whereas, the Delaware and Raritan Canal Company, and Camden. and Amboy Railroad Company, known as the Joint Companies, owners of one portion of said lines, and the New Jersey Railroad and Transportation Company, owners of another portion thereof, have made, or are about making, an agreement for a *consolidation* of interests, and an equality of dividends, be it enacted, &c., that said companies be and they are hereby authorized to make such agreement for consolidation of interests, as they may deem proper and expedient, &c."

And then, in the second section, it goes on : " When such agreement for consolidation is or shall be made, the said companies entering, or having entered into the same, shall be consolidated and united in interest, according to the terms of such agreement, and shall be authorized to transact their business as a joint concern." And a little further below : " The said consolidated interest shall thenceforward be called and known by such corporate name as they shall adopt for the said consolidated or united interest."

But the word appears still earlier in legislative use. The " Marriage Act," as it is generally called (*Laws of* 1831, *p.* 124,) uses it. It says : " It shall and may be lawful for the Delaware and Raritan Canal Company, and the Camden and Amboy Railroad and Transportation Company, by and with the consent of seven-eighths of the stockholders of said companies respectively, *to consolidate* the capital stock of

the said companies, for the purpose of erecting and completing the canal and feeder of the said railroad."

Here we have an early legislative use of these words. We know what was produced by the consolidation of these two companies : that they became from that moment one, and were known as "The Joint Companies of New Jersey," and their stockholders always shared dividends equally. Now, that was exactly what is designed to be accomplished by this act. It is no matter whether it was to be effected by a contract, agreement, lease, or other arrangement; all the while some sort of consolidation is intended.

A consolidation means perpetuity, when the two consolidated companies are in their nature perpetual. Therefore, it seems very clear that any lease, for however great a term of years, is not beyond the purview of this act. Suppose consolidation had been carried out by some other means, the debts of the consolidated concern would all have been charges upon the stockholders of each. There would have been this difference between a consolidation carried out by the lease, and a consolidation carried out otherwise, that whereas now all the works that belong to these stockholders of the United Companies remain security to them for the performance of the covenants that are made, for the payment of their ten per cent., and for all other covenants in the contract of lease, in the other case of consolidation that property would have passed away from them into the hands of some other company forever, and been subject not only to their own debts, but to the debts of that company; so that what this lease has effected, is less than what the act contemplated as possible to be effected, and the arrangement is far more secure for the stockholders.

A perpetual lease is then within the purview of the act. Could it be lawfully made to the Pennsylvania Railroad Company?

With what class of corporations did the act of the legislature empower connection to be made? 1st. Any, with which they (the United Companies) are or may be "identified in

interest." 2d. Any, "whose works shall form with their own, continuous or connected lines."

What does the legislature mean by the phrase " *identified in interest ?*" It illustrates its meaning in the preamble of the act, for it there recites not only that the three United Companies are "identified in interest," but that they have also an "identity of interest" with the Philadelphia and Trenton Railroad Company, and with other companies. When it is objected then that the legislature could not have meant companies of other states as among those with whom connection can be made, it is evident the suggestion is futile; for here is a corporation existing only by the laws of Pennsylvania, which is described by the legislature itself as having an "identity of interest."

But study the situation of this Philadelphia and Trenton Railroad, and the character of its relation to the United Companies; for the act expressly states that it has "an identity of interest" with them. It is one of their feeders, and it has a contract with them by which they divide the profits of business. The act contemplates two modes by which companies may be "identified in interest." One is an actually subsisting, legalized contract between them, by which the interests of the stockholders are all made the same; the other is by local relation, by which one becomes feeder to the other. And the context shows this latter meaning to have been intended. The phrase is used again, and is there followed by the important phrase "or whose works *shall* form, with their own, continuous or connected lines." This is mentioned as one mode of being "identified in interest." The language is in the disjunctive, and specifies another class of companies identified in interest than some who are yet so identified; for the routes of no company can possibly form a continuous line, or a connected line with those of another, without the two being "identified in interest," because, in such case, the travel of the one must flow into the other. And again: the preamble states that the United Companies have an "identity of interest," not only

with the Philadelphia and Trenton Railroad Company, but with *"other"* companies." How, except by means of local relation?

It is to be noticed that this description of this means of "identity in interest," to wit, by having the "works" of companies form "continuous or connected lines," is in the future tense; the language is, "whose works *shall* form" with their own "continuous or connected lines." Whenever any company shall so arrange its works, it becomes a company with which the consolidation, authorized by the act, can be made. If, then, any railroad acquires or possesses a line which connects with the Jersey lines, no matter how, whether by erection under their charter, or legal purchase, its "works" form, with those of the Jersey companies, a "continuous" or "connected" line, and that company may lawfully be a party to this consolidation. And even if it be thought that the having a continuous or connected line does not make the "identity of interest" contemplated by that phrase in the statute, still any company, who at any time may acquire "works," forming, with those of the defendants, a continuous or connected line, may then, by virtue of that description of the class of companies who may form the consolidation, take this lease.

But not only is it true that the act contemplates a foreign company as one with which a lease is or may be lawful, but it is further true that there is no company of this state so situate as that this phrase *"continuous"* applies to it. This word is not used as synonymous with "connected." It is a class of connections—one by which the "line" continues on —and the phrase of the statute is that they may connect with those "whose works shall form with their own continuous or connected lines." Spurs connect, but the "line" is not thereby continued. Force, in this connection, is due not only to the words "continuous" and "connected," but to the word "line." It is important; and if you find a railroad whose works form "a continuous line" with those of the United Companies, *a line of business* that continues on, you

have found a company with which this consolidation may take place.

Now, where is the company, organized under New Jersey laws, which forms "a continuous line" with the United Companies' works? The map presents none; and all companies owning their "connected" lines are subordinate companies —not likely to be expected to be lessees of these great works; while on the other hand, the Pennsylvania Railroad Company is, in the first place, "identified in interest," for it feeds and is fed by the travel of the United Companies; and again, it is connected with these companies by an agreement in perpetuity, by which travel is to be forever continuously carried over their respective roads. There is, therefore, clearly the "identity of interest" that is required.

But there is meaning in the phrase "connected line." It signifies business connection as well as structural. The peculiarity of such a connection is illustrated by the case of The Philadelphia and Erie R. Co. v. The Catawissa R. Co., reported in 15 Am. Law Reg. 231. The exact point of that case was to define what were connecting railroads. There it was held that connecting railroads are either those which have such a union of tracks as will admit the passage of cars from one to the other, or those which have an intersection such as will admit the convenient interchange of freight and passengers at the point of intersection. Therefore, if we show in this cause a line of travel having an intersection such as will admit of a convenient interchange of freight and passengers at the point of intersection, plainly there exists this "connected line" called for by the statute. See also Albany Law Journal of Sept. 16, 1871, p. 119, pl. 5.

To recapitulate: Several considerations justify and corroborate the idea that the legislature intended a consolidation of business with a foreign company: 1. The act mentions a foreign company when using the phrase "identity of interest." 2. It could not have contemplated any of the minor Jersey companies as likely to lease these great works. 3. It had evidently in view, when speaking of "identity of

*interest,"* a feeding line. 4. No company whose works form with theirs a "continuous" line, exists in New Jersey. 5. The Pennsylvania Railroad Company has both "identity of interest" with the United Companies by contracts already existing, and also carries on a "continued line," which is operated *continuously.* 6. In every railroad in New Jersey connected with them, the United Companies hold stock—generally a majority of the stock—by express authority of the legislature. What need was there for an act which should empower consolidation with these?

A list of all the acts since 1849, supplementary to the Joint Companies, shows acts authorizing stock subscriptions to the Freehold and Jamesburg, the Belvidere Delaware, the Flemington Railroad, the Rocky Hill, the Mount Holly and Pemberton, the New Egypt and Hightstown, and the West Jersey Railroad. Some of them authorize the endorsing of bonds of the Princeton branch and other railroad companies which are now connected with the United Companies. The legislature gave the United Companies express authority to purchase the stock of these companies. If, then, they had authority to purchase the stock of these companies, what need was there for any authority to consolidate with them? And these are the companies with whom connection in this state is made. Could they, then, have been meant as companies having "an indentity of interest," or "whose works form connected or continuous lines," with whom alone this consolidation might be effected?

And so, unless the Pennsylvania Railroad Company could consolidate with the United Companies, who could? There is not a single company of all those with which they connect, in whose stock the United Companies have not at this moment a controlling interest. It is manifest, therefore, that such companies could not have been those which were referred to by the legislature. Then where is the company, except it be the Pennsylvania Railroad Company, whose works form, with the works of the United Companies, a "continuous" or "connected" line?

Now, the view taken thus far leaves out of sight the words "or otherwise," upon which so much comment has been made; but these words evidently look to the same result.

Most evidently, by the act, three modes of actual consolidation are spoken of and intended as possible or permissible. One is "consolidation of stock;" another is "consolidation of business;" the third, the "connection" by lease of lines, or, if you use that term, "consolidation" of other *lines.* Now, what does the act mean? Does it mean all of these modes—or if not all, which of them? We insist it means all or any of them. Now, if it means "consolidate in this state or otherwise," having *structural* consolidation in view, then it must mean by a union of lines out of the state; for there can be no "continuous" line from New York to Philadelphia made by union with any companies in this state. If it means that the companies must be "in this state or otherwise," (which we think it must mean,) then what can "otherwise" signify, except companies not in this state? The rule of construction is to give effect, if you can, to every word, and it is not permissible to take a word out of one sentence and put in another; you must read the language of the statute as it stands. A reasonable paraphrase would be, "existing *in* this state," or "otherwise *than* in this state;" *i. e.,* existing somewhere else. But "companies *in* this state" is synonymous with companies "*of*" this state. Does not the preposition "in" there have just the meaning of the preposition "of," and nothing more? The phrase "companies in this state," has reference to the locality of creation; the place from which the company hails. Substitute the word "of" for "in," and does not all possible difficulty vanish? Then it would read, "to consolidate with any companies of this state or otherwise;" that is, "*otherwise than of this state.*" You cannot understand the word "otherwise" in any sentence, without filling out the sentence by repeating the words preceding, with the conjunction "than." Thus: "sick or otherwise;" otherwise than sick. "Well or otherwise;" otherwise than well. To give the

word "otherwise" any meaning at all, it is necessary that it be immediately succeeded by the word "than." Just follow, then, this rule in reading the statute—substitute "of" for "in"—and when you speak of companies of this state or otherwise than of this state, why they are companies that are of another state; that is all.

But again, this same preposition "in," just in that place, means "under the laws of," because a company cannot exist in this state, except it exists under the laws of this state. Use that phrase, then, in substitution; make the sentence read, "companies existing under the laws of this state or otherwise," and the meaning is obvious and clear. What intelligent meaning, therefore, can be given to these words, "or otherwise," excepting that they refer to the place where the corporation has its local habitation and whence it derives its name?

The method of explaining these words on the other side is extraordinary. They say, that you should drop the words "or otherwise" out of their place, then pick them up and put them back in the sentence in this connection: "or to consolidate *or otherwise,* with any other railroad or canal company or companies in this state with which they may be identified in interest." "Otherwise"—what? "Arrange," Mr. Browning has in his brief. But that is putting in an entirely new idea; that is coining another word; and yet he must do it, because by his arrangement he almost turns an adverb into a verb, and makes it have the force and effect of some other word than itself.

As to the second general point: Has the Pennsylvania Railroad Company the right to accept this lease? Remark, in the first place, that if the act authorized these companies to make a lease to a foreign company, it would seem to have authorized the reception by that foreign company of that lease; and that here, in this state, and before our tribunals, the question of power on the part of the company thus authorized to receive cannot be mooted. Suppose this Pennsylvania company accepts this lease, and suppose, also, it

had no power so to do, could it come into our court and deny that it had power to receive it? It might do that in Pennsylvania courts. But it seems to be a very different question as to whether it would be permitted to do it here;—after receiving all the property and making use of it, then to turn round and say, "we never had any power to receive this title, and therefore we will not abide by the liability which it imposes."

But the acts of Pennsylvania are full upon the subject. One act provides: "That it shall be lawful for any railroad company existing under the laws of this commonwealth, from time to time, to lease or become the lessees, by assignment or otherwise, of any railroad or railroads, or enter into any other contract with any railroad company or companies, individuals or corporations, whether the road embraced in such contract or lease be within the limit of this state, or created by or existing under the laws of any other state or states." This act empowers them not only to accept a loan and become a lessee, but it empowers them to enter into any other contract with any such company as is there referred to.

It is asked, what right has this Pennsylvania Railroad Company to take a lease of the goods and chattels, the moneys and effects, the ten thousand choses in action, which pass by virtue of the lease? They had express authority to enter into any contract other than the lease. And if they had that power to enter into any contract, though these articles are not the ordinary subjects of lease, nevertheless they have full authority to take title to any of them. And as to stock, in the acts of Pennsylvania for 1869, p. 11, is an act that bears directly on this subject. It is in these words: "It shall and may be lawful for any railroad company created by, or existing under the laws of this commonwealth, from time to time, to purchase and hold the *stock* and bonds, or either, or to agree to purchase or guarantee the payment of the principal or interest, or either, of the bonds of any other railroad company or companies chartered by, or existing under the laws of any other state."

What if consolidation had occurred otherwise than by a lease—what if, instead of this "mode of connection" in business, the mode had been adopted of absolutely consolidating with the Pennsylvania Railroad Company—what then would have become of the property, the choses in action, the stock, the rolling-stock, everything that belongs to the United Companies? They would at once pass over. And thus by means of this lease, comprehending in its terms an agreement for perpetual substitution, the stockholders of the United Companies retain their property in effect, while they simply part with it in form.

Passing to the third general head of discussion: *Was the act of the legislature constitutional?*

It is alleged that it was unconstitutional because it required the consent of only two-thirds of the stockholders; or, to put the objection in other words, it is alleged to be unconstitutional as against the dissentient stockholders. The inquiry is, is it such a change in the organic law or structure of the company as that it cannot be binding upon all stockholders, though a majority of them may adopt or wish it. It does not seem to be the intention of the legislature to authorize a hardship upon the stockholders, rather the reverse. If they had required no "consent," the act could have been accepted by but a majority of the stockholders, directly or indirectly. But they demand the consent of more than a majority—of two-thirds. Indeed, it would seem that their object was to test the wisdom and propriety of the measure. The act is no better, no more legal, in requiring two-thirds, than it would be if, expressly or impliedly, the consent of a majority of stockholders had been required.

Now, on this point we have nothing to do with consolidation; that is, consolidation of stocks or absorption of the company. The lease does not do this. And though it *may* be true that "a consolidation" would be an infringement of the rights of dissentient stockholders (that consolidation being in stock and in the ordinary form), it is by no means, there-

fore, true that a lease is an invasion of the rights of dissentient stockholders; because "a consolidation" does pass away all property forever, and put a man's interest into another concern, making him embark in a different enterprise. There is not here, as said before, *consolidation,* but only *connection of business;* and the argument is to proceed upon just what has been done, and not upon what might have been done under this act.

The simple question is this: Does the exercise of the power to lease, work such a change in the structure of the company as that an unwilling stockholder may say "*non haec in foedera veni.*" Two things appear to be clear: *first,* that the lease is no such change; and *second,* that if it be such a change, the act is still constitutional, because it provides for compensation to dissentient stockholders.

What, then, is the intrinsic nature of a lease? It is a delegation of the active powers of the managers of the company, to another corporation, in consideration of the guarantee of profits. It is, strictly and only, the provision of a new mode for the profitable use of the franchises. Though such a delegation is not lawful, without express authority of the legislature, yet when that authority is given, a majority of stockholders may accept it, and may make it binding upon all. We do not dispute the authority or soundness of the ruling in Zabriskie *v.* The Hackensack Railroad, or of the case which preceded it. Both were cases in which the legislature authorized the investment of the money of an individual in an enterprise entirely different from that in which the money had already been invested. In Kean *v.* Johnston, the legislature authorized the consolidation of the Elizabethtown and Somerville Road with the Elizabethtown and Easton Road, and the creation therefrom of the Central Railroad of New Jersey, and permitted the new company to give their shares to every stockholder in the old in lieu of the stock that he theretofore held; and the money of the Elizabethtown and Somerville stockholder was thenceforward to be used, not in the road for which he subscribed it (between

Elizabethtown and Somerville,) but in a road for which he never did subscribe it, between Somerville and Easton. In the other case—of the Hackensack Railroad—a branch was authorized, and the question was whether the stockholder's money, that was specially given for a certain road, could be used in another road. Those cases were both very different from this; because a new mode of using the very franchise, which was the subject of the investment authorized by public authority, is an entirely different matter from a law authorizing the use of the money, the subscription, the stock which was held, in an entirely different enterprise. A party may say to the legislature, "we embarked in one special enterprise; who ever dreamed that by so doing we should be dragged into another?" But a new mode of use; a selection of a different set of men for the discharge of the duties embraced in the running of a railroad; the giving power to perform a work which must be done by a different set of agents—this is a thing by no means parallel with the adoption of a different project. Suppose a supplementary law authorized a controlling executive committee to be constituted, to whom all powers were to be committed; suppose a law authorized a greater freedom in the mode of use, such as a greater width of track, or a change of route between the same termini, or an adoption of two routes between the same termini; or the adoption by a horse railroad of locomotive power; or, in these days of novelty, the adoption of stationary power like that used on the elevated railway in New York, or of magnetic power, if that be possible; or again, the building of the railroad on an elevation; or, if this were the original plan, then a change, and the authority to build it upon the land; or again, in the case of a trust company, the reception of goods on deposit; or if the company were a savings bank, the right of discount or of issue; or if a railroad company, that of connection simply, or even of a lease of a connecting railroad, or a bargain for the admission of a new railroad project to trade in just partnership; in all these cases, and as many more as may be conceived, a different

contract is made, and yet the structure of the contract remains. Cannot the state give this additional power? and does not every subscriber to stock agree, impliedly, that if the public authority demands or empowers any new way of discharging a public duty, his associates may agree to adopt it? That is the point that seems to meet us here.

The able decision of Chief Justice Gibson, 2 *Watts & Serg.* 161, states the distinction upon this subject.

In this case, it was insisted that there were two alterations in the original contract. One was that the legislature gave the larger stockholders more votes than they had at first; and the other (this to which the Judge refers) was that the legislature authorized them to raise the dam, thereby subjecting the stockholders to a greater amount of expenditure for damages. The argument was thus stated: "By the act no stockholder shall be entitled to more than ten votes, and by the eighth section the dams to be erected were limited to four feet six; whereas by the new act, the stockholder is in a measure silenced." The opinion of the Chief Justice decides that such new privileges and changes in the organization, and mode of use of the franchises, are not invasions of the structure of the contract, but they are such things as belong to the legislature, and which the legislature has the right to give to public corporations, and which every stockholder in such a corporation, when he makes his original contract, contemplates may yet be conferred by the legislature upon him.

This case has been followed in many others. Your Honor will find an illustration of the same principles strongly set forth in *White* v. *The Syracuse and Utica Railroad,* 14 *Barb.* 560, and in *The Troy and Rutland R. Co.* v. *Kerr,* 17 *Barb.* 601. The opinion there runs somewhat counter to the conclusion at which the court arrived, but it is valuable because it refers to the whole subject with a good deal of succinctness; and the court will find a number of cases cited there which are of use in the investigation of this subject. It cites two English cases, *Stevens* v. *The South Devon R.*

*Co.,* 13 *Beav.* 48, and *Ffooks* v. *The London and South
Western Railroad,* 19 *E. L. & Eq.* 11. I may add in re-
ferring to these decisions, without citing them, that your
Honor will find this class of ruling; that the courts will
restrain managers of a corporation, at the instance of stock-
holders, not from applying to Parliament to get new powers,
but from spending the money already subscribed for that
purpose. The courts seem to leave the stockholder in this
position. They say to him : if the company gets new
power, we won't help you as against their exertion; you
must help yourself, because evidently the legislature have
the right to confer these new privileges, and it being a public
matter their right is not to be abridged. And then the
remedy of the stockholder is simply this : if he chooses to
sell out, he gets his money back; if he chooses to go on, he
acquiesces in the privilege and in the new sort of enterprise,
or whatever the legislature orders.

This view of the law, as established in Great Britain, is
exactly in accordance, practically, with what we contend for
here; namely, that whenever a corporation having political
objects is organized, there lies reserved in the legislature, by
the contract of every stockholder, the authority to confer
upon that corporation new privileges as to the mode of exer-
cising its franchise, and that if the legislature does grant
these new privileges, then it may be accepted by a majority of
the stockholders, and is thereby made binding upon all. A
corroborative suggestion on this point is this : ordinary, that
is to say natural, persons can build a railroad if they do not
need the power of " eminent domain;" and if they thus build
one across the state, they would have the power of lease as
incident to the right of property. Corporations, for wise
purposes, are not invested with all the powers individuals
have. The directors are made trustees for the exercise of
the " public use," and they are public officers. Is there not
an implied contract by those who join such a corporation,
that any of the ordinary rights, as to disposition of property,

if the legislature chooses to confer them, may be acceded to by the corporation?

Now, this implication—the implied contract on behalf of every stockholder, that there were certain powers reserved by the legislature, and which it might yet confer, and which might lawfully be accepted by the corporation—this implication seems strengthened very much by a reference to the original acts chartering these two great companies; acts passed at the same session of the legislature, by which the Camden and Amboy and the Delaware and Raritan Companies were both incorporated. It is enacted that the corporations constituted, shall have, enjoy, and exercise all the rights, powers and privileges pertaining to corporate bodies; a very large power.

"All the powers pertaining to corporate bodies and necessary to perfect an expeditious and complete line of communication from Philadelphia to New York, and to carry the objects of this act into effect"—that was what the legislature proposed to give these corporations, each of them. That was the declaration of what their intent was; that is a description of what the stockholders accepted; that is a definition of what the stockholders understood as possible to be done in the future. It may, in one sense, be called a promise solemnly made on the part of the legislature, that if they did not then have all powers that were necessary "to perfect a complete line of communication from Philadelphia to New York, and to carry the objects of that act into effect," they might expect that the legislature would, one day, grant them. Now, why these very strong expressions, "*perfect* a line of communication"—give it everything that in the future, as well as in the present, could be dreamed of—"*perfect a complete line of communication?*" Complete—how? Everybody knew what the line of communication was, and was to be, a line of rails stretched from one city to another. Why use the word "complete?" Was there not some mind even then existing, some genius almost prophetic, which could peer into the future which was then unseen and almost unim-

aginable, and foretell that to-day there is necessary to fill out the word "complete," a much larger amount of power and a grander scope than then was dreamed of. The object of that act, in the minds of the wise and skillful men who devised it, had reference to what was, to their minds, plainly apparent, though others might not then have recognized the peculiar situation and locality of New Jersey. They saw that she lay in the pathway of all the industry and productive power of this whole continent, to its great commercial emporium. They saw that the time would come when the word "complete" would indeed be a large word and signify much. And in taking a contract from the state with a view to its great future, they took in words which clearly show that their intent, as stockholders, was to have every power of use of their franchise that could possibly be given for its promotion.

And, again, this implication is greatly strengthened by a reference to the course of legislative practice, which is the practice likewise of these very stockholders in relation to these acts. In 1831 was the first consolidation between these two companies; and a system or practice as to new powers, the mode of conferring and acquiring them, was at once then begun. Consolidation was effected between the canal and the railroad company. That consolidation could take place only on the consent of seven-eighths of the stockholders, and it was provided that disagreeing stockholders should be paid back what they had paid, with interest. In March, 1832, an act was passed by which authority was given to transfer a thousand shares of the stock to the state, by which it was provided that a new system of government should be created. A director was to be appointed by the state, and the authority of that director was particularly defined. A lateral railroad to New Brunswick was also authorized. Provision was thus made for changing the mode of government of this corporation, for giving away a large portion of its capital, and establishing a new mode of employment of its capital by a road to New Brunswick. All this

was provided to be done by the assent of a majority of the stockholders. A few days after, in 1832, a change of location was allowed. In 1835, a lateral road was authorized, without any consent being required. In 1837, connection with the New Jersey Railroad was permitted, without any stockholder's assent being required. And after that, running down from 1850 to the present time, no less than twenty-two acts authorizing subscriptions from the moneys of this corporation, for the Freehold and Jamesburg Railroad, the Belvidere Delaware Railroad, the Flemington, again for the Freehold and Jamesburg, the Rocky Hill, the Mount Holly and Pemberton, the New Egypt and Hightstown, the Flemington again, the West Jersey Railroad (permitting the endorsing of bonds of other companies), and so on—twenty-two acts of that nature will be found, entirely altering the very structure of the original contract, with no provisions for the assent of stockholders, nor for compensation to them. And this review brings us down to the act creating the United Companies, which act is the second in the list in which dissentient stockholders are provided for; and in that act the same kind of provision is made for their compensation as in the act which is now in question before this court.

It is one of the strong points of the stockholders who filed this bill, that they are either original or old stockholders. They state to the court as one of the reasons why their complaint should be listened to, that they invested their money long ago; that they have kept it there through all the changes and the chances of this mortal life that have intervened; and, therefore, they would urge the court to consider their rights with more gravity than if they were persons who had bought the opportunity of being injured. But all this while they have seen this practice of the legislature in relation to their own companies going on; all this while they have themselves acceded to these changes in the original contract. Can they come here at this late day and say, "all this is contrary to our contract?" Have they not established that, whatever may be the truth as to other corpora-

tions—particularly as to other public corporations—as to these corporations, the contract shall be held one whose structure is not invaded by any such law as that in question before this court? Have they not incorporated into their original contract this provision, that the legislature of New Jersey, whenever in its wisdom it may choose, may change their fundamental law, at least in such a manner as that new modes of use of their franchises, new methods of profit for themselves, may be devised and exercised?

But, without resorting to any implication in the original contract that greater power to exert the franchise may be granted and may be accepted by the corporation, remark that the legislature *has* given this power, and that being so, that there is nothing in the original contract which prevents the exercise of it, and nothing in this case of fraud or of folly which calls upon this court to interfere. The contract is two-fold: with the state and with each other. Only with that "with each other" are we here concerned. That contract is to use, not to abandon—for mutual pecuniary profit out of the earnings, at the reasonable discretion of a board of directors constituted as by the charter; not to be interfered with, except in case of fraud, or wanton mistake amounting thereto. This is all that can be reasonably claimed, and this definition accords almost precisely with that of the Attorney-General, in his brief given to the court. Now, suppose a partnership between individuals, in an enterprise which could be carried on by individual acts, where the contract restricted action to some selected by the rest, and the others were barred by it from any active agency. Suppose the matter related to a hotel, a farm, or a ship. Suppose the managers had carefully experimented, and, without fraud and in the exercise of a reasonable discretion, determined that it was better to lease than to otherwise manage, and should propose by leasing to secure a certain profit, what would be the course of a court of equity? Would it enjoin this mode of lease? Take a mine, for instance, and suppose the contract to be as described; a certain board are

to manage, and exclusively manage; the other partners in the enterprise give it all up to them. Now, suppose that board, instead of themselves employing miners, buying steam engines for drainage if needed, and making all the other arrangements that are necessary for a mine—suppose they choose to say to some man more expert in mining than themselves, "here, take this mine; we give it to you on a lease during all the time for which we ourselves are entitled to use it; agree that you shall work it; fix it so that you shall not abstain from working it, and pay us a royalty of so much for every ton you raise." Would there be any objection to this in the original contract of these parties, the whole end and object of which contract was the using of that mine —the deriving profit from it? Would there be anything in that case which would call for the interposition of a court of equity? What difference is it whether it be a mine or a railroad—what difference to the individual? There is a great difference to the state. The state needs the railroad for public purposes, and there may be a desire on the part of persons who are actuated by patriotic motives, as well as by considerations of pecuniary gain, that it shall be managed in a particular way; but as a matter of right between the parties, and of pecuniary right between individuals, would a court of equity interfere? One way of using either a mine or a railroad *is* authorized. Actual hand-work on the part of the men who are designated to manage the work is not contemplated; some class of agents must be appointed. Another method of using the property is to farm it out for a share of the profits—to fix what is called a rent, either by royalty or by calculating the profits of every year, and thus fixing a yearly sum. Fraud or egregious folly would be restrained, and always is; but would discretion, exercised by careful men, having their own interest in view, be interfered with by the court? See, on this point, *Featherstonhaugh* v. *The Lee Moor Porcelain Clay Co.*, 1 *Eq. Cas. Law Rep.* 318. A company was incorporated, in the first place, for "the making, preparation, and sale of porcelain clay," with

power, if it should be deemed expedient, after the original business had become developed, to *combine* "mining opera-- tions" with the original business. By the company's deed it was provided that it should be competent for any extra-- ordinary general meeting, by a majority of two-thirds in number of the shareholders, to empower and require the di-- rectors to bind the company, and every shareholder thereof, to any act, deed, matter or thing whatsoever which the com-- pany, by virtue of its corporate capacity, or otherwise, or all the shareholders together, would be enabled to make, do or execute, if the consent of every shareholder was given thereto. It also provided that the directors should have power to make contracts; and in case it should be doubtful whether it was in the competence of the directors to conclude any contract, the same might be submitted to an extraordinary general meeting, and, if sanctioned, should be binding upon every shareholder, whether under incapacity or not, in like manner as if every shareholder were *sui generis,* and had consented. The company obtained lease of land for ninety-- nine years, commenced business in 1852, and paid one divi-- dend and no other, the undertaking not turning out success-- ful. *Held*—that after this a majority of two-thirds of the shareholders, in general meeting, were empowered under the above clause to authorize the directors to make a valid mining lease for twenty-one years of the whole of the works and buildings of the company. But it seems the clauses would not authorize the like majority to engage the company in an undertaking wholly unconnected with their original° purpose.

Now the court will observe the doctrine of that case. It holds the doctrine of Natusch v. Irving, and of all the cases which formed the substrata of Zabriskie v. The Hackensack Railroad; but it says, although the contract provided for the absolute exercise of certain active power by the directors, and provided for nothing more, yet that under such power they might, where the case did not involve fraud, lease the property to somebody else, and let that somebody else do all

the work. The case is, in every respect, precisely parallel with that which is now before the court.

*Simpson* v. *Westminster Pal. Hotel Co.*, 8 *H. L. Cas.* 712. "The funds of a joint stock company, established for the purposes of one undertaking, cannot be applied to another, and the attempt so to apply them, though sanctioned by all the directors and by a large majority of the shareholders, is illegal. But where a company was established 'for the erection, furnishing, and maintenance of an hotel, the carrying on the usual business of an hotel and tavern therein, and the doing all such things as are incidental or otherwise conducive to the attainment of the above objects,' "—this is the language of the joint stock agreement: "and the directors, while the hotel was in course of being built, agreed to let out for a stipulated period of short duration, a large portion of it to the head of a government department for the business of his office, and evidence was given that such a letting was calculated to be productive of advantage to the company in its intended business, and that a majority of shareholders had sanctioned the act; it was held that the arrangement was valid, within the words of the clause 'all such things as are incidental or otherwise conducive to the attainment of the objects for which the company was established.' "

The Lord Chancellor says: "I think that this case is to be determined on the principles laid down by Mr. Gifford, in his very able argument for the appellant; and I bow to the authority of *Natusch* v. *Irving*, and the other decisions to which he referred. The funds of a joint stock company, established for one undertaking, cannot be applied to another. If an attempt to do so is made, this act is *ultra vires*, and although sanctioned by all the directors and by a large majority of the shareholders, any single shareholder has a right to resist it, and a court of equity will interpose on his behalf by injunction. A railway company cannot apply its funds to make a line of railway different from that described in the act by which the company was constituted. A company established for granting fire and life insurances cannot

engage in marine insurances. A company established to make a railway and exercise the trade of carriers upon the line, from one town in England to another, cannot add to it the trade of a steam packet company. And no company can ever abandon the business for which it was established and undertake another. Nevertheless, I cannot say that Vice-Chancellor Page Wood and Lord Justice Knight Bruce were wrong in holding that this agreement between the Westminster Hotel Company and the Secretary of State for India is not *ultra vires*. I think that, under this agreement, the directors do not abandon the undertaking for which the company was established, and they cannot be said to engage in any new undertaking."

And then he remarks upon the meaning of those words, " the doing of all such things as are incidental or conducive to the attainment of the above objects," and holds that, under a literal and fair construction of the contract, there was power in the directors to let these rooms in this way, although the lease was one for several years.

Is not that case exactly ours ? What is this company doing except providing for the use of their franchise ? And if in this contract there were large words, such as *the use of all powers incidental to the power or conducive to the end in question*, are they, when you come to consider them, stronger words than those in the contract in question, which are that this company [the Camden and Amboy Railroad Company] shall have all powers necessary to perfect a complete communication between Philadelphia and New York ? Now, we are not to-day standing where we stood half a century ago. What is necessary to-day to perfect a complete communication between New York and Philadelphia ? We say that the answer appears in the declaration of the legislature in this act of 1870 ; that in order to perfect a complete communication there must be consolidation—or what is, in effect, equivalent to consolidation—between the United Companies of New Jersey and the Pennsylvania Railroad Company of Pennsylvania.

But this act is constitutional, because the right of every dissenting stockholder is respected, and compensation is made to him. The steps in the procedure are the following :

1. The lease or contract is to be arranged for. 2. It is to be consented to by two-thirds of the stockholders of each company. 3. This consent, duly authenticated, is to be filed. 4. The lease is then to be made. 5. Stockholders may yet dissent; and then, 6. Payment is to be made, and the stock either taken or extinguished.

This is no novel mode of action. It began with these corporations in 1831, in the Marriage Act. It was again adopted by them in 1867, in the Marriage Act with the New Jersey Railroad Company, when the Camden and Amboy was permitted to commit polygamy. It has its counterpart in New York. In the laws of New York, of 1853, p. 113, your Honor will find the exact plan in all its details; a general law.

It was adopted in Pennsylvania, in the case of *Mott* v. *The Pennsylvania Railroad*, 6 *Casey.* It may be called a method of exercising the power of *eminent domain ;* and it is so called in cases in New Hampshire, in a note to p. 664 of Sedgwick on Statutes. If not a method of exercising *eminent domain*, it is a plan for the attaining of justice when possible injustice is supposable.

Two points are made against this method of compensation. *First*, it is said it does not precede the taking, and, therefore, does not meet the requirements of the New Jersey Constitution ; and *second*, it is said that it is not for " a public use," that this taking occurs.

As to its not preceding the taking, if there be anything whatever in this point, it is within the power of this court to obviate the difficulty. Let this court, if they have any doubt upon it, hold this cause and direct payment to any of these stockholders who come in before the absolute delivery of this lease, and all objection is obviated.

Remark, too, that this is a bill by stockholders generally. John Black, and other stockholders, sue for their own benefit,

and for that of all other stockholders who may come in and desire the benefit of this suit. It is, therefore, possible so to wield authority, that if any man says, " I am not paid before I am injured," the court may reply, " you shall be ; I will direct such an inquiry as is contemplated by the act as to the value; I will hold this cause until that inquiry is reported upon, and you shall not have it to say that you have been denied any privilege that belongs to you by the Constitution of your native state." And for this course, your Honor has direct precedent in a case already cited, of *Lauman* v. *The Lebanon Valley Railroad Company*, 6 *Casey* 42.

The counsel argue that we take their property when this lease is made; but they thereby beg the question entirely. The lease does not take that property away. If I let my house, does my tenant, in consequence, own my property? But that is a very insufficient illustration, because I *own* my house; but do the stockholders, in the legal sense, own the railroad? Can the stockholders sue for one iota of that railroad property? If a car is taken away by some person, if a locomotive is, by design, blown up or destroyed, can the stockholder come into court and say, " my property has been taken," and ask the court to restore it? Of course we all know that the contrary is the case. The stockholder in no respect owns the property; all he has, is an interest in the profits of the use of that property, and a right to defend the property itself in order that he may obtain those profits. Legally and equitably, the corporation owns the property. In no respect can the stockholder be held to own the property itself. He has a right and interest in it: the right of protection; the right that it shall be used; the right that from that use there shall come profit; the right that directors shall manage the property personally or by agency, and that that profit shall come to him regularly and honestly. And now do we meddle with this property when we make this lease? It is said that the perpetuity of the lease makes a difference, that here is a lease made for nine hundred and

ninety-nine years; but as that lease is made, the argument, it seems to me, is in no wise true. But admitting its soundness, it does not follow that there would be a taking away of the property of the stockholder. There might be wrong done. To make a case of wrong actually done him, there must be shown a fraud upon him, in that they disposed of the subject matter of the corporation, and prevented him thereafter from deriving a profit from its use. But this lease, though it be for nine hundred and ninety-nine years, so long as it constantly pays a fair rent, and makes large and adequate remuneration, is not a passing away or a sale of the property; *length of time,* in such a case, makes no difference. If, under this lease, there was a payment in gross, then there would be, in equity, a perfect alienation of the property away from its owner, and the owner would have, instead of the property, the money which had been realized or produced by it; but so long as the property is merely leased, and there springs from it everlastingly *rent,* and that rent is such as the court recognizes as fair remuneration, (and which experience shows, in the present case, to be an average remuneration,) there is no alienation, and no sale, and no wrong either.

Now, the real truth here is this: This lease may injure the stockholder by depreciating the value of his stock, or it may profit him by causing it to appreciate. That is all that the lease can do. It cannot take his stock; it may injure it. We know that it will appreciate it. It has already done so, though of course that is public rumor. But that is our conviction, that it will do so; and they on the other side think it will not. It is then uncertain whether injury will be done or not, to that which is the object and right of the stockholders, to wit, getting profit out of the use of this property. It is, perhaps, impossible for the stock to be *taken,* in the sense of the Constitution, because it cannot be touched; it is not the subject of handling. The certificate is merely evidence of interest; it is no more the property than is the title deed of the estate. Is the stockholder any

less a stockholder when this lease is made? Does he not still own his stock, himself? The property out of which he derived profit is placed in another condition of usefulness and profit, but it is there—it is just as much there as before. Could he not, after this lease is made, come into court and say, "I am a stockholder in the company. I own so many shares, being such and such a proportion of interest belonging to me in that company. Some other company has taken it away from the Pennsylvania Railroad Company to whom it was leased for use and profit, and they have not a sufficient title to it, and I want the aid of this court to help me, as a party having an equitable interest in that stock." And if all this could be done, then plainly the Constitution does not apply when it speaks of private property being *taken*, because it is not taken and it cannot be *taken*. Injury can be compensated for, but that is all. Now, then, comes in the statute. The lease makes not the slightest difference as to *the right* of the stockholder; the only difference it makes is in the amount of profit he can receive. It does nothing more than add to the security of the profits by the covenant of others. The argument that this property of the stockholder is taken when the lease is made, seems really unworthy of its authors and of the attention given it. After the lease is made, the stockholder is given by the statute a limit of time during which to consider whether he is injured or not. If he makes up his mind that he is, then the law says to him, "have your stock valued." The language there is very remarkable; it is to find out the "full value of his, her, or their stock immediately prior to such lease"—not "the market value," though that may be held by the court to be a measure of the full value. When reading this bill and observing the earnest rhetoric with which the value of this stock is magnified, it would seem that this act provides a remedy when it says, there shall be assessed the full value of that stock immediately prior to the lease. But whether the companies take the stock, or whether it is simply extinguished, leaving things as they were before, is of no moment

to the present controversy. We submit to your Honor that this law is entirely constitutional; and we wish, on that point, to draw attention again to the case of Mott v. The Pennsylvania Railroad Company, where such a provision was directly decided by the Supreme Court of Pennsylvania to be constitutional. 6 *Casey* 34.

Briefly, as to the other objection to this act—that the use is only private, not public. The act is for consolidation; that is the motive of the act. Though it is not subject to the same objection as is consolidation in stock, or even in business, yet the lease is as effective as consolidation, though it is not consolidation; for the United Companies remain intact, exercising powers of oversight, still protecting the rights of stockholders—the managers surrendering the authority over their subordinate agents, but nevertheless still existing as a distinct organization, and for the very purpose of promoting the interest of these stockholders by securing the most complete use of the franchise. But the effect is nevertheless exactly the same as if consolidation had been effected; and all the public good that the legislature contemplated in consolidation was not only meditated by them as arising from such a lease, but is actually attained by such a lease. What then is the motive of the legislature in enacting consolidation? Evidently the completion of the grand public purposes for which these companies were organized, by acquiring the largest through traffic. That is the public end. That would be a good public motive for granting a charter. If a charter could be granted to authorize transportation from Philadelphia to New York, without taking a ton of freight from any point along its way, would it not be a "public use?" What becomes of it at the other end? It must be landed from the cars; it must be warehoused; it must be re-shipped; it is the creation of commerce at that point.

For what was Harsimus Cove secured and preserved? It was for through traffic, nothing else; in the expectation that there would come to Jersey City from Pennsylvania, and all

the world beyond, immense quantities of merchantable commodities requiring trans-shipment, and therefore *room*, and therefore *commerce*.

Let us think for a moment on this matter of the public interest in through traffic. What made New York the commercial metropolis of the western world? Her bay is rivalled by Newport, by Portland, by Portsmouth, by Hampton Roads; all her natural capacities for commerce belong apparently (and in some of these instances in a larger degree) to other places; but her command of the great natural highway from Albany down, first gave New York her prominence as a mercantile emporium. Then the Erie Canal, devised by the far-seeing ken of DeWitt Clinton, enlarging still the sphere of through traffic; then the Hudson River Road increasing the capacity of transportation, with its companion, the Harlem, and their connecting roads, the New York Central and the Boston Road; and then the Erie— Briareus of railroads I may fairly call it; these great means of through traffic have been the source of the prosperity and wealth of the city of New York. The experience of Jersey City and of Hoboken is the same. When the Morris and Essex got there from Easton, and the New Jersey Central from the same point—these roads connecting with others that went far into the interior—and when the Erie arrived after them, what activity and prosperity did they not engender? It was through traffic that did it all. And not alone have Jersey City and the Bay of New York been benefited, but who can estimate the benefit to trade and business all along their routes, which has resulted from the construction of those railroads, originally designed to be promotive of through traffic? In through traffic no trans-shipment is required, nor breaking of bulk; on the contrary, merchandise may be shipped from all parts of New Jersey direct to every part of the great West, the South, and the whole continent. If these are the advantages of through traffic, and if the legislature thought, as they doubtless did, that consolidation with the Pennsylvania Railroad would increase its

facilities, or would hasten a result having that tendency, surely here is "public use."

No one can have observed the history of this country, or acquainted himself with that of Great Britain, without seeing that the necessities or conveniences of trade—in other words, the public weal, perpetually call for consolidation as a means of promoting traffic, of giving intensity to the energy of those who need these great public facilities. In New York, we notice the Central and the Hudson; the Erie, with a multitude of smaller roads. In New Jersey, the Delaware and Lackawanna has now absorbed the Morris and Essex; the Lehigh Valley has taken possession of the Morris Canal; the Erie has long ago appropriated the Paterson and Hudson and the Paterson and Ramapo. The United Companies themselves have appropriated numerous smaller tributaries, their works having served for years as a great river, into which ran from every direction rills of their own creation. They but follow the law of being, when they themselves to-day become, through this consolidation, a great trunk road, with which shall connect not only these, but the greater roads that actually cross the continent.

All this is not brought about by ambition or political design, but by *trade.* Thoroughness, completeness of execution and expedition in railroad duties, transportation without breaking bulk and without delay—these are the motives for railroad consolidation. Hence, experience seeks for consolidation; hence consolidation here; and, as soon as it is effected, the avenues of commerce will be improved and the public benefited, as was the legislative design.

Consolidation, too, tends to a proper obliteration of state lines. It binds a nation together, and makes us one. Suppose the line of the Pennsylvania Central to end at our state line, would it not be a public use to build a road which would connect it with our own? If consolidation would facilitate this connection, and promote vast trade, is it not a "public use?"

We have nothing to do here with the matter on political grounds. It may be unwise to trust these great corpora-

tions. That argument is for another forum. If valid in this instance, then it was equally valid as against the Marriage Act, and against the whole system of consolidation as established in New Jersey. It is no stronger argument, to-day, in this period of greater advancement in transportation facilities and traffic development.

It is said the state has left it to the companies to declare the "public use." Not so; the state declares any such "consolidation," as is called for by the act, to be a "public use," and leaves the companies to determine with what particular company they will consolidate. The property to be taken for public use is designated. The "public use"—consolidation with any road with which the United Companies are identified in interest, or with which their roads form a continuous line—is plain. As an act generally leaves to a company, organized for railroad purposes, to determine upon its route, so the act in this instance leaves to these companies to determine with which road consolidation shall take place.

Another objection to the validity of this act is, that it places the highways of the state under control of a foreign corporation; and it is urged that the legislature have no power so to do. But why have they not the right so to do with this class of highways? Is it anything more than consenting that citizens of another state may come here, subject themselves to our laws, and then manage our corporations? If our highways were placed under foreign laws it would be another matter; but are they? When a company comes here and accepts the privileges which are given by the legislature of the state of New Jersey, do they not become bound to exert those privileges in the manner provided for by the state of New Jersey?

The court is familiar with a leading illustration of this manner of naturalization of companies, so to speak. The Erie has, for years, been the lessee and sole manager of two of our railroads, having absorbed a company organized for the purpose of building a tunnel, and has, by direct charter, been authorized, itself, to construct a railroad from that

tunnel to its dock. And yet these lesser roads were all
public highways, not only in the limited, but in the enlarged
original sense of avenues for locomotion by the motive power
of individuals as well as of corporations. Still has there
been any difficulty between the state and the Erie Railway?
Has that corporation brought the laws of New York into
New Jersey and made them supreme? or has it not willingly
obeyed the laws of New Jersey? Why not admit other
citizens of the United States to the privileges of our own
state?

It is difficult to perceive that a foreign corporation, as
owner of our works, would prove a whit more dangerous to
our liberties than foreign owners of a domestic corporation.
The policy adopted by this act is no new thing in New Jer-
sey. It is but a new instance of that policy which has, in
truth, been her necessity, and in which she has been aided
by her singularly advantageous location—the policy of in-
ducing foreign capital hither. It was that policy which led
her first of all the states, it is believed, to abandon jealousy
of aliens, and to allow them to hold and convey real estate
without restriction. It was that policy which, in the infancy
of railroads, and when almost all her public men were
ignorant of their character and capacity, led her to give a
monopoly for crossing her territory, in order early to acquire
the benefits of through railroad traffic. It was that policy
which, within a few years, triumphed finally over the short-
sighted economy which even yet hampers Pennsylvania, and
established a rate of interest and an amendment of the usury
laws, which has brought and is bringing, yearly, millions of
foreign capital to enrich her. It was that policy which,
some twenty years ago, permitted the consolidation of two
of her roads—the Paterson and Hudson, and Paterson and
Ramapo—with the Erie, under the effects of which incalcu-
lable benefit has arisen to Jersey City and Hoboken, as well
as to the country through which these railroads pass. It
was that policy which authorized the lease of the Morris
and Essex to the Delaware and Lackawanna, by which that

great artery of public wealth has been made the rival of the Erie, not only in business, but in benefit to New Jersey. It was that policy which, later yet, has placed the Morris Canal in hands which will really develop its beneficial capacity. Nor is it a policy of which we should either be ashamed or afraid. It is our location which induces it. If we cannot ourselves make use of our local advantages, if we are not rich enough, why should we deny them to the nation?

The day is gone for state pride to intervene and forbid the use of foreign capital and enterprise upon our soil, except under the management of our own citizens. Out of the misery of those wretched five years, when wrongly asserted state rights contended against nationality, this good has already come, that local divisions are, to a greater extent, obliterated, and all American citizens stand everywhere, as they were meant to stand—alike. If corporations from other states acquire rights here, they acquire them under our laws; they will be compelled to obey them; they will repose under their protection. They become, in a sense, naturalized citizens of New Jersey. We lose nothing. We everywhere gain. Individuals may lose consequence, but the state and the public will be profited; for centralization will intensify energy and enterprise, and promote, tenfold, the good which a great railroad, actually beginning at the Pacific, having its trunk in New Jersey and its terminus upon her shore, must necessarily dispense within her borders.

*Hon. J. S. Black,* in reply.

All that is alleged, and all that is proved, on either side in this cause, is very easily understood, and being understood there is nothing left except to apply certain grave, fundamental principles of natural justice, which are not only embodied in all American constitutions, but are acknowledged to be a part of the jurisprudence of every civilized country of the world. There is no security for private rights without a recognition of these doctrines, and they need no authority.

It appears that three companies, established by the state of New Jersey, in connection with a fourth one outside of the state, have been engaged for forty years, and are still engaged, in carrying goods and passengers between New York and Philadelphia. By their original act of incorporation, by a great many supplementary laws, and by direct contracts made between themselves, they have become so united together that the interest of one is the interest of all. But, although they are united and connected together, they are not consolidated; they are separate, distinct corporations, having separate officers, and a separate board of directors to represent the stockholders. They have separate duties to perform, separate rights and obligations, which are to be protected and enforced in separate proceedings at law and in equity.

Counsel here summed up at length the value of the propperties of the United Companies, which, together with the franchises, the value of which, he insisted, the court could. not ignore, he estimated at $90,000,000.

The companies, by the use of this property, have made large gains. Taking the whole period that has elapsed since the first organization of these companies, thirty-five years ago; taking one year with another, allowing for all the mismanagement—deducting, also, the dividends that were not divided—the dividends that were divided actually amount to twelve and one-fifth per cent. The business is capable of indefinite expansion; it must increase. The general business of the country doubles itself in every twelve or fifteen years. I think that these companies have doubled their business every nine and a half years. While business goes on increasing in that way, the relative cost of conducting it decreases; the profits increase more rapidly than the business. The amount then that may be made out of these roads will startle us even to think of. The companies have done great public service. There are thousands of men in this state·

who owe their large fortunes in some way, directly or indirectly, to these companies. They have added to the prosperity of the state; they have behaved impartially to their own and to other states. They have promoted the general commerce of the country, and have done justice to those who did not belong to this state.

Besides the interest which the stockholders have, arising out of their rights to receive the very large profits which they may fairly look for, the state herself has a proprietary interest—an interest as an owner. The state is one of the stockholders of some of these companies, and she has an additional interest in the property which belongs to them—the right to take at a certain time the whole of that property in her own hands, at a certain fixed price, very far below the true ascertained value of it. You have the fair right to infer from the facts which are before you, that this additional asset is worth not less than $15,000,000.

After the directors of the United Companies and the Pennsylvania Railroad Company agreed upon their treaty, or compact, or bargain, for it is all these, but not a lease—they were nearly as far as ever from accomplishing their design, because the power to make the contract, even according to their own construction of it, was coupled with the condition that they should get the assent of at least two-thirds of the stockholders. In regard to the board of directors, I have to say that the general board passed upon it. It was not adopted nor agreed to by a concurrent majority of the several boards, but only by a majority of the general board, so that, for aught that appears, these stockholders, or some of them who own stock in one of the companies, may have had their rights passed upon, and their property taken away from them, without the consent of anybody who was ever trusted by them to represent them in anything. For this majority may have been made up, and in point of fact was made up, of members of two of the boards, who over-bore by their votes the members of the third one. After this it became necessary to get the ratification of two-thirds

of the stockholders. They accomplished this by appointing a committee of five agents, to go out among the individual stockholders and canvass them separately, and in this way we have reason to apprehend that they either have, or will have got, two-thirds of the stockholders to sign away our rights as well as their own.

Now, if those directors, together with the Pennsylvania Railroad Company, have the right to all the things which they claim, there are two fatal defects in the execution of the power, which alone are sufficient to entitle us to this injunction, if there were nothing else in the case. The first of those defects is, that the contract was not submitted to the directors of the several companies, and passed upon by them, but that it was submitted to the whole board of directors sitting together, whereby the rights of these complainants, and other stockholders, were passed upon by persons who had no authority whatever to represent them, against the consent and against the wishes of those who had authority to speak for them.

In that law, which they claim as their justification, your Honor will find it is simply necessary to have the consent of directors to the contract. It does not say how they shall pass upon it—whether the directors shall sit separately, or whether they shall unite together, nor what shall be considered as a consent of the directors. But, most assuredly, every just interpretation of the law requires that the directors of each company should have an opportunity to deliberate upon it, and pronounce their own separate judgment.

Where a law authorizes a thing to be done by the directors of several different companies, each company having a separate existence and a separate board of directors, it must be perfectly manifest that they are to act separately, and especially is this true where the act that is done, when it is done, is to destroy the separate lines of the companies, and take away their interest.

The other objection to the execution of this power is still more fatal, as it seems to me. Immediately after the con-

tract was assented to by the members of this general board of directors, a meeting for some purpose happened to be held by the stockholders of one of these companies, I do not recollect which, and that body of stockholders passed a solemn resolution, calling upon the directors who had agreed to this contract, to have it printed and distributed among the stockholders, and to call a meeting of the stockholders, in order that they might deliberate upon the subject and determine whether the contract ought to be ratified or not; and by which the directors acting in the interest of the Pennsylvania Railroad Company, and others, recently tried to spread their agents over the state, to gain, by personal solicitation, what they knew they never could by any open or fair examination of the subject. Of course, I do not know what was said to each of these stockholders, what inducement was held out to them, to put their names to that piece of paper; but I am sure, so must you be—so is everybody who knows anything about the fact—that they did not disclose to them the whole case; they could not get around to each one of the stockholders and tell them the facts of the case, and the very obscure provisions of that contract.

According to the effect which these gentlemen claim, this consent is not merely a surrender of the rights of those who signed it, but it is against our rights. They say it divested not only their own right and title to this large property, but it divested the rights of those who were never consulted, publicly, at all. I maintain it to be a rule of law too clear for dispute, that where any matter or thing is left by cestui que trust, or by judicial order, or in any other way, to be determined by any number of persons more than one, or a majority of the number to whom it is submitted, that such power cannot be exercised by those to whom it is committed separately; they must be called together. This is void upon another principle. These men are our trustees, they had the business of our property upon their hands—when I say ours, I mean the whole of the stockholders; and it is an undoubted rule, that, whenever a trustee wants a bargain to

be made by his *cestui que trust*, which will release the trustee from any obligation which he would otherwise be under, he must, before he can make use of the contract, show not merely that it has been executed by the *cestui que trust*, but that it has been executed upon the consideration of all the facts which may be adduced.

These parties have no power to make this contract. All the parties in the contract are corporations, and we have insisted that all of these corporations are destitute of those powers which they have undertaken and attempted to exercise in this case. Whenever a corporation undertakes to do anything which it is not specially authorized to do by the law of the state which created it, its act is void.

Had then the Pennsylvania Railroad Company the power, in its corporate character, to come over into the state of New Jersey and perform the things which it has undertaken? If it had, then it has derived that authority from the law of Pennsylvania, outside of which every act which it attempts to do is *ultra vires* and void. An examination of the laws of Pennsylvania will show beyond doubt, that a corporation has only such power as is plainly laid down. It has been decided over and over again, by the Supreme Court of that state, that there can be no such thing as a doubtful charter, because whenever you raise a doubt about the meaning of any word or phrase, the doubt is immediately decided against the corporation. An act of incorporation for an act for extending the powers of a corporate body, is made certain by the very obscurity of the words in which it is written. It is necessary to establish this doctrine as a universal and infallible rule, because if it had been otherwise, the legislature might be induced to pass a law which, although it might seem to be perfectly harmless, was really pregnant with the greatest mischief.

The Pennsylvania Railroad Company procured from the state of Pennsylvania a law authorizing them to become the lessees of any railroad outside of that state. I admit that the Pennsylvania Company has authority from the legislature of

that state, to go into any state and there become lessees of railroads and canals. I deny, however, that they have any power which extends to other subject matter than railroads and canals. I deny that they have power to do anything with railroads or canals except to lease them. They came into the state of New Jersey, however, and, instead of leasing them, they bought both of them out.

Applying the rules of strict construction which prevail in Pennsylvania, I contend that the act of 1870 and the act of 1871, of the legislature of Pennsylvania, and the act of 1869, do not all, or either of them, give to that corporation the privilege of doing the things which it has undertaken to do by this contract. When they accepted the authority to make a lease they did not get the authority to make a purchase. On the contrary, the power to make a purchase being withheld, it is entirely forbidden, and it is a fraud upon the state which confers the power to lease, to make use of that power, and under the color of this to make what is practically a purchase. Nevertheless, they came here, and with the power to lease canals and railroads within the state of New Jersey and elsewhere, they did not make a lease of either, but they made a purchase of both. This reservation of an estate in the vendor, which is to be enjoyed and take effect after the expiration of nine hundred and ninety-nine years, does not diminish the value of the estate which is granted to the Pennsylvania Railroad Company one whit, nor does it add one farthing to the value of the estate in our hands. It is not worth anything to either party. To call this contract, therefore, a lease and not a purchase, because of that reversionary right which is to be enjoyed at the end of a thousand years, is a mere mockery. Long before that time comes around it will take a skillful antiquarian to decipher the lost and forgotten language in which this lease is written. Look back a thousand years. There is but one single institution now existing that stood a thousand years ago, and that stands because its divine founder built it upon a rock, and pronounced the omnipotent decree that the gates of hell

should not prevail against it. All the rest have been swept away by the floods of time.

I repeat that these people, when they took the power to make a lease, made a solemn promise that they would not, under any circumstances, make use of it for the purpose of making a purchase, which they were forbidden to do. They pretend to be doing one thing when they are doing another. All courts of justice, and courts of equity especially, are bound to look at the substance of things, and not at the mere form in which the parties have chosen to put them. The insertion of those words which are intended to make this a lease, is only calculated to excite that disgust and indignation which every honest man is bound to feel when he looks upon that which he knows and feels to be a breach of faith. The courts hold that that kind of bad faith which keeps within the letter of the law but breaks the spirit of it, is a great deal worse than no pretence of fulfillment at all.

The act of 1869 may be a justification of the lease, but you cannot stretch that act so as to extend it over one-twentieth part of the things that are made the subject matter of this contract. These things bring me to the conclusion that any stockholder of the Pennsylvania Railroad Company, or the Attorney-General, on behalf of the commonwealth of Pennsylvania, could go into a court on the other side of the line and bring a bill to restrain this corporation from making this contract; and the courts of that state would be compelled to declare it utterly null and void.

I do not deny, and one of the reasons why I do not deny is because I do not care whether it is true or not, that a corporation merely private, established in one state, has a right to go into another state and then do whatever it is authorized to do by the laws of the other state. The corporation of Pennsylvania comes here for the purpose of taking possession of the public highways of New Jersey, and for the purpose of regulating and controlling, to a certain extent, the commerce and trade of New Jersey and the commerce

and trade of our sister states. I suppose that it is not necessary for me to establish that this is a power which, in all times past, in all countries, ancient and modern, has been regarded as belonging, necessarily, to the sovereign power of the state. New Jersey, more, perhaps, than any other state in the Union, by her geographical position, owes it to her own honor and conscience, and not only to her own people, but to the commercial world, that she should perform this duty as impartially as possible.

Now, she may perform that duty herself, that is by the direct and immediate agency of her own authorized representatives, reimbursing herself by a general tax upon all of her people, or by a special tax imposed upon those only who use the facilities which she has furnished; or she may do what she has done, that is, employ a servant, or any number of servants, on other terms than she employs her public officers. She may create a corporation, or corporations, for that purpose, and delegate the duty to them under direction and control. When she bestows that power on a corporation, it becomes just as much her servant as are her executive and ministerial officers. In selecting an agent or servant of this kind, I do not pretend to say that the commonwealth is under the necessity of confining herself to her own citizens; nor do I assert that it is my objection that she takes a set of men already incorporated in another state. If, therefore, the franchises which belong to these United Companies were forfeited by some act of the corporation, or if surrendered by the unanimous consent of all the stockholders to the state, and the state should resume these franchises, she might make a re-grant of them to the people who compose the Pennsylvania Railroad Company. But that would be simply making those persons who are now a Pennsylvania corporation a New Jersey corporation.

Now, the legal proposition is that these franchises and powers and privileges to take charge of the public highways, and to perform the great public function which belongs to the sovereign state of New Jersey, with reference to the

trade and commerce of New Jersey, cannot be held by any-body, unless they be held by virtue of a direct grant immediately from the state, made through her supreme legislature; and the grant then made in that way, and coming from that, the highest of all sources, is invalid, unless it be coupled with the imposition of a direct responsibility on the part of the grantee to the state, for the faithful performance of all the things which are correlative to the exercise of such a power.

I hope I am understood. If I am, then your Honor sees two fatal objections to this contract. It transfers to the Pennsylvania Railroad Company a very important portion of the sovereignty which belongs to the state of New Jersey, and takes away from the place where the state has deposited it, and totally out from under her control, one of the most important functions of her government. Another objection to it is, that it is an exercise of legislative power by parties who have not been entrusted with any such privileges. It is impossible to suppose that the legislature has the right to depute ten or twelve individuals, and say that they may make laws; that they may establish corporations with great public power; and, least of all, can that sort of power be entrusted to the directors of a private corporation? Especially is it improper, and even absurd, to allow such a power as that to be exercised by men who will acknowledge to you that they do it entirely with reference to their own interest.

But then I maintain that even if the legislature itself, in the most solemn manner that you can conceive of, and according to all the forms of organic law, should undertake to confer a power like this upon any individual, or any corporate body, that the grant of such a power is utterly worthless and invalid, if it be not accompanied with the imposition of a direct responsibility to the state of the exercise of the power by the grantees when they get it. Will the counsel on the other side tell us that the state can control this matter; that there is here any direct responsibility to the state, by virtue of which the state, whenever it finds the Pennsylvania Railroad

Company misbehaving itself, can come down upon it? I say no. On that covenant, nobody on earth can sue. They say that the United Companies may suffer whatever the state may choose to impose, and then the companies must recover from the Pennsylvania Company, and, by this circuity of action, justice will be reached at last. Well, I do not believe that for any public mischief which may be done by the Pennsylvania Railroad Company, the New Jersey Companies can recover damages, or bring suit on that covenant. The consequence of this lease taking effect, if your Honor permits it ever to take effect, will necessarily be that these companies, who were responsible to the state heretofore, with their corporate life for anything that was injurious to the public done by them, will have stripped themselves of all their property, so that you cannot reach them, and, with the consent of New Jersey, they have disarmed themselves utterly and completely of all power to perform the duties imposed upon them by their charter. This is a previous pardon—a condonement before hand; it is a plenary indulgence to sin as much as they please.

Now, a most important question arises. Has the state of New Jersey ever consented to put herself in this anomalous position? Have the members of the legislature, or any one of them, ever expressed the intention that is imputed, of so degrading this commonwealth, whose dignity and rights they are bound to protect and preserve? No such thought as that was ever in the minds of any legislative body that ever sat in the state of New Jersey. I can prove it by the only evidence of which such a fact is capable —that is, by taking up the statute book and showing, from beginning to end, no thought of that kind was ever expressed, and, as it is not expressed in a matter of this kind, that must be taken as conclusive evidence that it was not intended. Look now at the only law which is referred to as any justification of this contract. Before doing so, let me remind

you that the rules of strict construction are adhered to in New Jersey; that they are adhered to everywhere. .

No court on earth has a right to assume that a thing is meant when it is not clearly expressed. See whether this tremendous power was intended to be given, and, if given, what words are used to express that intention : "They may lease to or consolidate with any other railroad or canal company or companies in this state, or otherwise." "Consolidate with any other canal or railroad company." The generality of these words might excuse an argument.in favor of the power to bargain for consolidation or lease with any corporation that could be found anywhere in the world. But that would not be the true construction. It is perfectly certain that, when the legislature went on to say "any other corporation in this state," they surely meant to confine the companies to domestic corporations.

As to the words "or otherwise." Whenever a word of doubtful meaning occurs in a statute of this kind, it means nothing that can be made valuable to the grantee claiming privileges under it.

The state of New Jersey, by her geographical position, holds the key to the city of New York for all the commerce that passes over both of these roads through Philadelphia. Up to the present time, she has done her duty; she has behaved with perfect impartiality toward the Baltimore and Ohio Railroad and the Pennsylvania Railroad.

Now, it is proposed that the Pennsylvania Railroad Company shall have absolute and unlimited power, not only with reference to the trade that she brings herself, but she may make what discrimination she thinks proper, and thus what produce which may be on its way to New York over the Baltimore and Ohio Road, is stopped at Philadelphia, or it is taxed to death before it reaches New York. I take it that the legislature of New Jersey have neither the moral, legal nor constitutional right to do that thing. One of the purposes of the Constitution of the United States goes to prevent

that kind of improper partiality between the commerce of one state and that of another. It is a purpose to which, if the state of New Jersey lends herself, she must and will stand disgraced forever before this nation.

But we have been told that these public considerations ought to be suppressed here; that this is a private bill, brought by private parties, in vindication of private rights. In other words, we are required to submit to the operation of a void contract which robs us,—for we are able to say it is void, because the persons who went into it had no authority to do so. On the same principle, if this contract was a forgery, we would not be permitted to show it. This contract is an invasion of our private property. There was some argument made here which I was not able to comprehend exactly, and from which it seems to have been intended to draw the inference that this was not properly private property. Undoubtedly every man who owned any portion of this stock may say, "It is mine, and I will keep it until I choose to part with it; and when I do make up my mind to let it pass out of my hands, it shall be for such a consideration as I deem an equivalent, and I will not allow the purchaser to put his own price upon it; nor will I part with it for a price that may be put upon it by any third person." Being private property, it is within the protection of that provision of the state and federal Constitution which declares that no man shall be deprived of his property except by due process of law; and surely no man will say that we are deprived of this by due process of law, when it is taken from us by a clandestine contract, made behind our backs, without consulting us, contrary to our wishes and against our will. Before your Honor assents to this proposition, I suppose you will make up some reason or another which will be satisfactory to the general mind as well as to your own conscience. It will be necessary for you to show two things: first, that the legislature of the state of New Jersey has actually authorized this thing to be done; has placed upon her statute book a command that the contract which we had

before shall be abolished, and another contract, to which we never consented, shall be substituted in its place, if it be the will of the directors of two companies and two-thirds of the stockholders thereof. And after you have done that, you will not have accomplished your object unless you can do this also, and that is to raze out from the Constitution of New Jersey and the federal Constitution that which declares that no legislature shall have the power to do any such thing.

A very large portion of the property which is transferred to the Pennsylvania Railroad Company by the contract, consists, some of it of actual cash, some of it of choses in action, bonds and bills receivable, which can be sold in the market immediately, surplus real estate, surplus floating and rolling stock, amounting in all to $15,000,000; that the present companies might, without violating any obligation of their charters, or without disabling themselves in any way from the future performance of their duties, convert into cash and divide among themselves. All this goes to the Pennsylvania Railroad Company. In addition to that, the Pennsylvania Company gets $6,250,000 of stock issued for their own special use. It is true there is a stipulation contained in this contract which shall apply at least a portion of the money thus received to the improvement of the works; but they are bound to make no particular improvements; if they make none at all, they cannot be made to fulfill this part of the contract. They may make improvements anywhere on their seven thousand miles of road, and claim that they have fulfilled the contract.

A question has been raised whether this is an exercise of a right of eminent domain. Of course all the arguments on that subject are good for nothing, if the legislature did not intend the right to be exercised in that way. There is no question here about public use, if you can say that this is a right of eminent domain, this taking of property from one who owns it and handing it over to another person who does

not own it.   Assuming that the legislature intended what they say it did, it is simply an attempt on the part of the legislature to suspend the eighth commandment.

THE CHANCELLOR.

The complainants in this case are stockholders in the three corporations who are the defendants.   The object of the bill is to restrain these corporations from executing a contemplated contract with the Pennsylvania Railroad Company, by which the works of the defendants are to be leased to that company for nine hundred and ninety-nine years, for an annual rent of ten per cent. on the amount of their capital stock.   The matter before the court is an application for a preliminary injunction.

The aggregate capital stock of the three defendants, consists of one hundred and eighty-nine thousand nine hundred and four shares of $100 each, of which the twenty-one complainants own three thousand four hundred and fifty-five shares, being a little more than one fifty-fifth of the whole.   The bill is filed for the benefit of the complainants, and all other stockholders of the defendants, who may join therein.

The defendants are The Delaware and Raritan Canal Company, The Camden and Amboy Railroad and Transportation Company, and The New Jersey Railroad and Transportation Company, all incorporated by special charters. The first two, incorporated by charters passed February 4th, 1830, were consolidated by an act passed February 15th, 1831, and have since been commonly known by the appellation of the Joint Companies.   In their business affairs, and in legal proceedings, the joint name was retained, and their affairs were managed by a joint board composed of the directors elected by each company, according to its charter. The charter of the New Jersey Railroad Company was passed March 7th, 1832, and it was consolidated with the Joint Companies by virtue of an act of the legislature authorizing it, passed February 27th, 1867, confirming an agree-

ment made on the first day of that month. By this they were only consolidated in interest, the stock and corporate existence of each remaining as before, but were governed by a joint board, composed of the directors of all. They have since been commonly known by the name of the United Companies of New Jersey, but have not adopted or assumed a corporate name for the consolidated companies, as authorized by the act.

The Canal Company was authorized to construct a canal from the Delaware to the Raritan, and a feeder to supply it with water from the Delaware. The Camden and Amboy Railroad Company was authorized to construct a railroad from the Delaware, opposite Philadelphia, to Raritan Bay, with steamboats at both extremities, to convey passengers and freight from the city of New York to the city of Philadelphia, so as "to perfect a complete line of communication from Philadelphia to New York." It was authorized, after the main line was completed, to construct a lateral road from the main road to the Delaware, at Bordentown. The New Jersey Railroad Company was authorized to construct a railroad from some point in the city of New Brunswick, to the Hudson river, opposite the city of New York, with power to construct a branch to any ferry on that river, opposite the city.

In the act of 1831, to consolidate the Joint Companies, it was provided that any stockholder of either, who dissented, should be paid back the price of his stock, with interest; neither work being then constructed. And in the act of 1867, to consolidate the United Companies, it was provided, that each dissenting stockholder should be paid the value of his stock, to be appraised by commissioners.

The Joint Companies, by an act passed March 15th, 1837, were authorized to construct a railroad from the southwesterly end of the New Jersey Railroad, in the city of New Brunswick, to Trenton, and thence to connect with their road at or south of Bordentown; with a spur to the Trenton Delaware Bridge. This act made no provision for dissen-

tient stockholders. In 1835 the Joint Companies, by an agreement with the Trenton Delaware Bridge Company, of which they owned a majority of the stock, were allowed to lay rails upon the bridge over the Delaware, at Trenton, and to use it for their trains. And in 1836, they made an agreement with the Philadelphia and Trenton Railroad Company, whose road run from the west end of that bridge to Philadelphia, by which that road was used as a part of the line of the Joint Companies to Philadelphia, and by which the clear profits of these three companies should be divided among all their stockholders, share and share alike.

The Joint Companies constructed a canal from the Delaware to the Raritan; a railroad from Camden, through Bordentown, to South Amboy, and provided steamboats at either end, to New York and Philadelphia, so as to make a complete line of communication from one city to the other; and also a railroad from the western extremity of the New Jersey Railroad, in New Brunswick, through Trenton to Bordentown, with a spur to the Trenton bridge, and laid rails on that bridge to connect with the Philadelphia and Trenton Railroad. The New Jersey Company constructed its road from the west boundary of New Brunswick, to the Hudson, at Jersey City, near the ferry of the Jersey Associates, but did not construct a branch to any other ferry. These works were all completed, as required by the acts authorizing them.

In this manner, besides the canal from the Delaware to the Raritan, three complete lines of communication between New York and Philadelphia were perfected: One, from New York to Amboy by steamboat, from Amboy to Camden by rail, and from Camden to Philadelphia by steamboat; the second, from Jersey City, through Newark and New Brunswick, to Trenton, and over the Trenton bridge and the Trenton and Philadelphia Railroad, into Philadelphia; and the third, by using the second to Trenton, then by the road from Trenton to Bordentown, and passing on the first from

thence to Philadelphia. Each of these lines was a continu-- ous line from New York to Philadelphia.

Each of these companies had, with the authority of the· legislature, but without the express assent of its stock- holders, varied and changed its located ·route, and con- structed branches not authorized by its original charter;, and had purchased stock of other corporations deemed auxiliary to its own, guaranteed their bonds, and leased their works. Each had established and maintained a ferry at the termination of its road, over the Hudson and Delaware· respectively, not for its own passengers merely, but for the public; and for this purpose the New Jersey Railroad Com- pany had purchased, at the cost of nearly half a million of dollars, the capital stock of the Jersey. Associates. These things were done, sometimes with, sometimes without special authority of the legislature, always without the express assent of the stockholders.

These lines were the only canal and railroad routes· authorized by the state, by which passengers and freight coming to Philadclphia from the West, could cross the state to New York. The Pennsylvania Railroad Company owns or controls the railroads which are the chief means of com- munication from the western states, including California, to Philadelphia. This company made an agreement with the Joint Companies in 1863, by which freight and passengers coming over its road, and the roads controlled by that com- pany, to Philadelphia, should be carried to New York over the roads of the Joint Companies without change of cars,. and the fare and freight received should be divided accord- ing to the distance passed over the respective lines.

The depot and other terminal accommodations at Jersey City, barely sufficient for the proper business of the United Companies, were found inadequate for the freight business· from the West, which was coming over the Pennsylvania Railroad. The United Companies, to provide for this need,. in the autumn of 1867, purchased of the owners, the Har- simus Cove property at Jersey City, extending from South.

Second street to South Seventh street, giving them a front of thirteen hundred feet on the Hudson, opposite New York, and containing about seventy acres. This purchase was made at the cost of near half a million of dollars, without any special authority from the legislature, and without any express assent of the stockholders.

By virtue of an act approved March 30th, 1868, the right of the state to the lands in this purchase, with the right of reclaiming lands under water, was conveyed to the United Companies, for the price of $500,000. This act authorized them to construct a branch road from this property to the New Jersey Railroad, at Bergen Hill. To this act the assent of the stockholders was not required or obtained. And, as is alleged, the United Companies have expended about $600,000 in procuring the right of way for the branch so authorized by this act; and the improvement of this property for use will require several millions more.

By an agreement made between the Joint Companies and the Pennsylvania Railroad Company, in 1863, that company agreed to construct, and did construct, a railroad called the Connecting Road, from the Philadelphia and Trenton Railroad, at Frankford, to its own road, at Mantua. By this, a continuous and connected line of railroad was completed from Jersey City to Pittsburg, and farther west, so that passengers and freight could be transported from Jersey City, and also from Amboy, in the same cars in which they were there placed, to Pittsburg. The Pennsylvania Railroad had a branch road to the Delaware at the foot of Washington street in Philadelphia, and the Joint Companies connect with it there, by a ferry from the terminus of their railroad at Camden.

In this situation of their works, connections, and contracts, the defendants, jointly with the Philadelphia and Trenton Railroad Company, agreed with the Pennsylvania Railroad Company to enter into the proposed contract with that company. The terms of that contract have been settled and agreed upon, and the joint board of the directors of the

United Companies has, by resolution entered on its minutes, directed its execution. By that contract the canal, railroads, and all the other property, real and personal, and the franchises of the United Companies, and the Philadelphia and Trenton Railroad Company, are leased to the Pennsylvania Railroad Company, for nine hundred and ninety-nine years, for the annual rent of $1,948,500, being ten per cent. on the capital stock of the United Companies and the four thousand nine hundred and forty-six shares of the capital stock of the Philadelphia and Trenton Railroad Company, not held by the Joint Companies, and so not represented by their capital. The lessee agrees to assume and perform the duties, obligations, contracts, and liabilities of the lessors, and to save them harmless from all existing or future claims. The lessors agree to furnish the lessee with twenty-two thousand two hundred and fifty shares of their capital stock, and mortgage bonds, on an executed mortgage for twenty millions, to the extent of about four millions more than is required to pay their debts now maturing; such stock and excess of bonds to be used in the improvement and development of Harsimus Cove, and to be advanced in installments after the amount of each installment shall have been expended. The lessee is to keep the works in repair; and the contract contains a clause for re-entry upon non-performance of any stipulation by the lessee, and that thereupon its estate and interest shall cease and be void. An act approved March 17th, 1870, is relied on as giving power to make this contract.

The act of 1870 declares: "That it shall be lawful for the United Companies, by and with the consent of two-thirds of the stockholders of each, to consolidate their respective capital stocks; or to consolidate with any other railroad or canal company or companies, in this state or otherwise, with which they are or may be identified in interest, or whose works shall form with their own connected or continuous lines; or to make such other arrangements for connection or consolidation of business with any such com-

pany or companies, by agreement, contract, lease or other-wise, as to the directors of said United Companies shall seem expedient." It provides that any stockholder who shall be dissatisfied with such arrangement, and shall give notice of his dissatisfaction within three months after it shall be made, shall be paid the full value of his stock, to be ap-praised by commissioners appointed for the purpose.

To entitle a party to protection by injunction, it must clearly appear that he has some right which is about to be violated, as well as that the threatened injury is irreparable or cannot be adequately compensated for by suits in the law courts. The right of the complainants claimed here, is the right to have the works of the defendants remain under the present management without being leased or transferred to any person or corporation at a fixed rent, instead of the pos-sible profits to be made by the management of the directors. The right of the complainants to their stock is not disputed. The only question is, whether this gives them the right to control the action of the directors and the majority of the stockholders, in such disposition of the works and franchises.

It is contended that the act of 1870 does not authorize this lease, and that if it gives any authority in this case, this lease extends to objects not within it.

It may be considered as settled, that a corporation cannot lease or alien any franchise or any property necessary to perform its obligations and duties to the state, without legis-lative authority. *Beman* v. *Rufford*, 1 *Sim., N. S.*, 550; *Johnson* v. *Shrewsbury & B. R. Co.*, 3 *DeG., Mac. & G.* 914; *Shrewsbury & Birmingham R. Co.* v. *North Western R. Co.*, 6 *H. L. Cas.* 131; *South Yorkshire R. Co.* v. *Great Northern R. Co.*, 3 *DeG., Mac. and G.* 576; *Winch* v. *Birkenhead R. Co.*, 5 *DeG. & Sm.* 562; *Great Northern R. Co.* v. *Eastern Counties R. Co.*, 9 *Hare* 306; *Troy & Rut-land R. Co.* v. *Kerr*, 17 *Barb.* 601; *Ohio & Miss. R. Co.* v. *Ind. & Cin. R. Co.*, 14 *Am. Law Reg.* 733; *Lauman* v. *Lebanon Valley R.*, 6 *Casey* 42; *York & Md. R.* v. *Winans*, 17 *How.* 39; *Commonwealth* v. *Smith*, 10 *Allen* 455; *Rich-ardson* v. *Sibley*, 11 *Allen* 66.

This rule is founded on reason and principle. The franchises granted by the state are often parts of the sovereign power delegated to a subject, and always privileges to which other citizens are not entitled. In these grants the state is supposed to regard the character of the grantee, or the guards and restrictions placed upon the corporation, when the grant is by a charter to persons continually changing by transfer of stock. In this case the franchise of maintaining a canal and railroads across public highways and navigable rivers, and of taking tolls and rates of fare fixed by themselves without control, are with others a material part of the property leased; these cannot be leased or aliened without consent of the state.

The act of 1870 clearly grants the power to the United Companies to consolidate their own capital stocks, and to consolidate their stocks or business with any other connecting railroad in the state; but it is contended that it does not authorize such consolidation or connection of business with any corporation of another state. The question depends upon the meaning and effect of the word *otherwise.* This is certainly an inapt word to designate companies out of the state, by being placed in apposition to the words "in this state." It is inapt, because its proper use is to express difference of means or manner, and not of place. The word is used here in a way that admits of no change of place in the sentence, even if such change can ever be permitted. "Companies *in this state*" are one subject of the provision; the word *or* plainly denotes that some other subject is to be indicated. If the word elsewhere or otherwhere had been used, it would have appropriately expressed the meaning intended. The radical meaning of the word *otherwise,* which is always a relative word, is "different from that to which it relates," and the phrase to which it relates in this case, both from location and the sense, is clearly the words "in this state." It means companies different from or other than companies in this state. This is the meaning that I think would strike every one upon the first reading of the sentence. But any one

conversant with the correct use of language would be struck with the inappropriateness of this word to express the meaning. It is a case of bad grammar, and not of doubtful meaning. The maxim *"mala grammatica non vitiat chartam"* applies to statutes as well as to deeds. If a statute provided *"*that if any father or mother should chastise a child so as to maim it, he or *her* so doing should be guilty of felony," a guilty mother would hardly escape on the ground that the word *her*, by which she was included, could not be applied to "be guilty," because the rules of grammatical construction and the settled use of language forbid it. Something was intended by the use of this word, and a settled rule of construction requires that no part of a statute shall be disregarded if any effect can be given to it. *Den.* v. *Dubois*, 1 *Harr.* 293. And where the intention of the legislature is plain, the words of the statute must be construed according to that intention. No one can read this statute, either in a cursory manner, or with deliberation and repeated reading, without being convinced that such was the intention, and that the words used express it, although awkwardly, inappropriately, and ungrammatically.

It is a rule of construction, that all grants from the state, and grants of franchises and exemptions in charters, must be construed strictly, and most strongly in favor of the public and against the grant. The object is to protect the public against improvident grants, and grants made by implication, without clear intention. And such grant will not be sustained by doubtful words. Ambiguity in such grant vitiates it. But this rule is qualified by another, that such grant, and the statute making it, must receive a reasonable construction, and not be so construed as to defeat the intention of the legislature, and that the ambiguity must be such as is not removed by the settled rules of construction. *Sedg. on Stat.* 259 & 327 ; *State* v. *Newark*, 4 *Dutcher* 529 ; *Wright* v. *Carter*, 3 *Dutcher* 76 ; *Briggs' case*, 2 *Zab.* 644 ; *Bridge Proprietors* v. *Hoboken L. & I. Co.*, 2 *Beas.* 81 ; *Del. & Rar. Canal Co.* v. *Rar. & Del. Bay R. Co.*, 1 *C.*

*E. Green*, 372; *Richmond R. Co.* v. *Louisa. R. Co.*, 13 *How.* 81; *Perrine* v. *Ches. & Del. Canal Co.*, 9 *How.* 172; *Pennock* v. *Coe*, 23 *How.* 132; *Rice* v. *Railroad Co.*, 1 *Black* 380; *Phila. & Erie R. Co.* v. *Catawissa R. Co.*, 53 *Penn.* 20.

This act can hardly be considered a grant from the state, .or to fall within the reason of the rule requiring strict construction in all such grants. The state here parts with no property, and creates no new privilege or franchise that can ·affect the public. It simply permits a new arrangement or contract as to privileges and franchises already granted. It enlarges none. It clearly allows such arrangement with companies in the state; and the only question is, whether it shall be allowed with like companies of another state.

It is also urged that the Pennsylvania Company is not within the purview of the act, because their works do not form connected or continuous lines with the works of the defendants. I think that the lines are both continuous and connected. The works of the Camden and Amboy Railroad Company extend from New York to Philadelphia. It was so held in the *Briggs case*, 2 *Zab.* 623, and in *The Delaware and Raritan Canal Company* v. *The Raritan and Delaware Bay Railroad Company*, 1 *C. E. Green* 321, and 3 *C. E. Green* 546. They extend to the foot of Washington street, at Philadelphia, to the railroad of the Pennsylvania Railroad Company. Thus their works, though not their railroads, form a continuous line. Also, the road of the Camden and Amboy Company, at Trenton, is *connected* by three intervening roads with the Pennsylvania railroad. They are not continuous; that implies, without interval or interruption. Railroads can be connected, either directly or by intervening roads. The provisions of the Acts of Pennsylvania show this; their phrase is, "connected directly or by intervening roads." In either way they are connected; if directly connected, they are also continuous. And the fact ·that this act uses the word "connected" after "continuous," for the obvious purpose of adding something to the extent of

the provision, shows that the intention was to include roads connected, not directly, but by some intervening or connecting road.

It is also urged that the means proposed are beyond the powers in the statute; that the authority is to lease, but that the proposed lease for nine hundred and ninety-nine years is, in reality and substance, a sale, though in name a lease. This term is no doubt practically equivalent to the fee; but it differs radically from a sale, because it is for rent reserved during the term, with power of re-entry. The distinguishing feature of a sale is, that it is for a consideration paid, and extinguishes all right to the property. This is, in substance as well as in form, a lease. The act of 1870 is, in my opinion, authority by the state to make the proposed contract and lease.

The complainants further insist, that even if the act authorizes the making of this contract as far as the state is concerned, yet that against them it is invalid, as it impairs the obligation of a contract existing between them and the defendants, arising out of the charters and their subscription to the stock. This contract they claim to be, that the roads and canal shall be maintained and operated by directors chosen by the stockholders, for their benefit, and the whole net profits divided among them as dividends; and that this contract continues without limit of time, unless every stockholder shall consent to change or terminate it. It is settled that a charter without reservation of the power of repeal, is a contract between the state and the corporators, which can not be altered without their consent. It is also settled, by many decisions, that a corporation cannot use the capital stock of the company for any enterprise substantially different from that authorized by the charter, as the stock is subscribed and paid in for that purpose, and that only, which raises a contract not to apply it to any other; and that, when persons enter into partnership, or become incorporated for a specified object or business, and the articles or charter stipulate that the business is to be continued for

a time specified, the business cannot be abandoned within that time, except by the consent of all the partners or stockholders. See *Zabriskie* v. *Hack. & N. Y. R. Co.*, 3 *C. E. Green* 178, and the authorities there cited.

But there is no case that holds that a majority of corporators, where a time is not specified for which the enterprise must be continued, may not abandon the enterprise and sell out the property of the company. The dictum of Parker, Master, in *Kean* v. *Johnston*, 1 *Stockt.* 413, is the only authority which I find in support of the doctrine. The dictum, in my own opinion, in *Zabriskie* v. *Hack. & N. Y. R. Co.*, 3 *C. E. Green* 193, that a single stockholder can prevent all others from changing or abandoning the work, must be taken with the qualification annexed to it in the former part of that opinion, p. 183; that is, "where they become members of a corporation for definite purposes specified in their charter, and for a time settled by it." The case of Natusch *v.* Irving, cited in Kean *v.* Johnston, does not support the position. The complainant there held a life policy in a life insurance company, by which he became a member. This was a contract that the company should continue until his death. Lord Eldon held that they could not add marine insurance to the business against his will, while the partnership continued, nor compel him to retire by indemnifying him, or by valuing his policy and paying it off. Nor does the opinion of Chancellor Kent, in *Livingston* v. *Lynch*, 4 *Johns. Ch.* 573, sustain it. There the partnership was stipulated to continue as long as Fulton's exclusive right continued; and it was held that a majority could not change the essential provisions of the articles of partnership. Angell and Ames, in the section referred to, and Binney's case, 2 *Bland's Ch.* 142, simply state that there is little doubt that a court of equity, in a proper case made, would restrain the disposition of the property of a corporation for other than corporate purposes. This refers to a disposition of the whole property during the continuance of a corporation, and not to an abandonment of the enterprise by the

vote of the majority.    The reasoning of all these authorities is based upon the law of partnership.    By that law, when there is no definite time fixed for the duration of a partner-ship, it is a partnership at will, and may be ended by any partner at his will.    *Story on Part.*, §§ 269, 270; *Coll. on Part.* (2d ed.), B. 2, ch. 2, § 2.    And this was the doctrine of the civil law.    *Pothier on Part.*, *Lib.* 17, *tit.* 2, *n.* 64; 1 *Domat's Civil Law*, §§ 802, 803.

Becoming incorporated for a specified object, without any specified time for the continuance of the business, is no contract to continue it forever, any more than articles of partnership without stipulation as to time.    There is no reason why it should be construed into such a contract; such is not implied by the charter.    And a doctrine that all the stockholders but one may be compelled to continue a business which they find undesirable and unprofitable, and wish to abandon, is so unreasonable and unjust that it will not be held to arise by implication, unless that implication is a necessary one.

The Supreme Court of Pennsylvania held, in *Lauman* v. *The Lebanon Valley R. Co.*, 6 *Casey* 42, that private corpo-rations can, by a vote of the majority, abandon their enter-prise and sell their property, and that such sale violates no contract.    In their opinion they say : " If there is anything in the relation existing between the corporation and its members that prevents a sale, then a more serious difficulty is presented.    For if there is, it must be a part of the con-tract of the association, and cannot be changed by the legis-lature.    But is there ?    The charter contains the terms of the contract, and in it we discover no provision of this kind. Can we regard it as implied or involved in the nature of such a contract?    We do not think so ; for property in itself is essentially alienable, and the right of alienation is essential to complete ownership."    The court further hold, that a dis-senting stockholder can not be forced into a new enterprise, or to take, as compensation for his shares, stock in a a new company, or a company into which the old one is consolida-

ted. They hold that there are two contracts : one with the legislature, which it can dispense with; the other between the stockholders, as to what object they will enter into, and that this cannot be altered by the legislature. They say : "It is the nature of his contract with his associates, by which, under legislative authority, they constituted themselves into a corporation; that it is dissoluble, and that, upon its dissolution, the rights and property shall be distributed among the members." And again : "A railway corporation may, by legislative consent, abandon its franchises as conservators of a highway."

In that case the legislature had omitted to provide any compensation for shareholders, except the stock of the new company, supposing the change so beneficial that none would dissent. Yet the court held that the change might be made by the directors, upon giving security to dissenting stockholders to pay them the value of their stock, to be appraised by commissioners. In that conclusion I do not concur.

In *Gratz* v. *Penn. R. Co. and Phila. & Erie R. Co.*, 5 *Wright* 447, in the same court, the complainant, who was a stockholder in both companies, applied for an injunction against the lease of the road and franchises of one company to the other, for nine hundred and ninety-nine years, a lease authorized by the legislature. The court held that both corporations had the power, without the consent of all the stockholders.

In *The Commonwealth* v. *Atlantic & Great Western R. Co.*, 3 *P. F. Smith* (53 *Penn. R.*) 9, on an information by the Attorney-General in nature of *quo warranto*, the same court held that a corporation created by consolidating two corporations of New York with one of Ohio and one of Pennsylvania into a new corporation, with the consent of two-thirds of the stockholders of each, according to the provisions of a statute of Pennsylvania, constituted a lawful corporation.

In *Treadwell* v. *Salisbury Man. Co.*, 7 *Gray* 393, it was held by the Supreme Court of Massachusetts, that a private

incorporation, by a vote of the majority, may abandon the business of the corporation and sell out their property. The doubt expressed, whether a corporation for a quasi public purpose could do this, and whether the state, by mandamus, could not compel them to continue their business, does not apply to a case where a state has authorized it.

Such a radical change as the abandonment of business cannot generally be effected by directors; their duty in most charters is to manage and conduct the business. It requires the action of the corporators themselves. In corporations where there is no provision to the contrary in the charter, the rule is that the majority governs. The assent of all is therefore not required. *Grant on Corp.* 68; *A. & A.*, § 499.

The legislature as sovereign, can prescribe laws which shall govern corporations where there is no contract in their charters to exempt them. It can direct that a majority of members, or two-thirds in interest, shall control. If it can do this by general law, it can by special act. The act of 1870 does that in this case.

But, because the corporators may, with the consent of the state, by the vote of a majority or two-thirds in interest, abandon their enterprise, sell out their property, and return his share of the proceeds to each stockholder, it does not follow that by the same authority the works may be leased to be carried on and conducted by others, the corporation continuing to exist. The right to elect the directors by whom the business is to be managed, is a provision in the charter which the state or a majority cannot interfere with; it is a contract.

The true question on that point here is, whether the making of this lease and contract is an exercise of the power of managing the business and concerns of the corporation conferred in the charter, such as can be used by consent of the legal majority of corporators, without that of all.

Such directors have power to make contracts binding beyond their term of office, power to commute fares, and to do

so for a fixed period; it is a power constantly exercised. They contract with express companies and other railroads for the use of their roads, for a term of years, at a stipulated price. Such contracts are universally admitted to be valid, if permitted by the state. These roads are public highways, on which any citizen or corporation of Pennsylvania has a right to travel and run trains. The state cannot prohibit this, as long as they are public highways; much less can the defendants. There is no reason why the directors should not make a contract with any one, for a term of years, that he might have the use of these roads for a stipulated price; nor why part of that price should not be the keeping the works in repair, and paying all dues and taxes. I see no reason why directors, the officers who are authorized by the charter to conduct the whole business and manage the affairs of the corporation should not exercise that power by leasing the works to others, obligated properly to perform all the duties of the corporation, in a manner stipulated in the contract, and for such rent or consideration as in their judgment will be as beneficial to the corporators as operating and maintaining the road themselves, or more so. This authority as to the stockholders, must be founded on the provisions of the charter, and not upon a special authority from the state, which is required only to bind the state. No court of law in this state, or in any other state, so far as I know, has determined that the directors have not such power, if exercised with the consent of a majority of the stockholders. It has never been held that there is an implied contract in the charters, that the directors of such corporation shall not exercise their power in this manner. On the other hand, it has been held that a legislature, clothed with the power of making and changing the laws, clearly including the power and duty to levy taxes and provide highways, may, by stipulations in charter and other laws, deprive themselves and their successors of the power of levying taxes on any portion of property in the state, and of making roads in any part, and of course in the whole of its territory; and

this must now be regarded as law until wiser counsels still cherished prevail; *Washington University* v. *Rouse*, 8 *Wallace* 441; and this, under constitutions which provide that the law making power shall be vested in representatives elected yearly by the people. If this can be done, much more may the directors of a corporation so exercise their powers, especially by the actual consent of a majority of the corporators, which in that case is equivalent to a change of constitution in a state by a majority of the whole people. Whatever view may be taken at law, such power seems equitable, as the owners of two-thirds of the stock have power, by contracts for proxies or other means, to pledge their stock to vote for directors who would, from year to year, renew and continue such contracts.

Over much, if not the most of the property to be transferred by this lease, the directors have absolute control. They can dispose of it without the consent of the state or the stockholders. Of this class are the lands and real estate held, not needed for sustaining their proper works; all moneys and securities for moneys invested; all shares of stock in other corporations, and all leases of other works or roads. It has been questioned, whether the defendants had power to take or hold such stocks or leases, even with consent of the state, and whether all these acquisitions were not *ultra vires*. But the charter of each of these corporations gives absolute power of "purchasing, holding, and conveying real and personal estate," without limitation; and to make it stronger, if that is possible, in the New Jersey charter the words are "*any* real or personal estate." In each case the last clause of the section grants all rights and powers pertaining to corporate bodies, necessary for the purposes of the act. This limitation cannot be annexed to the right of holding property, because the two clauses are separated by other provisions of a different character, and the annexing the qualifications to one power, and not to the other, seems to indicate the intention to grant the one as it reads, without the limitation. "*Expressio unius est exclu-*

*sio alterius.*" I know that it has been held in many cases that the power conferred on corporations to hold property, is confined to such property as is necessary or convenient for the purpose of the charter; yet these decisions, I apprehend, will be found to be made upon charters containing that limitation, although the dictum of Potts, J., in *The State* v. *Mansfield*, 3 *Zab.* 510, would seem to apply that construction to these charters. But even if that limitation must be applied by construction to the express words of those charters, yet the application of the principle by the decision in The State *v.* Mansfield, is that the authority to hold extends to all property that it may be expedient or convenient to hold, the better to effect the purposes of the charter; such as dwelling-houses for employees; though these were not adjudged to be free from taxation, like houses for lock-tenders, car and repair shops which were necessary or proper for maintaining and operating the roads and canal. This construction would include the stock in the Belvidere and other tributary roads, and even the stock of the Jersey Associates, necessary to obtain the ferry privileges so important to the profitable operation of the New Jersey road. Unlimited powers of holding any real or personal estate, would in all cases authorize the directors to purchase and hold such property, when bought in good faith to promote and further the objects of the corporation, even without the consent of the stockholders. But all such property not expressly authorized to be held by the charter, or necessary for its proper objects, the directors may dispose of by sale or lease, or in any manner, at their discretion, without the consent of either the stockholders or the state. They may also thus dispose of any cars, locomotives, steamboats, or fuel provided expressly for their works. They may sell or dispose of their wharves and ferry landings in New York or Philadelphia, and purchase others, or may discontinue any ferry. They may, and constantly do, lease parts of these, and of their other real estate not needed for present use. They may take up and discontinue any side track or stations

that are useless. The New Jersey Company took up the third rail, laid on each track to enable the cars of the Erie Railroad to reach the Jersey City Ferry. It sold its branch railroad and bridge at Newark, and the right to occupy part of its road bed, to the Hoboken Company. These sales and changes were made without the consent of the legislature or the stockholders, and were within the corporate powers. The directors could abandon and take up the second track on the whole route, and sell the rails, if it became useless and a source of loss by decrease of business. They can discontinue any train or trains, and any stations, except such as they are bound by their charter, or by contract, to continue.

It may be a serious question whether either of the defendants is bound, by its original charter, either to the state or its stockholders, to operate its road. The Canal Company is neither bound nor authorized by its charter, expressly or by possible implication, to run boats on its canal. The Camden and Amboy Company is neither bound nor expressly authorized by its charter to run trains on its road. And by the rules of strict construction insisted upon by the counsel of complainants, authority to run trains cannot be sustained by implication. The implication is very slight. It cannot be had from the power to construct and maintain the railroad, any more than the franchise of being a transportation company could be implied to be granted to any turnpike or plank road company. The word "transportation" in the name does not imply it, because on the water they were made a transportation company by express enactment. On land a railroad, and on water a transportation company—the name was apt. The eleventh section, which states the object and confers the power, confers power only to construct the road, not to operate it. The sixteenth section, which provides for tolls and charges for transportation, will be satisfied by tolls on land and transportation on water. And the part that speaks of its *use* of the road does not necessarily imply the use by running trains, but is satisfied by its being kept in

repair and *used* for earning tolls. The eighteenth section,. providing against injury to its works, *carriages* and *machines*,. raises the very slight implication, which may be drawn from the fact that it was contemplated that it might for some purpose own carriages and machines. Certainly no authority is here given to run trains, either expressly or by necessary implication, which is insisted on by the complainants as· necessary to confer it. And the presumption against the· implication seems strengthened by the fact that, in three railroad charters granted in 1831, viz.: 'The Paterson and Hudson River Road' (*P. L.* 24), 'The Paterson Junction Road' (*P. L.* 66), and 'The Elizabethtown and Somerville· Road' (*P. L.* 80); and in three charters granted in 1832,. viz.: 'The New Jersey Road' (*P. L.* 96), 'The Paterson and Fort Lee Road' (*P. L.* 121), and 'The New Jersey, Hudson and Delaware Road' (*P. L.* 133); express authority was· given to operate the roads with locomotives and cars, to charge one rate for tolls, and another for transportation in the cars of the company.

In 1815, a charter was granted to the New Jersey Rail-· road Company to construct a railroad from the Delaware to the Raritan, with a capital of $500,000. This, with the steam navigation on the Delaware and Raritan, had it been constructed by the parties interested, would have furnished a direct and expeditious route of communication from Philadelphia to New York, and of transit over· this state from all parts of the Union. It was, so far as I have been able to ascertain, the first railroad charter· granted in America; and it shows that New Jersey has always been foremost in works of public improvement, and willing not only to permit, but to provide for the passage of all across her territory. This act provided, in its tenth. section, for rates and charges for transportation of merchandise and produce, and tolls for all persons ·using or traveling on the road; but no other or express power for running; trains was given. The implication is a little stronger in this than the other; yet either act may be read and fairly con--

strued, as merely authorizing the construction of a road to be used by the public with their own carriages, horses, and motive power, like a turnpike or plank road.

Yet no one can doubt that in both these cases, both the legislature and the corporators supposed that the right to operate these roads was granted by these charters. The first charter was granted at the session of the legislature next after George Stephenson, in 1814, placed his first locomotive on the Killingworth Railroad, and succeeded by surface traction in drawing a load of fourteen tons, six miles per hour. The other was granted at the session next after his famous engine, the Rocket, the father and prototype of our present improved locomotives, was put in successful operation, at the opening of the Liverpool and Manchester Railroad, in 1829. It had attained its fastest speed of twenty-nine miles unloaded, and, with a load of fifty tons, fourteen miles an hour. These roads were both projected, at least in part, for locomotives, and probably the projectors intended that these engines should be run by the corporations.

But although thus the conclusion may be arrived at with some difficulty, that this corporation was authorized by the charter to equip and operate its road, there clearly is not, either by express enactment or implication, any obligation to the state, or contract with its stockholders, to do this; and that contract, and not the power to do it, is the question now under consideration.

In the charter of the New Jersey Railroad Company, there is clear and express power to equip, and implied power to operate the road, granted in the sixteenth section. But neither this section nor any other part of the charter makes it obligatory. It is compelled to construct and maintain the road under pain of forfeiture of the charter. This act declares the road a public highway, and provides for the use by the public, limits the tolls to be charged, and directs toll boards to be put up at the toll gates. The duty of the company to the public would be fulfilled by constructing and maintaining the road. This power, like the power to

construct branches, to erect dams and dykes, and every other mere power granted by the words "it may be lawful" or "it shall have power," may be exercised or not at the discretion of the directors. If such a corporation provided omnibuses, waiting rooms, and lunch rooms for the accommodation of travelers, or baggage wagons, trucks, and store rooms for baggage and freight, which they have power by implication to do, they can change or abolish them at pleasure if they become unnecessary, or the directors are of opinion that these conveniences will be better furnished by others. The directors of these companies have power to discontinue any train, or half the number of trains run, and to reduce the fares and rates of freight, although in the opinion of the stockholders, and in fact, these changes may be injurious to the interests of the company. The stockholders have no right to require the directors to exercise to its fullest extent, or at all, any discretionary power conferred by the charter.

If these principles are correct, the defendants by their directors have the power to discontinue operating the roads, and to sell or dispose of all their equipment or plant. And the only question that remains is, whether they can by lease delegate the power and duty to keep the road in repair, with the right to operate it, to another corporation, for a consideration which, in their opinion, is adequate and beneficial to the stockholders. I am of opinion, for the reasons above stated, that they have such power.

As before observed, there is no decision against such power to lease; and there are many instances in this state, in which such leases have been made and approved by the legislature. They have been made by corporations, the management of whose affairs was, by the charter, entrusted to directors elected from year to year, as in this case. The Paterson and the Ramapo Roads were both thus leased to the New York and Erie Company. The Warren Railroad and the Morris and Essex Railroad, were both thus leased to the Delaware, Lackawanna and Western Railroad Company.

The Morris Canal to the Lehigh Valley Railroad. The Pemberton and Hightstown Railroad and the Camden and Burlington Railroad were severally leased to the Joint Companies. None of these leases received the assent of all the stockholders, and they were all authorized or sanctioned by the legislature without such assent. These leases were unquestionably made with the advice of the most eminent counsel in the state, and their validity has never been questioned by any one in the courts. This sanction would not settle the law; but they are both matters of great weight, and to be regarded in considering the question; especially in a court of equity, on a motion for preliminary injunction, where the question is, as this, merely a question of law, and has never been settled by the law courts, and the right to the relief depends upon it.

But if I am right in the conclusion arrived at above, that the majority of corporators under a charter which specifies no definite time for its continuance, have a right to abandon the undertaking, and dispose of and divide the property, the proceeding in this case is valid as against the complainants as a lawful way of accomplishing that end as to them. Two-thirds of these corporators have determined that they do not desire to go on with these enterprises, under the charters, and that they wish to abandon them, and are willing to accept as their share of the corporate property a yearly rent or annuity secured by a provision like that contained in this proposed lease. Some stockholders are not willing; and although the majority can effect the abandonment, they can not compel the dissentients to accept like compensation for their stock; it might be compelling them to embark their capital in a new enterprise. Provision is therefore made to pay or return to them the full value of their share of the whole property of the corporation. This is all they would have if the works were sold out. The provision is a most equitable one, and without it the transaction, even if valid and legal, would not be equitable and just.

In arriving at this conclusion, I do not change or modify

any of the positions laid down in the case of Zabriskie v Hackensack and New York Railroad, except so far as the correction of an inadvertent expression heretofore noticed is concerned; on the contrary, I re-affirm them all, as founded upon established principles that cannot be changed consistently with good faith and justice. Capital contributed for one purpose, under a charter declaring that purpose, can never be applied to one substantially different without consent. I hold that a charter which declared that the undertaking should be prosecuted for a definite time, is a contract for that time, and binds all to continue it; but that, on the other hand, a charter that states no such definite time, like a partnership made in that manner, can be abandoned by a majority; that there is no contract which prevents it; that the will of the majority, which is the law of corporations, must govern. And if there were no such law, that, like any other law, may at any time be enacted by the legislature, who may declare that a majority, or two-thirds, of the stock, or of the corporators, shall govern. Of course such law would not affect corporations with irrepealable charters declaring a different rule.

Again, the defendants contend that the lease, and the act authorizing it, must be sustained, on the ground that this property is taken for public use, and that compensation is provided. The complainants deny that this is taken for a public use, and argue that the act provides for compensation only after the taking, and is therefore void by the Constitution of the state.

The properties of a corporation, such as bridges, turnpike and rail roads, and its franchises, are property, and as such are subject to the power of eminent domain, and may be taken, upon compensation, for public use. Any other corporation could be thus authorized to take the whole or any part of the roads of the defendants. Highways, whether by railroad, canal, turnpike roads, or common roads, are for the public use. It is one of the functions and duties of government to provide them. This is a duty recognized in all civi-

lized nations from time immemorial. The absolute duty is only to the subjects or citizens of the nation or state. But among modern nations, by comity, neighboring countries are permitted to use their highways; and railroads and other highways are often constructed to accommodate the inhabitants of such countries in passing to and through them. These roads are built by the sovereign power, and for a public use. And in these United States, bound together in one country, with many common interests, and in which the citizens of many states can only reach other states, or the seaboard, the harbors, and marts of commerce, by crossing intervening states, the construction of highways for such purpose, although only required by comity, is for a public use. The law, unquestionably, is as laid down by Chief Justice Beasley with so much clearness in the case of *The Delaware and Raritan Canal Co.* v. *The Raritan and Delaware Bay R. Co.*, 3 *C. E. Green* 561—that "one state cannot, as of right, demand that a certain mode of passage shall be provided for her citizens and their property by any other state." Yet, as the Federal Government has not been empowered, and has not yet assumed the power, to construct railroads through states, it seems almost a moral duty, or imperfect obligation upon each state, especially one situate as this state is, to provide for passage across it by citizens of sister states. If the state chooses to do this, it may; but it is an act done in its sovereign capacity, and the property taken for it is taken for public use. The Camden and Amboy Railroad was constructed across the state for that purpose, and that only. Its termini were the cities of New York and Philadelphia. The second section of the charter declares its purpose, which was to "perfect a complete line of communication from New York to Philadelphia." It is obliged to provide steamboats at either extremity of the road, to transport passengers and goods from city to city, but not for local passengers or freight. It was not obliged to have depots, or to stop for passengers or freight at any point in the state; and while the railroad was declared a public

road for all who could get their carriages upon it, there was no obligation to provide switches or turnouts anywhere along the line for the accommodation of Jerseymen. Pennsylvania, by an act of February 16th, 1841, provided that the New York and Erie Railroad might pass for about fifteen miles through the northeast corner of the state, and might take land by power of eminent domain. New York authorized the Morris Canal Company, a corporation whose works were wholly in this state, to condemn lands in that state for a reservoir for a feeder for the canal, and it was sanctioned as a proper exercise of eminent domain. *Morris Canal Co.* v. *Townsend,* 24 *Barb.* 658. This state, by the act of February 21st, 1856, (*P. L.* 42,) authorized the New York and Erie Railroad Company, a foreign corporation, whose business was to convey passengers and freight from Dunkirk and other parts of New York, to New York City, to proceed in their own name to construct a railroad from the Paterson Railroad to a point opposite New York City. The act gave power to condemn lands, which was acted on, as appears by the case of *Ross* v. *Adams,* 4 *Dutcher* 160, and 1 *Vroom* 505, where the dispute was concerning funds in court, the proceeds of lands so condemned. The State of New York authorized the New York and New Haven Railroad Company to extend its road through that state, and take lands by condemnation. But, in the present case, the public use does not depend on this alone. The object of consolidating the business of these companies is to facilitate and improve communication all along their line. The large business and manufacturing cities of New Jersey are upon the route of the United Companies. Many of these cities constantly receive and send goods and passengers from and to places in the interior of Pennsylvania, Ohio, Illinois and other western states. If the communication is really improved, which is the object and intent of giving this power, it is a public benefit to the citizens of this state in providing a more convenient highway for their intercourse with the western part of our own country. Taking the roads of these companies

for this purpose, is clearly taking them for public use, and for the use of the citizens of this state; it is simply furnishing the proportion of this state for the highway that will be provided by this union of companies, or one consolidated company, from the Pacific to the Atlantic, for the common use of all the citizens of the nation, including those of New Jersey.

If the defendants and all their stockholders had refused consent, the state could still have authorized the taking of these roads for the purpose contemplated, by condemnation. But the act of 1870, did not provide for this. Its intention was only to allow these roads to be taken, if two-thirds of the stockholders should consent. In that case the act intended that the stock or interest of the others who did not consent, should be taken by condemnation. It is only when no bargain can be made with the owner, that the power to condemn is usually given. And if the owner of an undivided share, or an estate for years, for life, or in reversion, in lands required, consents, his estate need not be condemned, but only the estate of those who did not agree to sell. It is fair and equitable that such stockholders as prefer to take the arrangement made by their directors for them, a perpetual annuity of ten per cent. on the par value of their stock, to receiving its actual value as represented by the property, should be permitted to accept such compensation; they could not be compelled to take it; and that the others should receive what the law requires in all cases of condemnation, the money value of their property as compensation. The objection that, in this case, the defendants and not the legislature, determine that the case is a proper one for the exercise of the power of eminent domain, is not founded in fact. There are only a few companies in the state, and a few out of the state, whose works connect with those of the defendants. The legislature have determined that consolidating business with either or all of these, is for public use, and a proper occasion for the exercise of this power.

But the statute only provides for compensation *after* the

road is taken. The Constitution, Article IV, Section 7, ¶ 9, provides that "private corporations shall not be authorized to take private property for public use, without just compensation *first made.*" A provision like that in this act was inserted in the act consolidating the United Companies, and in several other statutes of this state, enacted since the present Constitution, authorizing like changes. Thus sanctioned by legislative approval, and that of the counsel under whose advice these important transfers have been made, it would seem presumption to treat it as invalid and of no effect, even if that was my opinion.

But it seems to me that the taking intended to be prohibited by the Constitution, is an illegal or forcible taking possession, without the consent of the owner. It does not prohibit receiving or accepting, by consent of the owner, when the compensation is to be settled afterwards. Any one in lawful possession, or having the legal authority to do it, may give possession before compensation. If a tenant for life or years, gives possession of the land, and consents to its use, a railroad company may enter under him, and this would not be taking the property of the reversioner. His estate may be taken and condemned, when the reversion falls in; compensation to him must be made then before his estate is taken. The directors of these defendants are in the possession and control of these roads. The roads are not in the possession of the complainants. The corporation, not the complainants, have the title; the stockholders have neither the legal nor equitable title, nor the right to the possession. At the lease, the directors will *give* up the possession of the property. It will not be *taken* from them. But on the hypothesis that they have not the right to do this as against the complainants, the complainants will have the right to call them to an account in equity, as their *cestuis que trust*, and to compel the lessee to surrender the lease, as obtained by a breach of trust in which it was an abettor, and to compel the directors to account for the profits which would have accrued, but for the breach of trust. Their property in the stock is not taken, impaired, or affected by

the lease. They can, after it, proceed for any redress to which they were entitled before it. But upon the proceedings prescribed by the act for condemnation being had, and after compensation paid, the stock which was their property is taken, and their right to any other redress is gone. Thus the compensation is first paid before this property is taken.

Here are unsettled questions of constitutional law, proper for the courts of law to determine. Upon them rests the right to this injunction. Were my leaning the other way, it would be against the settled rule of equity to grant an injunction upon a doubtful right, where the injury by arresting, and possibly defeating a negotiation like this, might be so great and irreparable; especially in a case where only a little more than one-sixtieth of the stockholders apply, and the rest by their silence acquiesce in, or by their written consents approve of the proposed contract, and where the act provides for compensation to be made by their own trustees, upon a simple notice that they demand it. The object of courts of equity in interfering where property is taken contrary to the constitutional provision is, to save citizens whose property is taken, from the expense and trouble of pursuing at law, strangers who, without legal right, take their lands. Here it is a claim against their partners or trustees. Equity does not relieve by injunction in all cases of violation of constitutional provisions. The Supreme Court of Pennsylvania, in *Mott* v. *Pennsylvania R. Co.*, 6 *Casey* 23, refused unanimously, a preliminary injunction on this ground, to a stockholder who was offered compensation by the act, and held that his rights were to be determined on the final hearing.

Another question is, as to the power of the corporation lessee to enter into the proposed contract; whether they can bind themselves to it, or whether it is not *ultra vires*, and therefore all their undertakings void. The position of the defendants' counsel, that this is only a question between it and the state that created it, to be raised by its officers, and in which the complainants have no concern, is not

sound. If these directors deliver to the lessee all this property, and these valuable assets, some of which to the amount of millions it may take away and convert to its own use, without being liable on its obligations, this would be such faithless and improvident waste, and squandering of the assets of these corporations and corporators, as would entitle them to the preventive protection of a court of equity.

That a foreign corporation may own property in this state, and transact business, and make contracts in it to be performed here, is too well settled to discuss. There is no law of this state prohibiting it. The capacity of such foreign corporation to hold property, or transact business, depends upon the law of the state which created it. If that gives it power to own, lease, or use property in another state, it has that capacity. The Pennsylvania acts of February 17th, 1870, and May 3d, 1871, set forth by the answer, unquestionably give this authority. This allows of no discussion, and was frankly admitted by the distinguished counsel who closed the argument for the complainants; he only excepted from it the personal property and stocks in other companies, whose railroads do not connect. But that restriction is only as to the roads embraced in the lease—it gives authority to enter into *any other contract with* companies owning connecting roads. This surely will include power to take with such railroads leased, all property which the lessors hold for the furtherance of the objects of the leased road as appurtenant to it. Charters and statutes of a foreign state must be construed here as by the courts of that state. *Amer. Print Works* v. *Lawrence*, 3 *Zab*. 590. And it was held in the Supreme Court of Pennsylvania, in *The Phila. & Erie R. Co.* v. *The Catawissa R. Co.*, 53 *Penn. R*. 20, that a statute authorizing the lease of one railroad by another company, authorises it to lease another railroad leased to the lessor as *appurtenant* to its road. And many decisions of that court, besides that in Gratz's case, hold leases and purchases made by this lessee, without the consent

of all the stockholders, to be valid. And by statute (*Nix. Dig.* 915, § 34), the printed reports of the decisions in other states are evidence.

The conclusions thus arrived at are these :

1. That the act of 1870 gives authority to the United Companies to lease to a corporation of another state.

2. That their works form both connected and continuous lines with the works of the proposed lessee.

3. That the directors of these companies have power to sell or otherwise dispose of all the property of the companies, except the roads and canal, and the franchises granted, without the consent of the state, or of all the stockholders.

4. That they have power, by consent of the state, and of a majority of the stockholders, or of any other proportion required by law, to sell, or lease, or otherwise dispose of these works, or to abandon them.

5. That a lease made by virtue of such authority is within the power delegated to the directors, and that there is in their charters no express or implied contract violated by it, and, therefore, the act authorizing it is not unconstitutional.

6. That the purpose for which these works are leased, the benefit and advantage of extended public highways, controlled and operated by one head, for regular and easy communication from and through New Jersey with other states, is evidently a public use for which property may be taken on compensation.

7. That, even if the directors have not power to lease for a term so as to bind the stockholders or their successors, the leasing and delivering the works to the lessee, with a stipulation and obligation to have the shares of dissenting stockholders valued and paid for, is not taking property without first making compensation.

8. That the Pennsylvania Railroad Company, the proproposed lessee, has by its charter and supplements, and the public laws of Pennsylvania, as construed by the courts of

that state, power to take this lease, and bind itself to all its stipulations.

There are many other reasons against making this lease, urged by counsel with great power and eloquence, which are not proper subjects for judicial consideration or action, but for that of legislators, and the companies or their stockholders. Such are : state policy and pride, which should not allow these works to be under the control of non-residents, or of a foreign corporation. The inexpediency of permitting an overgrown, gigantic corporation, like another Colossus, to place one foot on our shore, with the other, perhaps, on the Pacific. That this lease of nine hundred and ninety-nine years may impair or destroy the right of the state to take these works at cost in 1889. And that our citizens may be put to great inconvenience in being compelled to resort to courts of other states for redress of injuries suffered in this. These matters are proper subjects for the consideration of the legislature only; that has considered and decided. Its action in this case has been in accordance with the policy of the state for years, which has been to permit corporations of other states to lease works in this, and to construct new ones for themselves, under the impression that the expenditure of large sums of money on these works, and the increase of business which they bring here, are a great advantage to the state, the works themselves being constructed and operated by authority of, and subject to the laws of this state. This general policy I have no power or inclination to over-rule. I need not say whether in this case I think it wisely exercised. Neither is the policy or wisdom of the surrender by the state of its right to take these roads in 1889, at cost, for my consideration. If they were, I cannot comprehend how a permission to the defendants to connect or consolidate their own business by contract, lease or otherwise, could confer power to affect the rights of the state, even without the clear and distinct reservation of these rights contained in this act. This result could not be reached by the most

liberal and latitudinarian construction, much less by the rules of strict construction which most clearly apply. Had the state expressly authorized a lease of all the works for nine hundred and ninety-nine years, the question would have been different.

The question whether the rent in this case is sufficient, and whether greater should not have been required to be paid, is exclusively for the determination of the directors, and such stockholders as agree to receive it for their stock. The sufficiency of the security—the mere undertaking of the lessee—with the right of re-entry, is for like determination. For property and assets of this amount entrusted to the directors of any corporation, it is not usual to require sureties; they could hardly be obtained. As the charters now stand, the persons who control the corporation lessee, by purchasing a bare majority of the stock of the New Jersey corporations, or by the vote of the two-thirds who assent, could be elected directors, and without sureties obtain control of the alleged fifteen millions of cash and convertible assets, and appropriate or squander them beyond control of any of those who dissent.

Had my views of the questions above considered been different, my determination of this application must have been the same. It has for a long time been the established rule in courts of equity, in matters of preliminary injunction, that where the right of the complainants, to which the alleged injury is threatened, has never been established at law, and is not to the equity judge clear and free from serious doubt, an injunction will not be granted, but the party will be left to his remedy at law. In some cases where the leaning of the judge is in favor of the right, and the intended injury is great, and if once done can never be fully remedied, the judge in his discretion will, by injunction, retain matters *in statu quo* until the hearing of the cause, or a decision at law. Here the right on which the application is based, the right of a minority of stockholders, down to the owner of a single share, to prevent all the others from making what

to them seems an advantageous disposition of their property, has never been established at law. And were my views in favor of that right, the injury to result from a temporary violation of that right, if the lease should be declared void in the end, is not so great or irreparable as to justify the exercise of that discretion in a case where it would seem so inequitable, where less than one-fiftieth of the stockholders claim to control all the others, and where full compensation is provided. If the interference of this court should defeat the proposed arrangement, as it might, the loss of a bargain which they think very advantageous, to the stockholders who consent, would, from the extent of their interest, be far greater than that of the complainants by the refusal to enjoin.

This restriction on their action, adopted by courts of equity, has been somewhat extended and definitely settled as the law in this state, by the Court of Appeals, by the judgment in the case of *The Morris & Essex R. Co.* v. *Prudden,* 5 *C. E. Green* 530. The Chancellor in that case had assumed that Prudden, by the purchase of a lot fronting on a street laid down on a map and staked out on the ground, from the owner of the tract so mapped and laid out, was entitled to have the street kept open to its full width, and that the subsequent laying out of a public highway over this street, and its vacation, both by surveyors of the highways, without compensation, did not affect the right of way. These questions the court held were proper to be determined by the courts of law, and that an injunction ought not to issue, except in a strong and mischievous case of pressing necessity, without the right having been previously established at law. And while the opinion in that case admits that the law as to the right of way had been so established in other States, and cites a number of cases to show it, the decision of the Chancellor is reversed for this, among other causes, and very consistently, without deigning to review the correctness of his conclusion, although the inference is hardly questionable that the court agreed with him in it. This judgment is direct authority for the position that the right of the com-

plainant which he seeks to protect, or the principle of law on which it depends, must have been settled by the courts of law of this state, or the decision of the court of equity, even if correct, will be reversed.

There has been no decision on the right of the complainants to prevent a sale or lease of these works, by any court of law in this state. None is pretended. The only decision relied on is that of the learned Master who advised the Chancellor in Kean v. Johnston. In the first place, this is only a dictum, a dictum founded on no precedent, and followed by no court; the case was expressly decided on other grounds. But the Master, whatever his standing and authority as a lawyer, was sitting in a court of equity, and not in a court of law, and, therefore, the authority is not sufficient. This is not only to be inferred from the language of the opinion in Prudden's case, but from the case itself. The Chancellor, in his opinion, relied upon and cited the decision of the Court of Appeals, in the case of *Holmes* v. *Jersey City*, 1 *Beas.* 299. In that case Holmes had purchased of Van Vorst a lot laid out on his map, under the same circumstances precisely as Prudden's purchase. The question was upon the right of the city to close part of the street. In the opinion of the Court of Appeals, delivered by Chief Justice Green, the proposition is stated at the commencement, as the foundation of the claim, "that the complainant, who had purchased under Van Vorst, is entitled to the use of the entire street as dedicated." This proposition was at the foundation of the claim of Holmes; without it he had no standing in court. To this proposition the whole court assented, both by adopting the opinion, and by reversing the decree of the Chancellor, who did not, perhaps, differ from them on this point; but his order dissolving the injunction was correct, if Holmes had not this right. Six judges of the Supreme Court, and five judges of the Court of Appeals, also law judges, concurred in this judgment. But they were sitting, not as a court of law, but as a court of equity, on an appeal from the Chancellor, and therefore it is properly

assumed, in Prudden's case, that this question had not been determined by a court of law. This must have been the main question, as the other, whether the right was lost by laying out and vacating a highway over the lands in which the easement was, is included in that so often declared by the courts of law, that the vacation of a highway laid out over lands, leaves the title as it was before the laying out. But both questions are included in the opinion in Prudden's case. The opinion of a Master sitting in equity, could not affect what was not done by the unanimous opinion of a court composed of all the law judges, because sitting in equity. This doctrine has been, since that decision, followed by this court in many cases, including that of *The Hackensack Improvement Commission* v. *The N. J. Midland Railway Co., ante p.* 94.

The doctrine of acquiesence, too, as laid down and applied in Prudden's case, must deprive the complainants of the remedy by preliminary injunction. In that case the road had been located, and a track laid in 1846 and 1847, after Prudden's purchase on the street in front of his lot, but on the side most distant from his lot. At the laying of the first track, there was nothing to intimate to Prudden that a second track would ever be required, or that the right to lay it was claimed. His only acquiescence was silence. In June, 1848, the highway was vacated by surveyors, and in December, 1848, the owners who laid out the street and sold to Prudden, conveyed to the railroad company a strip in the street fifty feet wide. These facts appear in the opinion, and the judgment is founded on them. The court held that this acquiescence in laying the first track, deprived him of the right to the protection of an injunction, when the same company attempted to lay another track on the same street, nearer to his lot, that seriously incommoded the access to it over the street. The doctrine of acquiescence had not before been extended, even in injunction cases, beyond the thing or erection acquiesced in, and was not held to pretect further

encroachments of a like nature upon other parts of the same property.

In this case the delay of the complainants in filing their bill until the terms of the contract were fully agreed upon, cannot be held to be acquiescence. Until they knew the terms, they could not know that they were not such as might induce them to acquiesce or consent, even if they were not bound. But the acquiescence is their consenting to, or acquiescing in former encroachments of the same nature, on these very rights, by the legislature and their directors. For the gist of the decision in Prudden's case is, that it need not be an acquiescence in the injury then contemplated, but in a former one touching the same right. Prudden had never for a moment acquiesced in the laying of the second track; he filed his bill before any work was done. These complainants are in precisely the same situation. Some of them acquiesced in the act of 1831, consolidating the Joint Companies; all, as expressly alleged in the bill, assented to, or acquiesced in the act consolidating the United Companies, and the agreement which it confirmed. These matters were, according to the Hackensack and New York Railroad case, greater encroachments on these rights of stockholders than the present lease.

The doctrine of acquiescence settled in Prudden's case, must be applied as it was then applied, only to affect the remedy by injunction. For that purpose, though novel, it may seem equitable. It will never answer, nor was it intended, to apply it, to affect or change rights of property, or to claims in the courts of law; else, the owner of a lot with a house removed from the front, if he suffered his neighbor to erect a building encroaching on the lot a few feet or a few inches, would be bound by this, if that neighbor twenty years afterwards should erect a wing to this building, extending across the lot and cutting off access from the house to the street. But such acquiescence must in this case as in that, deprive the complainant of his remedy

by injunction.    That decision is the law of this court until reversed or modified.

These views make it unnecessary for me to consider other questions presented, including that of want of necessary parties to the suit, so ably urged by the counsel who opened the argument for the defendants.

The injunction must be denied, and the order restraining the defendants from executing the lease vacated.

I have arrived at the above conclusion after careful ·investigation and deliberate reflection.    The case itself is of great importance; the principles involved are still more important.    I have been much aided by the able and exhaustive arguments of the distinguished counsel concerned in it; their briefs, especially the full and elaborate brief of the opening counsel, containing a summary of the law upon the subject.